## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| INSILCO TECHNOLOGIES, INC., *et al.*, | ) Case No. 02-13672 (KJC) |
| | ) |
| Debtors | ) (Jointly Administered) |
| | ) |
| CHAD SHANDLER, as Trustee to the Insilco | ) Case No. 04-1567 (GMS) |
| Liquidating Trust, | ) |
| | ) |
| Appellant. | ) |
| | ) |
| v. | ) |
| | ) |
| TERM C LENDERS, | ) |
| | ) |
| Appellees. | ) |
| | ) |

### APPELLANT'S BRIEF

DUANE MORRIS LLP
Michael R. Lastowski (ID No. 3892)
Richard W. Riley (ID No. 4052)
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246
Telephone: (302) 657-4900
Facsimile: (302) 657-4901

-and-

ARENT FOX LLPC
Andrew I. Silfen
Michael S. Cryan
Heike M. Vogel
1675 Broadway
New York, New York 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990

*Attorneys for Chad Shandler,*
*Trustee of the Insilco Liquidating Trust*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

JURISDICTIONAL STATEMENT ....................................................................................... 2

QUESTIONS PRESENTED .................................................................................................. 2

STATEMENT OF THE NATURE AND STAGE OF PROCEEDING ................................... 3

SUMMARY OF ARGUMENT .............................................................................................. 4

STATEMENT OF FACTS .................................................................................................... 6

ARGUMENT ........................................................................................................................ 14

I.    DISMISSING THE OBJECTION SIMPLY BECAUSE CERTAIN LANGUAGE
      UNDER THE SETTLEMENT AGREEMENT ESABLISHED THE TERM-C
      CLAIMS AS ALLOWED CLAIMS IS CONTRARY TO SECTIONS 510 AND
      502 OF THE BANKRUPTCY CODE ........................................................................... 14

      A.    The Term-C Claims Had To Be Allowed Pursuant to  Section 510 of the
            Bankruptcy Code to Enable the Committee to Commence the
            Subordination Claim against the Term-C Lenders ............................................. 14

II.   THE PLAIN LANGUAGE OF THE RELEVANT PROVISIONS UNDER THE
      SETTLEMENT AGREEMENT AND THE AMENDED PLAN DOES NOT
      RELEASE THE TERM-C LENDERS FROM THE CLAIMS ASSERTED IN
      THE OBJECTION AND BY DISMISSING THE OBJECTION, THE
      BANKRUPTCY COURT IGNORED WELL-ESTABLISHED PRINCIPLES OF
      CONTRACT INTERPRETATION ............................................................................... 16

      A.    Unlike the Broad Release Given to the Senior Lenders, the  Limited
            Release in the Settlement Agreement Does Not Absolve the  Term-C
            Lenders Form Subordination and Reclassification Claims ................................. 16

      B.    By Dismissing the Objection, the Bankruptcy Court  Ignored the
            "Harmonious Whole" Principle of Contract Construction By Disregarding
            the Provisions under the  Amended Plan Which Specifically Entitle the
            Committee to Bring the Objection Against the Term-C Claims ......................... 18

III.  ALTERNATIVELY, ALTHOUGH THE COMMITTEE MAINTAINS THAT
      THE LANGUAGE IN THE PROVISIONS OF THE SETTLEMENT
      AGREEMENT AND AMENDED PLAN IS CLEAR AND STRICTLY LIMITS
      THE RELEASE PROVIDED TO THE TERM-C LENDERS, TO THE EXTENT
      THE LANGUAGE IS AMBIGIOUS, THE BANKRUPTCY COURT SHOULD
      HAVE CONDUCTED AN EVIDENTIARY HEARING TO CLARIFY THE
      TRUE INTENT OF THE PARTIES TO THE SETTLEMENT AGREEMENT
      INSTEAD OF DISMISSING THE OBJECTION ........................................................... 20

CONCLUSION ..................................................................................................................... 22

NYC/221705 1

## TABLE OF AUTHORITIES

### CASES

Page

Computer Assocs. Int'l, Inc. v. U.S. Balloon Mfg. Co.,
    10 A.D.3d 699, 782 N.Y.S.2d 117 (2d Dep't 2004)........................................................20

Gordon Sel-Way, Inc. v. United States (In re Gordon Sel-Way, Inc.),
    No. 95-CV-76223, 1996 WL 571652 (E.D. Mich. 1996)............................................14

In re Aerovias Nacionales De Colombia, S.A. Avianca,
    323 B.R. 879 (Bankr. S.D.N.Y. 2005) ....................................................................16, 17

In re Einstein/Noah Bagel Corp.,
    257 B.R. 499 (Bankr. D. Ariz. 2000)..........................................................................19

In re WorldCom, Inc. ERISA Litig.,
    354 F. Supp. 2d 423 (S.D.N.Y. 2005)........................................................................19

Liebowitz v. Columbia Packing Co.,
    56 B.R. 222 (D. Mass. 1985), aff'd, 802 F.2d 439 (1st Cir. 1986) ..............................15

Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,
    926 F.2d 1248 (1st Cir. 1991).......................................................................................15

PNC Bank v. Spring Ford Indus. (In re Spring Ford Indus.),
    Nos. 02-15015DWS, 04-0479, 2005 WL 984180 (Bankr. E.D. Pa.
    Apr. 19, 2005).............................................................................................................19

Penske Logistics, Inc. v. KLLM, Inc.,
    285 F. Supp. 2d 468 (D.N.J. 2003)...........................................................................17

TIG Insurance Co. v. Combustion Eng'g (In re Combustion Eng'g),
    366 F. Supp. 2d 224 (D.N.J. 2005).......................................................................17, 20

Teig v. Suffolk Oral Surgery Assocs.,
    2 A.D.3d 836, 769 N.Y.S.2d 599 (2d Dep't 2003)......................................................21

### STATUTES

11 U.S.C. § 502(a) ...........................................................................................................15

11 U.S.C. § 510(c)(1)........................................................................................................14

## JURISDICTIONAL STATEMENT

(A)     This is a controversy arising under the bankruptcy laws of the United States.

(B)     This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a)(1).

(C)     The Notice of Appeal was timely filed on November 23, 2004.

(D)     This is an appeal from a final order of the bankruptcy court that disposed of all the parties' claims that were the subject of the contested matter.

## QUESTIONS PRESENTED

1.     Did the Bankruptcy Court err in dismissing the Committee's Objection when the claims asserted in that contested matter were specifically preserved for the benefit of the bankruptcy estate under the provisions of the Settlement Agreement and the Amended Plan which must be read as an harmonious whole according to principles of contract interpretation under the laws of the State of New York?

2.     Did the Bankruptcy Court err in dismissing the Committee's Objection when the clear and unambiguous release language in the Settlement Agreement is strictly limited to allowance of the Term-C Claims and does not release the Term-C Lenders from the subordination and reclassification of their allowed claims as raised in the Objection?

3.     Alternatively, did the Bankruptcy Court err in failing to conduct an evidentiary hearing as to the intent and interpretation of the provisions under the Settlement Agreement and Amended Plan when the Bankruptcy Court's finding that the language in these provisions is supposedly "plain and clear" rendered the limited release given to the Term-C Lenders and the right of the Committee to commence the Objection entirely meaningless?

## STATEMENT OF THE NATURE AND STAGE OF PROCEEDING

The Insilco Liquidating Trust brings this appeal from an order entered by the Honorable Kevin J. Carey of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), dismissing the First Omnibus (Substantive) Objection (the "Objection") (D.I. 1169) of the The Official Committee of Unsecured Creditors (the "Committee") to Claims of Class 7 Creditors[1] to Claim Nos. 607-616 (the "Term C- Claims") and granting the Motion and Memorandum of Law of the Term-C Lenders to Enforce Orders, Dismiss Objection of the Committee, and Authorize Distribution (the "Motion to Dismiss") (D.I. 1234).

The Committee filed the Objection on June 9, 2004. By the Objection, the Committee timely sought to equitably subordinate the allowed Term C Claims or, in the alternative, to reclassify or set off all allowed claims held by the Term C Lenders. *See* Objection at Appendix page 174.[2] The Objection did not seek the disallowance of the Term-C Claims. The Objection alleged that DLJ infused the already financially dying Insilco (as defined below) with an additional funding, but mischaracterized such funding as debt, which further burdened Insilco. Objection at 16-17, ¶¶ 57, 61 (A-188-89). DLJ incorrectly labeled this $15 million equity capital as a "loan". *Id.* at 16, ¶ 57 (A-188). As required under the Amended Plan (defined below), the Objection duly requested that this $15 million infusion be either properly reclassified as an equity contribution rather than as a "loan" or be subordinated. Thus, the Objection properly objects to the *treatment* – not the allowance - of the Term-C Claims.

---

[1] The Class 7 Creditors include the following entities: MBP II Plan Investors, L.P., DLJ Offshore Partners II, C.V., DLJ Millenium Partners-A, L.P., DLJ Millenium Partners, L.P., DLJ ESC II, L.P., DLJ EAB Partners, L.P., DLJ Merchant Banking Partners II-A, L.P., DLJ Merchant Banking Partners II, L.P., DLJ Diversified Partners, L.P., and DLJ Diversified Partners-A, L.P. (collectively referred to as, the "Term C Lenders" or "DLJ").

[2] Citations to the Appendix are referred to hereafter as "A- __."

In response to the Objection, the Term-C Lenders filed the Motion to Dismiss, asserting that various provisions of the court-approved Settlement Agreement, the Confirmation Order and the Amended Plan (each is defined below) release all claims and defenses relating to the Term-C Loans, that the Term-C Claims have been "allowed" and that, therefore, the Objection should be denied. Motion to Dismiss at 1 (A-358).

Judge Carey signed an order on November 18, 2003, that denied the Objection and granted the Term-C Lenders' Motion to Dismiss. The order was entered on the docket on November 22, 2004 (the "Order") (D.I. 1356).[3] The Committee timely filed a Notice of Appeal (D.I. 1360) on November 23, 2004. This is the Committee's opening brief.

## SUMMARY OF ARGUMENT

(1)     By agreeing to allow a claim, a party is not, without more, agreeing to waive a claim of equitable subordination, reclassification, netting or offset. In fact, pursuant to section 510 of the Bankruptcy Code, a claim must be first allowed before a subordination action may be brought. Here, the simple fact that the Settlement Agreement resolves allowance of a claim does not mean that equitable subordination or similar claims are waived without a specific provision providing for such a release or waiver. The Settlement Agreement does not contain such a release or waiver.

(2)     Neither the Settlement Agreement, nor the Confirmation Order nor the Amended Plan was intended to provide or did provide the Term-C Lenders with a broad and absolute release. The release given to the Term-C Lenders is strictly limited to allowance of the Term-C Claims which is evidenced by the fact that the release provisions in question differentiate and

---

[3] Pursuant to section 7.3 of the Amended Plan and paragraph 33 of the Confirmation Order, all claims and objections to claims were assigned to the Unsecured Creditor Trustee, and the Unsecured Creditor Trustee is now the proper party and has standing to prosecute this appeal.

separate the Term-C Lenders from the Senior Lenders who did receive a broad, absolute release and by the fact that the Amended Plan specifically provides that the Committee may bring the Objection against the Term-C Lenders.

(3)    The plain meaning of terms such as "limited" contained in the release provision given to the Term-C Lenders in the Settlement Agreement indicates that the Term-C Lenders were in no way released from the claims asserted in the Objection, but only received a limited release, namely one that merely *allowed* the Term-C Claims. However, contrary to the assertions of the Term-C Lenders and the Bankruptcy Court's ruling, *allowing* the Term-C Claims under the Settlement Agreement only further assured that the Committee could commence a subordination claim as specifically preserved by the provisions under the Amended Plan. By dismissing the Committee's Objection, the Bankruptcy Court rendered these provisions entirely superfluous, which is in complete contradiction to well-established principles of contract law. Thus, the Bankruptcy Court erred in finding that the expressly limited release under the Settlement Agreement released the Term-C Lenders from all claims including the claims asserted in the Objection that were specifically preserved under the Amended Plan.

(4)    Since the Term-C Lenders were *not* signatories to the Settlement Agreement, *not* all issues between the Term-C Lenders and the bankruptcy estate were resolved by the Settlement Agreement. The Settlement Agreement and Amended Plan clearly preserved and deferred the issues of treatment of the allowed Term-C Claims, the Bankruptcy Court's Order renders the preservation and adjudication of the estate claims, including the Term-C Claims, meaningless and unnecessary.

(5)     In the very least, rather than rendering the limited-release language and the provisions under the Amended Plan superfluous, the Bankruptcy Court should have conducted an evidentiary hearing to determine the true interpretation of all of the relevant provisions.

## STATEMENT OF FACTS[4]

Bankruptcy Petition of Insilco

On December 16, 2002 (the "Petition Date"), Insilco Technologies, Inc. *et al.*[5] ("Insilco" or the "Debtors") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware. On January 3, 2003, the Office of the United States Trustee for the District of Delaware appointed five members of the Committee pursuant to Section 1102(a) of the Bankruptcy Code. Committee Opposition at 10 (A-409).

DLJ and Insilco Prior to Bankruptcy

In late 1997 or early 1998, DLJ and its affiliates acquired control of Insilco via a merger. Through a highly-leveraged transaction, DLJ acquired more than 70% of Insilco's equity – valued at over $471 million – while only contributing $43 million of DLJ's own capital. After the merger, DLJ owned approximately 70% of the company while Insilco's prior shareholders and its management retained only 10%.[6] *Id.* at 3 (A-402).

---

[4] The facts of the case discussed herein were primarily derived from the Memorandum of Law of Official Committee of Unsecured Creditors in Opposition to the Class 7 Creditors' Motion to Dismiss the Committee's Objection (the "Committee Opposition") (D.I. 1275). A-394.

[5] The other debtors in these jointly administered Chapter 11 proceedings are Insilco Holding Co., InNet Technologies Inc., Insilco International Holdings, Inc., Precision Cable Mfg. Corporation, Eyelets for Industry, Inc., EFI Metal Forming, Inc., Stewart Stamping Corporation, Stewart Connector Systems, Inc., Signal Caribe, Inc. and Signal Transformer Co., Inc.

[6] 399 Venture Partners, Inc., an affiliate of CVC, acquired the remaining approximately 19.3%. This contested matter does not deal with the claims of the Debtors and the Estates against CVC; upon the occurrence of the effective date of the Plan, such claims will be transferred to the Creditor Trustee.

DLJ immediately took advantage of its financial control over the new company in 1998 by causing the company to buy or sell eight different businesses and amend its existing pre-merger credit agreements three times to fund many of these transactions. *Id.*

The 12% Senior Subordinated Notes

On November 9, 1998, three months after DLJ inquired Insilco, Insilco had to refinance its 10.25% Senior Subordinated Notes. Insilco did this by underwriting the sale of $120 million of 12% Senior Subordinated Notes governed by a 12% Note Indenture. Specifically, Insilco issued 12% Senior Subordinated Notes due 2007 in the principal amount of up to $150,000,000. *Id.* at 4 (A-403).

Notably, the 12% Note Indenture included an anti-layering provision. Section 10.10 of the 12% Note Indenture, called "Limitation on Layered Debt," prohibited Insilco from issuing debt that was subordinate to Senior Debt, but senior in right of payment to the 12% Senior Subordinated Notes under the 12% Note Indenture. *Id.*

Insilco was forced to borrow an additional $30 million from its credit facilities to complete this transaction because the $116 million generated from this sale was insufficient to pay off the 10.25% Senior Subordinated Notes. *Id.*

The merger apparently left Insilco without sufficient working capital to continue its operations. As a result, on November 24, 1998, Insilco amended and restated its then-existing $200 million revolving credit line to add an additional $100 million to its credit facility. *Id.* at 5 (A-404).

<u>Amendments to Insilco's Amended and Restated Credit Agreement</u>

In 2000, DLJ caused Insilco to amend the "Amended and Restated Credit Agreement" two times (the "Credit Agreement") when it acquired two businesses and sold one, thus further complicating Insilco's financial situation. *Id.* at 5-6 (A-404-05).

The Credit Agreement provided for three credit facilities: (a) a $50 million, 6-year senior secured revolving loan (the "Revolver"), (b) a $35 million, 6-year senior secured amortizing term-A loan (the "Term-A Facility"), and (c) a $125 million, 7-year senior secured amortizing term-B loan (the "Term-B Facility"). The Revolver matured on the sixth anniversary of the Credit Agreement. The Term-A Facility required quarterly prepayments in each of its six years, beginning with December 2000, as follows: $875,000 for the first two years, $1,312,500 for the third year, $1,750,000 for the fourth and fifth years and $2,187,500 for the final year. The Term-B Facility required quarterly prepayments of $312,500 for the first six years and quarterly prepayments of $29.4 million in the seventh year. This Credit Agreement remained subject to the 12% Note Indenture (including the Indenture's anti-layering provision) executed by Insilco in November of 1998. *Id.* at 6 (A-405).

<u>The Term C Loan</u>

By June 30, 2001, Insilco, while either insolvent or in the zone of insolvency, had violated the loan covenants under the Credit Agreement. Insilco's Lenders instructed the company to produce additional cash and amend certain negative covenants in the Credit Agreement in order to avoid enforcement of the Credit Agreement's default provisions. Upon information and belief, DLJ – Insilco's majority equity holder – was asked to contribute such funds to Insilco as equity capital. Specifically, DLJ was asked to make a "cash infusion" of $15 million, junior and subordinate to the claims of the Lenders. *Id.* at 7 (A-406).

Upon information and belief, DLJ at that time expressed its desire to make such funds as a loan rather than an equity contribution. It appears that the Lenders agreed to the terms upon which DLJ was willing to make the loan, so long as the DLJ funds were made junior to the credit facility. Thus, DLJ attempted to make this cash infusion as an equity investment under the guise of a loan. *Id.*

On August 15, 2001, the Lenders amended Section 2.1 of the Credit Agreement to include a new provision, Section 2.1.6, whereby DLJ agreed to make a "loan" to the company (the "Term-C Loan"). DLJ was to receive warrants to purchase approximately 60,000 shares of Insilco's common stock at $0.01 per share, which would, upon exercise, constitute approximately 38% of Insilco's then-outstanding common stock. *Id.* at 8 (A-407).

This purported loan was in direct violation of the 12% Note Indenture's anti-layering provision, as it essentially directed the Debtors to issue debt that was junior to the Senior Lenders and senior in right of payment to the 12% Senior Subordinated Notes issued under the 12% Note Indenture. The Term-C Loan was, by its terms, part of the facility under the Credit Agreement, but in actuality an unsecured obligation not entitled to the benefit of the liens granted to the Lenders. The Term-C Loan, however, as part of the credit facility, improperly entitled the Term-C Lenders to the benefits of the subordination provisions of the 12% Note Indenture. By virtue of the subordination turnover provisions of the 12% Note Indenture, any payments made to the 12% Senior Subordinated Notes would be given back to the Lenders, including the Term-C Lenders. *Id.*

Since the Term-C Lenders were neither entitled to the secured position of the other Lenders nor entitled to structurally subordinate themselves (to the Senior Lenders) or the holders of the 12% Note, the Term-C Loan violated the 12% Note Indenture's anti-layering provisions.

Moreover, this transaction was improper because DLJ had attempted to camouflage its risk

investment in the Debtors as a loan to take above other unsecured creditors and avoid the fate of

equity holders in bankruptcy. *Id.*

The Asset Reallocation and Settlement Agreement and its *Broad* Release
Given to Senior Lenders and *Limited* Release Given to Term C Lenders

On May 13, 2003, the following parties entered into the Asset Reallocation and

Settlement Agreement (the "Settlement Agreement"):[7] (i) the Debtors, (ii) the Committee, (iii)

indenture trustee for the 12% Senior Subordinated Notes, (iv) indenture trustee for the 14%

Senior Discount Notes due 2008, and (v) Bank One, NA as agent and the lenders, including

Bank One, NA under the Credit Agreement (the "Senior Lenders"). Settlement Agreement at 1

(A-8). Footnote 1 of the Settlement Agreement specifically states that "the term 'Senior

Lenders' as used herein does not include those lenders participating in the Term-C Loan, except

in respect of Paragraph 1 only, wherein the term "Senior Lender" shall include those lenders

participating in the Term C Loan." *Id.* at 1, fn 1. Indeed, The Term-C Lenders were not

signatories to the Settlement Agreement. The Term-C Lenders, however, are beneficiaries of the

terms of the Settlement Agreement. As such, the Term-C Lenders can only benefit from those

provisions applicable to them.

Paragraph 1 of the Settlement Agreement, entitled "ALLOWANCE OF SENIOR

LENDERS' CLAIMS," **in full** states that:

> The Senior Lenders' liens and claims against the Debtors (i.e., the prepetition revolving
> credit facility, Term Loan A, Term Loan B and Term Loan C) are fully and finally
> allowed in the amount of $254,933,571.49[2] (the "Allowed Senior Lenders' Claims"). The

---

[7] On June 11, 2003, the Bankruptcy Court signed the Order Pursuant to Bankruptcy Code Sections 363(b) and
105(a) and Fed. R. Bankr. P. 9019 Approving Settlement Agreement by and among the Debtors, The Official
Committee of Unsecured Creditors, Wachovia Bank, N.A., U.S. Bank, N.A., Certain of the Debtors' Senior Secured
Lenders and the Agent for the Debtors' Senior Secured Lenders (the "Settlement Order"). The Settlement Order
was entered on the court docket on June 16, 2003 (D.I. 721).

liens and security interests of the Senior Lenders (**other than the Term-C Lenders, which are, under the Terms of the Credit Agreement, unsecured**) are deemed valid, perfected, first priority, and indefeasible and neither such liens nor such claims shall be subject to any further challenge, and the Senior Lenders shall not be required to file any proof of claim or further evidence of the indebtedness owing by the Debtors or of any collateral securing such indebtedness.

[2] Of this amount $232,712,443.42 represents principal, accrued interest and fees owing on the revolving credit facility, Term Loan A and Term Loan B as of the Petition Date, and $22,221,128.07 represents principal and accrued interest owing on Term Loan C as of the Petition Date.

*Id.* at 5-6, ¶ 1 (A-12-13) (bold emphasis added).

In Paragraph 4A of the Settlement Agreement, entitled RELEASES BY THE DEBTORS

AND CREDITORS' COMMITTEE, the Debtors and Committee provide the **Senior Lenders**,

not the Term-C Lenders, with a broad release, fully releasing, waiving and forever discharging

the Senior Lenders from, *inter alia*, any and all causes of actions, claims and controversies from

the beginning of time and through the Settlement Effective Date. *Id.* at 10, ¶ 4A, (A-17) (bold

emphasis added).

In comparison, paragraph 4C of the Settlement Agreement, entitled LIMITATION ON

RELEASE OF TERM C LENDERS, strictly limits the release given to the Term-C Lenders to

allowance of the Term-C Loan and provides as follows:

> The releases and waivers contained in Paragraph 4A of this Settlement Agreement for the benefit of the Released Lender Parties shall also apply to the Term-C Lenders . . . **only in respect of the Term-C Loans under the Credit Agreement** and notwithstanding anything therein to the contrary, **the Term-C Lenders . . . shall not otherwise be released or deemed released. Nothing contained herein shall be deemed to discharge, impair or otherwise affect any claim, action, cause of action or right against the Term-C Lenders** . . . except as specifically set forth in the preceding sentence, <u>provided</u> <u>however</u>, that the reservation of non-released claims, causes of action or rights in this Paragraph shall not extend to the Released Lender Parties.

*Id.* at 12-23, ¶ 4C (A-19-20) (bold emphasis added).

Based upon the language contained in paragraphs 1, 4A and 4C of the Settlement

Agreement, the Senior Lenders received a much broader release than the Term-C Lenders. The

release provided to the Senior Lenders and the Term-C Lenders are not identical, and the

language contained in the Settlement Agreement clearly differentiated the Senior Lenders from

the Term-C Lenders in a manner that unequivocally preserved certain claims that could be

commenced against the Term-C Lenders. These preserved claims were carved out from the

release language and include claims of equitable subordination, reclassification, netting and set-

off. This is the precise reason why the Senior Lenders and the Term-C Lenders are addressed

under different provisions of the Settlement Agreement. Obviously, if the Senior Lenders and

the Term-C Lenders were supposed to receive the same releases, it would have been unnecessary

to separate and treat them differently.

The Debtors' Amended Plan and Pertinent Provisions
Regarding Treatment of Term C Claims

On February 13, 2004, the Debtors filed with the Bankruptcy Court the Amended Joint

Liquidating Plan (the "Amended Plan") (D.I. 1019). A-71. The terms of the Settlement

Agreement were incorporated in the Amended Plan. The Amended Plan sets forth the

mechanism by which subordination and reclassification claims are adjudicated as contemplated

by the Settlement Agreement. Section 4.8(a) of the Amended Plan classifies the Term-C Claims

under Class 7. More importantly, Section 4.8(b), entitled TREATMENT, states in pertinent part

that:

> **[u]nless** the Debtors (or the **Creditors' Committee** on behalf of the Debtors or their
> estates) or Indenture Trustees have **commenced** an adversary proceeding or **contested
> matter prior to the Confirmation Date seeking to subordinate or reclassify the
> Allowed Claims in Class 7,** each Holder of an Allowed Class 7 Claim shall receive, on
> each Distribution Date, Cash derived from Excluded Assets equal to its ratable share of
> the Unsecured Creditor Distribution Fund available for Distribution on such Distribution
> Date and the Rights of Action Recovery available for Distribution on each such
> Distribution Date. **If the Debtors (or the Creditors' Committee or Indenture
> Trustees) have commenced such an adversary proceeding or contested matter prior
> to the Confirmation Date, then the Allowed Class 7 Claims shall be Disputed
> Claims,** and any Distribution otherwise payable to the Holders of Class 7 Claims shall be
> held in the Unsecured Creditor Disputed Claims Reserve pending the resolution of such

adversary proceeding or contested matter by a Final Order. Any Distribution made hereunder to holders of Class 7 Claims represents a reallocation from holders of claims in Class 1 pursuant to the Asset Reallocation and Settlement Agreement.

Amended Plan at 17, § 4.8(b) (A-91) (bold emphasis added).

Moreover, section 14.9 of the Amended Plan expressly underscores that the releases provided to the Released Lender Parties in the Settlement Agreement are strictly limited as to Term-C Lenders. In particular, § 14.9(a) states as follows:

Pursuant to Paragraph 4A of the Asset Reallocation and Settlement Agreement, the Debtors and the Creditors' Committee have provided the releases, waivers and discharge in respect of the Released Lender Parties as set forth herein. Pursuant to Paragraph 4C of the Asset Reallocation and Settlement Agreement, **the release, waiver and discharge of the Term-C Lenders is expressly limited and qualified as set forth therein.**

*Id.* at 34, § 14.9(a) (A-108).

The Amended Plan defines "Released Lender Parties" as "[t]he Agent and each of the Senior Lenders and each of their agents, employees and professionals." *Id.* at 8 (A-82). "Senior Lenders" are further defined as "[t]he Lenders other than the Term C Lenders." *Id.* at 9 (A- 83). Lastly, "Term C Lenders" are defined by the Amended Plan as consisting of the following entities: MBP II Plan Investors, L.P., DLJ Offshore Partners II, C.V., DLJ Millenium Partners-A, L.P., DLJ Millenium Partners, L.P., DLJ ESC II, L.P., DLJ EAB Partners, L.P., DLJ Merchant Banking Partners II-A, L.P., DLJ Merchant Banking Partners II, L.P., DLJ Diversified Partners, L.P., and DLJ Diversified Partners-A, L.P.

Confirmation Order and the Unsecured Creditor Trustee

On June 10, 2004, the Bankruptcy Court confirmed the Amended Plan by signing and entering the Findings of Fact, Conclusions of Law and Order Under Section 1129 of the Bankruptcy Code and Rule 3020 of the Bankruptcy Rules Confirming the Amended Joint Liquidating Plan Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Confirmation Order") (D.I. 1173). A-207. The Amended Plan provides for and the

NYC/221705.1                                    -13-

Confirmation Order confirms the creation of a liquidating trust to hold and administer the

Liquidating Trust Assets in accordance with the Insilco Liquidating Trust Agreement, dated

September 10, 2004 (the "Trust Agreement"). The Amended Plan and the Trust Agreement duly

appoint and recognize the appointment of Chad J. Shandler of Traxi, LLC as the trustee for the

Unsecured Creditor Series Beneficiaries (the "Unsecured Creditor Trustee"). The Confirmation

Order authorizes and empowers the Unsecured Creditor Trustee to pursue and prosecute,

maintain, settle or to decline to pursue the Rights of Action, including all pending adversary

proceedings and contested matters, whether or not such causes of action have been commenced

prior to the Effective Date. Confirmation Order at 17, ¶ 33 (A-223).

## ARGUMENT

**I.    DISMISSING THE OBJECTION SIMPLY BECAUSE CERTAIN LANGUAGE UNDER THE SETTLEMENT AGREEMENT ESABLISHED THE TERM-C CLAIMS AS ALLOWED CLAIMS IS CONTRARY TO SECTIONS 510 AND 502 OF THE BANKRUPTCY CODE**

### A.    The Term-C Claims Had To Be Allowed Pursuant to Section 510 of the Bankruptcy Code to Enable the Committee <u>to Commence the Subordination Claim against the Term-C Lenders</u>

Section 510(c) provides in pertinent part that a court may "under principles of equitable

subordination, subordinate for purposes of distribution all or part of an *allowed* claim to all or

part of another *allowed* claim or all or part of an allowed interest to all or part of another allowed

interest." See 11 U.S.C. § 510(c)(1) (emphasis added). Turning to <u>Collier on Bankruptcy</u>, the

District Court of Michigan explains that "[s]ubordination of claims and interest should be

distinguished from allowance of and objections to claims and interests . . . Before a claim can be

subordinated, it must first be allowed." *See Gordon Sel-Way, Inc. v. United States (In re Gordon*

*Sel-Way, Inc.)*, No. 95-CV-76223, 1996 WL 571652, at *2 (E.D. Mich. 1996) (citing 9 <u>Collier on</u>

<u>Bankruptcy</u> ¶ 7001.11 (15th ed.)) (a copy of which is attached hereto as Exhibit "A"); *see also*

*Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1257 n.16 (1st Cir. 1991)

(determining that "if a proof of claim is filed but the claim is *disallowed*, the principles of

equitable subordination never come into play") (emphasis added); *Liebowitz v. Columbia

Packing Co.*, 56 B.R. 222, 224 (D. Mass. 1985) (finding that the plain language of section 510

shows that it applies to claims already allowed by a bankruptcy court), *aff'd*, 802 F.2d 439 (1st

Cir. 1986). Consequently, in the present case, the Term-C Lenders' argument hat the claims

asserted in the Committee's Objection had to be dismissed, because the provision under the

Settlement Agreement allowed the Term-C Claims, is simply incorrect. To the contrary, by

allowing the Term-C Claims, the provision under the Settlement Agreement further assured that

the Committee could commence the subordination claim pursuant to section 510. Precisely

because the Term-Lenders were not a signatory to the Settlement Agreement, not all of the issues

were resolved between the Term-C Lenders and the bankruptcy estate, certain claims are clearly

preserved by the Settlement Agreement and is consistent with allowance and differing issues of

treatment. Thus, the Bankruptcy Court erred in dismissing the Objection simply because the

Settlement Agreement provides that the Term-C Claims shall be an "allowed" claim as opposed

to a disputed claim, and the Order must be overruled.[8]

---

[8] Moreover, section 502 of the Bankruptcy Code confirms that "allowance" of a claim is different from "treatment" of a claim and evidences that simply holding an "allowed claim" does not shelter the Term-C Lenders from the Objection. Section 502 states in pertinent part that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects." 11 U.S.C. § 502(a). The mere fact that ¶ 1 of the Settlement Agreement acknowledges that the Term-C Loan shall be deemed allowed, does not shelter the Term-C Lenders from claims as to the treatment of the Term-C Claims. Indeed, if "allowance" of claims were the same as "treatment" of claims, it would have been unnecessary to include ¶ 2 entitled, "Treatment of Senior Lenders' Claims" in the Settlement Agreement. Paragraph 2 only addresses the treatment of the claims of the Senior Lenders. It specifically describes the payment of the Senior Lenders' *secured* claim; it does not mention entitlement of a specific treatment of the Term-C Claims. More importantly, section 502 of the Bankruptcy Code expressly provides that a party in interest may object to an allowed claim. Thus, the Term-C Lenders' entitlement to an allowed claim alone under the Settlement Agreement does not absolve them from the claims not specifically released, and the Order dismissing the Objection should be overruled.

II.    **THE PLAIN LANGUAGE OF THE RELEVANT PROVISIONS UNDER THE SETTLEMENT AGREEMENT AND THE AMENDED PLAN DOES NOT RELEASE THE TERM-C LENDERS FROM THE CLAIMS ASSERTED IN THE OBJECTION AND BY DISMISSING THE OBJECTION, THE BANKRUPTCY COURT IGNORED WELL-ESTABLISHED PRINCIPLES OF CONTRACT INTERPRETATION**

A.    **Unlike the Broad Release Given to the Senior Lenders, the Limited Release in the Settlement Agreement Does Not Absolve the Term-C Lenders Form Subordination and Reclassification Claims**

The laws of the State of New York are the laws that are applicable to the Settlement Agreement.[9] The Bankruptcy Court of the Southern District of New York explains the application of New York law with regard to contract interpretation as follows: "[Under] New York [law], when a court adjudicates the rights of parties to a contract it is required to discern the intent of the parties, to the extent that the parties memorialized what they intended, by what they wrote." *In re Aerovias Nacionales De Colombia, S.A. Avianca*, 323 B.R. 879, 887 (Bankr. S.D.N.Y. 2005) (citing *In re Okura & Co. (America), Inc.*, 249 B.R. 598, 603 (Bankr. S.D.N.Y. 2000)). The *Avianca* court continues to explain that, "where a document is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence." *Id.* (internal quotation marks omitted).

In the present case, the separate and distinctly different releases provided to the Senior Lenders, on one hand, and the Term-C Lenders, on the other hand, makes it clear that the parties to the Settlement Agreement did not intend to give to the Term-C Lenders the broad release given to the Senior Lenders that would absolve the Term-C Lenders from any and all claims. The Settlement Agreement contains two release provisions – paragraph 4A, which provides the Senior Lenders with a broad release from any and all claims or causes of action, and paragraph

---

[9] Paragraph 23 of the Settlement Agreement provides that "the Settlement Agreement shall be construed and enforced in accordance with the laws of the State of New York, and, to the extent applicable, the Bankruptcy Code."

4C, which gives the Term-C Lenders a very limited release only with regard to the Term-C Loan and does not release the Term-C Lenders from any other claims.

Had the parties to the Settlement Agreement intended to give the Term-C Lenders the same broad release as the one provided to the Senior Lenders, it would have been unnecessary to separate and treat differently the Term-C Lenders from the Senior Lenders. Indeed, the Order by the Bankruptcy Court dismissing the Committee Objection rendered the language limiting the release given to the Term-C Lenders completely meaningless, thereby violating a well-established rule of contract interpretation. "It is a cardinal principle of contract construction that a document should be read to give effect to all its provisions and to render them consistent with each other." *Avianca*, 323 B.R. at 888 (citing *John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n.7 (2d Cir. 1983)); *see also TIG Insurance Co. v. Combustion Eng'g (In re Combustion Eng'g)*, 366 F. Supp. 2d 224, 231 (D.N.J. 2005) (finding that "under the principles of contract interpretation, a contract should not be given an interpretation which renders a term or terms superfluous"); *Penske Logistics, Inc. v. KLLM, Inc.*, 285 F. Supp. 2d 468, 474 (D.N.J. 2003) (stating that in determining whether the language of the Agreement is ambiguous, the Court is guided by the principle that it should avoid interpreting contractual language in such a way as to render any term of the contract meaningless or superfluous). In the present case, the Bankruptcy Court failed to adhere to these cardinal principles of contract interpretation and instead interpreted the limited-release language of the Settlement Agreement so broadly that it rendered meaningless the limited release given to the Term-C Lenders.

Paragraph 4C is even entitled "Limitation on Release of Term-C Lenders." By dismissing the Objection and granting the Term-C Lenders a broad release, the Bankruptcy Court

clearly ignored the qualifier "Limitation" in the title of the release provision. Moreover, the

Bankruptcy Court also disregarded the clear language of paragraph 4C which only applies to the

allowance of the Term-C Loan and, more importantly, specifically and plainly states that

"[n]othing contained herein shall be deemed to discharge, impair or otherwise affect any claim,

action, cause of action or right against the Term-C Lenders . . ." Dismissing the Objection and

its subordination and reclassification claims against the Term-C Lenders is in complete

contravention to the plain language and the true intention of paragraph 4C. Thus, considering

the broad release given only to the Senior Lenders and not to the Term-C Lenders and the fact

that the interpretation by the Bankruptcy Court rendered the "limited" language superfluous, the

Order must be overruled.

> **B.    By Dismissing the Objection, the Bankruptcy Court
> Ignored the "Harmonious Whole" Principle of Contract
> Construction By Disregarding the Provisions under the
> Amended Plan Which Specifically Entitle the Committee
> to Bring the Objection Against the Term-C Claims**

Section 4.8 of the Amended Plan provides for the treatment of Class 7, which was

comprised of the Term-C Lenders. Section 4.8(b) specifically provides that each Holder of an

*Allowed* Class 7 Claim would receive the treatment established by the Amended Plan *unless* the

Debtors, Creditor Committee or Indenture Trustees commenced an action, contested matter or

adversary proceeding, seeking to subordinate and reclassify the *Allowed* Claims in Class 7 prior

to the Confirmation Date. Clearly, the Amended Plan sets forth the resolution and adjudication

procedures and mechanism for the claims that remained under the Settlement Agreement. Since

the Committee filed the Objection seeking subordination and reclassification of the Term-C

Claims prior to the bar date under the Amended Plan, the Committee properly commenced an

adversary proceeding against the Term-C Lenders. The Objection was properly filed in

accordance with the provision of the Amended Plan. The Amended Plan was formulated and

finalized several months after the execution of the Settlement Agreement. The terms of the Settlement Agreement were incorporated in the Amended Plan, and the Term-C Lenders voted in favor of the Amended Plan, thereby binding themselves to all of its provisions.

In dismissing the Objection, the Bankruptcy Court completely ignored another important principle of contract interpretation. It is well-settled law that a "contract should be construed as a whole and effect given to all provisions." *See PNC Bank v. Spring Ford Indus. (In re Spring Ford Indus.)*, Nos. 02-15015DWS, 04-0479, 2005 WL 984180, at *5 (Bankr. E.D. Pa. Apr. 19, 2005) (a copy of which is attached hereto as Exhibit "A"); *see also In re WorldCom, Inc. ERISA Litig.*, 354 F. Supp. 2d 423, 442 (S.D.N.Y. 2005) ("It is a well-established principle of contract construction that all provisions of a contract be read together as a harmonious whole, if possible.") (internal quotation marks omitted); *In re Einstein/Noah Bagel Corp.*, 257 B.R. 499 (Bankr. D. Ariz. 2000) (finding that under Delaware law, court interpreting any contract must give effect to all terms of instrument, must read instrument as whole and, if possible, must reconcile all provisions of instrument).

If the limited release provision of the Settlement Agreement was supposed to absolve the Term-C Lenders from the claims asserted in the Objection, the Amended Plan would not expressly provide for the following treatment of the Term-C Claims: "[u]nless the Debtors (or the Creditors' Committee on behalf of the Debtors or their estates) or Indenture Trustees have commenced an adversary proceeding or contested matter prior to the Confirmation Date seeking to subordinate or reclassify the Allowed Claims in Class 7 . . . If the Debtors (or the Creditors' Committee or Indenture Trustees) have commenced such an adversary proceeding or contested matter prior to the Confirmation Date, then the Allowed Class 7 Claims shall be Disputed Claims . . ." *See* Amended Plan at 17, § 4.8(b) (A-91). Indeed, in accordance with § 4.8(b), the

Amended Plan further explains that the release, waiver and discharge of the Term-C Lenders

given under Paragraph 4C of the Settlement Agreement, is expressly limited and qualified as set

forth therein. *See Id.*, § 14.9(a) (A-108). By dismissing the Objection and thereby preventing

the Committee from asserting the claims that are specifically preserved under the Amended Plan

and anticipated under the Settlement Agreement, the Bankruptcy Court created an irreconcilable

conflict within the documents and ignored the principle of contract interpretation which requires

that all of the provisions must be read together as an harmonious whole. Thus, the Order of the

Bankruptcy Court must be overruled.

**III.    ALTERNATIVELY, ALTHOUGH THE COMMITTEE MAINTAINS THAT THE
LANGUAGE IN THE PROVISIONS OF THE SETTLEMENT AGREEMENT
AND AMENDED PLAN IS CLEAR AND STRICTLY LIMITS THE RELEASE
PROVIDED TO THE TERM-C LENDERS, TO THE EXTENT THE LANGUAGE
IS AMBIGIOUS, THE BANKRUPTCY COURT SHOULD HAVE CONDUCTED
AN EVIDENTIARY HEARING TO CLARIFY THE TRUE INTENT OF THE
PARTIES TO THE SETTLEMENT AGREEMENT INSTEAD OF DISMISSING
THE OBJECTION**

As explained by the Third Circuit, "A court's primary objective in interpreting a contract

is to derive the objective intent of the parties at the time of the making of the contract . . . [I]n

construing a contract, a court's paramount consideration is the intent of the parties." *See TIG*

*Insurance Co. v. Combustion Eng'g (In re Combustion Eng'g)*, 366 F. Supp. 2d 224, 229 (D.N.J.

2005) (internal quotation omitted). With regard to establishing the true intent of the parties,

courts have pointed out that, "[e]xtrinsic evidence of the parties' intent may be considered only if

the agreement is ambiguous, which is an issue of law for the courts to decide." *See Computer*

*Assocs. Int'l, Inc. v. U.S. Balloon Mfg. Co.*, 10 A.D.3d 699, 699-700, 782 N.Y.S.2d 117, 118 (2d

Dep't 2004). "A contract is unambiguous if the language it uses has 'a definite and precise

meaning, unattended by danger of misconception in the purport of the [agreement] itself, and

concerning which there is no reasonable basis for a difference of opinion.'" *Id.* at 699, 782

N.Y.S.2d at 118 (alteration in original). "If a provision of an agreement is ambiguous, it is imperative for courts to resolve the ambiguity by resorting to surrounding circumstances . . ." *See Teig v. Suffolk Oral Surgery Assocs.*, 2 A.D.3d 836, 837, 769 N.Y.S.2d 599, 600 (2d Dep't 2003) (internal quotation omitted). Although the Committee maintains that the language of the limited release and the Amended Plan is perfectly clear in preserving the Committee's right to commence the Objection, and therefore, the Order of the Bankruptcy Court must be overruled, if this Court should determine otherwise and find that the language is ambiguous and its interpretation is subject to difference of opinion, then, in the alternative, the Committee respectfully requests that the Order be remanded to the Bankruptcy Court with instructions to conduct an evidentiary hearing as to the intent of the parties.

*[signature page below]*

## CONCLUSION

For the foregoing reasons, the Order of the Bankruptcy Court dismissing the Objection of the Committee and granting the Motion to Dismiss of the Term-C Lenders, should be overruled or, alternatively, the Order should be remanded instructing the Bankruptcy Court to conduct an evidentiary hearing with regard to the true intent of the parties.

Dated:  July 13, 2005
      Wilmington, Delaware

Michael R. Lastowski (ID No. 3892)
Richard W. Riley (ID No. 4052)
DUANE MORRIS LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246
Telephone:  (302) 657-4900
Facsimile:  (302) 657-4901
        mlastowski@duanemorris.com
        rriley@duanemorris.com


-and-

Andrew I. Silfen
Michael S. Cryan
Heike M. Vogel
ARENT FOX LLP
1675 Broadway
New York, New York 10019
Telephone:  (212) 484-3900
Facsimile:  (212) 484-3990
        silfen.andrew@arentfox.com


*Attorneys for Chad Shandler, Trustee of the Insilco Liquidating Trust*