# EXHIBIT A

Case 1:04-cv-01567-GMS   Document 12-2   Filed 07/13/2005   Page 1 of 12

WLM\209776.1

Westlaw.

Slip Copy  
2005 WL 984180 (Bankr.E.D.Pa.)  
(Cite as: 2005 WL 984180 (Bankr.E.D.Pa.))

Page 1

H  
Only the Westlaw citation is currently available.

United States Bankruptcy Court,
E.D. Pennsylvania.
In re SPRING FORD INDUSTRIES, INC., aka SPRING FORD KNITTING COMPANY, INC.,
Debtor.
PNC BANK, National Association, Plaintiff,
v.
SPRING FORD INDUSTRIES, INC., aka Spring Ford Knitting Company, Inc.,
Commonwealth of Pennsylvania, Department of Labor & Industry, Self-Insurance
Division, Bureau of Workers' Compensation [dsm'd 8/26/04] Defendants
No. 02-15015DWS, 04-0479.

April 19, 2005.

**Background:** Bank brought adversary proceeding against Chapter 11 debtor seeking determination that excess funds obtained by Pennsylvania Bureau of Workers Compensation through letter of credit were not property of estate and should be returned to bank. Debtor brought motion for summary judgment.

**Holding:** The Bankruptcy Court, Sigmund, Chief Judge, held that funds were property of estate.
Motion granted.

[1] Bankruptcy ⚖2163

51k2163 Most Cited Cases  
While a court may not take judicial notice sua sponte of facts contained in the file that are disputed, it may take judicial notice of adjudicative facts not subject to reasonable dispute and so long as it is not unfair to a party to do so and does not undermine the trial court's fact-finding authority. Fed.Rules Evid.Rule 201(f), 28 U.S.C.A.

[2] Bankruptcy ⚖2164.1

51k2164.1 Most Cited Cases  
On summary judgment, court could consider documents attached to respective motions without any affidavit support, since no objection had been made to those documents by either side. Fed.Rules Bankr.Proc.Rule 7056, 11 U.S.C.A.

[3] Bankruptcy ⚖2163

51k2163 Most Cited Cases  
Statements in briefs are not evidence.

[4] Bankruptcy ⚖2534

51k2534 Most Cited Cases  
The nature of the estate's interest in property is determined by reference to state law. Bankr.Code, 11 U.S.C.A. § 541.

[5] Bankruptcy ⚖2536

51k2536 Most Cited Cases  
Funds obtained by Pennsylvania Bureau of Workers Compensation from bank through letter of credit, which were in excess of debtor's obligations to Bureau, were property of Chapter 11 estate under Pennsylvania law, rather than bank, although independence principle precluded debtor from asserting interest in letter of credit or its proceeds based solely upon that instrument; contract which provided for letter of credit also provided for trust fund to hold proceeds from letter of credit, and trust agreement gave all reversionary rights to debtor, and Bureau paid excess funds into that trust. Bankr.Code, 11 U.S.C.A. § 541; 13 Pa.C.S.A. §§ 5102, 5103.

[6] Banks and Banking ⚖191.15

52k191.15 Most Cited Cases  
Under Pennsylvania law, a letter of credit is a commercial instrument completely separate from the underlying contract between the customer and beneficiary; the issuer's obligation to the beneficiary is primary and does not depend on any obligation or agreement between the customer and beneficiary. 13 Pa.C.S.A. §§ 5102, 5103.

[7] Contracts ⚖143.5

95k143.5 Most Cited Cases  
A contract should be construed as a whole and effect given to all provisions.

James W. Hennessey, Esquire, Scott J. Freedman, Esquire, Dilworth Paxson LLP, Philadelphia.

Paul B. Maschmeyer, Esquire, Ciardi, Maschmeyer, Karalis, P.C., Philadelphia.

MEMORANDUM OPINION

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                          Page 2
2005 WL 984180 (Bankr.E.D.Pa.)
(Cite as: 2005 WL 984180 (Bankr.E.D.Pa.))

SIGMUND, Chief Bankruptcy J.

*1 Before the Court is the Motion of Plaintiff PNC Bank, National Association ("PNC"), for Summary Judgment ("PNC's Motion") and the response thereto and Cross-Motion for Summary Judgment of Debtor/Defendant Spring Ford Industries, Inc. ("Debtor" and "Debtor's Motion"). For the reasons stated herein, PNC's Motion shall be denied and Debtor's Motion shall be granted.

UNCONTESTED FACTUAL AND PROCEDURAL BACKGROUND

[1] The parties agree that the relevant facts are uncontested [FN1] and that disposition of the motions turns on issues of law. Debtor was formerly a manufacturer of textile products. As an employer with employees in Pennsylvania, Debtor was subject to the Pennsylvania Workers' Compensation Act, 77 P.S. § 1-2626 et seq. Pursuant to the statute, Debtor chose to become a self-insurer, which means that Debtor paid its employees' workers' compensation claims rather than obtaining private insurance or insurance through the Pennsylvania's State Workers' Insurance Fund. See In re Sacred Heart Hospital, 212 B.R. 467, 470 (E.D.Pa.1997) (explaining options available to employers under Workers' Compensation Act). In order to obtain self-insurer status, Debtor was required by the Department of Labor and Industry, Self-Insurance Division, Bureau of Workers' Compensation (the "Bureau") to post security for the payment of its workers' compensation liability. 77 P.S. § 501(a)(2).

[2] To cover this security obligation, Debtor arranged for PNC to issue a letter of credit in favor of the Bureau on Debtor's behalf, in the amount of one million dollars (the "Letter of Credit"). To this effect, on January 6, 1994, Debtor and PNC entered into an agreement titled "Acknowledgment of Terms and Conditions on Posting Letters of Credit" Exhibit 1 to Debtor's Motion (the "Acknowledgment"). [FN2] The Bureau was not a party to the Acknowledgment, but the document nevertheless provides a list of circumstances under which the Bureau may draw on the Letter of Credit, including if it is notified that the Letter of Credit will not be renewed. Id. ¶ 4. The Acknowledgment also states that Debtor will enter into a trust agreement that provides for the establishment of a trust fund to hold the proceeds from the Letter of Credit. Id. ¶ 3.

On January 10, 1994, PNC issued the Letter of Credit, titled "Irrevocable Letter of Credit No. PROV3-4077." The Letter of Credit names the Bureau as beneficiary and provides that it will be honored upon presentment by the Bureau. There are no other conditions or qualifications to the Bureau's drawing upon the Letter of Credit. Exhibit A to Complaint; Exhibit 4 to Debtor's Motion. [FN3]

On January 11, 1994, Debtor and PNC entered into an agreement titled "Irrevocable Agreement of Trust for the Payment of Workers' Compensation by Self Insurer." Exhibit 2 to Debtor's Motion (the "Trust Agreement"). The Trust Agreement provides, inter alia, that (1) a trust fund is established "to provide a source of funds and to maintain adequate reserves" for the payment of workers' compensation claims and administrative expenses (the "Trust Fund"); and (2) Debtor will deliver and maintain a certain amount of funds in the Trust Fund. Id. § 2(a)-(b). PNC is the named trustee of the Trust Fund. Id. at 1.

*2 Though the Bureau is not a party to the Trust Agreement, the agreement nevertheless provides that:
   The Bureau may direct that proceeds from security posted by the Employer to secure its Claims Liability, such as surety bonds or letters of credit, be deposited into a segregated account which is a part of the Trust Fund. During a Default, the Bureau may direct the use of such security proceeds to pay Claims Liability, Claims Administration Expenses and Trust Operating Expenses as outlined in this Agreement. If the Default is cured or if the Bureau determines that the proceeds from the security are no longer needed, the Bureau may direct that any remaining such security proceeds held in the segregated account be distributed as directed by the Bureau.
Id. § 2(e). This provision does not specifically name the Letter of Credit issued by PNC for the benefit of the Bureau, nor is the Letter of Credit defined or mentioned in any other provision of the Trust Agreement, but the top of the Agreement does contain a header reference to the Letter of Credit. Id. at 1.

[3] In any case, the parties agree that on March 25, 2002 the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
2005 WL 984180 (Bankr.E.D.Pa.)
(Cite as: 2005 WL 984180 (Bankr.E.D.Pa.))

Page 3

Bureau drew on the Letter of Credit to its full amount of one million dollars. [FN4] Request for Admissions and Answers ¶ 9. The Bureau deposited the proceeds from the Letter of Credit (the "Letter Proceeds") into a segregated account that is part of the Trust Fund. Affidavit of George Knehr, Chief of the Bureau ("Knehr" and the "Knehr Affidavit"), Exhibit B to Joint Stipulation by the Parties ("Joint Stip.")

Debtor subsequently filed a voluntary petition on April 2, 2002 under Chapter 11 of the Bankruptcy Code. PNC has filed and the Court has allowed a $1,000,000 unsecured claim against the estate. To date, PNC has received distributions from the estate totaling $528,890.08 on account of its claim.

The instant adversary proceeding arises from the undisputed fact that the Bureau has now paid all outstanding workers' compensation claims and expenses from the Letter Proceeds, leaving an unneeded excess of $440,000 (the "Excess") Exhibit B to Joint Stip. PNC filed this adversary proceeding, seeking a determination that the Excess is not property of the estate and should be returned to PNC as a matter of law. Debtor has countered with legal theories as to why the estate does indeed have a property interest in the Excess. The Bureau makes no claim to the Excess. Pursuant to an "Escrow Agreement," the Bureau transferred the Excess to an escrow account at United Savings Bank pending the outcome of this dispute. Exhibit A to Joint Stipulation

DISCUSSION

Summary judgment, "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Here, the parties agree that there are no disputed facts and that resolution of this adversary proceeding turns upon issues of law.

*3 [4] The commencement of a bankruptcy case creates an estate comprised of all legal and equitable interests of the debtor in property, wherever located, as of the commencement of the case. 11 U.S.C. § 541(a)(1). The scope of this statutory provision is broad. H.R.Rep. No. 595, 95th Cong., 1st Sess. 367-68 (1978); S.Rep No. 989, 95th Cong., 2nd Sess. 82-83 (1978) "All conceivable interests of a debtor, even those that are future, nonpossessory, contingent, speculative, or derivative, lie within the scope of § 541." *Bernstein v. Himel (In re Himel),* 190 B.R. 59, 61 (Bankr.W.D.Pa.1995). The nature of the estate's interest in property is determined by reference to state law *Nobelman v. American Savings Bank,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993); *Butner v. U.S.,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Accordingly, I turn to Pennsylvania law to ascertain the Debtor's interest in the Excess Funds as of the commencement of the case when the estate was created. [FN5]

[5][6] PNC's argument for summary judgment is based upon the nature of letters of credit, which, under Pennsylvania law, has been aptly explained as follows:

A letter of credit is a promise by the issuer, frequently a bank, to the beneficiary that it will honor drafts or other demands for payment upon compliance with the conditions specified in the letter. 13 Pa.C.S.A. § 5103(a) (Purdons 1984). There are commonly three parties to the transaction: (1) the issuer--the party who extends the promise to pay; (2) the customer--the party who requests issuance of the letter on his behalf; and (3) the beneficiary--the party who is "entitled to draw or demand payment" on the letter. See: 13 Pa.C.S.A. § 5102. Among the three parties, there are three separate contractual relationships: (1) the underlying contract between the customer and the beneficiary which "may be for the purchase and sale of goods, the construction of a building, the provision of services, or anything else which the parties wish to exchange." (2) the relationship between the customer and the issuer, pursuant to which the customer instructs the issuer to make out a letter of credit in favor of a designated beneficiary; and (3) the document created when the issuer carries out that instruction, i.e. the letter of credit itself.

*Tudor Development Group, Inc. v. U.S. Fidelity & Guar. Co.,* 1991 WL 353443, *4 (M.D. Pa. Jan. 07, 1991), aff'd 968 F.2d 357 (3d Cir.1992). The "most salient feature" of the letter of credit is the "independence principle," i.e. that the letter is a commercial instrument completely separate

Westlaw.

Slip Copy
2005 WL 984180 (Bankr.E.D.Pa.)
(Cite as: 2005 WL 984180 (Bankr.E.D.Pa.))

Page 4

from the underlying contract between the customer and beneficiary. *Tudor,* 968 F.2d at 360. The issuer's obligation to the beneficiary is *primary* and does not depend on any obligation or agreement between the customer and beneficiary.

PNC has cited to several bankruptcy decisions purporting to hold that, given the independence principle, neither letters of credit nor their proceeds may constitute property of the estate. *In re Metro Communications, Inc.,* 115 B.R. 849, 854 (Bankr.W.D.Pa.1990) (payments made to creditors pursuant to letters of credit could not be avoided as preferential transfer). *See also Willis v. Celotex Corp.,* 978 F.2d 146, 148 n. 3 (4th Cir.1992) (noting that automatic stay would not bar third party from proceeding against letter of credit issued on behalf of debtor); *In re Air Conditioning, Inc.,* 845 F.2d 293, 296 (11th Cir.1988) (payments made to creditors pursuant to letters of credit could not be avoided as preferential transfer); *In re Compton Corp.,* 831 F.2d 586, 589-90 (5th Cir.1987) (automatic stay does not prohibit a lender from drawing upon a letter of credit following the borrower's bankruptcy because the lender is receiving property of the issuer, not property of the debtor's estate, and that the independence principal is the cornerstone of letter of credit law); *In re Green,* 210 B.R. 556, 559 (Bankr.N.D.Ill.1997) (court had no "related to" jurisdiction over dispute between debtor's creditor and bank that issued letter of credit on debtor's behalf, as no estate property was implicated).

*4 I agree that the independence principle would preclude Debtor from asserting an interest in the Letter of Credit or its proceeds based solely upon that instrument. The Letter of Credit is a contract is between PNC and the Bureau, separate and distinct from any agreement to which the Debtor is a party. However, Debtor is not proceeding against the Excess pursuant to the Letter of Credit. None of the cases cited by PNC involve proceeds that, while traceable to a letter of credit, are subsequently placed in another vehicle that arguably gives the estate an interest in the proceeds. That is exactly the case here. Though the Bureau was not a party to the Trust Agreement and therefore not bound by it, there is no factual dispute that the Bureau nevertheless placed the Letter Proceeds into the Trust Fund. Knehr Aff. The Trust Fund is in turn is governed by the Trust Agreement, which Debtor asserts gives the estate a reversionary interest in the Excess. [FN6] I must therefore address the Trust Agreement.

As noted earlier, the Trust Agreement is between Debtor and PNC, as Trustee, and states that the purpose of the Trust Fund is to pay for workers' compensation claims and administrative expenses. Exhibit 2 to Debtors Motion, Preamble and § 2(a). The provision dealing with the parties rights to the Trust Fund is § 19, aptly titled "Rights to Trust Fund." That provision states as follows:

> It is understood and agreed that no person or corporation, except the parties hereto, shall have any rights under this Agreement or in the Trust Principal except as provided in this Agreement. The Trust Fund shall not be subject to the direct action or seizure by any creditor or claimant of the Employer under any writ or proceeding at law or equity except as contemplated by and under the Acts. The Employer shall not have right, title, interest, claim or demand whatsoever in or to the Trust Principal other than the right to a proper application and accounting of it by the Trustee and the right of reversion as provided under sections 2(e), 13 and 14(c), all as set forth in this Agreement.

Exhibit 2 to Debtor's Motion at 13. Under the plain language of this provision, PNC has no rights to the Trust Principal. Indeed, as a creditor/claimant of Debtor, PNC's ability to move against the Trust Fund is specifically limited to actions contemplated under the "Acts," which are defined as the Pennsylvania Workers Compensation Act (77 P.S. §§ 1-1031) and the Pennsylvania Occupational Disease Act (77 P.S. §§ 1201-1603). PNC cites to no provision of these Acts which supports its claim to the Excess that is part of the Trust Fund.

Debtor (identified as Employer [FN7]), however, specifically has rights of reversion as provided under §§ 2(e), 13, and 14 of the Trust Agreement. Exhibit 2 to Debtor's Motion at 13. Section 2(e) expressly addresses security posted by the Debtor, *i.e.* the Letter of Credit. This section allows the Bureau to place the proceeds from the Letter of Credit into a "segregated account which is a part of the Trust Fund." *Id.* at 5. The parties agree this happened.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy  
2005 WL 984180 (Bankr.E.D.Pa.)  
(Cite as: 2005 WL 984180 (Bankr.E.D.Pa.))

Page 5

The portion dealing with reversion states in relevant part: "If the Default is cured or if the Bureau determines that the proceeds from the security are no longer needed, the Bureau may direct that any remaining such security proceeds held in the segregated account be distributed as directed by the Bureau." There is no question that the Bureau has determined that the Letter Proceeds are no longer needed.

*5 PNC is quick to point out that § 2(e) does not require that the Bureau must distribute the security proceeds *to the Debtor*. PNC argues that this failure to identify a payee, in conjunction with the requirement that security proceeds be placed in a segregated account, leads to the conclusion that § 2(e) gives Debtor only a right to unused trust principal that it contributed into the Trust Fund. Otherwise, argues PNC, the segregated account language would not be needed.

[7] There are two problems with PNC's interpretation. First, § 2(e) is limited in scope to the proceeds from the security. Second, while this section does not identify Debtor as the party to whom the Bureau should distribute unneeded proceeds, § 19 specifically identifies the reversionary interests of § 2(e) as belonging to the Debtor. A contract should be construed as a whole and effect given to all provisions. *E.g., Williams v. Metzler, 132 F.3d 937, 947 (3d Cir.1997)*.

Sections 13 and 14 also provide for reversion of any "Trust Principal" to the Debtor upon termination of the Trust Agreement or termination of Debtor's self-insurance status. "Trust Principal" is broadly defined in § 1 of the Trust Agreement: "All assets of the Trust fund established by this Agreement including cash and all Authorized Investment held by the Trustee in trust under this agreement." Exhibit 2 to Debtor's Motion at 3. As the parties agree that the Letter Proceeds are part of the Trust Fund, the Excess falls under the purview of this "all assets" definition.

In sum, the Trust Agreement gives all reversionary rights to Debtor while expressly prohibiting PNC from any rights to the Trust Fund save those contemplated by the Acts, which PNC does not allege are applicable. Reversionary rights fall within § 541's broad definition of property of the estate. *E.g. In re Wray, 258 B.R. 777, 785 n. 8 (Bankr.D.Idaho 2001); Matter of Hernando Healthcare, Inc., 157 B.R. 701,* (Bankr.M.D.Fla.1993)( "Section 541 of the Bankruptcy Code is broad enough to encompass Debtors' equitable interest, *i.e.*, a reversionary interest in this Fund, notwithstanding its inchoate nature") [FN8] Thus, I agree with Debtor that the Excess is property of the estate.

On the contrary, PNC fails to cite any authority to support its own entitlement to the Excess based upon the independence principle, which merely states that the Letter of Credit is a separate agreement between PNC and the Bureau. Indeed, my own research leads to the contrary holding. In *Barclay's Bank v Dresdner Bank Lateinamerika, Inc. (In re Lancaster Steel Co.), 284 B.R. 152 (S.D.Fla.2002)*, the beneficiary/drawer of a letter of credit (Los Amigos) settled a dispute under the contract it had with the debtor (Lancaster Steel) resulting in its returning funds to the debtor that were traceable to the letter of credit issued on debtor's behalf. The letter of credit issuer (Dresdner) sought return of those funds, offering the rationale that PNC relies upon, *i.e.* that letters of credit and proceeds are not part of a debtor's estate, and citing similar cases to those relied upon by PNC. The district court rejected that argument, holding:

> *6 While ... traceable to the letter of credit funds, the funds were not, technically speaking, "proceeds of the letter of credit." Once Dresdner performed under the letter of credit and gave the funds to Los Amigos, all obligations under the letter of credit were satisfied. Dresdner can only look to Lancaster for repayment under the letter of credit agreement--and therefore Dresdner must be treated like any other creditor.

*Id.* at 160. Limiting its review only to the letter of credit itself under the independence principle espoused by Dresdner, the district court found that nothing in that document governed how much Los Amigos could draw down or what it could do with the proceeds. Therefore, Los Amigos was free to return any excess to the debtor under their separate contract.

Similarly, in *Gluck v Seaboard Surety Co (In re Eastern Freight Ways, Inc.), 9 B.R. 653 (Bankr.S.D.N.Y.1981)*, the letter of credit issuer, Chase Manhattan Bank ("Chase"), sought to restrict the use of letter of credit proceeds it had issued to the beneficiary on behalf of its customer. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy  
2005 WL 984180 (Bankr.E.D.Pa.)  
(Cite as: 2005 WL 984180 (Bankr.E.D.Pa.))

Page 6

court noted:

> The provisions of the letter of credit dealt with the mechanics for draw down and not with the purpose for which the proceeds were made available. This aspect is dealt with by the underlying agreement between the beneficiary, Seaboard and the account party, Eastern. If it were otherwise, the utility of a letter of credit would be frustrated and its unique nature in the world of commerce obliterated.

Thus, Chase comes out where it does because it has gone in on a misapprehension of the operative agreement. The cases it cites deal with challenges to the issuing banks' decision to make or withhold payment and not, as here, with the use of proceeds by the beneficiary after payment. *Id.* at 662-663. The Letter of Credit before me, like that before the *Gluck* court, simply deals with the mechanics for draw down. Nothing in that contract speaks to either how the Letter Proceeds are to be used or whether any amounts are to be returned. Therefore, once PNC performed under the Letter of Credit and paid the funds to the Bureau, that contract was fully executed and all obligations were satisfied. The Bureau was free to do whatever it wanted with the Letter Proceeds, subject to any other contracts or statutory restrictions which might bind it. Here it chose to place the Letter Proceeds into the Trust Fund, which in turn is governed by the Trust Agreement. As noted, that agreement gives all rights of reversion to Debtor.

CONCLUSION

For the reasons stated herein, Debtor's Motion shall be granted and PNC's Motion shall be denied. An order consistent with this Memorandum Opinion shall issue.

ORDER

AND NOW, this 19th day of April 2005, upon consideration of the Motion of Plaintiff PNC Bank, National Association ("PNC"), for Summary Judgment ("PNC's Motion") and the response thereto and Cross-Motion for Summary Judgment of Debtor/Defendant Spring Ford Industries, Inc. ("Debtor" and "Debtor's Motion"), and for the reasons stated in the accompanying Memorandum Opinion;

*7 It is hereby ORDERED that PNC's Motion is DENIED and Debtor's Motion is GRANTED. The sum of $437,000 currently held in escrow by United Savings Bank shall be paid to Debtor.

FN1. While statements in briefs are not evidence, the parties' memoranda agree as to the relevant background facts. While a court may not take judicial notice *sua sponte* of facts contained in the debtor's file that are disputed, *In re Augenbaugh,* 125 F.2d 887 (3d Cir.1942), it may take judicial notice of adjudicative facts "not subject to reasonable dispute ... [and] so long as it is not unfair to a party to do so and does not undermine the trial court's factfinding authority." *In re Indian Palms Assoc.,* 61 F.3d 197, 205 (3d Cir.1995)(citing Fed.R.Evid. 201(f) advisory committee note (1972 proposed rules).

FN2. The parties simply attached documents to their respective motions without any affidavit support. As no objection has been made to these documents by either side, I will consider them in deciding the motions. "As is true with other material introduced on a summary judgment motion, uncertified or otherwise inadmissible documents may be considered by the court if not challenged." 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 2722, at 384 (1998). *Accord Johnson v. United States Postal Service,* 64 F.3d 233, 237 (6th Cir.1995) (ruling that the "failure to object to evidentiary material submitted in support of a summary judgment motion constitutes a waiver of those objections"); *H. Sand & Co., Inc. v. Airtemp Corporation,* 934 F.2d 450, 454-55 (2d Cir.1991) (Rule 56 does not require parties to authenticate documents "where appellee did not challenge the authenticity of the documents in the district court."); *Dautremont v. Broadlawns Hospital,* 827 F.2d 291, 294-95 (8th Cir.1987) (affirming summary judgment where appellant failed to object in district court to its consideration of documents not in compliance with Rule 56 and failed to

Westlaw.
Slip Copy
2005 WL 984180 (Bankr.E.D.Pa.)
(Cite as: 2005 WL 984180 (Bankr.E.D.Pa.))

Page 7

demonstrate that district court's consideration of documents constituted reversible error); *Giovacchini v. Perrine (In re Giovacchini),* 1995 WL 80102, at *3 n. 1 (E.D.Pa. Feb.27, 1995) (*citing* Federal Practice and Procedure § 2722) (holding that unauthenticated medical reports would be considered in ruling on motion for summary judgment since no objection was raised thereto).

FN3. The parties agree that there were several amendments to the Letter of Credit, including renumbering of the Letter of Credit's reference number and automatic extension provisions, none of which are relevant to this decision.

FN4. The reason for the Bureau doing so is not apparent on the record, though Debtor asserts that the Bureau drew upon the Letter of Credit pursuant to ¶ 4 of the Acknowledgment when PNC refused to extend the Letter of Credit past its expiration date of March 31, 2002. It is axiomatic that statements in briefs are not evidence. *See Braden v. University of Pittsburgh,* 477 F.2d 1, 6 (3d Cir.1973) (statements in briefs do not constitute record evidence unless admitted by the opposing party); *Westport Taxi Service, Inc. v. Westport Transit District (In re Westport Transit District),* 141 B.R. 543, 545 (Bankr.D.Conn.1992) (facts set forth solely in memorandum of law do not constitute part of record on which findings of fact can be based); *In re Carter,* 74 B.R. 613, 615 n. 3 (Bankr.E.D.Pa.1987) (factual assertions set forth in legal memoranda are not in evidence and cannot be considered) *See also In re Spring Ford Industries,* 2003 WL 21785960, *1 n. 4 (Bankr.E.D.Pa.2003).

FN5. The Letter of Credit states that Pennsylvania law governs any dispute. Moreover, a substantial contacts analysis would find Pennsylvania law applicable in this dispute involving a letter of credit that is: (1) issued by a bank with offices in Pennsylvania, Complaint ¶ 8, (2) on behalf of a Pennsylvania corporation which conducts business in the Commonwealth, Answer to Complaint ¶ 9, (3) for the benefit of a Pennsylvania governmental agency. Exhibit A to Complaint. *See Tudor,* 1991 WL 353443 at *4 n. 15.

FN6. Because I find the Debtor's argument under the Trust Agreement to be dispositive, I do not address its alternative claim that the Workers' Compensation Act grants a reversionary interest.

FN7. *See* Preamble to Trust Agreement, Exhibit 2 to Debtor's Motion at 1.

FN8. Such a result may, at first blush, seem to provide an inequitable windfall to Debtor given that the clear purpose of the Letter of Credit was to fund workers' compensation claims. It cannot be forgotten, however, that PNC is a sophisticated entity. It could have protected itself in any number of ways, including (1) inserting language in the Letter of Credit that limited the Bureau's draw to anticipated workers compensation claims and costs or requiring refund of any excess; (2) inserting language in the Trust Agreement calling for its own right of reversion to unused Letter Proceeds; or (3) contracting with Debtor for a security interest in other assets. It did none of these things "Courts have declined to use equity to grant rights to a [letter of credit] issuer where the issuer could have contracted for those rights." *Lancaster Steel,* 284 B.R. at 161 (*citing In re Carley Capital Group,* 119 B.R. 646, 650 (W.D.Wis.1990) ("[T]here is no equitable reason to grant such additional rights to the plaintiffs in this case since they could have achieved the same protection by contract"); *Briggs v. Goodyear Tire & Rubber Co.,* 79 F.Supp.2d 228, 237 (W.D.N.Y.1999) ("Settled law indicates that the equitable claims of unjust enrichment and constructive trust are unavailable where plaintiffs have rights under a valid and enforceable contract")).

2005 WL 984180 (Bankr.E.D.Pa.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
1996 WL 571652 (E.D.Mich.), 78 A.F.T.R.2d 96-6031, 97-1 USTC P 50,146
(Cite as: 1996 WL 571652 (E.D.Mich.))

Page 1

H

**Motions, Pleadings and Filings**

United States District Court, E.D. Michigan,
Southern Division.
In the Matter of GORDON SEL-WAY, INC.,
Debtor.
GORDON SEL-WAY, INC., Plaintiff,
v.
UNITED STATES OF AMERICA, Defendant.
No. 95-CV-76223-DT.

July 16, 1996

ORDER

DeMASCIO, District Judge.

*1 This matter is before the court on the United States' appeal from the Bankruptcy Court's Order subordinating the claims of the Internal Revenue Service.

Debtor filed its petition for bankruptcy on July 1, 1988. On August 15, 1991, debtor filed a Complaint for Abatement and Refund seeking a refund of post-petition tax penalties of $170,108.73 and an abatement of pre-petition tax penalties of $482,931.42.

The Bankruptcy Court entered an Order Confirming the Plan of Reorganization on October 25, 1991. Debtor timely filed its objections on February 3, 1992. In March 1995, debtor attempted to file an amendment to the petition for abatement by adding a claim for equitable subordination. The Bankruptcy Court denied debtor's motion to amend, and later denied debtor's petition for abatement. [July 24, 1995, Order]

The Bankruptcy Court entered a March 27, 1992 order withdrawing debtor's objections to two claims, including the IRS's claim. The order states that "the Debtor's Objection to Claim No. 22 filed by the Internal Revenue Service be and is hereby withdraw[n] for the reason that the Debtor has submitted a prior objection to the Internal Revenue Service claim which remains pending before this Court." [March 27, 1992 Order, p. 3]

On May 18, 1995, debtor filed a complaint for equitable subordination of the IRS's claims. The United States objected contending that the complaint was filed outside the period for objections as provided by the confirmed plan and that such complaint was an attempt to revoke the confirmed plan. The Bankruptcy Court held that debtor's Petition for Abatement preserved the debtor's objection to the allowance of the IRS's claims. Therefore, the Bankruptcy Court held, debtor's motion for equitable subordination filed after the cut-off period for objections was not time barred. Relying on the Sixth Circuit's opinion in *In re First Truck Lines,* 48 F.3d 210 (6th Cir.1995), the Bankruptcy Court found the IRS's pre-petition and post-petition tax penalties subject to equitable subordination. The United States appeals, contending that the Bankruptcy Court erred in subordinating the IRS's claims.

The parties present two issues on appeal: 1) whether the Bankruptcy Court may equitably subordinate the IRS's tax penalty claims; and 2) whether debtor timely filed its complaint for equitable subordination.

In *In re First Truck Lines,* the Sixth Circuit held that despite the absence of misconduct, post-petition, nonpecuniary loss tax penalties could be equitably subordinated to the claims of general unsecured creditors. The court held that "[b]ecause of the nature of postpetition, nonpecuniary loss tax penalty claims in a Chapter 7 case, we believe such claims are susceptible to subordination." *In re First Truck Lines,* 48 F.3d at 217.

Since the filing of this appeal, the United States Supreme Court reversed the Sixth Circuit's holding in *In re First Truck Lines,* finding "the Sixth Circuit's rationale ... inappropriately categorical in nature." *United States v. Noland,* 116 S.Ct. 1524, 1996 WL 241657 (May 13, 1996). The court held that "[t]he circumstances that prompt a court to order equitable subordination must not occur at the level of policy choice at which Congress itself operated in drafting the Bankruptcy Code." "[A] distinction between compensatory and noncompensatory tax penalties ... [is] itself a categorical distinction at a legislative level of generality." Thus, the Court held that the circumstances counseling equitable subordination must derive from the individual circumstances of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 571652 (E.D.Mich.), 78 A.F.T.R.2d 96-6031, 97-1 USTC P 50,146
(Cite as: 1996 WL 571652 (E.D.Mich.))

Page 2

particular case, not the character of the tax penalty, i.e. whether the penalty is compensatory or noncompensatory. The court may subordinate a tax penalty, but it must focus its inquiry on the application of the tax penalty to the particular case, rather than the nature of the tax penalty in general.

*2 The Bankruptcy Court here did not have the benefit of the Supreme Court's holding and found the IRS's claims subject to subordination on the basis of the Sixth Circuit's opinion in *In re First Truck Lines*. The court did not specify the equitable factors counseling subordination. Therefore, remand is necessary to determine whether, in light of the Supreme Court's holding, equitable subordination of the IRS's noncompensatory tax penalties is appropriate.

If, on remand, the Bankruptcy Court subordinates the IRS's claims, the government argues that the equitable subordination complaint was untimely because debtor filed it after the time for objections. Section 1141(a) of the Bankruptcy Code provides that a plan of reorganization is binding upon all parties once it is confirmed. 11 U.S.C. § 1141(a). *In re St. Louis Freight Lines, Inc.*, 45 B.R. 546, 551-52 (E.D.Mich.1984). The plan of reorganization here provided the debtor with 90 days after the effective date to object to the claim of any creditor, i.e. until February 3, 1992. Debtor filed its equitable subordination complaint on May 18, 1995. Thus, resolution of the timeliness of debtor's complaint turns on whether an equitable subordination complaint should be considered an objection.

Section 510(c) of the Bankruptcy Code provides, inter alia: "[A]fter notice and a hearing, the court may--(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim...." 11 U.S.C. § 510(c). Section 510 does not specify a time at which a party must file a subordination claim, nor whether the complaint should be treated as an objection or revocation of a confirmed plan.

*Collier on Bankruptcy* distinguishes between subordination claims and objections. "Subordination of claims and interests should be distinguished from allowance of and objections to claims and interests.... Before a claim can be subordinated, it must first be allowed." 9 *Collier on Bankruptcy* (15th ed.), ¶ 7001.11.

Bankruptcy courts have also drawn a distinction. In *Liebowitz v. Columbia Packing Co.*, 56 B.R. 222 (D.Mass.1985), affd., 802 F.2d 439 (1st Cir.1986), the court held:

> The plan language of [section 510] shows that it applies to claims already allowed by a bankruptcy court. The section refers to the order in which claims to the bankrupt estate will be satisfied when the assets are distributed, not the validity of the claims themselves. The Bankruptcy Court sits as a court in equity, and may find that principles of fairness require that particular proven claims be relegated to a position inferior to the claims of general creditors. There is no statutory requirement that the determination to subordinate a claim be incorporated in an order of allowance. Where a claim is deemed allowed unless an objection is made, as it was in this case, the court may prefer to consider questions of subordination only after the period for objections is over. It is logical that a claim must first be allowed before it can be subordinated. I rule that the motion to subordinate was not time-barred by the Bankruptcy Court's order.

*3 *Id.* at 224. Other Bankruptcy Courts have barred equitable subordination complaints prior to disallowance of a claim. In *In re Palombo Farms of Colorado, Inc.*, 43 B.R. 709 (D.Colo.1984), the court found plaintiff's complaint for subordination premature because there had been no determination as to the allowability of the claim; "It would be a waste of time, energy, and resources of all concerned to proceed with a protracted trial on subordination of a claim if that claim is ultimately disallowed." *Id.* at 712.

The First Circuit inferentially discussed the timing of subordination complaints in *Max Sugarman Funeral Homes, Inc. v. A.D.B. Investors*, 926 F.2d 1248 (1st Cir.1991). In the context of claims to fraudulently transferred property, the court noted that:

> Only an "allowed claim" (or an "allowed interest") may be subjected to equitable subordination under Bankruptcy Code § 510(c). Unless a claim has been filed it may not be allowed. 11 U.S.C. §§ 501, 502(a); Bankruptcy Rules 3002, 3005. Of course, if a proof of claim is filed but the claim is disallowed, the principles of equitable subordination never come into play....

*Id.* at 1257 n. 16 (citing *Collier on Bankruptcy* § 510.02 (15th ed. 1988)).

Still other courts have distinguished between subordination complaints and objections in the context of res judicata. In *In re GEX Kentucky*, 100 B.R. 887 (N.D.Ohio 1988), plaintiff argued that its

Not Reported in F.Supp.
1996 WL 571652 (E.D.Mich.), 78 A.F.T.R.2d 96-6031, 97-1 USTC P 50,146
(Cite as: 1996 WL 571652 (E.D.Mich.))

Page 3

complaint for subordination was an objection to defendants' claims and not barred by res judicata. The court found "Plaintiff's attempt to characterize its subordination actions as objections to the claims of [defendants] to be without merit." Id. at 891. The court held:

> Subordination of a claim and the objection to the claim are two separate and distinct procedures under the Bankruptcy Code with each having a different result.
> The subordination of a claim, pursuant to 11 U.S.C. § 510(c), concerns the distribution and classification of an allowed claim based upon principles of equity. The objection to a claim, pursuant to 11 U.S.C. § 502, does not deal with the distribution and classification of a claim but to the allowance of such claim.
> Id

However, at least one court has construed a subordination complaint as an objection for res judicata purposes. In In re Outdoor Sports Headquarters, Inc., 168 B.R. 177 (S.D.Ohio 1994), the court held:

> [T]he Plan does not define its use of the word "objection," nor does any other provision of the Plan assist in determining its scope and meaning. Because the term objection is not restricted in any manner in the Plan and is not defined in the Bankruptcy Code or Rules, this court concludes that based upon the general use of the word objection and its ordinary meaning, "any adverse reason raised to oppose a matter or proceeding," objection is not limited to allowance or disallowance of claims, but includes the concept of subordination.
> *4 Id at 182.

We find those decisions which draw a distinction between objections and equitable subordination to apply the more sound approach. Only a claim which has been allowed may be subordinated. A claim can be allowed, in the face of an objection, only after the objection is denied. Logically, a party may bring a subordination complaint only after the court denies the objection and allows the claim. Consequently, a plan provision setting the time for objections does not address or prescribe a time period for filing complaints for subordination.

Debtor here filed an objection to the IRS's claim on the last date allowable under the confirmed plan, February 3, 1992. The court withdrew the claim due to an earlier filed adversary complaint challenging the same claim. Debtor filed its complaint for equitable subordination on May 18, 1995. The Bankruptcy Court denied debtor's petition for abatement on July 24, 1995. Consequently, the court effectively allowed the IRS's claim on July 24, 1995. Because debtor filed its complaint before July 24, 1995, the complaint was premature. However, because the government did not object at that time, and the court did not address the merits of the equitable subordination complaint until after July 24, 1995, there are no grounds to bar the complaint at this juncture. The objection period prescribed by the plan at issue here did not bar plaintiff's equitable subordination complaint.

The government next contends that the complaint for equitable subordination is a prohibited attempt to revoke a confirmed plan. 11 U.S.C. § 1144 provides:

> On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud. An order under this section revoking an order of confirmation shall--
> (1) contain such provisions as are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation; and
> (2) revoke the discharge of the debtor.

In In re Crown-Globe, Inc., 107 B.R. 60 (E.D.Pa.1989), the court interpreted section 1144 to bar plaintiff's subordination claim filed after the 180 day period. Because the subordination complaint sought to shift the priority of claims as they were to be paid under the plan, the court dismissed the complaint as an untimely attempt to revoke confirmation of the plan.

Crown-Globe appears to be the sole precedent interpreting section 1144's application to section 510 equitable subordination. We are not persuaded by Crown-Globe's analysis. Because subordination complaints cannot be filed until a claim has been allowed, Crown-Globe would interpret all equitable subordination complaints as a revocation of a confirmed plan. Moreover, because a plan may be revoked only on the basis of fraud, only equitable subordination complaints based on fraud would be permitted.

*5 Application of Crown-Globe's analysis would be particularly inequitable here. The Bankruptcy Court denied debtor's petition for abatement and effectively allowed the government's claim more than four years after plan confirmation. In this case, Crown-Globe would prohibit an equitable subordination claim to be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 4
1996 WL 571652 (E.D.Mich.), 78 A.F.T.R.2d 96-6031, 97-1 USTC P 50,146
**(Cite as: 1996 WL 571652 (E.D.Mich.))**

filed at any time. Consequently, section 1144 does not bar debtor's equitable subordination complaint.

ACCORDINGLY, this matter is REMANDED for further proceedings consistent with this order.

IT IS SO ORDERED.

**Motions, Pleadings and Filings (Back to top)**

• 2:95cv76223 (Docket) (Dec. 28, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.