## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x

| | |
|---|---|
| In re | **Chapter 11** |
| | **Case No. 02-13672 (KJC)** |
| **INSILCO TECHNOLOGIES, INC., et al.,**[1] | |
| | **(Jointly Administered)** |
| Debtors. | |
| | **Docket Ref. Nos. 666 and 670** |

---------------------------------------------------------------x

### ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 363(b) AND 105(a) AND FED. R. BANKR. P. 9019 APPROVING SETTLEMENT AGREEMENT BY AND AMONG THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, WACHOVIA BANK, N.A., U.S. BANK, N.A., CERTAIN OF THE DEBTORS' SENIOR SECURED LENDERS AND THE AGENT FOR THE DEBTORS' SENIOR SECURED LENDERS

This matter having come before the Court upon the motion (the "Motion")[2] filed by

Insilco Holding Co. and certain of its direct and indirect subsidiaries, as debtors and debtors-in-

possession in these chapter 11 cases (collectively, the "Debtors"), requesting entry of an order

pursuant sections 363(b) and 105(a) of the Bankruptcy Code and Rule 9019(a) of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") approving the Asset Reallocation and

Settlement Agreement dated as of May 13, 2003 (the "Settlement Agreement", a copy of which

is annexed hereto as Exhibit A) by and among the Debtors, the official committee of unsecured

creditors appointed in these cases (the "Creditors' Committee"), Wachovia Bank, N.A. as

indenture trustee for the Debtors' 12% senior subordinated notes ("Wachovia"), U.S. Bank, N.A.

as indenture trustee for the Debtors' 14% senior discount notes ("U.S. Bank"), the Senior

---

[1]     The other debtors in these jointly administered chapter 11 proceedings are Insilco Holding Co., InNet Technologies, Inc., Insilco International Holdings Inc., Precision Cable Mfg. Corporation, Eyelets for Industry, Inc., EFI Metal Forming, Inc., Stewart Stamping Corporation, Stewart Connector Systems, Inc., Signal Caribe, Inc. and Signal Transformer Co., Inc.

[2]     All capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

and objections having been filed by the City of El Paso, Rio Grande City CISD, Rockwall CAD, Rockwall County and Starr County and the New York State Department of Taxation and Finance, and such objections having been withdrawn;

Lenders[3] that have consented to the terms of the Settlement Agreement and delivered to the Debtors' a duly executed signature page thereto, and Bank One, N.A. as agent to the senior secured lenders (the "Agent", and together with the Debtors, the Creditors' Committee, the Lenders, Wachovia and U.S. Bank, the "Settling Parties"); and the Court having reviewed the Settlement Agreement and the pleadings filed with the Court related thereto, and considered the arguments of counsel and the opposition thereto, if any, the Court having determined that granting the relief requested in the Motion is in the best interests of the Debtors and their estates and creditors, that the settlement is fair and equitable and will result in the resolution of complex and potentially protracted litigation, the outcome of which is uncertain, and that the settlement is the product of arm's length, non-collusive bargaining among the Settling Parties and has been reached in good faith; and it appearing that notice of the Motion has been given as provided for in the Motion, that such notice was adequate under the circumstances, and that no other or further notice need be given; and for sufficient cause shown, it is hereby

ORDERED that:

1.    The Motion is granted.

2.    The settlement by and among the Settling Parties, as embodied in the Settlement Agreement, is hereby approved, and the terms of the Settlement Agreement are hereby incorporated herein by reference.

3.    The Settlement Agreement constitutes valid and binding obligations of the Settling Parties which shall be enforceable in accordance with the terms thereof.

---

[3]    In accordance with the Settlement Agreement, the term "Senior Lenders" as used herein does not include those lenders participating in Term Loan C, except in respect of Paragraph 1 of the Settlement Agreement and the corresponding Paragraph 5 of this Order only, wherein the term "Senior Lenders" shall include those lenders participating in Term Loan C.

NYDOCS03/680569.3
WP3:889101.1

2

61683.1001

A - 2

4.    The Settling Parties are authorized to take any and all actions necessary to effectuate and implement the Settlement Agreement, and the Settling Parties are directed to take such actions in furtherance of the settlement as are required by the Settlement Agreement.

5.    The Senior Lenders' liens and claims against the Debtors (i.e., the claims arising under prepetition revolving credit facility, Term Loan A, Term Loan B and Term Loan C) are fully and finally allowed in the amount of $254,933,571.49[4] (the "Allowed Senior Lenders' Claims"). The liens and security interests of the Senior Lenders (other than the Term Loan C Lenders, which are, under the terms of the Credit Agreement, unsecured) are deemed valid, perfected, first priority and indefeasible and neither such liens nor such claims shall be subject to any further challenge, and the Senior Lenders shall not be required to file any proof of claim or further evidence of the indebtedness owing by the Debtors or of any collateral securing such indebtedness.

6.    In consideration of the treatment accorded them under the Settlement Agreement (including as set forth in Paragraphs 5 and 7 of this Order), the Senior Lenders have agreed to waive and relinquish any right or entitlement to recovery or distributions on their allowed unsecured deficiency claims and, effective upon the receipt of the releases described in Paragraph 4B of the Settlement Agreement from the holders of the 12% Senior Subordinated Notes and the 14% Senior Discount Notes, to waive enforcement of their contractual and structural subordination rights vis-à-vis the holders of the 12% Senior Subordinated Notes and the 14% Senior Discount Notes, respectively, in order to effectuate the reallocation and distributions set forth in Paragraph 3 of the Settlement Agreement; provided that, the Senior

---

[4]    Of this amount $232,712,443.42 represents principal, accrued interest and fees owing in respect of the revolving credit facility, Term Loan A and Term Loan B as of the Petition Date, and $22,221,128.07 represents principal and accrued interest owing in respect of the Term Loan C as of the Petition Date.

Lenders' sharing and reallocation of the Contributed Assets in respect of the holders of the 14% Senior Discount Notes and 12% Senior Subordinated Notes is expressly conditioned upon and subject to the provisions of Paragraph 4B of the Settlement Agreement. Likewise, in consideration of the treatment accorded them under the Settlement Agreement (including as set forth in Paragraph 5 and 7 of this Order), and subject to the provisions of Paragraph 4B of the Settlement Agreement, the Senior Lenders have agreed to the sharing and reallocation of the Contributed Assets to the holders of allowed general unsecured claims, with the Contributed Assets to be distributed in a manner and pursuant to the terms set forth in Paragraph 3 of the Settlement Agreement.

7. Except with respect to (i) amounts which are required to be funded pursuant to the "Carve Out" and "Wind Down Budget" under the Cash Collateral Order, (ii) the Contributed Assets (subject to the provisions of Section 4B of the Settlement Agreement in respect of the holders of the 14% Senior Discount Notes and the 12% Senior Subordinated Notes), and (iii) Avoidance Actions (including the proceeds of Avoidance Actions) (clauses (i) through (iii), collectively the "Excluded Assets"), the Senior Lenders shall receive and be entitled to receive and to indefeasibly retain as of the Settlement Effective Date, in full satisfaction of their secured claims, all proceeds (including all payments previously received by the Agent or its professionals in connection with these Chapter 11 cases), from the disposition of the Debtors' businesses and assets whether pursuant to the Sale Orders or otherwise, and all other cash, including without limitation cash currently held or to be received in the future by the Debtors from any source whatsoever, including without limitation, litigation recoveries, tax refunds, asset dispositions, unapplied retainers and cash on hand. The Agent's prepetition and postpetition liens on all such cash and assets other than the Excluded Assets shall remain in place

until the payments required herein have been made to the Agent, and the Agent shall be entitled
to the receipt of all cash and proceeds of assets (whether or not subject to any such liens) other
than the Excluded Assets; provided, however, that the Senior Lenders' recovery shall not exceed
the amount of the Allowed Senior Lenders' Claims. The Debtors (or such other party as may be
responsible for administering the Settlement Agreement on behalf of, or as successor to, the
Debtors' estates) shall, without further order of the Court, promptly remit to the Agent all
proceeds other than Excluded Assets as and when such proceeds are received and shall
expeditiously remit all such proceeds in their possession and cause their foreign subsidiaries to
repatriate any such proceeds in their possession.

      8.     The waivers and releases contained in the Settlement Agreement are
supported by good, valid and sufficient consideration and are hereby approved, and the Settling
Parties are hereby released to the extent and in the manner provided in the Settlement
Agreement.

      9.     The Trustee Motion is hereby deemed withdrawn with prejudice, provided
however, that nothing in this Order shall limit the right of the Creditors' Committee, Wachovia
or U.S. Bank to file a motion for appointment of a chapter 11 trustee or examiner based on
events or facts occurring after the date of entry of this Order.

      10.    The Cash Collateral Order is hereby deemed amended to the extent
necessary to implement the provisions of Paragraphs 3A(iv) and 5 of the Settlement Agreement.

      11.    The Settlement Agreement shall inure to the benefit of and be binding
upon the Parties and their respective agents, representatives, successors and assigns, including
without limitation, any chapter 7 trustee or any other representative of these estates, custodian of

A - 5

the assets subject to this Settlement Agreement or such other legal entity as may be responsible for carrying out all or any portion of this Settlement Agreement.

12.     The provisions of this Order and the Settlement Agreement shall survive any order dismissing these cases or converting these cases to cases under chapter 7 of the Bankruptcy Code.

13.     This Court shall retain jurisdiction over the Settling Parties for the purposes of interpreting, implementing and enforcing the terms and conditions of the Settlement Agreement and resolving any disputes arising thereunder during the pendency of the Debtors' chapter 11 cases. To the extent of any conflict or inconsistency between the terms of the Settlement Agreement and this Order, the Settlement Agreement shall control.

Date: Wilmington, Delaware
     June 11, 2003

HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT

# A

WP3:421928 1

99999 1001

## ASSET REALLOCATION AND SETTLEMENT AGREEMENT

THIS ASSET REALLOCATION AND SETTLEMENT AGREEMENT

("SETTLEMENT AGREEMENT") dated as of May 13, 2003, by and among (i) Insilco

Technologies, Inc. ("Technologies") and its undersigned affiliated debtors (together with

Technologies, the "Debtors") in the administratively consolidated chapter 11 bankruptcy cases

pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy

Court") bearing docket number 02-13672 (KJC) (the "Chapter 11 Cases"), (ii) the official

committee of unsecured creditors appointed in the Bankruptcy Cases (the "Creditors'

Committee"), (iii) Bank One, NA as agent (the "Agent") and the lenders, including Bank One,

NA, under the Second Amended and Restated Credit Agreement dated as of August 25, 2000, as

amended (the "Credit Agreement") that have consented to the terms of this Settlement

Agreement (the "Senior Lenders")[1], (iv) Wachovia Bank, National Association, as indenture

trustee for the 12% senior subordinated notes due 2007 (the "12% Senior Subordinated Notes")

issued by Technologies ("Wachovia") and (v) U.S. Bank, N.A. ("U.S. Bank") as the indenture

trustee for the 14% senior discount notes due 2008 (the "14% Senior Discount Notes") issued by

Insilco Holding Co. (collectively, the parties to this Settlement Agreement are hereinafter

referred to as the "Parties"). Except as expressly provided otherwise herein, the terms and

provisions of this Settlement Agreement shall become effective and binding upon the Settlement

Effective Date, as defined in Paragraph 6 below.

### RECITALS

---

[1] As used herein, the term "Senior Lenders" does not include those lenders participating in Term Loan C, except in respect of Paragraph 1 only, wherein the term "Senior Lenders" shall include those lenders participating in Term Loan C.

2

A.     On December 16, 2002 (the "Filing Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code") commencing the Chapter 11 Cases. The Debtors continue in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Chapter 11 Cases have been consolidated for procedural purposes and are being jointly administered pursuant to an order of the Bankruptcy Court. No trustee or examiner has been appointed in the Chapter 11 Cases.

B.     On December 19 and 20, 2002, the Debtors filed motions seeking, inter alia, the entry of orders (i) approving bidding procedures governing the sale of substantially all of the Debtors' assets, (ii) approving the sale of substantially all of the Debtors' assets, and (iii) granting certain relief related thereto (the "Sale Motions"). The Sale Motions contemplated the sale of substantially all of the Debtors' assets in separate transactions (the "Sales") pursuant to five separate sale agreements described below (collectively, the "Sale Agreements"), subject to higher or otherwise better offers and Bankruptcy Court approval:

> a. Stock and Asset Purchase Agreement By and Among Amphenol Corporation, Amphenol Technical Products International Co., Insilco Technologies, Inc., T.A.T. Technology Inc., Insilco International Holdings, Inc. and Precision Cable Mfg. Co., Inc. dated as of December 15, 2002;
>
> b. Stock and Asset Purchase Agreement Among Bel Fuse Ltd., Bel Fuse Macau, L.D.A., Bel Connector Inc., Bel Transformer Inc., and Insilco Technologies, Inc. and Certain of its Subsidiaries, dated as of December 15, 2002;
>
> c. SRDF Acquisition Company, LLC, Insilco Technologies, Inc., Stewart Stamping Corporation, Eyelets For Industry, Inc. and EFI Metal Forming, Inc., dated as of December 15, 2002;
>
> d. Asset Purchase Agreement By and Between LL&R Partnership and Insilco Technologies, Inc., dated as of December 15, 2002; and

3

e. Share Sale and Asset Purchase Agreement between Insilco Technologies, Inc. and Stephen Bullock, dated as of December 15, 2002.

C. On January 3, 2003, the Office of the United States Trustee appointed five members to serve on the Creditors' Committee in these cases.

D. On January 14, 2003, the Creditors' Committee and Wachovia filed objections to the bidding procedures. After extensive negotiations with the Creditors' Committee and Wachovia at the January 16, 2003 hearing to consider approval of the bidding procedures, the Debtors consented to various amendments to Debtors' proposed bidding procedures and agreed to continue the hearing on the Sale Motions until March 7, 2003.

E. On January 16, 2003, the Bankruptcy Court entered the Final Order Authorizing Use of Cash Collateral and Granting Replacement Liens (the "Cash Collateral Order"). Annexed to the Cash Collateral Order as Exhibit B is a budget listing anticipated wind down expenses (the "Wind Down Budget"), including line items for payments that may be triggered under the Debtors' Key Executive and Key Employee Severance Plan (the "KESP") and the Debtors' Key Executive and Key Employee Retention Plan (the "KERP"). Paragraph 3 of the Cash Collateral Order provides that, subject to certain limitations, to the extent amounts allocated to line items other than "Selling Costs" in the Wind Down Budget exceed the amounts necessary to fund such line items, then up to $500,000 of the amount allocated to non "Selling Costs" line items may be reallocated and used by the Debtors' estates for other necessary expenses for a period of six months following the completion of the Sales (the "Reallocated Monies"), at which time the remaining balance of the Reallocated Monies shall be returned to the Agent.

4

F.    On January 30, 2003, the Court docketed the orders approving the Bidding Procedures. With respect to the Custom Assemblies deal and the N. Myrtle Beach deal, the Debtors submitted revised orders to effect certain ministerial changes, on or about February 6, 2003. These revised orders were entered by the Bankruptcy Court on February 19, 2003.

G.    On February 26, 2003, the Creditors' Committee and Wachovia filed objections to the Sale Motions, and on March 6, 2003, the Creditors' Committee filed a supplement to the objection (collectively, the "Sale Objections").

H.    On March 5, 2003, the Creditors' Committee filed a motion seeking inter alia appointment of a chapter 11 trustee for the Debtors' estates or an examiner (the "Trustee Motion").

I.    At the Sale Hearing on March 7, 2003, the Debtors presented argument and evidence in support of the Sales. Prior to the Committee and Wachovia presenting evidence in support of the Sale Objections and a ruling by the Bankruptcy Court on the Sale Motions, counsel for the Debtors, the Agent and the Creditors' Committee informed the Bankruptcy Court that they, together with Wachovia, had reached a settlement in principle pursuant to which the Sale Objections were withdrawn. Counsel for the Debtors, the Agent and the Creditors' Committee described certain of the general terms and conditions of the settlement on the record at the Sale Hearing and noted that the settlement was subject to definitive documentation and certain further approvals, including Bankruptcy Court approval and, in the case of the Agent, approval of the terms of the settlement by the requisite majorities of the Senior Lenders sufficient to bind the Senior Lenders, including as a class under a plan incorporating the settlement terms, if necessary

5

J.     Pursuant to the terms and conditions set forth in this Settlement Agreement, the Parties have agreed to resolve all disputes among them, including without limitation the disputes regarding the Sale Motion (including the Sale Objections), the Trustee Motion and all matters related thereto, and otherwise resolve their differences amicably in order to avoid costly litigation and facilitate the orderly conclusion of these Chapter 11 Cases.

K.     Following the withdrawal of the Sale Objections, the Bankruptcy Court approved the Sale Motions by orders dated March 7, 2003 (the "Sale Orders").

NOW THEREFORE, in consideration of the mutual covenants, release of claims and agreements contained herein, including without limitation the resolution of the Sale Objections and the withdrawal of the Trustee Motion (which shall be deemed a withdrawal "with prejudice" to the extent set forth herein), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, in full and final settlement of the disputes among the Parties, the Parties to this Settlement Agreement hereby agree as follows:

## AGREEMENT

1.     **ALLOWANCE OF SENIOR LENDERS' CLAIMS.** The Senior Lenders' liens and claims against the Debtors (i.e., the prepetition revolving credit facility, Term Loan A, Term Loan B and Term Loan C) are fully and finally allowed in the amount of $254,933,571.49[2] (the "Allowed Senior Lenders' Claims"). The liens and security interests of the Senior Lenders (other than the Term Loan C Lenders, which are, under the terms of the Credit Agreement, unsecured) are deemed valid, perfected, first priority and indefeasible and neither

---

[2] Of this amount $232,712,443.42 represents principal, accrued interest and fees owing on the revolving credit facility, Term Loan A and Term Loan B as of the Petition Date, and $22,221,128.07 represents principal and accrued interest owing on Term Loan C as of the Petition Date.

6

such liens nor such claims shall be subject to any further challenge, and the Senior Lenders shall
not be required to file any proof of claim or further evidence of the indebtedness owing by the
Debtors or of any collateral securing such indebtedness.

    2.    **TREATMENT OF SENIOR LENDERS' CLAIMS.**  A. Except with
respect to (i) amounts which are required to be funded pursuant to the "Carve Out" and "Wind
Down Budget" under the Cash Collateral Order, (ii) the Contributed Assets (as defined in
Paragraph 3, below, subject to the provisions of Section 4B in respect of the holders of the 14%
Senior Discount Notes and the 12% Senior Subordinated Notes), and (iii) Avoidance Actions (as
defined in Paragraph 3 below and which, whenever used herein, shall be deemed to include the
proceeds of Avoidance Actions) (clauses (i) through (iii), collectively the "Excluded Assets"), the
Senior Lenders shall receive and be entitled to receive and to indefeasibly retain as of the
Settlement Effective Date, in full satisfaction of their secured claims, all proceeds (including all
payments previously received by the Agent or its professionals in connection with these Chapter
11 cases), from the disposition of the Debtors' businesses and assets whether pursuant to the Sale
Orders or otherwise, and all other cash, including without limitation cash currently held or to be
received in the future by the Debtors from any source whatsoever, including without limitation,
litigation recoveries, tax refunds, asset dispositions, unapplied retainers and cash on hand. The
Agent's prepetition and postpetition liens on all such cash and assets other than the Excluded
Assets shall remain in place until the payments required herein have been made to the Agent, and
the Agent shall be entitled to the receipt of all cash and proceeds of assets (whether or not subject
to any such liens) other than the Excluded Assets; provided, however, that the Senior Lenders'
recovery shall not exceed the amount of the Allowed Senior Lenders' Claims. The Debtors (or
such other party as may be responsible for administering this Agreement) shall, without further

7

order of the Court, promptly remit to the Agent all proceeds other than Excluded Assets as and when such proceeds are received and shall expeditiously remit all such proceeds in their possession and cause their foreign subsidiaries to repatriate any such proceeds in their possession.

    B.    In consideration of the treatment set forth in Paragraph 2A, the Senior Lenders waive and relinquish any right or entitlement to recovery or distributions on their allowed unsecured deficiency claims and, effective upon the receipt of the releases described in Paragraph 4B from the holders of the 12% Senior Subordinated Notes and the 14% Senior Discount Notes, further waive any enforcement of their contractual subordination rights vis-à-vis the holders of the 12% Senior Subordinated Notes and their structural subordination rights vis-à-vis the holders of the 14% Senior Discount Notes in order to effectuate the reallocation and distributions set forth in Paragraph 3 below, provided, however that, the Senior Lenders' sharing and reallocation of the Contributed Assets in respect of the holders of the 14% Senior Discount Notes and the 12% Senior Subordinated Notes (collectively, the "Noteholders") is expressly conditioned upon and subject to the provisions of Paragraph 4B.

    3.    **ASSET REALLOCATION/CONTRIBUTED ASSETS.** A. Subject to the provisions of Paragraph 4B, the Senior Lenders agree to the following sharing and reallocation of cash and proceeds, as set forth in the following subparagraphs (i) through (iv) (the "Contributed Assets"), to the holders of allowed general unsecured claims including those of the Noteholders (collectively the "Unsecured Creditors") to be distributed in a manner set forth in a liquidating trust agreement or a Plan (as defined in Paragraph 6), if such a Plan is required:

>       i.    $1.75 million of the net proceeds realized from the closing of the pending Sales;
>
>       ii.    the sale proceeds paid to the Debtors' estate from the sale of the real properties located in Larne, Northern

8

Ireland (whether paid directly to the Debtors or paid to TAT Canada and by TAT Canada to the Debtors), Taylorsville, North Carolina and McAllen, Texas, and the proceeds paid to the Debtors' estate from the sale of miscellaneous personal property, including the Debtors' interest in artwork, equipment and furnishings, located in the Debtors' Columbus, Ohio offices and listed on Exhibit A hereto; provided, however, that, in the event the Debtors seek to implement this Settlement Agreement through a Plan, then, to the extent that the Debtors' estates do not otherwise have sufficient readily available unencumbered assets to pay administrative expenses required to be paid in order to confirm such a Plan (other than professional fees, including the Agent's professional fees, incurred pursuant to Paragraph 11 below), the estate shall have the benefit of up to $250,000 of the Contributed Assets described in this subparagraph (ii) for the payment of such administrative expenses (the "Administrative Expense Carve Out"); provided further that the aggregate Contributed Assets under subparagraphs (i) and (ii) shall not together exceed $3 million (inclusive of the Administrative Expense Carve Out) with any excess over such $3 million to be promptly remitted to the Senior Lenders and any such excess will not constitute "Contributed Assets";

iii.    $250,000 of cash collateral (which shall be asset sale proceeds), plus 10% of the net recoveries derived from (x) the Debtors' claims and causes of action against Star Services, Inc. relating to the litigation bearing Supreme Court of the State of New York Index # 605676/97 and generally referred to as the "Star Services Litigation" and (y) income tax refunds received by the Debtors from and after April 15, 2003, for the purpose of establishing a "Creditors' Trust" to investigate and pursue claims, actions and causes of action not specifically released under this Settlement Agreement, assertable by or on behalf of the Debtors or their estates for the benefit of unsecured creditors and, including claims arising under Chapter 5 of the Bankruptcy Code ("Avoidance Actions"), provided the Contributed Assets under this subparagraph (iii) shall not exceed $750,000, with any excess over $750,000 to be promptly remitted to the Senior Lenders and which

9

excess (including any net recoveries derived from the assets described under (x) and (y) beyond the amount allocated to the Creditor Trust in this paragraph (iii)) will not constitute "Contributed Assets";

iv.     the Cash Collateral Order shall be amended (or deemed amended on the Settlement Effective Date) to provide that the Reallocated Monies shall remain as a reserve with the estate (not subject to the requirement that such Reallocated Monies be returned to the Agent), and that the first $200,000 of any such Reallocated Monies shall be allocated and earmarked for the payment of the allowed and unpaid fees and expenses of the Creditors' Committee's professionals incurred from and after May 1, 2003, with any remaining Reallocated Monies available for payment of other administrative expenses of the Debtors' estates.

B.     The Contributed Assets, as and when received by the Agent, shall be held

by the Agent in a separate interest bearing account pending the earlier to occur of (i) the

Settlement Effective Date (as defined herein) at which time such Contributed Assets shall be

remitted to such account as has been designated by the Creditors' Committee, if any, for further

distribution in accordance with the terms hereof upon order of the Court pursuant to a confirmed

Plan (as defined in Paragraph 6), or other court order (provided that the Debtors or such other

entity as may be administering this Settlement Agreement shall be responsible for the costs of

maintaining such account for so long any of the Contributed Assets are held by the Agent), or (ii)

the Settlement Termination Date (as defined herein) at which time such Contributed Assets may

be provisionally applied by the Agent in accordance with the Cash Collateral Order.  In the event

any of the assets described in Paragraph 3A have not been liquidated as of the Settlement

Effective Date ("Unliquidated Contributed Assets"), the provisions of this Paragraph 3 shall

apply to the proceeds of such Unliquidated Contributed Assets as and when any of such

Unliquidated Contributed Assets are liquidated.  The Debtors shall use their reasonable best

10

efforts to promptly liquidate and reduce to cash the Unliquidated Contributed Assets, provided
that the disposition or liquidation of the Unliquidated Contributed Assets shall be on terms
reasonably acceptable to the Agent and the Creditors' Committee. The Agent's prepetition and
postpetition liens on the Unliquidated Contributed Assets shall remain in place until such
Unliquidated Contributed Assets have become Contributed Assets and the Senior Lenders'
allocable share of such Assets has been remitted to the Agent for distribution to the Senior
Lenders. All interest accruing on the Contributed Assets shall constitute Contributed Assets.

4.    **RELEASES AND WAIVER OF CLAIMS AND INTERESTS.**

A. Releases by the Debtors and the Creditors' Committee – The Debtors and the
Creditors' Committee, on behalf of themselves and the estates of the Debtors, and each of their
respective predecessors, successors and assigns (the "Releasing Estate Parties"), hereby fully
waive, release and forever discharge the Agent and each of the Senior Lenders and each of their
agents, employees and professionals ("Released Lender Parties") from any and all manner of
actions, causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises,
liabilities, claims, damages, losses, controversies, trespasses, remedies, defenses, set-offs,
surcharges, costs or expenses of any nature whatsoever, known or unknown, fixed or contingent,
which the Releasing Estate Parties have had, now have, or may hereafter have against the
Released Lender Parties, by reason of any matter, cause or thing whatsoever, from the beginning
of time through and to the Settlement Effective Date; provided, however, that nothing in this
Paragraph 4A releases any Parties' obligations or agreements pursuant to this Settlement
Agreement, or bars claims directed solely at enforcing the provisions of this Settlement
Agreement.

11

B. Releases By Wachovia, U.S. Bank and Noteholders – Wachovia and U.S.
Bank, and each of their respective predecessors, successors and assigns (together, the "Trustees")
shall use their reasonable best efforts either to obtain authority under their respective indentures
or, pursuant to the Bankruptcy Code (including pursuant to a Plan) to cause their constituencies
to, fully waive, release and forever discharge the Released Lender Parties from any and all
manner of actions, causes of action, in law or in equity, suits, debts, liens, contracts, agreements,
promises, liabilities, claims, damages, losses, controversies, trespasses, remedies, defenses, set-
offs, surcharges, costs or expenses of any nature whatsoever, known or unknown, fixed or
contingent, which the Releasing Trustee Parties have had, now have, or may hereafter have
against the Released Lender Parties, by reason of any matter, cause or thing whatsoever, from the
beginning of time through and to the Settlement Effective Date relating to or concerning in any
way the Debtors, the Credit Agreement, the 12% Senior Subordinated Notes and the 14% Senior
Discount Notes (all of the foregoing, collectively the "Noteholder Claims"); provided, however,
that nothing in this Paragraph 4B contemplates the release of any Party's obligations or
agreements under this Settlement Agreement or the bar of claims directed solely at enforcing the
provisions of this Settlement Agreement. The Trustees further agree that, in the event this
Settlement Agreement is consummated as part of or otherwise incorporated into a Plan (as
defined in Paragraph 6), they shall support and use their reasonable best efforts to obtain
acceptance by their constituencies of such Plan, which shall provide for the releases set forth
herein by the Trustees and by all holders of the 12% Senior Subordinated Notes and 14% Senior
Discount Notes of the Noteholder Claims. Whether the Contributed Assets are distributed under
a Plan or otherwise, however, it shall be a condition both (i) to the receipt of any Contributed
Assets and any other distributions of any kind and howsoever generated, (such as, by way of

12

example, recoveries obtained by the Creditor Trust), by any Noteholder and (ii) to the waiver by the Senior Lenders, as to any Noteholder, of the Senior Lenders' contractual subordination rights in respect of the 12% Senior Subordinated Notes and structural subordination rights vis-à-vis the holders of the 14% Senior Discount Notes, either that such Noteholder has provided the Agent and Senior Lenders with a release of the Noteholder Claims in a form reasonably satisfactory to the Agent, or that the Bankruptcy Court has determined, in a final order, that the Noteholder Claims have been deemed released as to such Noteholder. The Senior Lenders' waiver of subordination rights shall not apply to any Noteholder who elects not to grant or who is not deemed to have granted such release. With respect to any Noteholder that shall not have granted or deemed to have granted such release, (a) the Agent shall be paid the amount which equals the Noteholder's Share (as defined below) of the amount of Contributed Assets, exclusive of (x) the Contributed Assets described in Paragraph 3(A)(iii), and (y) the pro rata portion of the Administrative Expense Carve Out allocable to such non-releasing Noteholder (which shall be an amount equal to the Noteholder's Share of the Administrative Expense Carve Out), and (b) such Noteholder shall not receive any distributions from the estates, including any proceeds of recoveries obtained through the use of Contributed Assets described in Paragraph 3(A)(iii), with distributions instead to be reallocated, pursuant to a confirmed Plan or other order of the Court, among the allowed claims of other Unsecured Creditors. "Noteholder's Share" shall mean the ratio of the allowed claims of such non-releasing Noteholder to the allowed claims of all Unsecured Creditors.

C.  Limitation on Release of Term C-Lenders – The releases and waivers contained in Paragraph 4A of this Settlement Agreement for the benefit of the Released Lender Parties shall also apply to the Term-C Lenders (DLJ Capital Funding, Inc., DLJ Merchant

13

Banking Partners II, L.P., DLJ Merchant Banking Partners II-A, L.P., DLJ Offshore Partners II, C.V., DLJ Diversified Partners, L.P., DLJ Diversified Partners-A, L.P., DLJ EAB Partners, L.P., DLJ Millenium Partners, L.P., DLJ ESC II, L.P., DLJ Millenium Partners-A, L.P. and Donaldson, Lufkin and Jenrette Securities Corporation (collectively, the "Term-C Lenders")) and their affiliates, insiders (as defined in Section 101 of the Bankruptcy Code), agents, employees and professionals, only in respect of the Term-C Loans under the Credit Agreement (as defined therein) and notwithstanding anything herein to the contrary, the Term-C Lenders and their affiliates, insiders (as defined in Section 101 of the Bankruptcy Code) agents, employees and professionals, shall not otherwise be released or deemed released. Nothing contained herein shall be deemed to discharge, impair or otherwise affect any claim, action, cause of action or right against the Term-C Lenders and any affiliate, insider, agent or professional of the Term-C Lenders, except as specifically set forth in the preceding sentence, provided however that the reservation of non-released claims, causes of action or rights in this Paragraph shall not extend to the Released Lender Parties.

D. The Agent and the Senior Lenders – Except to the extent specifically otherwise provided herein, the Agent and the Senior Lenders hereby waive and relinquish any and all interest in and claims that each of them have or may have against the Contributed Assets and Avoidance Actions.

E. Release of Certain Avoidance Actions – In consideration for the agreement set forth herein and the benefits and services provided by the Released Employees (defined below), and subject to the terms of this Settlement Agreement, the Debtors, the Creditors' Committee, the Agent and the Senior Lenders, on behalf of themselves and the estates of the Debtors, and each of their respective predecessors, successors and assigns, hereby fully waive, release and

14

forever discharge all avoidance claims and causes of action arising under chapter 5 of the
Bankruptcy Code or otherwise relating to or concerning the conversion from recourse to non-
recourse of certain loans and the deferred payment of certain bonuses, in an aggregate amount not
to exceed $250,000, in respect of the following employees of the Debtors:  Michael Elia, Fred
Stewart, Steve Crea, and Phil Pittman ("Released Employees").

F.  Scope of Releases – The Parties acknowledge and agree that nothing contained
in the foregoing releases shall release or discharge any person or entity other than the specifically
identified beneficiaries of the releases in this Paragraph 4.

5.  SUPPLEMENTAL SEVERANCE PROGRAM.  On April 14, 2003, the
Bankruptcy Court entered an order approving, and authorizing the Debtors to make payments
under, Debtors' Employee Compensation Program, in an amount not to exceed $750,000, from
sums allocated in the Wind Down Budget, for employees who are not covered by the KERP and
the KESP but who are not being hired by the purchasers of the Debtors' assets (the "Severance
Pay Order").  Notwithstanding the Severance Pay Order, the Debtors have agreed that until
sufficient excess funds have been identified in the Wind Down Budget, the Debtors would not
distribute not more than $500,000 of the $750,000 that was identified as "Employee Benefits"
unrelated to Sales in the Wind Down Budget, so that the remaining $250,000 of such $750,000
would be applied to the $500,000 of Reallocated Monies.  The Debtors have identified sufficient
additional unused funds related to wind down costs unrelated to Sales (as set forth in the Wind
Down Budget) thus, the Creditors' Committee, Wachovia and U S. Bank have consented to and
agreed, absent any errors with respect to identified recipients and the calculation of applicable
amounts, not to raise any objection to, the Debtors making severance payments not to exceed
$750,000 in accordance with the Severance Pay Order.

15

6.    **SETTLEMENT EFFECTIVE DATE.** Subject to Paragraph 7 herein, the date this Settlement Agreement shall become effective and shall be binding upon and inure to the benefit of all the Senior Lenders, the Agent, the Debtors, the Creditors' Committee, Wachovia and U.S. Bank (the "Settlement Effective Date") shall be the earlier of (i) the date on which the Bankruptcy Court enters a final and non-appealable order approving this Settlement Agreement if the Settlement Agreement is executed by or on behalf of all of the Senior Lenders, or (ii) the date on which the Bankruptcy Court enters a final and non-appealable order confirming a plan of liquidation proposed by the Debtors which incorporates the terms of and is otherwise consistent with this Settlement Agreement and is in form and substance reasonably acceptable to the Creditors' Committee, Wachovia, U S. Bank, the Debtors and the Agent ("Plan"). Notwithstanding the prior occurrence of the Settlement Effective Date, no holder of the 12% Senior Subordinated Notes or the 14% Senior Discount Notes shall be bound by or entitled to the benefit of this Settlement Agreement until such holder shall have provided (or be deemed to have provided) the release set forth in Paragraph 4B. For the avoidance of doubt, upon the Settlement Effective Date, the obligations of the Agent and the Senior Lenders, whether under this Settlement Agreement or otherwise, to the Debtors and the other signatories to this Settlement Agreement shall be limited to their consent to the reallocation of the Contributed Assets in accordance with and subject to the terms and conditions of this Settlement Agreement, the obligations under the Cash Collateral Order in respect of the Carve Out and the Wind Down Budget, the continuing confidentiality obligations under the Credit Agreement and, to the extent the Agent and the Debtors may mutually agree, to the continuation of the existing cash management system with the Agent. For the further avoidance of doubt, the allowance of the Senior Lenders' liens and claims, as set forth in Paragraph 1, the treatment of the Allowed Senior

A - 22

16

Lenders' Claims, as set forth in Paragraph 2, the releases of the Senior Lenders set forth in Paragraph 4 and the reallocation of the Contributed Assets set forth in Paragraph 3 shall be final and irrevocable upon the Settlement Effective Date, without regard to whether the Debtors effectuate a Plan or whether (or in what manner) the distributions contemplated herein for Unsecured Creditors are effected.

7.    **SETTLEMENT TERMINATION EVENT.** A Settlement Termination Event shall be the earliest to occur of the following, provided that the Settlement Effective Date shall not previously have occurred: (i) May 14, 2003, (x) if this Settlement Agreement has not been executed by or on behalf of the Creditors' Committee, the Debtors, Wachovia, U.S. Bank and holders of not less than two-thirds (2/3) in amount and over one-half (1/2) in number of the holders of the Senior Lenders' claims, or (y) a motion for approval of this executed Settlement Agreement ("Settlement Motion") has not been filed with the court; (ii) ~~June 15~~ *June 30,* 2003, if a final and non-appealable order approving the Settlement Motion has not been entered by the Bankruptcy Court and become final; (iii) ~~May 30~~ *May 30,* 2003, if the Plan and disclosure statement have not been filed with the Court; and (iv) ~~August 15~~ *September 30,* 2003, if a final and non-appealable confirmation order has not been entered in respect of such Plan. In the event of the occurrence of a Settlement Termination Event for any reason, including the failure to confirm the Plan due to the insufficiency of estate funds to pay administrative or priority claims under a Plan, the Settlement Agreement shall be deemed withdrawn and shall be null and void and of no further force and effect, and the parties shall be restored to their respective rights as if the Settlement Agreement had not been executed, except that (i) the Bar Date Amendment (as defined in Paragraph 9(a) below) shall survive the occurrence of any subsequent Settlement Termination

17

Event and (ii) provided that this Settlement Agreement is approved by order of the Bankruptcy Court, the provisions of Paragraph 8 of this Settlement Agreement shall survive the occurrence of any subsequent Settlement Termination Event.

8.    **WITHDRAWAL OF TRUSTEE MOTION.** Upon the entry of a final order approving this Settlement Agreement, the Creditors' Committee will withdraw its Trustee Motion and such withdrawal shall be with prejudice to the filing by the Creditors' Committee of any future motion seeking the same or similar relief on substantially the same factual grounds, provided that nothing in this Paragraph 8 shall limit the Creditors' Committee's right to file a motion for appointment of a chapter 11 trustee or examiner based on events or facts occurring after the date of this Settlement Agreement. Wachovia and U.S. Bank likewise agree not to file any further motion(s) seeking similar relief on substantially the same factual grounds as are set forth in the Trustee Motion, but shall retain the right to file a motion for appointment of a chapter 11 trustee or examiner based on events or facts occurring after the date of this Settlement Agreement.

9.    **AMENDMENTS OF OTHER ORDERS.** A. The Cash Collateral Order shall be amended (or deemed amended as of the Settlement Effective Date) to the extent necessary to implement the provisions of Paragraphs 3A(iv) and 5 herein.

B.    Except as expressly amended hereby, the provisions of the Cash Collateral Order shall continue in full force and effect and shall not be deemed altered or affected in any way by this Settlement Agreement.

18

10.  **SUBSTANTIVE CONSOLIDATION/CREDITORS' TRUST.** The

Plan shall provide for the substantive consolidation of the Debtors' estates for purposes of Plan

distributions. The Plan shall also provide for the creation and implementation of a Creditors'

Trust for the benefit of Unsecured Creditors of the Debtors, which would be funded with the

proceeds of the Contributed Assets received under Paragraph 3A(iii) and the Avoidance Actions

and the Creditors' Trust shall pursue all claims, actions and causes of action that have been or

could be asserted by the Debtors or their estates, including Avoidance Actions, other than the

claims specifically released under this Settlement Agreement.

11.  **MONITORING/ADMINISTRATION/SUPPORT.** All parties to this

Settlement Agreement shall be entitled to a monthly written accounting and status report from

the Debtors or such other legal entity as may be administering the estate or the implementation of

this Settlement Agreement, which shall include an accounting of all asset dispositions,

distributions, cash and other assets in which the estate has an interest and such other information

as may be necessary or desirable in order to monitor the implementation of this Settlement

Agreement. Representatives of the Parties shall continue to be provided reasonable access to the

entity administering the estate and the implementation of this Settlement Agreement, and the

books, records and other relevant information in order to further monitor the implementation of

this Settlement Agreement. The Parties shall use their reasonable best efforts and endeavor in

good faith to implement, and conclude, as expeditiously and cost effectively as possible, the

Settlement Agreement through a Plan or otherwise. The Chapter 11 Cases shall not be dismissed

or converted to a case under Chapter 7 of the Bankruptcy Code unless and until procedures

reasonably acceptable to the Parties hereto have been adopted to carry out the provisions of this