DLJ's own benefit, at the expense of the Debtors and their unsecured creditors, in many ways, including:

(a)     obtaining more than 70% of the equity of the Debtors in 1998 and increasing DLJ's equity holdings in Insilco;

(b)     installing DLJ affiliates in a host of fee-generating positions, including Insilco's financial advisor, banker, lender, lead arranger and syndication agent;

(c)     designating a majority of the members of Insilco's Board of Directors, naming four of seven Directors by 1999 and subsequently adding a fifth DLJ insider as Director in 2000;

(d)     inducing Insilco to enter into numerous insider transactions to the detriment of the Debtors, their estates and Insilco's unsecured creditors;

(e)     requiring Insilco to retain hand-picked consultants to deliver services intended to further DLJ's aims to the extreme prejudice of the Debtors, their estates and Insilco's unsecured creditors; and

(f)     delaying improperly the filing of insolvency petitions, deepening the Debtors' insolvency and compounding the losses sustained by the Debtors, their estates and the unsecured creditors.

**The Term-C Loans Violate The 12% Note Indenture**

9.     The Debtors issued 12% Senior Subordinated Notes due 2007 in the principal amount of up to $150,000,000 ("Senior Subordinated Notes") under the 12% Note Indenture.

10.     The Term-C Loans were, as is discussed more fully below, in direct violation of the terms of the 12% Note Indenture.

11.     The Claims must be reclassified or subordinated as the Term-C Loans violate the 12% Note Indenture. The anti-layering provision of the 12% Note Indenture (Section 10.10,

4

"Limitation on Layered Debt") prohibited the issuance of debt that was subordinate to Senior

Debt (under the Credit Agreement) but was senior in right of payment to the 12% Senior Notes.

Yet this is precisely what Insilco and DLJ attempted to accomplish under the Term-C Loan. For

this reason alone, the Claims are subject to subordination, reclassification, and, to the extent

permitted under the Plan, set off and netting of claims.

**DLJ's Leveraged Recapitalized Acquisition Of Insilco**

      12.    In late 1997 or early 1998, members of DLJ Merchant Banking Partners II

("DLJMB") identified Insilco as an attractive equity investment. DLJMB believed that Insilco's

shares were under-valued because Insilco had limited research coverage, diverse business

segments and complex financial statements, which DLJMB believed did not adequately capture

the value of Insilco's businesses.

      13.    DLJ and its affiliates acquired control of the Debtors in 1998. DLJMB employed

a bet-the-company strategy involving a leveraged recapitalization financed almost entirely by

credit facilities that were initially funded and syndicated by another DLJ entity, DLJ Capital

Funding, Inc. ("DLJ Capital"). This gambit saddled the Debtors with an overwhelming and

crushing debt load from which Insilco never recovered. Using this highly-leveraged transaction,

DLJ acquired more than 70% of the equity of the Debtors, which were valued at over $471

million, while only contributing $43 million of DLJ's own capital.

      14.    At the time, Insilco had three primary operating divisions, which were operated

independently:

      (a)    The Automotive Businesses, global manufactured specialized automotive

components businesses;

      (b)    Taylor Publishing Company, which was engaged primarily in the contract

design and printing of student yearbooks; and

5

(c)     The Technologies Segments, which consisted of four sub-units that manufactured telecommunications and electrical component products for computer networking, telephone digital switching, premises wiring, mainframe computer, automotive and medical equipment markets.

15.     DLJ acquired Insilco in order to leverage Insilco through an unprecedented "aggressive acquisition program" under which DLJ would sell off Insilco's "non-core businesses" and prepare Insilco for a successful public offering. Specifically, DLJ sought to increase Insilco's technology segments by acquiring their market competitors and also increase Insilco's valuable "heat exchanger" segment of the Automotive Businesses.

16.     DLJ did not plan to pay cash for Insilco. To the contrary, DLJ sought to acquire Insilco by using a combination of (a) assumption of debt, (b) high-yield issuances, (c) senior debt, and (d) new equity. In all, DLJ risked only $43 million of its own capital to acquire control over a company it valued at more than ten times that amount.

17.     "Leveraged recapitalization" is a tactic whereby a company borrows 80% - 90% of the market value of its common stock and then distributes the funds to its shareholders either as a special dividend or a share repurchase. The debt financing the leverage is often secured by substantially all of the borrower's assets. The strategy is highly dependent upon management having confidence in the future prospects of the company. The tactic is so risky that it is popularly known as "shark repellant" in the securities business.

18.     Insilco and DLJMB agreed to terms and announced the merger agreement on or about March 24, 1998.

19.     The merger closed on August 17, 1998. Insilco announced DLJ's acquisition of Insilco as a "major reorganization." The merger resulted through a complex two-step process.

6

Insilco Holding Co. ("Holdings") first became the parent of the Company (in order to avoid violating certain covenants in the Company's senior subordinated notes) and then merged it with a DLJMB portfolio company called Silkworm Acquisition Corp. ("Silkworm"). Shareholders would receive approximately $44.50 per share in the form of 97% cash consideration and the 3% balance payable in "stub equity" in the reorganized entity. Each share of the Holdings common stock was then converted into the right to receive $43.47 in cash and 0.03378 of a share of Holdings common stock.

    20.    After the reorganization, DLJ and its affiliates owned approximately 70% of the Company while 399 Venture Partners, Inc., an affiliate of CVC, acquired approximately 19.3%. Insilco's prior shareholders and its management retained the remaining 10% "equity stub."

    21.    DLJ required approximately $204.4 million to consummate the merger. DLJ also incurred approximately $25,529,000 in merger and recapitalization costs.

    22.    DLJ financed its acquisition using:

    (a)    Gross proceeds of approximately $70.2 million from the issuance by Silkworm of the units (which were covered into units of Insilco in the merger), each unit consisting of $1,000 principal amount at maturity of 14% Senior Discount Notes due 2008 and one warrant to purchase 0.325 of a share of Insilco common stock at an exercise price of $0.01 per share;

    (b)    $56.1 million in net proceeds from the sale of 1,245,138 shares of Silkworm common stock (which were converted into Holdings common stock in the merger) to DLJMB Funds, CVC and certain members of Insilco's management;

7

(c)     $35 million in proceeds from the sale of certain DLJMB Funds of 1,400,000 shares of Insilco's payment-in-kind ("PIK") preferred stock and warrants to purchase 65,603 shares of Insilco's common stock at an exercise price of $0.001 per share; and

(d)     Approximately $43.1 million borrowed from Insilco's then-existing credit facility.

## DLJ Received Extraordinarily High Fees From Insilco

23.     DLJ not only acquired control of a $471 million company for $43 million, but also received enormous fees from Insilco.  DLJ received in excess of $8.7 million in banking and underwriting fees in 1999 alone, including a $3.5 million "merger advisory fee."  DLJ received at least $15 million in fees from Insilco from 1998 to 2002.

24.     DLJ also required the Debtors to employ DLJ as Insilco's financial advisor, underwriter, Syndication Agent, Lead Arranger and Lender.  DLJ abused Insilco by requiring or forcing Insilco to buy or sell eight (8) different businesses and amend its credit agreements three times since August 1998, generating substantial fees for DLJ attendant to each transaction, and numerous other benefits to DLJ, as discussed more fully below.

## DLJ Installed Insiders On Insilco's Board

25.     Since its acquisition in 1998, DLJ has controlled and dominated the Debtors' ownership and management in part by installing its designees as a majority of the Debtors' Board of Directors.  By 1999, DLJ installed DLJ insiders as four of the seven Insilco Directors (the DLJ insiders were William F. Dawson, Jr., Thompson Dean, John F. Fort, III, and Keith Palumbo).  The proxy admitted that Mr. Dawson, Mr. Dean and Mr. Palumbo were DLJ insiders but failed to disclose that Mr. Fort was also an insider and affiliate of DLJ.  The remaining directors were Randall E. Curran (Chairman of the Board of Thermadyne Holdings, one of

8

Insilco's automotive divisions), Insilco's CEO David Kauer and David Y. Howe, a vice president of Insilco's minority shareholder, a Citibank affiliate.

**DLJ Caused Precarious Financial Condition At Insilco**

26.     DLJ's leveraged recapitalization strategy caused immediate and irreversible harm to Insilco's financial condition. For example, the merger with DLJ forced Insilco to refinance its 10.25% Senior Subordinated Notes. Thus, on November 9, 1998, Insilco retained DLJ Securities to underwrite the sale of $120 million of 12% Senior Subordinated Notes, due in 2007 and governed by the 12% Note Indenture. The Senior Subordinated Notes had warrants for the purchase of 62,400 shares of Insilco common stock at $45 per share. The sale generated $116.4 million for Insilco and another $3.6 million in fees for DLJ. The $116 million was, however, insufficient to entirely pay off the 10.25% Senior Subordinated Notes and Insilco had to borrow an additional $30 million from its credit facilities.

27.     The merger left Insilco without sufficient working capital to continue its operations. On November 24, 1998 Insilco amended and restated its then-existing bank credit agreement to, among other things, add an additional $100 million to its credit facility. Previously Insilco had one $200 million revolving credit line. Insilco restructured its new credit facility with a two-tier $300 million credit facility:  a $175 million, 4.8 year senior secured revolving loan (which replaced the prior $200 million facility) and a new $125 million "term" loan.

28.     As with Insilco's prior bank credit agreements, the new credit facility was secured by a first-priority perfected lien on substantially all of Insilco's assets, including a pledge of the stock of Insilco's domestic subsidiaries.

29.     However, Insilco's pledge and security agreement excluded Insilco's real property leaseholds, certain general intangibles, and the capital stock of substantially all of Insilco's

9

foreign subsidiaries in excess of 65% thereof. Upon information and belief, Insilco did not pledge the remaining 35% of its foreign subsidiaries as collateral in order to avoid triggering Section 7701(a)(30) of the Internal Revenue Code, which would cause Insilco to incur a major tax liability.

30.    Following DLJ's acquisition of Insilco and the 1998 amendments to Insilco's credit agreements, DLJ implemented an aggressive and unwarranted growth strategy. In January 1999, DLJ used a portion of the funds from the new $300 million credit facility to purchase two new divisions: Eyelets for Industry, Inc. ("Eyelets") and its subsidiary EFI Metal Forming, Inc., a foreign wire harness and cable assembly business based in Northern Ireland.

31.    DLJ caused Insilco to begin preparations to sell Taylor Publishing, and one segment of its Automotive Businesses named Steel Parts. In April 1999, Insilco's Board of Directors held a meeting at DLJ's Park Avenue, New York, New York offices where they engaged DLJ Securities as Insilco's exclusive financial advisor to sell Taylor Publishing. The Board had previously engaged DLJ Securities as its financial advisor for the divestiture of Steel Parts. In consideration for DLJ Securities' assistance, Insilco agreed to pay a $100,000 retainer fee, a $250,000 fee for an opinion letter, and a transaction fee equal to 1¼% of the aggregate consideration sale price up to $75 million, 3% of the aggregate between $75 million and $85 million, and 5% in excess of $85 million.

32.    Meanwhile on June 25, 1999 Insilco announced that its CEO Robert Smialek was resigning and would be replaced by CFO David Kauer. Insilco announced a series of moves to "reduce the Company's staff and accelerate its planned divestiture of certain non-core businesses" that were characterized as "part of [Insilco's] corporate-wide initiative to focus resources at key business units." Concurrently, Insilco announced that John F. Fort, III was

10

named "non executive Chairman of the Board." Mr. Fort, who already was an Insilco Board member, was also a member of DLJ Merchant Banking Advisory Group (Mr. Fort was also a director of several other companies, including Tyco International, where he was formerly the chairman and CEO).

33.    At year-end 1999, Insilco had in excess of $430 million in total liabilities, $401 million of which was designated as long-term debt, against $280 million in total assets.

**DLJ's Self-Interested Transactions**

34.    DLJ caused or forced Insilco to complete numerous transactions with DLJ insiders or DLJ-related entities that stripped Insilco of valuable assets without either providing fair value in return or any sound business reason supporting such transactions. Specifically, DLJ delivered the Insilco subsidiary Taylor Publishing to a DLJ insider. DLJ caused the sale of Taylor Publishing to Castle Harlan Partners III, L.P. ("CHP"), which was an insider transaction because one of CHP's principals was John K. Castle, DLJ's former president and CEO.

35.    Despite – or because of – the fact that DLJ dominated and controlled Insilco's Board of Directors, was acting as advisor to the board, and had affiliates on the other side of the transaction, DLJ caused the Insilco Board of Directors to reach the incredible and disingenuous determination that the Taylor Publishing divestiture was in the best interest of the Company and were on terms that were no less favorable than what the Company could have obtained in the open market. The Taylor Publishing sale closed on February 11, 2000. Insilco used the $9.48 million in proceeds to reduce its credit facility debt.

36.    While Insilco's Board of Directors believed at one point that it had identified a buyer who offered to pay $80 million for Insilco's Steel Parts division, such a deal was never consummated.

11

37.    DLJ employed its control of Insilco and its Board of Directors to cause Insilco to acquire T.A.T. Technologies ("TAT"), a Canadian wire and cable assembly operation based in Quebec, whose sole principal customer was a nearby Nortel Network facility. Insilco's initial offering price was $67.4 million. However, TAT's Board subsequently demanded that Insilco increase its offer and Insilco did so. Insilco ultimately agreed to pay $102.1 million to finance the acquisition of TAT. To complete the transaction, the consent of the Lenders was required. Before granting their consent, Insilco's Lenders requested that TAT be added as a listed borrower to Insilco's Credit Agreement (thus giving the Lenders a 100% security interest in TAT's Canadian shares and assets). Approximately one week after the Taylor Publishing sale closed, on or about February 16, 2000, Insilco, TAT and Insilco's Lenders executed the "First Amendment to the Amended and Restated Credit Agreement" and the TAT acquisition was finalized.

38.    DLJ further exercised its domination and control over Insilco's affairs in 2000. On April 26, 2000, Insilco's DLJ-dominated Board determined that a straight cash sale for the Automotive Businesses, accompanied by another restructuring Insilco's debt, would yield the greatest value for DLJ. DLJ caused Insilco to seek to sell its Automotive Businesses in another insider sale. Insilco sold the profitable Automotive Businesses to ThermaSys Holdings, which was owned by DLJ affiliates, for approximately $147 million in cash.

39.    The Insilco Board purported to recognize a serious conflict of interest affecting the proposed sale of Insilco's Automotive Businesses to affiliates of DLJ. The Insilco Board purported to address the conflict by retaining McDonald Investments, Inc. ("McDonald"), a subsidiary Key Corp. (with whom DLJ had an underwriting relationship), to provide a fairness opinion.

40.    The Insilco Board established a "special committee" comprised one director, James E. Ashton, to review, negotiate and approve the sale of the Automotive Businesses to DLJ affiliates. In a self-serving resolution, the Insilco Board represented that Mr. Ashton was "completely disinterested in the Proposed Transactions and [had] no financial interest in common with the proponents of the Proposed Transactions."

41.    Prior to the meeting at which the Insilco Board was expected to ratify the sale of Insilco's Automotive Businesses to the DLJ-led purchasing group, board member Randall Curran, who formerly headed elements of Insilco's Automotive Businesses, resigned his seat and was replaced by another DLJ insider, George A. Peinado. DLJ thus installed DLJ insiders as five of the seven Insilco Directors.

42.    On or about July 14, 2000, Mr. Ashton, as the sole "independent" special committee member, approved the terms of Insilco's agreement to sell the Automotive Businesses to the DLJ venture ThermaSys. Insilco's Board then ratified Mr. Ashton's decision and authorized the sale. The purportedly "independent" Mr. Ashton was soon installed as the chairman of the ThermaSys board of directors.

43.    On July 20, 2000, McDonald provided the special committee with an opinion letter stating that DLJ's $147 million offer for the Automotive Businesses was "fair, from a financial point of view" to Insilco.

44.    In addition, DLJ caused Insilco to agree to acquire another cable and wire assembly manufacturer, Precision Cable Manufacturing and its Mexican subsidiaries ("PCM"). The acquisition was financed through another restructuring of Insilco's credit facility.

45.    DLJ used its insider and control status to generate additional fees and expose Insilco to three major transactions, all scheduled to close on August 25, 2000: (a) the sale of the

13

Automotive Businesses to ThermaSys, (b) Insilco's purchase of PCM, and (c) a major refinancing of Insilco's credit facility.

46.    Insilco completed its transactions on August 25, 2000 when it executed the Second Amended and Restated Credit Agreement dated as of August 25, 2000, as thereafter amended from time to time, among Insilco Technologies and TAT Technologies Inc., as Borrowers, U.S. Bank, N.A., as Administrative Agent, DLJ Capital Funding, Inc. as Lead Arranger and Syndication Agent, TransAmerica Business Credit Corporation and LaSalle National Bank, as co-Documentation Agents, and the various financial institutions party thereto (the "Credit Agreement"). Significantly, DLJ installed an affiliate, DLJ Capital, as Lead Arranger and Syndication Agent under the Credit Agreement.

47.    The Credit Agreement provided for three credit facilities: (a) a $50 million, 6-year senior secured revolving loan (the "Revolver"), (b) a $35 million, 6-year senior secured amortizing term-A loan (the "Term-A Facility"), and (c) a $125 million, 7-year senior secured amortizing term-B loan (the "Term-B Facility"). The Revolver matured on the sixth anniversary of the Credit Agreement. But there were no mandatory prepayments. However, the term loan facilities did have mandatory quarterly prepayments. The Term-A Facility required quarterly prepayments in each of its six years, beginning with December 2000, as follows: $875,000 for the first two years, $1,312,500 for the third year, $1,750,000 for the fourth and fifth years and $2,187,500 for the final year. The Term-B Facility required quarterly prepayments of $312,500 for the first six years and quarterly prepayments of $29.4 million in the seventh year.

48.    Upon information and belief, DLJ subsequently syndicated and/or assigned its interest in the revolving facility and Term-A and Term-B Facilities to various lenders. DLJ continued to solicit potential lenders to invest in Insilco high-yield secured credit facilities. DLJ

14

(now known as Credit Suisse First Boston ("CSFB")) held a "high-yield conference" in January 2001 to sell the financing. DLJ tried to present Insilco's financials in the best possible light despite the fact that the market was already turning against Insilco.

49.    In 2000, DLJ Capital received $5.3 million in fees for its efforts as Lead Arranger and Syndication Agent for the Credit Agreement. Insilco paid an additional $1.4 million to DLJ in fees for its retainer and advisory functions in 2000, raising DLJ's total fee income to at least $6.7 million in 2000.

50.    As of December 31, 2000, Insilco's working capital was half of its level from the previous year (from approximately $150 million to approximately $75 million), while its long-term debt remained a staggering $380,160,000 against $356,888,000 in total assets.

51.    On January 10, 2001, Insilco completed its last major acquisition when it acquired the stock of InNet Technologies, Inc., a California-based designer, manufacturer and seller of magnetic components for use in networking and telecommunication industries and its Hong Kong subsidiary for a gross purchase price of $44.9 million. Insilco used cash and all remaining funds under the Term-B Facility to finance the purchase.

**Insilco Defaulted On The Credit Agreement In 2001**

52.    As 2000 drew to a close, Insilco's Board recognized that Insilco was in dire financial straits. At a February, 2001 board meeting held in DLJ's offices, David Kauer, Insilco's CEO, reported that Insilco was feeling the effects of a general downturn in the economy and most sharply in the telecommunication industry. Insilco's largest customers were experiencing their own slow downs and it was reflected in quickly diminishing orders.

53.    Insilco came closer to financial collapse in the second quarter 2001, when Insilco's major customers further reduced their order forecast and canceled previous-placed orders.

15

54.    Insilco was forced to reevaluate the value of its goodwill assets. On June 30, 2001, Insilco wrote down more than $97 million in goodwill. Six months later it would write down an additional $50 million.

55.    Insilco was able to avoid defaulting on its loan covenants in the first quarter of 2001; it violated its loan covenants in the second quarter of 2001. As of June 30, 2001, Insilco was insolvent and in violation of the loan covenants under the Credit Agreement.

**The Term-C "Loan"**

56.    As noted above, the Credit Agreement originally provided for a Term-A Facility and a Term-B Facility. As also noted above, Insilco was in violation of the Credit Agreement as of June 30, 2001.

57.    By August 6, 2001, when Insilco held a Board meeting, the Lenders requested that Insilco produce additional cash to postpone enforcement of the Credit Agreement. During the initial negotiations, upon information and belief, the Lenders requested that DLJ contribute additional equity capital. Initially, DLJ was going to contribute such funds as equity capital. Thereafter, after internal discussions at DLJ, DLJ determined to attempt to advance the funds so that the funds may be characterized as debt rather than equity.

58.    Eventually, the Lenders agreed to waive Insilco's defaults provided that Insilco's majority equity holders, DLJ (and CVC), make a "cash infusion" of $15 million, junior and subordinate to the claims of the Lenders.

59.    The $15 million cash infusion by DLJ was risk capital and an "investment." Insilco also agreed to amend certain negative covenants in the Credit Agreement.

60.    On August 15, 2001, Insilco and DLJ agreed to the terms of the Credit Agreement as amended and restated effective June 30, 2001.

16

61.    Under the Credit Agreement as amended, DLJ agreed to make an equity investment, under the guise of a "loan" pursuant to section 2.1.6 of the Credit Agreement (the "Term-C"). The Term-C Lenders were the Claimants herein – DLJ Merchant Banking Partners II-A, L.P., DLJ Offshore Partners II, C.V., DLJ Diversified Partners, L.P., DLJ Diversified Partners-A, L.P., DLJ EAB Partners, L.P., DLJ Millenium Partners, L.P., DLJ ESC II, L.P., DLJ Millenium Partners-A, L.P., and MBP II Plan Investors, L.P., and their respective successors and assigns. Pursuant to this "investment," DLJ received warrants to purchase approximately 60,000 shares of Insilco's common stock at $0.01 per share, which would, upon exercise, constitute approximately 38% of Insilco's then-outstanding common stock. Insilco used the $15 million cash infusion to shore up Insilco's cash balances and meet its other loan covenants under the Credit Agreement.

62.    The Term-C Loan was part of the Pre-Petition Facility but was, by its terms, an unsecured obligation not entitled to the benefit of the liens granted to the Lenders.

63.    Claimants attempted to camouflage their risk investments in the Debtors as loans to avoid the fate of equity holders in bankruptcy.

64.    Insilco's Board reported in the minutes of its August 14, 2001 meeting that it obtained a fairness opinion from the firm Houlihan Lokey Howard & Zukem Financial Advisors, Inc., which provided that (a) transaction was "fair" to Insilco's outstanding 14% Senior Discount Noteholders, (b) the dilution that Insilco could suffer as a result of the transactions was "fair" to Insilco, and (c) the terms which Insilco received in this transaction were no less favorable than what Insilco could have "obtained in a comparable arm's length transaction with an unaffiliated entity."

17

65.    The Lenders received an agreement from Insilco to reduce the required commitment for the Revolver from $50 million to $44 million. Insilco also agreed to add unencumbered real property with a value in excess of $2 million as collateral.

66.    Upon information and belief, DLJ knew, or should have known, that the $15 million cash infusion was ineffective to rescue Insilco from its insolvency. The purpose and effect of the $15 million "investment" was merely to prolong and deepen the period of insolvency prior to the filing of insolvency petitions to permit DLJ to attempt to improperly elevate its interests above Insilco's unsecured creditors.

**DLJ Delayed The Filing Of Insolvency Petitions**

67.    Throughout 2001 and 2002, upon information and belief, DLJ refused to allow Insilco to file insolvency petitions. Upon information and belief, beginning on or before June 2001, DLJ knew that Insilco could not survive in its current form. Bankruptcy was a foregone conclusion. DLJ coerced Insilco into numerous transactions that deepened Insilco's insolvency. DLJ intended to allow itself to elevate its claims at the expense of the unsecured creditors of Insilco.

68.    On November 7, 2001 Insilco agreed to provide the Lenders additional collateral in the form of an interest in the "Star Services" litigation. On November 13, 2001 Insilco reported that its insolvency worsened, as third quarter sales totaled $56.5 million compared with $114.2 million in 2000.

69.    By January 2002, Insilco's Board already had determined that the combination of the declining economy and Insilco's highly-leveraged position seriously threatened Insilco's ability to continue as a going concern. DLJ, thus, decided to force the sale of the Debtors. But upon information and belief, DLJ was fearful that its status as an insider and affiliate of the Debtors would result in the avoidance of its liens and claims. Moreover, DLJ exercised its

18

dominance over Insilco to manipulate Insilco's assets sale process and the timing of the Debtors'
insolvency petitions to ensure that DLJ, alone among all of the Debtors' creditors, would benefit
from the remaining assets of the Debtors.

70.    Despite its ongoing insolvency, on March 5, 2002 the Insilco Board adopted a
resolution authorizing Insilco to pay two CSFB invoices for "work performed or payments made
by CSFB on behalf of [Insilco]" totaling $575,000 as "valid operating expenses" of Insilco.
None of the DLJ/CSFB directors abstained from the vote. Significantly, the amount of $362,500
of CSFB's invoices was for "annual retainer fees" for services rendered by CSFB to Insilco in
2001 and in advance for the period from January 2002 to September 2002.

71.    At that time, Insilco was in default pursuant to the 12% Notes and, because of
cross-default covenants, Insilco was also in default of the Credit Agreement.

72.    In addition, on March 31, 2002, Insilco failed to meet the EBITDA covenant
under the Credit Agreement and was "operating in default" on its Credit Agreement and its 12%
Notes. Insilco reported in its public filing that as a result of these defaults, the debt under the
Credit Agreement, 12% Notes and 14% Senior Discount Notes was classified as "current."

73.    Despite the fact that Insilco was clearly insolvent and that its Board clearly owed
fiduciary duties to all of its creditors, DLJ exercised dominion and control over Insilco in order
to enhance DLJ's position to the detriment of unsecured creditors. DLJ was exposed to
potentially significant liability to the Lenders arising from DLJ's conflicted positions as majority
equity holder, financial advisor, lender, syndication agent and lead arranger for Insilco. Upon
information and belief, despite the fiduciary duties owed by Insilco's Directors to all of Insilco's
unsecured creditors, DLJ required its appointees (who controlled the Board) to maximize the
recovery of DLJ and the Lenders at the expense of Insilco's other creditors.

74.    At the April 24, 2002 teleconference meeting of Insilco's Board, David Kauer, Insilco's CEO, placed "highest priority on a quick sale of the Company, as a whole or in separate transactions." DLJ sought to arrange for the sale of the Company to take place within a Chapter 11 bankruptcy proceeding, which it wanted filed after receipt of letters of intent from proposed buyers but prior to the time that the transactions were consummated. DLJ directed that Insilco obtain the letters of intent by June 2002.

75.    DLJ further exercised dominion and control over Insilco by demanding that Insilco continue to delay the filing of insolvency petitions as directed by DLJ. Insilco also negotiated a "Forbearance Agreement" with the Lenders. The Lenders agreed not to accelerate their loans or take enforcement actions on their liens during the term of the forbearance. DLJ premised the transactions on the basis that Insilco would refrain from initiating insolvency proceedings. The April 24, 2002 Board minutes indicate that Insilco's Board gave little or no consideration to strategic alternatives and simply agreed to the Forbearance Agreement with the Lenders at the direction of DLJ and the DLJ-controlled Directors.

76.    The interests of unsecured creditors were sacrificed in connection with the Forbearance Agreement, as DLJ improperly delayed the filing of insolvency petitions. The Lenders also obtained a pledge of the remaining 35% of Insilco's foreign subsidiaries. This pledge caused Insilco to incur an approximately $8 million tax liability. Insilco continued to default on its Credit Agreement, failing to make its $7.2 million payment as required on August 15, 2002 on the 12% Note and failing to meet other covenants under the Credit Agreement for June 30, 2002 and September 30, 2002. As noted above, the Debtors filed their insolvency petitions on December 16, 2002.

77.     The Debtors, their estates and the unsecured creditors have been harmed as a direct result of the inequitable and improper conduct of DLJ.

### Relief Requested Herein

78.     The Committee seeks an order of this Court under applicable law subordinating the Claims, in whole or in part or, in the alternative, reclassifying the Claims filed by the Claimants, in whole or in part, and, to the extent permitted under the Plan, allowing set off or netting of claims.

### Reservation of Rights

79.     The Committee reserves its right to supplement, modify or make additional objections to any of the Claims objected to in this Objection on any other available ground, or to assert any other claims against the Claimants in this or any other proceedings.

### Notice

80.     The Committee will give notice of this Objection pursuant to Rule 3007 of the Federal Rules of Bankruptcy Procedure.

### Compliance with Local Bankruptcy Rule 3007-1

81.     This Objection complies with Local Bankruptcy Rule 3007-1 of this Court.

21

## Conclusion

WHEREFORE, the Committee respectfully requests that the Court enter an order

subordinating, in whole or in part or, in the alternative, reclassifying the Claims filed by the

Claimants, in whole or in part, and allowing set off or netting of claims to the extent permitted

under the Plan, and granting the Committee such further relief as is proper.

Dated:    Wilmington, Delaware
          June 9, 2004

Respectfully submitted,

ARENT FOX PLLC
Andrew I. Silfen
Schuyler G. Carroll
1675 Broadway
New York, NY 10019
(212) 484-3900

-and-

DRINKER BIDDLE & REATH LLP

*/s/ David Primack*
David Primack
1100 North Market Street, Suite 1000
Wilmington, DE 19801
(302) 467-4200

Counsel for the Official Committee of
Unsecured Creditors

NYC/141599.11

22

A - 194

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| INSILCO TECHNOLOGIES, INC., *et al.*, | : | Case No. 02-13672 (KJC) |
|  | : |  |
| Debtors | : | (Jointly Administered) |
|  | : |  |

## NOTICE OF OBJECTION OF THE OFFICIAL COMMITTEE
## OF UNSECURED CREDITORS TO CLAIMS OF CLASS 7 CREDITORS

TO:    The Office of United States Trustee, the Debtors, each of the holders of claims listed on
Exhibit A to the Objection, and all other parties who have requested notice pursuant to
Rule 2002 of the Federal Rules of Bankruptcy Procedure.

The Official Committee of Unsecured Creditors (the "Objector") of Insilco

Technologies, Inc. *et al.*, by its attorneys, Arent Fox PLLC and Drinker Biddle & Reath LLP, has

filed its first omnibus (substantive) objection (the "Objection") to the claims of Class 7

Creditors, including MBP II Plan Investors, L.P., DLJ Offshore Partners II, C.V., DLJ Millenium

Partners-A, L.P., DLJ Millenium Partners, L.P., DLJ ESC II, L.P., DLJ EAB Partners, L.P., DLJ

Merchant Banking Partners II-A, L.P., DLJ Merchant Banking Partners II, L.P., DLJ Diversified

Partners, L.P., and DLJ Diversified Partners-A, L.P., Claim Nos. 607-616 (collectively, the

"Claims"). The reason is much detailed and is more fully described in the Objection.

You are required to file a response to the Objection on or before August 12, 2004 at 4:00

p.m.

At the same time, you must also serve a copy of the response upon counsel for the

Objector, Arent Fox PLLC, 1675 Broadway, New York, New York 10019 (Attention: Andrew I.

Silfen, Esq.) and Drinker Biddle & Reath LLP, 1100 North Market Street, Suite 1000,

Wilmington, DE 19801 (Attention: David Primack, Esq.).

HEARING ON THE OBJECTION WILL BE HELD ON AUGUST 19, 2004 AT 3:00

P.M.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF DEMANDED BY THE OBJECTION WITHOUT FURTHER NOTICE OF HEARING.

Dated:    Wilmington, Delaware          Respectfully submitted,
          June 9, 2004

                                         ARENT FOX PLLC
                                         Andrew I. Silfen
                                         Schuyler G. Carroll
                                         1675 Broadway
                                         New York, NY 10019
                                         (212) 484-3900

                                         -and-

                                         DRINKER BIDDLE & REATH LLP

                                         /s/ David Primack
                                         David Primack
                                         1100 North Market Street, Suite 1000
                                         Wilmington, DE 19801
                                         (302) 467-4200

                                         Counsel for the Official Committee of
                                         Unsecured Creditors

NYC/143540.1

2

A - 196

## EXHIBIT A

| NAME OF CLAIMANT | CLAIM NUMBER | CLAIM AMOUNT | REASON FOR PROPOSED OBJECTION[1] |
|---|---|---|---|
| MBP II Plan Investors, L.P. | 607 | $22,221,128.08 | Subordination/Reclassification/Set Off/Netting |
| DLJ Offshore Partners II, C.V. | 608 | $22,221,128.08 | Subordination/Reclassification/Set Off/Netting |
| DLJ Millenium Partners-A, L.P. | 609 | $22,221,128.08 | Subordination/Reclassification/Set Off/Netting |
| DLJ Millenium Partners, L.P. | 610 | $22,221,128.08 | Subordination/Reclassification/Set Off/Netting |
| DLJ ESC II, L.P. | 611 | $22,221,128.08 | Subordination/Reclassification/Set Off/Netting |
| DLJ EAB Partners, L.P. | 612 | $22,221,128.08 | Subordination/Reclassification/Set Off/Netting |
| DLJ Merchant Banking Partners II-A, L.P. | 613 | $22,221,128.08 | Subordination/Reclassification/Set Off/Netting |
| DLJ Merchant Banking Partners II, L.P. | 614 | $22,221,128.08 | Subordination/Reclassification/Set Off/Netting |
| DLJ Diversified Partners, L.P. | 615 | $22,221,128.08 | Subordination/Reclassification/Set Off/Netting |
| DLJ Diversified Partners-A, L.P. | 616 | $22,221,128.08 | Subordination/Reclassification/Set Off/Netting |

---

[1] The Official Committee of Unsecured Creditors (the "Committee") is seeking subordination of the Claims to other unsecured claims or, in the alternative, reclassification of the Claims as equity, and, to the extent permitted under the Plan, to allow the set off and netting of Claims, as is more fully set forth in the Objection.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| INSILCO TECHNOLOGIES, INC., *et al.*, | : | Case No. 02-13672 (KJC) |
|  | : |  |
| Debtors | : | (Jointly Administered) |
|  | : |  |

## ORDER GRANTING OBJECTION TO CLASS 7 CLAIMS

Upon consideration of the proofs of claim the Class 7 Creditors, including MBP II Plan Investors, L.P., DLJ Offshore Partners II, C.V., DLJ Millennium Partners-A, L.P., DLJ Millennium Partners, L.P., DLJ ESC II, L.P., DLJ EAB Partners, L.P., DLJ Merchant Banking Partners II-A, L.P., DLJ Merchant Banking Partners II, L.P., DLJ Diversified Partners, L.P., and DLJ Diversified Partners-A, L.P. (collectively, the "Claimants"), Claim Nos. 607-616 (collectively, the "Claims") along with all of the attachments, and the first omnibus (substantive) objection thereto by the Official Committee of Unsecured Creditors (the "Committee") of Insilco Technologies, Inc. *et al.*[1] (the "Debtors"), the Amended Joint Liquidating Plan Pursuant To Chapter 11 Of The United States Bankruptcy Code dated February 13, 2004 (as amended, the "Plan"),[2] and on the prior proceedings herein, it is hereby

ORDERED that the Allowed Claims, listed on Exhibit A to this Order, shall be and hereby are subordinated to all claims of Class 4 – General Unsecured Claims; and it is further

---

[1] The other debtors in these jointly administered Chapter 11 proceedings are Insilco Holding Co., InNet Technologies Inc., Insilco International Holdings, Inc., Precision Cable Mfg. Corporation, Eyelets for Industry, Inc., EFI Metal Forming, Inc., Stewart Stamping Corporation, Stewart Connector Systems, Inc., Signal Caribe, Inc. and Signal Transformer Co., Inc.

[2] All capitalized terms not defined herein shall have the meanings ascribed to them in the Amended Joint Liquidating Plan Pursuant To Chapter 11 Of The United States Bankruptcy Code dated February 13, 2004 (as amended, the "Plan").

ORDERED that the Allowed Claims, listed on Exhibit A to this Order, shall be and hereby are reclassified as Equity Interests and the Claimants shall recover in *pari passu* with the claims of Class 8 – Equity Interests; and it is further

ORDERED that, to the extent permitted under the Plan, set off and netting of the Allowed Claims, listed on Exhibit A to this Order, shall be permitted to an extent to be determined.

Dated:    Wilmington, Delaware

_____ __

_____
Kevin J. Carey
United States Bankruptcy Judge

2

A - 199

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| INSILCO TECHNOLOGIES, INC., *et al.*, | : | Case No. 02-13672 (KJC) |
| | : | |
| Debtors | : | (Jointly Administered) |
| | : | |

### CERTIFICATE OF SERVICE

I, Michelle Abraham, an employee of Drinker Biddle & Reath LLP, hereby certify that I caused a true and correct copy of the First Omnibus (Substantive) Objection of the Official Committee of Unsecured Creditors to Claims of Class 7 Creditors, including MBP II PLAN INVESTORS, L.P., DLJ OFFSHORE PARTNERS II, C.V., DLJ MILLENIUM PARTNERS-A, L.P., DLJ MILLENIUM PARTNERS, L.P., DLJ ESC II, L.P., DLJ EAB PARTNERS, L.P., DLJ MERCHANT BANKING PARTNERS II-A, L.P., DLJ MERCHANT BANKING PARTNERS II, L.P., DLJ DIVERSIFIED PARTNERS, L.P., AND DLJ DIVERSIFIED PARTNERS-A, L.P. (CLAIM NOS. 607-616) to be served on the attached service list. Parties located in Wilmington, DE were served Via Hand Delivery and all other parties were served Via United States Mail, first class, postage prepaid.

Michelle Abraham
Legal Secretary
Drinker Biddle & Reath LLP
1100 North Market Street, Suite 1000
Wilmington, Delaware 19801-1254
(302) 467-4200

A - 200