33

have accepted this Plan shall be deemed to have accepted this Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim.

Section 14.4. *Revocation or Withdrawal*

This Plan may be revoked or withdrawn by the Debtors prior to the Confirmation Date. If this Plan is revoked or withdrawn prior to the Confirmation Date, then this Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceedings involving the Debtors.

Section 14.5. *Injunction*

(a)    Except as otherwise expressly provided in this Plan, all Entities who have held, hold or may hold Claims or Interests are permanently enjoined, from and after the Effective Date, from: (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Interest against the Debtors, their estates, the Creditor Trust or the Trustees; (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, their estates, the Creditor Trust or the Trustees; and (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, their estates, the Creditor Trust or the Trustees against the property or interests in property of any of the foregoing Entities. Except with respect to the Released Claims, nothing contained in this Plan or the Confirmation Order shall prohibit or restrain the prosecution of any Claims or Rights of Action against the Debtors' present or former directors and officers or Holders of Equity Interests based on acts, events or omissions occurring before the Petition Date.

(b)    With respect to the matters within the scope of Section 13.1(q) herein, all Persons and Entities shall be and are permanently enjoined from commencing or continuing any such matter except in the Bankruptcy Court and the Bankruptcy Court shall retain exclusive jurisdiction over such matters.

Section 14.6. *Discharge*

Consistent with section 1141(d)(3) of the Bankruptcy Code, this Plan does not grant the Debtors a discharge. Notwithstanding the foregoing, except as otherwise provided herein, (1) the rights afforded in this Plan and the treatment of all Claims and Equity Interests shall be in exchange for and in complete satisfaction, discharge and release of such Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Creditor Trust and any of its assets or properties, and (2) all Persons and Entities shall be precluded from asserting against the Creditor Trust or any of its assets or properties any other or further Claims or Equity Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred before the Confirmation Date, except as otherwise provided in this Plan.

Section 14.7. *Indemnification*

The Creditor Trust shall indemnify and hold harmless (i) Trustees, (ii) Plan Oversight Committee, and (iii) all professionals retained by the Trustee or Plan Oversight Committee (collectively, the "Indemnified Parties"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Debtors or the implementation or administration of this Plan, if the Indemnified Parties acted

34

in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Debtors, and, with respect to any criminal action or proceeding, had no reasonable cause to believe its conduct was unlawful; provided, however, that the Unsecured Creditor Series of the Creditor Trust shall be exclusively responsible (and the Senior Lender Series shall have no obligation) for such indemnity as it relates to the Unsecured Creditors' Trustee, the Plan Oversight Committee and all professionals retained by either. To the extent the Creditor Trust indemnifies and holds harmless the Indemnified Parties comprised of the Unsecured Creditors' Trustee, Plan Oversight Committee or their professionals, as provided above, the legal fees and costs related to the defense of such claims giving rise to the right of indemnification shall be paid out of the Rights of Action Recovery. The Senior Lender Series shall be exclusively responsible (and the Unsecured Creditor Series shall have no obligation) for the foregoing indemnity as it relates to the Senior Lender Trustee, the Agent and all professionals retained by either.

Section 14.8. *Term of Existing Injunctions or Stays*

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105, 362 or 525 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date, and thereafter shall be annulled.

Section 14.9. *Releases*

The releases set forth in the Asset Reallocation and Settlement Agreement are approved and ratified (as applicable) as set forth herein:

(a)     Releases by the Debtors and the Creditors' Committee. Pursuant to Paragraph 4A of the Asset Reallocation and Settlement Agreement, the Debtors and the Creditors' Committee have provided the releases, waivers and discharge in respect of the Released Lender Parties as set forth therein. Pursuant to Paragraph 4C of the Asset Reallocation and Settlement Agreement, the release, waiver and discharge of the Term C Lenders is expressly limited and qualified as set forth therein.

(b)     Noteholder Releases. As of the Effective Date, each Holder of a Claim in Class 5 and each Holder of a Claim in Class 6 that is entitled to vote on this Plan shall be deemed to have unconditionally and fully waived, released and forever discharged the Released Lender Parties from any and all manner of actions, causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liabilities, claims, damages, losses, controversies, trespasses, remedies, defenses, set-offs, surcharges, costs or expenses of any nature whatsoever, known or unknown, fixed or contingent, which such Holder or Trustee has had, now has, or may hereafter have against the Released Lender Parties, by reason of any matter, cause or thing whatsoever, from the beginning of time through and to the Effective Date, relating to or concerning the Debtors, the Credit Agreement, the Senior Subordinated Notes or the Senior Discount Notes; provided, however, that the foregoing release does not apply to claims (if any) for enforcement of the Senior Lenders' obligations under the Asset Reallocation and Settlement Agreement, and provided further that each Holder of a Claim in Class 5 and each Holder of a Claim in Class 6 entitled to vote on this Plan may elect, by checking the box provided on the Ballot, not to grant the releases set forth in this Section 14.9(b); provided further, that all Noteholders that do not expressly "opt out" of the Plan releases by returning a Ballot electing such "opt out" (including all Noteholders who do not return a Ballot) or who receive a Distribution under the Plan shall be deemed to have granted the releases as set forth in Section 14.9 of the Plan. However, as provided under the Asset Reallocation and Settlement Agreement the granting of the release set forth herein shall be a condition to both (i) the receipt of any distribution under this Plan by any Noteholder, and (ii) the waiver by the Senior

35

Lenders of their contractual and structural subordination rights in respect of the Holders of Class 5 and Class 6 Claims. In addition, the releases set forth in and in the manner provided by Section 4.B. of the Asset Reallocation and Settlement Agreement shall be deemed delivered by the 12% Note Indenture Trustee and the 14% Note Indenture Trustee as of the Effective Date.

(c)    Releases by the Agent and the Senior Lenders. Pursuant to Paragraph 4D of the Asset Reallocation and Settlement Agreement, the Agent and the Senior Lenders waived and relinquished any and all interest in and claims that each of them have or may have against the Excluded Assets, including the Contributed Assets and Rights of Action, except to the extent specifically set forth in the Asset Reallocation and Settlement Agreement.

(d)    Release of Certain Avoidance Actions. Pursuant to Paragraph 4E of the Asset Reallocation and Settlement Agreement, the Debtors, the Creditors' Committee, the Agent and the Senior Lenders, on behalf of themselves and the estates of the Debtors, and each of their respective predecessors, successors and assigns, have fully waived, released and forever discharged all Avoidance Actions arising under chapter 5 of the Bankruptcy Code or otherwise relating to or concerning the conversion from recourse to non-recourse of certain loans and the deferred payment of certain bonuses, in an aggregate amount not to exceed $250,000, in respect of the Released Employees.

Section 14.10. *Exculpation and Limitation of Liability*

(a)    None of the Agent, the Debtors, the Creditor Trust, the Trustees, the Creditors' Committee, the Senior Lenders or the Indenture Trustees, nor any of their respective present of former members, officers, directors, employees, advisors, or attorneys shall have or incur any liability to any holder of a Claim or Equity Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, including, without limitation, the Asset Reallocation and Settlement Agreement, the formulating, negotiating or implementing of this Plan, the solicitation of acceptances of this Plan, the pursuit of confirmation of this Plan, the confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for their gross negligence or willful misconduct, and in all respects such parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities in the Chapter 11 Cases and under this Plan.

(b)    Notwithstanding any other provision of this Plan, no holder of a Claim or Equity Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, shall have any right of action against the Creditor Trust, the Trustees, any of the Debtors, any statutory committee, or any of their respective present or former members, officers, directors, employees, advisors or attorneys, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, formulating, negotiating or implementing this Plan, the consummation of this Plan, the confirmation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except to the extent such right of action arises from any such party's gross negligence or willful misconduct.

(c)    The Creditor Trust shall indemnify each Person exculpated pursuant to this Section 14.10 against, hold each such Person harmless from, and reimburse each such Person for, any and all losses, costs, expenses (including attorneys' fees and expenses), liabilities and damages sustained by such Person arising from any liability described in Section 14.10(a) of this Plan.

36

Section 14.11. *Cancellation of Notes, Instruments, Debentures and Equity Securities*

On the Effective Date, except to the extent provided otherwise in this Plan, all notes, instruments, certificates and other documents evidencing Claims and all Equity Interests in any of the Debtors shall be canceled and deemed terminated, without any further act or action under any applicable agreement, law, regulations, order or rule. On the Effective Date, except to the extent provided otherwise in this Plan, any indenture relating to any of the foregoing, shall be deemed canceled as permitted by section 1123(a)(5)(F) of the Bankruptcy Code. The Indentures shall survive confirmation of this Plan solely to effectuate Distributions to be made to holders of the Senior Notes as provided herein and to enforce the rights, duties and administrative functions of the Indenture Trustees as provided herein and therein with respect to such Distributions, and permitting the Indenture Trustees to assert the Charging Lien against such Distributions for the payment of the Indenture Trustees' fees and expenses. Upon the final Distributions to the holders of the Senior Notes pursuant to this Plan, the Indentures shall be canceled and deemed terminated and the Indenture Trustees shall be discharged of any further duties, without any further act or action under any applicable agreement, law, regulations, order or rule and the obligations of the Debtors under such Indentures shall be terminated.

Section 14.12. *Post-Effective Date Fees and Expenses*

From and after the Effective Date, the Creditor Trust shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Plan Oversight Committee, the Indenture Trustees in their capacity as disbursing agents, and the Creditor Trust related to implementation and consummation of this Plan, subject to any restrictions imposed under the Cash Collateral Order, provided that such payment shall be borne by the Series of the Creditor Trust to which such fees and expenses relate.

Section 14.13 *Section 1146 Exception*

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of any security under this Plan, or the making or delivery of an instrument of transfer under this Plan, may not be taxed under any law imposing a stamp tax or similar tax.

Section 14.14. *Severability*

The provisions of this Plan shall not be severable unless such severance is agreed to by the Debtors, the Creditors' Committee and the Lenders and such severance would constitute a permissible modification of this Plan pursuant to section 1127 of the Bankruptcy Code.

Section 14.15. *Recognition*

As of the close of business on the Record Date, the Indenture Trustees will have no obligation to recognize any transfer of Notes occurring after the Record Date. For purposes of making distributions under this Plan, the Indenture Trustees will be entitled to recognize and deal for all purposes herein with only those holders of record stated on the transfer ledger maintained by the Indenture Trustees or their designees as of the close of business on the Record Date.

Section 14.16. *Governing Law*

Except to the extent that other federal law is applicable, or to the extent that an exhibit hereto provides otherwise, the rights, duties and obligations arising under this Plan shall be governed by, and

37

construed and enforced in accordance with, the Bankruptcy Code and, to the extent not inconsistent therewith, the laws of the State of New York.

Section 14.17. *Notices*

All notices, requests and demands to or upon the Debtors, the Creditor Trust, the Creditors' Committee or the Lenders to be effective shall be in writing, including by facsimile transmission, and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered to all of the following or, in the case of notice by facsimile transmission, when received by all of the following and telephonically confirmed, addressed as follows or to such other addresses as filed with the Bankruptcy Court.

To:

**On behalf of the Debtors:**

Constance A. Fratianni
Scott C. Shelley
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179

- and -

Pauline K. Morgan
YOUNG CONAWAY STARGATT
& TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

**On behalf of the Creditor Trust:**

—————  ———————
—  ·  ———————
————————  —  ——  ——
————————  ·  ————
————  ————————
——  ————————  —  ·
Telephone: ————  ·
Facsimile: ————  —  ————

**On behalf of the Creditors' Committee:**

Andrew I. Silfen
ARENT FOX KINTER PLOTKIN & KAHN

38

1675 Broadway
New York, NY 10019
Telephone: (212) 484-3903
Facsimile: (212) 484-3990

**On behalf of the Prepetition Agent:**

Janet E. Henderson
SIDLEY AUSTIN BROWN & WOOD
10 South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

**On behalf of the US Trustee:**

David L. Buchbinder
Officer of the United States Trustee
844 King Street
Suite 2313
Wilmington, DE 19801
Telephone: (302) 573-6491
Facsimile: (302) 573-6497

Section 14.18. *Closing of Cases*

The Creditor Trust shall, promptly upon the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to obtain a Final Decree closing the Chapter 11 Cases.

Section 14.19. *Section Headings*

The section headings contained in this Plan are for reference purposes only and shall not affect the meaning or interpretation of this Plan.

Section 14.20. *Primacy of Asset Reallocation and Settlement Agreement*

To the extent of any conflict or inconsistency between the provisions of this Plan and the provisions of the Asset Reallocation and Settlement Agreement, the provisions of the Asset Reallocation and Settlement Agreement shall govern and be deemed controlling. Notwithstanding anything herein to the contrary, the rights and entitlement of the Senior Lenders, as set forth in the Asset Reallocation and Settlement Agreement, shall in no way be dependent upon, and are expressly independent of, the provisions of this Plan.

Section 14.21. *Continuing Viability of Other Orders/Agreements*

Except to the extent expressly modified by this Plan or the Asset Reallocation and Settlement Agreement, (i) all Final Orders previously entered by the Bankruptcy Court and (ii) any agreements between creditors or between the debtors and their creditors shall continue in full force and effect.

NYDOCS03/672357.16

WP3 973424 1          616K3 1001

39

Section 14.22. *Administration of Wind Down Budget*

The Trustees shall provide the Agent and the Plan Oversight Committee upon request and no less frequently than monthly a written accounting of (i) all line item expenses paid in the prior month pursuant to the Wind Down Budget and (ii) all projected payments for line item expenses. As soon as the Unsecured Creditors' Trustee determines in his reasonable judgment that any line item expense provided for in the Wind Down Budget has been paid, the Trustee shall, in accordance with the Cash Collateral Order, remit to the Agent for the benefit of the Senior Lenders any and all remaining cash collateral allocable to such line item in the Wind Down Budget, provided that the Unsecured Creditors' Trustee shall remit to the Agent all remaining unused cash allocable to the Wind Down Budget no later than January 5, 2004 (or such later date as the Agent may agree in writing). Notwithstanding anything herein to the contrary, and except as expressly provided in the Asset Reallocation and Settlement Agreement, the Creditor Trust or Contributed Assets shall not be subject to any Claims payable under the Wind Down Budget.

Dated:  Wilmington, Delaware
February _23_, 2004

Respectfully Submitted,

INSILCO HOLDING CORPORATION
By: _Carol WStur_
Its: _President and General Counsel_

INSILCO TECHNOLOGIES, INC.
By: _Carol W_
Its: _President and General Counsel_

INNET TECHNOLOGIES, INC.
By: _Carol Wr_
Its: _Secretary and General Counsel_

INSILCO INTERNATIONAL HOLDINGS, INC.
By: _Carol WStur_
Its: _Secretary and General Counsel_

PRECISION CABLE MFG. CORPORATION
By: _Carol W_
Its: _General Counsel_

EYELETS FOR INDUSTRY, INC.
By: _Carol W_
Its: _Secretary and General Counsel_

EFI METAL FORMING, INC.
By: _Carol W_
Its: _Secretary and General Counsel_

STEWART STAMPING CORPORATION
By: _Carol WStur_
Its: _Secretary and General Counsel_

STEWART CONNECTOR SYSTEMS, INC.

By: _Carol Asten_

Its: _Secretary and General Counsel_

SIGNAL CARIBE, INC.

By: _Carol Asten_

Its: _General Counsel_

SIGNAL TRANSFORMER CORPORATION, INC

By: _Carol Asten_

Its: _Secretary and General Counsel_

# EXHIBIT A

## ASSET REALLOCATION AND SETTLEMENT AGREEMENT

## ASSET REALLOCATION AND SETTLEMENT AGREEMENT

THIS ASSET REALLOCATION AND SETTLEMENT AGREEMENT

("SETTLEMENT AGREEMENT") dated as of May 13, 2003, by and among (i) Insilco

Technologies, Inc. ("Technologies") and its undersigned affiliated debtors (together with

Technologies, the "Debtors") in the administratively consolidated chapter 11 bankruptcy cases

pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy

Court") bearing docket number 02-13672 (KJC) (the "Chapter 11 Cases"), (ii) the official

committee of unsecured creditors appointed in the Bankruptcy Cases (the "Creditors'

Committee"), (iii) Bank One, NA as agent (the "Agent") and the lenders, including Bank One,

NA, under the Second Amended and Restated Credit Agreement dated as of August 25, 2000, as

amended (the "Credit Agreement") that have consented to the terms of this Settlement

Agreement (the "Senior Lenders")[1], (iv) Wachovia Bank, National Association, as indenture

trustee for the 12% senior subordinated notes due 2007 (the "12% Senior Subordinated Notes")

issued by Technologies ("Wachovia") and (v) U.S. Bank, N.A. ("U.S. Bank") as the indenture

trustee for the 14% senior discount notes due 2008 (the "14% Senior Discount Notes") issued by

Insilco Holding Co. (collectively, the parties to this Settlement Agreement are hereinafter

referred to as the "Parties"). Except as expressly provided otherwise herein, the terms and

provisions of this Settlement Agreement shall become effective and binding upon the Settlement

Effective Date, as defined in Paragraph 6 below.

## RECITALS

---

[1] As used herein, the term "Senior Lenders" does not include those lenders participating in Term Loan C, except in respect of Paragraph 1 only, wherein the term "Senior Lenders" shall include those lenders participating in Term Loan C

2

A.    On December 16, 2002 (the "Filing Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code") commencing the Chapter 11 Cases. The Debtors continue in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Chapter 11 Cases have been consolidated for procedural purposes and are being jointly administered pursuant to an order of the Bankruptcy Court. No trustee or examiner has been appointed in the Chapter 11 Cases.

B.    On December 19 and 20, 2002, the Debtors filed motions seeking, inter alia, the entry of orders (i) approving bidding procedures governing the sale of substantially all of the Debtors' assets, (ii) approving the sale of substantially all of the Debtors' assets, and (iii) granting certain relief related thereto (the "Sale Motions"). The Sale Motions contemplated the sale of substantially all of the Debtors' assets in separate transactions (the "Sales") pursuant to five separate sale agreements described below (collectively, the "Sale Agreements"), subject to higher or otherwise better offers and Bankruptcy Court approval:

    a.  Stock and Asset Purchase Agreement By and Among Amphenol Corporation, Amphenol Technical Products International Co., Insilco Technologies, Inc., T.A.T. Technology Inc., Insilco International Holdings, Inc. and Precision Cable Mfg. Co., Inc. dated as of December 15, 2002;

    b.  Stock and Asset Purchase Agreement Among Bel Fuse Ltd., Bel Fuse Macau, L.D.A., Bel Connector Inc., Bel Transformer Inc., and Insilco Technologies, Inc. and Certain of its Subsidiaries, dated as of December 15, 2002;

    c.  SRDF Acquisition Company, LLC, Insilco Technologies, Inc., Stewart Stamping Corporation, Eyelets For Industry, Inc. and EFI Metal Forming, Inc., dated as of December 15, 2002;

    d.  Asset Purchase Agreement By and Between LL&R Partnership and Insilco Technologies, Inc., dated as of December 15, 2002; and

3

     e.   Share Sale and Asset Purchase Agreement between Insilco Technologies, Inc. and Stephen Bullock, dated as of December 15, 2002.

     C.    On January 3, 2003, the Office of the United States Trustee appointed five members to serve on the Creditors' Committee in these cases.

     D.    On January 14, 2003, the Creditors' Committee and Wachovia filed objections to the bidding procedures. After extensive negotiations with the Creditors' Committee and Wachovia at the January 16, 2003 hearing to consider approval of the bidding procedures, the Debtors consented to various amendments to Debtors' proposed bidding procedures and agreed to continue the hearing on the Sale Motions until March 7, 2003.

     E.    On January 16, 2003, the Bankruptcy Court entered the Final Order Authorizing Use of Cash Collateral and Granting Replacement Liens (the "Cash Collateral Order"). Annexed to the Cash Collateral Order as Exhibit B is a budget listing anticipated wind down expenses (the "Wind Down Budget"), including line items for payments that may be triggered under the Debtors' Key Executive and Key Employee Severance Plan (the "KESP") and the Debtors' Key Executive and Key Employee Retention Plan (the "KERP"). Paragraph 3 of the Cash Collateral Order provides that, subject to certain limitations, to the extent amounts allocated to line items other than "Selling Costs" in the Wind Down Budget exceed the amounts necessary to fund such line items, then up to $500,000 of the amount allocated to non "Selling Costs" line items may be reallocated and used by the Debtors' estates for other necessary expenses for a period of six months following the completion of the Sales (the "Reallocated Monies"), at which time the remaining balance of the Reallocated Monies shall be returned to the Agent.

4

F.      On January 30, 2003, the Court docketed the orders approving the Bidding Procedures. With respect to the Custom Assemblies deal and the N. Myrtle Beach deal, the Debtors submitted revised orders to effect certain ministerial changes, on or about February 6, 2003. These revised orders were entered by the Bankruptcy Court on February 19, 2003.

G.      On February 26, 2003, the Creditors' Committee and Wachovia filed objections to the Sale Motions, and on March 6, 2003, the Creditors' Committee filed a supplement to the objection (collectively, the "Sale Objections").

H.      On March 5, 2003, the Creditors' Committee filed a motion seeking *inter alia* appointment of a chapter 11 trustee for the Debtors' estates or an examiner (the "Trustee Motion").

I.      At the Sale Hearing on March 7, 2003, the Debtors presented argument and evidence in support of the Sales. Prior to the Committee and Wachovia presenting evidence in support of the Sale Objections and a ruling by the Bankruptcy Court on the Sale Motions, counsel for the Debtors, the Agent and the Creditors' Committee informed the Bankruptcy Court that they, together with Wachovia, had reached a settlement in principle pursuant to which the Sale Objections were withdrawn. Counsel for the Debtors, the Agent and the Creditors' Committee described certain of the general terms and conditions of the settlement on the record at the Sale Hearing and noted that the settlement was subject to definitive documentation and certain further approvals, including Bankruptcy Court approval and, in the case of the Agent, approval of the terms of the settlement by the requisite majorities of the Senior Lenders sufficient to bind the Senior Lenders, including as a class under a plan incorporating the settlement terms, if necessary.

5

J.     Pursuant to the terms and conditions set forth in this Settlement Agreement, the Parties have agreed to resolve all disputes among them, including without limitation the disputes regarding the Sale Motion (including the Sale Objections), the Trustee Motion and all matters related thereto, and otherwise resolve their differences amicably in order to avoid costly litigation and facilitate the orderly conclusion of these Chapter 11 Cases.

K.     Following the withdrawal of the Sale Objections, the Bankruptcy Court approved the Sale Motions by orders dated March 7, 2003 (the "Sale Orders").

NOW THEREFORE, in consideration of the mutual covenants, release of claims and agreements contained herein, including without limitation the resolution of the Sale Objections and the withdrawal of the Trustee Motion (which shall be deemed a withdrawal "with prejudice" to the extent set forth herein), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, in full and final settlement of the disputes among the Parties, the Parties to this Settlement Agreement hereby agree as follows:

## AGREEMENT

1.     **ALLOWANCE OF SENIOR LENDERS' CLAIMS.** The Senior Lenders' liens and claims against the Debtors (i.e., the prepetition revolving credit facility, Term Loan A, Term Loan B and Term Loan C) are fully and finally allowed in the amount of $254,933,571.49[2] (the "Allowed Senior Lenders' Claims"). The liens and security interests of the Senior Lenders (other than the Term Loan C Lenders, which are, under the terms of the Credit Agreement, unsecured) are deemed valid, perfected, first priority and indefeasible and neither

---

[2] Of this amount $232,712,443.42 represents principal, accrued interest and fees owing on the revolving credit facility, Term Loan A and Term Loan B as of the Petition Date, and $22,221,128.07 represents principal and accrued interest owing on Term Loan C as of the Petition Date.

6

such liens nor such claims shall be subject to any further challenge, and the Senior Lenders shall not be required to file any proof of claim or further evidence of the indebtedness owing by the Debtors or of any collateral securing such indebtedness.

        2.    TREATMENT OF SENIOR LENDERS' CLAIMS.  A.  Except with respect to (i) amounts which are required to be funded pursuant to the "Carve Out" and "Wind Down Budget" under the Cash Collateral Order, (ii) the Contributed Assets (as defined in Paragraph 3, below, subject to the provisions of Section 4B in respect of the holders of the 14% Senior Discount Notes and the 12% Senior Subordinated Notes), and (iii) Avoidance Actions (as defined in Paragraph 3 below and which, whenever used herein, shall be deemed to include the proceeds of Avoidance Actions) (clauses (i) through (iii), collectively the "Excluded Assets"), the Senior Lenders shall receive and be entitled to receive and to indefeasibly retain as of the Settlement Effective Date, in full satisfaction of their secured claims, all proceeds (including all payments previously received by the Agent or its professionals in connection with these Chapter 11 cases), from the disposition of the Debtors' businesses and assets whether pursuant to the Sale Orders or otherwise, and all other cash, including without limitation cash currently held or to be received in the future by the Debtors from any source whatsoever, including without limitation, litigation recoveries, tax refunds, asset dispositions, unapplied retainers and cash on hand.  The Agent's prepetition and postpetition liens on all such cash and assets other than the Excluded Assets shall remain in place until the payments required herein have been made to the Agent, and the Agent shall be entitled to the receipt of all cash and proceeds of assets (whether or not subject to any such liens) other than the Excluded Assets; provided, however, that the Senior Lenders' recovery shall not exceed the amount of the Allowed Senior Lenders' Claims.  The Debtors (or such other party as may be responsible for administering this Agreement) shall, without further

7

order of the Court, promptly remit to the Agent all proceeds other than Excluded Assets as and when such proceeds are received and shall expeditiously remit all such proceeds in their possession and cause their foreign subsidiaries to repatriate any such proceeds in their possession.

      B.    In consideration of the treatment set forth in Paragraph 2A, the Senior Lenders waive and relinquish any right or entitlement to recovery or distributions on their allowed unsecured deficiency claims and, effective upon the receipt of the releases described in Paragraph 4B from the holders of the 12% Senior Subordinated Notes and the 14% Senior Discount Notes, further waive any enforcement of their contractual subordination rights vis-à-vis the holders of the 12% Senior Subordinated Notes and their structural subordination rights vis-à-vis the holders of the 14% Senior Discount Notes in order to effectuate the reallocation and distributions set forth in Paragraph 3 below, provided, however that, the Senior Lenders' sharing and reallocation of the Contributed Assets in respect of the holders of the 14% Senior Discount Notes and the 12% Senior Subordinated Notes (collectively, the "Noteholders") is expressly conditioned upon and subject to the provisions of Paragraph 4B.

      3.    ASSET REALLOCATION/CONTRIBUTED ASSETS.  A.  Subject to the provisions of Paragraph 4B, the Senior Lenders agree to the following sharing and reallocation of cash and proceeds, as set forth in the following subparagraphs (i) through (iv) (the "Contributed Assets"), to the holders of allowed general unsecured claims including those of the Noteholders (collectively the "Unsecured Creditors") to be distributed in a manner set forth in a liquidating trust agreement or a Plan (as defined in Paragraph 6), if such a Plan is required:

      i.    $1.75 million of the net proceeds realized from the closing of the pending Sales;

      ii.    the sale proceeds paid to the Debtors' estate from the sale of the real properties located in Larne, Northern

8

Ireland (whether paid directly to the Debtors or paid to
TAT Canada and by TAT Canada to the Debtors),
Taylorsville, North Carolina and McAllen, Texas, and
the proceeds paid to the Debtors' estate from the sale of
miscellaneous personal property, including the Debtors'
interest in artwork, equipment and furnishings, located
in the Debtors' Columbus, Ohio offices and listed on
Exhibit A hereto; provided, however, that, in the event
the Debtors seek to implement this Settlement
Agreement through a Plan, then, to the extent that the
Debtors' estates do not otherwise have sufficient readily
available unencumbered assets to pay administrative
expenses required to be paid in order to confirm such a
Plan (other than professional fees, including the Agent's
professional fees, incurred pursuant to Paragraph 11
below), the estate shall have the benefit of up to
$250,000 of the Contributed Assets described in this
subparagraph (ii) for the payment of such administrative
expenses (the "Administrative Expense Carve Out");
provided further that the aggregate Contributed Assets
under subparagraphs (i) and (ii) shall not together
exceed $3 million (inclusive of the Administrative
Expense Carve Out) with any excess over such $3
million to be promptly remitted to the Senior Lenders
and any such excess will not constitute "Contributed
Assets";

iii.   $250,000 of cash collateral (which shall be asset sale
proceeds), plus 10% of the net recoveries derived from
(x) the Debtors' claims and causes of action against Star
Services, Inc. relating to the litigation bearing Supreme
Court of the State of New York Index # 605676/97 and
generally referred to as the "Star Services Litigation"
and (y) income tax refunds received by the Debtors
from and after April 15, 2003, for the purpose of
establishing a "Creditors' Trust" to investigate and
pursue claims, actions and causes of action not
specifically released under this Settlement Agreement,
assertable by or on behalf of the Debtors or their estates
for the benefit of unsecured creditors and, including
claims arising under Chapter 5 of the Bankruptcy Code
("Avoidance Actions"), provided the Contributed
Assets under this subparagraph (iii) shall not exceed
$750,000, with any excess over $750,000 to be
promptly remitted to the Senior Lenders and which

9

excess (including any net recoveries derived from the
assets described under (x) and (y) beyond the amount
allocated to the Creditor Trust in this paragraph (iii))
will not constitute "Contributed Assets";

iv.  the Cash Collateral Order shall be amended (or deemed
amended on the Settlement Effective Date) to provide
that the Reallocated Monies shall remain as a reserve
with the estate (not subject to the requirement that such
Reallocated Monies be returned to the Agent), and that
the first $200,000 of any such Reallocated Monies shall
be allocated and earmarked for the payment of the
allowed and unpaid fees and expenses of the Creditors'
Committee's professionals incurred from and after May
1, 2003, with any remaining Reallocated Monies
available for payment of other administrative expenses
of the Debtors' estates.

B.    The Contributed Assets, as and when received by the Agent, shall be held

by the Agent in a separate interest bearing account pending the earlier to occur of (i) the

Settlement Effective Date (as defined herein) at which time such Contributed Assets shall be

remitted to such account as has been designated by the Creditors' Committee, if any, for further

distribution in accordance with the terms hereof upon order of the Court pursuant to a confirmed

Plan (as defined in Paragraph 6), or other court order (provided that the Debtors or such other

entity as may be administering this Settlement Agreement shall be responsible for the costs of

maintaining such account for so long any of the Contributed Assets are held by the Agent), or (ii)

the Settlement Termination Date (as defined herein) at which time such Contributed Assets may

be provisionally applied by the Agent in accordance with the Cash Collateral Order. In the event

any of the assets described in Paragraph 3A have not been liquidated as of the Settlement

Effective Date ("Unliquidated Contributed Assets"), the provisions of this Paragraph 3 shall

apply to the proceeds of such Unliquidated Contributed Assets as and when any of such

Unliquidated Contributed Assets are liquidated. The Debtors shall use their reasonable best

10

efforts to promptly liquidate and reduce to cash the Unliquidated Contributed Assets, provided

that the disposition or liquidation of the Unliquidated Contributed Assets shall be on terms

reasonably acceptable to the Agent and the Creditors' Committee. The Agent's prepetition and

postpetition liens on the Unliquidated Contributed Assets shall remain in place until such

Unliquidated Contributed Assets have become Contributed Assets and the Senior Lenders'

allocable share of such Assets has been remitted to the Agent for distribution to the Senior

Lenders. All interest accruing on the Contributed Assets shall constitute Contributed Assets.

### 4.    RELEASES AND WAIVER OF CLAIMS AND INTERESTS.

A. Releases by the Debtors and the Creditors' Committee – The Debtors and the

Creditors' Committee, on behalf of themselves and the estates of the Debtors, and each of their

respective predecessors, successors and assigns (the "Releasing Estate Parties"), hereby fully

waive, release and forever discharge the Agent and each of the Senior Lenders and each of their

agents, employees and professionals ("Released Lender Parties") from any and all manner of

actions, causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises,

liabilities, claims, damages, losses, controversies, trespasses, remedies, defenses, set-offs,

surcharges, costs or expenses of any nature whatsoever, known or unknown, fixed or contingent,

which the Releasing Estate Parties have had, now have, or may hereafter have against the

Released Lender Parties, by reason of any matter, cause or thing whatsoever, from the beginning

of time through and to the Settlement Effective Date; provided, however, that nothing in this

Paragraph 4A releases any Parties' obligations or agreements pursuant to this Settlement

Agreement, or bars claims directed solely at enforcing the provisions of this Settlement

Agreement.

11

B. Releases By Wachovia, U.S. Bank and Noteholders – Wachovia and U.S. Bank, and each of their respective predecessors, successors and assigns (together, the "Trustees") shall use their reasonable best efforts either to obtain authority under their respective indentures or, pursuant to the Bankruptcy Code (including pursuant to a Plan) to cause their constituencies to, fully waive, release and forever discharge the Released Lender Parties from any and all manner of actions, causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liabilities, claims, damages, losses, controversies, trespasses, remedies, defenses, set-offs, surcharges, costs or expenses of any nature whatsoever, known or unknown, fixed or contingent, which the Releasing Trustee Parties have had, now have, or may hereafter have against the Released Lender Parties, by reason of any matter, cause or thing whatsoever, from the beginning of time through and to the Settlement Effective Date relating to or concerning in any way the Debtors, the Credit Agreement, the 12% Senior Subordinated Notes and the 14% Senior Discount Notes (all of the foregoing, collectively the "Noteholder Claims"); provided, however, that nothing in this Paragraph 4B contemplates the release of any Party's obligations or agreements under this Settlement Agreement or the bar of claims directed solely at enforcing the provisions of this Settlement Agreement. The Trustees further agree that, in the event this Settlement Agreement is consummated as part of or otherwise incorporated into a Plan (as defined in Paragraph 6), they shall support and use their reasonable best efforts to obtain acceptance by their constituencies of such Plan, which shall provide for the releases set forth herein by the Trustees and by all holders of the 12% Senior Subordinated Notes and 14% Senior Discount Notes of the Noteholder Claims. Whether the Contributed Assets are distributed under a Plan or otherwise, however, it shall be a condition both (i) to the receipt of any Contributed Assets and any other distributions of any kind and howsoever generated, (such as, by way of

12

example, recoveries obtained by the Creditor Trust), by any Noteholder and (ii) to the waiver by
the Senior Lenders, as to any Noteholder, of the Senior Lenders' contractual subordination rights
in respect of the 12% Senior Subordinated Notes and structural subordination rights vis-à-vis the
holders of the 14% Senior Discount Notes, either that such Noteholder has provided the Agent
and Senior Lenders with a release of the Noteholder Claims in a form reasonably satisfactory to
the Agent, or that the Bankruptcy Court has determined, in a final order, that the Noteholder
Claims have been deemed released as to such Noteholder. The Senior Lenders' waiver of
subordination rights shall not apply to any Noteholder who elects not to grant or who is not
deemed to have granted such release. With respect to any Noteholder that shall not have granted
or deemed to have granted such release, (a) the Agent shall be paid the amount which equals the
Noteholder's Share (as defined below) of the amount of Contributed Assets, exclusive of (x) the
Contributed Assets described in Paragraph 3(A)(iii), and (y) the pro rata portion of the
Administrative Expense Carve Out allocable to such non-releasing Noteholder (which shall be an
amount equal to the Noteholder's Share of the Administrative Expense Carve Out), and (b) such
Noteholder shall not receive any distributions from the estates, including any proceeds of
recoveries obtained through the use of Contributed Assets described in Paragraph 3(A)(iii), with
distributions instead to be reallocated, pursuant to a confirmed Plan or other order of the Court,
among the allowed claims of other Unsecured Creditors. "Noteholder's Share" shall mean the
ratio of the allowed claims of such non-releasing Noteholder to the allowed claims of all
Unsecured Creditors.

     C.  Limitation on Release of Term C-Lenders -- The releases and waivers
contained in Paragraph 4A of this Settlement Agreement for the benefit of the Released Lender
Parties shall also apply to the Term-C Lenders (DLJ Capital Funding, Inc., DLJ Merchant

13

Banking Partners II, L.P., DLJ Merchant Banking Partners II-A, L.P , DLJ Offshore Partners II,

C.V., DLJ Diversified Partners, L.P., DLJ Diversified Partners-A, L.P., DLJ EAB Partners, L.P.,

DLJ Millenium Partners, L.P., DLJ ESC II, L.P., DLJ Millenium Partners-A, L.P. and

Donaldson, Lufkin and Jenrette Securities Corporation (collectively, the "Term-C Lenders")) and

their affiliates, insiders (as defined in Section 101 of the Bankruptcy Code), agents, employees

and professionals, only in respect of the Term-C Loans under the Credit Agreement (as defined

therein) and notwithstanding anything herein to the contrary, the Term-C Lenders and their

affiliates, insiders (as defined in Section 101 of the Bankruptcy Code) agents, employees and

professionals, shall not otherwise be released or deemed released  Nothing contained herein shall

be deemed to discharge, impair or otherwise affect any claim, action, cause of action or right

against the Term-C Lenders and any affiliate, insider, agent or professional of the Term-C

Lenders, except as specifically set forth in the preceding sentence, provided however that the

reservation of non-released claims, causes of action or rights in this Paragraph shall not extend to

the Released Lender Parties.

      D  The Agent and the Senior Lenders – Except to the extent specifically

otherwise provided herein, the Agent and the Senior Lenders hereby waive and relinquish any

and all interest in and claims that each of them have or may have against the Contributed Assets

and Avoidance Actions.

      E.  Release of Certain Avoidance Actions – In consideration for the agreement set

forth herein and the benefits and services provided by the Released Employees (defined below),

and subject to the terms of this Settlement Agreement, the Debtors, the Creditors' Committee,

the Agent and the Senior Lenders, on behalf of themselves and the estates of the Debtors, and

each of their respective predecessors, successors and assigns, hereby fully waive, release and

14

forever discharge all avoidance claims and causes of action arising under chapter 5 of the
Bankruptcy Code or otherwise relating to or concerning the conversion from recourse to non-
recourse of certain loans and the deferred payment of certain bonuses, in an aggregate amount not
to exceed $250,000, in respect of the following employees of the Debtors: Michael Elia, Fred
Stewart, Steve Crea, and Phil Pittman ("Released Employees").

F    Scope of Releases – The Parties acknowledge and agree that nothing contained
in the foregoing releases shall release or discharge any person or entity other than the specifically
identified beneficiaries of the releases in this Paragraph 4.

5.    SUPPLEMENTAL SEVERANCE PROGRAM. On April 14, 2003, the
Bankruptcy Court entered an order approving, and authorizing the Debtors to make payments
under, Debtors' Employee Compensation Program, in an amount not to exceed $750,000, from
sums allocated in the Wind Down Budget, for employees who are not covered by the KERP and
the KESP but who are not being hired by the purchasers of the Debtors' assets (the "Severance
Pay Order"). Notwithstanding the Severance Pay Order, the Debtors have agreed that until
sufficient excess funds have been identified in the Wind Down Budget, the Debtors would not
distribute not more than $500,000 of the $750,000 that was identified as "Employee Benefits"
unrelated to Sales in the Wind Down Budget, so that the remaining $250,000 of such $750,000
would be applied to the $500,000 of Reallocated Monies. The Debtors have identified sufficient
additional unused funds related to wind down costs unrelated to Sales (as set forth in the Wind
Down Budget) thus, the Creditors' Committee, Wachovia and U.S. Bank have consented to and
agreed, absent any errors with respect to identified recipients and the calculation of applicable
amounts, not to raise any objection to, the Debtors making severance payments not to exceed
$750,000 in accordance with the Severance Pay Order.

15

6.    SETTLEMENT EFFECTIVE DATE.  Subject to Paragraph 7 herein, the date this Settlement Agreement shall become effective and shall be binding upon and inure to the benefit of all the Senior Lenders, the Agent, the Debtors, the Creditors' Committee, Wachovia and U.S. Bank (the "Settlement Effective Date") shall be the earlier of (i) the date on which the Bankruptcy Court enters a final and non-appealable order approving this Settlement Agreement if the Settlement Agreement is executed by or on behalf of all of the Senior Lenders, or (ii) the date on which the Bankruptcy Court enters a final and non-appealable order confirming a plan of liquidation proposed by the Debtors which incorporates the terms of and is otherwise consistent with this Settlement Agreement and is in form and substance reasonably acceptable to the Creditors' Committee, Wachovia, U.S. Bank, the Debtors and the Agent ("Plan"). Notwithstanding the prior occurrence of the Settlement Effective Date, no holder of the 12% Senior Subordinated Notes or the 14% Senior Discount Notes shall be bound by or entitled to the benefit of this Settlement Agreement until such holder shall have provided (or be deemed to have provided) the release set forth in Paragraph 4B.  For the avoidance of doubt, upon the Settlement Effective Date, the obligations of the Agent and the Senior Lenders, whether under this Settlement Agreement or otherwise, to the Debtors and the other signatories to this Settlement Agreement shall be limited to their consent to the reallocation of the Contributed Assets in accordance with and subject to the terms and conditions of this Settlement Agreement, the obligations under the Cash Collateral Order in respect of the Carve Out and the Wind Down Budget, the continuing confidentiality obligations under the Credit Agreement and, to the extent the Agent and the Debtors may mutually agree, to the continuation of the existing cash management system with the Agent  For the further avoidance of doubt, the allowance of the Senior Lenders' liens and claims, as set forth in Paragraph 1, the treatment of the Allowed Senior

A - 300