this result with the Term C Loan. (Id.) The legal conclusion that the Term C Loan was subordinate in right of payment to the other Senior Debt is not supported by reference to any document subordinating the Term C Loan. Then, the Objection alleges that, by the Term C Loan, "DLJ" agreed to make an equity investment "under the guise of a 'loan'." (Id. ¶ 61.) In direct contradiction to this conclusion, the Objection alleges that the Term C Loan was memorialized as part of Insilco's pre-petition credit facility. (Id.)

### Allegations Regarding "Deepening Insolvency"

In support of its second contention, the Committee makes numerous allegations about many transactions by Insilco over several years, but fails to allege any role that the Term C Lenders played in any of them, other than making the Term C Loan.

Thus, the Committee alleges that DLJ Merchant Banking Partners II, a separate corporate entity that is not a Term C Lender and is not before this Court, identified Insilco as an "attractive equity investment." (Obj. ¶ 12.) It is alleged that ultimately the DLJ Funds owned approximately 70% of Insilco, while an affiliate of Citicorp Venture Capital, Ltd. owned 19.3% and Insilco's prior shareholders retained a 10% ownership interest. (Id. ¶¶ 20, 22.)

The Committee alleges that certain DLJ entities, including "DLJ Securities Corporation" and "DLJ Capital Funding," received banking and underwriting fees in 1999 from Insilco. (Obj. ¶ 24.) There is no allegation that these fees were paid to the Term C Lenders, who are alleged to be neither bankers nor underwriters. Similarly, the Committee asserts that "DLJ" required Insilco to employ "DLJ as Insilco's financial advisor, underwriter, Syndication Agent, Lead Arranger and Lender." (Obj. ¶ 24.) There

10

is no allegation that the funds played any of these roles. Instead, the Committee alleges that it was "DLJ Securities Corporation" that provided financial advisory and underwriting services to Insilco (Id. ¶¶ 26, 31), and that "DLJ Capital Funding, Inc." served as the Syndication Agent, Lead Arranger and Lender under Insilco's credit facilities. (Id. ¶¶ 13, 46, 49.) Neither entity is a Term C Lender nor is either entity a party to this proceeding.

The Committee alleges that Insilco was caused to enter into a series of transactions, but fails to allege any participation by the Term C Lenders.[5] For example, the Committee states that Insilco purchased Eyelets for Industry, Inc., T.A.T. Technologies, Precision Cable Manufacturing and its Mexican subsidiaries, and the stock of InNet Technologies, Inc. (Obj. ¶¶ 30, 37, 44, 51.) No role by the Term C Lenders is alleged. Similarly, the Committee complains of Insilco's sale of Taylor Publishing to Castle Harlan Partners III, L.P., (id. ¶¶ 31, 34-36), and the sale of Insilco's automotive businesses (id. ¶¶ 38-43), but does not allege that the Term C Lenders played any part in these transactions.

Finally, the Committee alleges that Insilco became insolvent in June of 2001, and "DLJ" exercised dominion and control over Insilco in order to enhance "DLJ's" position to the detriment of unsecured creditors by delaying a bankruptcy filing. Again, there is

---

[5] The Committee has defined "DLJ" as the Term C Lenders, however, in the overwhelming majority of the allegations against "DLJ," it is apparent that the limited partnership funds that were the Term C Lenders were not the actors. The Committee, for example, uses the generic term "DLJ" to refer to the entities that provided financial advisory services to Insilco or that served as Syndication Agent, Lead Arranger and Lender. Yet, the Committee alleges that such services were provided by DLJ Securities Corp. or DLJ Capital Funding, entities which are not alleged to have been, and were not, Term C Lenders. The only allegations that appear attributable to the Term C Lenders are those addressing the holding of stock and the making of the Term C Loan.

no mention of a role by the Term C Lenders. (Obj. ¶ 73.) Thus, except for holding the

equity investments and making the Term C Loan, there is no act alleged by the Term C

Lenders, and no basis alleged for attributing the allegations regarding other parties to the

Term C Lenders.

**ARGUMENT**

**POINT I**

**THE OBJECTION VIOLATES THE**
**SETTLEMENT ORDER AND THE CONFIRMATION ORDER**

The Committee challenges the status of the Term C Claims, which arise solely

from the Term C Loans. But this Court's Settlement Order rules that the Claims shall not

be subject to further challenge. This Court's Confirmation Order, which incorporates the

Settlement Agreement, rules that the Settlement Agreement is the governing document in

the event of any conflict with the Plan, and reaffirms the releases contained in the

Settlement Agreement. (Confirmation Order ¶¶ 52, 56.) The filing of the Objection

violates, and is in contempt of, both Orders and the Plan.

Both the Settlement Order and the Confirmation Order are final. Both

specifically addressed and approved the Settlement Agreement. The Committee and the

Debtors, parties to the Settlement Agreement and the proceedings leading to each of these

final orders, are bound by res judicata or claim preclusion to observe the terms of both of

the Orders. See 11 U.S.C. § 1141(a); Katchen v. Landy, 382 U.S. 323, 334 (1966) ("The

normal rules of res judicata and collateral estoppel apply to the decisions of bankruptcy

courts."); Stoll v. Gottlieb, 305 U.S. 165, 170-171 (1938) (confirmation order is final

adjudication precluding later claims.); CoreStates Bank, N.A. v. Huls Am., Inc., 176 F.3d

12

187, 195 (3d Cir. 1999) ("[A] confirmation order is <u>res judicata</u> as to all issues decided or

which could have been decided at the hearing on confirmation," quoting <u>Donaldson v.</u>

<u>Bernstein</u>, 104 F.3d 547, 554 (3d Cir. 1997)); <u>In re Glenn</u>, 124 B.R. 195, 199 (Bankr.

W.D. Pa. 1991) (bankruptcy court's order adjudicating debtor's objection to proof of

claim was a final order on the merits and <u>res judicata</u> barred debtor from prosecuting

second objection to same claim, even if different legal theories were raised).

 The Confirmation Order binds the parties to the terms of the Plan. <u>See</u> 11 U.S.C.

§ 1141(a); <u>see also</u> <u>Ernst & Young LLP v. Baker O'Neal Holdings, Inc.</u>, 304 F.3d 753,

755 (7th Cir. 2002) ("A confirmed plan of reorganization is in effect a contract between

the parties and the terms of the plan describe their rights and obligations "); <u>First Union</u>

<u>Commercial Corp. v. Nelson, Mullins, Riley & Scarborough</u>, 81 F.3d 1310, 1317 (4th

Cir. 1996) ("Once a plan is confirmed, neither a debtor nor a creditor can assert rights

that are inconsistent with its provisions."); <u>In re Sugarhouse Realty, Inc.</u>, 192 B.R. 355,

362 (E.D. Pa. 1996) ("Confirmed bankruptcy plans of reorganization are binding

contracts[.]")

 This Court has been given express statutory authority to take any action necessary

to enforce or implement court orders. "The court may issue any order , process or

judgment to carry out the provisions of this title. No provision of this title providing for

the raising of an issue by a party in interest shall be construed to preclude the court from,

sua sponte, taking any action or making any determination necessary or appropriate to

enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C.

§ 105. This Court also has inherent and statutory authority to enforce its prior orders.

13

See Local Loan Co. v. Hunt, 292 U.S. 234 (1934) (court has jurisdiction of any matter seeking to secure or preserve the fruits and advantages of a judgment or decree rendered by that court); In re Continental Airlines, 236 B.R. at 325-26, 331 ("courts have specifically, and consistently, held that the bankruptcy court retains jurisdiction, to enforce its confirmation order," including by civil contempt, where party commenced enforcement action in contradiction of plan confirmation order)(citing Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 379-80 (1994)).

The Objection was filed in breach of these final Orders.[6]  Consequently, the Term C Lenders ask this Court to enforce its prior orders and dismiss this Objection with prejudice.  The Committee's commencement of this adversary proceeding in the face of these Orders is inexplicable and contemptuous.  The Committee obtained a war chest by agreeing, and having the Debtors agree, to the asset reallocation that was part of the Settlement Agreement.  The Debtors sponsored a plan based upon the Settlement Agreement, for which the Term C Lenders voted in reliance upon the releases in the Settlement Agreement.  The Committee may not now be permitted to renege on its Agreement, and violate these Orders, by prosecuting the Objection.  The Objection must be dismissed with prejudice.

---

[6] Under the Plan, in order to classify the Allowed Term C Claims as "Disputed Claims," the Committee was required to seek recharacterization "on behalf of the Debtors or the Estates." (Plan, Section 4.8.) The Objection asserts claims of the Debtors, but the Committee did not seek or obtain authorization to assert such claims prior to confirmation. See, e.g., Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery, 330 F.3d 548, 580 (3d Cir. 2003) (bankruptcy court may confer standing on creditors committee to bring suit on behalf of debtor's estate), cert. dismissed, __ U.S __, 124 S. Ct. 530 (2003). Therefore, the Term C Claims cannot be considered "Disputed Claims" and distribution may not be withheld.

14

## POINT II

### THIS COURT HAS NO JURISDICTION OVER THE OBJECTION

The ruling of the Court of Appeals for the Third Circuit in In re Resorts

International, Inc., 372 F.3d 154 (3d Cir. 2004), sharply curtails the post-confirmation

jurisdiction of a bankruptcy court with respect to matters, even core proceedings, that do

not have "a close nexus to the bankruptcy plan or proceeding, as when a matter affects

the interpretation, implementation, consummation, execution or administration of a

confirmed plan or incorporated litigation trust agreement." 372 F.3d at 168-69. The

court adopted the holding of the Court of Appeals for the Fifth Circuit that "[t]he source

of the bankruptcy court's subject matter jurisdiction is neither the Bankruptcy Code nor

the express terms of the Plan. The source of the bankruptcy court's jurisdiction is 28

U.S.C. §§ 1334 and 157." Id. at 161 (quoting United States Brass Corp. v. Travelers Ins.

Group, Inc., 301 F.3d 296, 303 (5th Cir. 2002)).

In the Resorts case, a post-confirmation litigation trust sued an accounting firm

for alleged errors in auditing and tax advice to the trust. The court ruled that subject

matter jurisdiction was lacking.

> [W]e believe this proceeding lacks a close nexus to the bankruptcy plan or
> proceeding and affects only matters collateral to the bankruptcy process.
> The resolution of these malpractice claims will not affect the estate; it will
> have only incidental effect on the reorganized debtor; it will not interfere
> with the implementation of the Reorganization Plan; though it will affect
> the former creditors as Litigation Trust beneficiaries, they no longer have
> a close nexus to bankruptcy plan or proceeding because they exchanged
> their creditor status to attain rights to the litigation claims; and as stated,
> the jurisdictional retention plans cannot confer jurisdiction greater than
> that granted under 28 U.S.C. § 1334 or 28 U.S.C. § 157. For these
> reasons, the malpractice claims here lack the requisite close nexus to be
> within the Bankruptcy Court's 'related to' jurisdiction post-confirmation.

15

The Trustee argues the estate is affected because the Litigation Trust is a continuation of the estate. The District Court agreed, reasoning that the affairs of post-confirmation trusts are 'effectively those of the estate (or at least analogous to those of the estate) for jurisdictional purposes.' Though the Litigation Trust's assets, the proceeds from the litigation claims, were once assets of the estate, that alone does not create a close nexus to the bankruptcy plan or proceeding sufficient to confer bankruptcy jurisdiction. The Litigation Trust's connection to the bankruptcy is not identical to that of the estate. Under section 1.1 of the Litigation Trust, the debtor 'absolutely assigned to the Trustee and to its successors and assigns, all right, title and interest of the Reorganizing Entities in and to the Litigation Claims.' Moreover, the Litigation Trust was created in part so that the Plan could be confirmed and the debtor freed from bankruptcy court oversight without waiting for the resolution of the litigation claims. The deliberate act to separate the litigation claims from the bankruptcy estate weakens the Trustee's claim that the Litigation Trust has the same jurisdictional nexus as that of the estate. Given the limited jurisdiction of non-Article III bankruptcy courts, jurisdiction does not extend necessarily to all matters involving litigation trusts. (citations omitted)

*    *    *

Resolution of this matter will not require a court to interpret or construe the Plan or the incorporated Litigation Trust Agreement. Whether Price Waterhouse was negligent or breached its contract will not be determined by reference to those documents. There is no dispute over their intent. The Trustee's claims are 'ordinary' professional negligence and breach of contract claims that arise under state common law. Though the Plan and Trust Agreement provide the context of the case, this bare factual nexus is insufficient to confer bankruptcy jurisdiction.

The malpractice action could result in an increase in the Litigation Trust's finite assets. But the potential to increase assets of the Litigation Trust and its beneficiaries does not necessarily create a close nexus sufficient to confer 'related to' bankruptcy court jurisdiction post-confirmation. The Trust beneficiaries here no longer have the same connection to the bankruptcy proceeding as when they were creditors of the estate. For reasons they believed financially prudent, they traded their creditor status as claimants to gain rights to the Litigation Trust's assets. Thus, their connection to the bankruptcy plan or proceeding is more attenuated. Furthermore, if the mere possibility of a gain or loss of trust assets sufficed to confer bankruptcy court jurisdiction, any lawsuit involving a continuing trust would fall under the 'related to' grant. Such a result would widen the scope of bankruptcy court jurisdiction beyond what Congress intended for non-Article III bankruptcy courts. Accordingly,

16

resolution of these malpractice claims will not affect the interpretation, implementation, consummation, execution, or administration of the Plan. 372 F.3d at 169-71.

This case is very similar, except that there is an even more tenuous nexus between the allegations in the Objection and the administration of the Insilco estate than there was in the litigation before the Third Circuit. The Objection, though brought by the Committee one day before confirmation, will be litigated by a post-confirmation litigation trust after the Effective Date. (Plan, Section 7.2.) The allegations in the Objection relate solely to pre-petition acts; adjudication of these allegations does not require reference to the Plan; and, as in <u>Resorts</u>, the outcome will have no effect upon the liquidated debtor or its estate. Subject matter jurisdiction is therefore lacking, and the Objection must be dismissed.

### POINT III

### THE CLAIMS OBJECTION FAILS TO STATE A CLAIM
### FOR EQUITABLE SUBORDINATION OR RECHARACTERIZATION

The Objection must also be dismissed because it fails adequately to plead a basis for equitable subordination or recharacterization.

When considering a motion to dismiss made pursuant to Federal Rule of Civil procedure 12(b)(6), made applicable to these proceedings by Bankruptcy Rule 7012, a court is required to accept as true all allegations in the complaint and view them in a light most favorable to the plaintiffs. <u>See</u> <u>Morse v. Lower Merion School District</u>, 132 F.3d 902, 906 (3d Cir. 1997). A court, however, need not credit a complaint's "bald assertions" or "legal conclusions" when deciding a motion to dismiss. <u>Id.</u> (citing <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1429-30 (3d Cir. 1997). A motion to

17

dismiss should be granted "if it appears to a certainty that no relief could be granted under any set of facts which could be proved." Id.

Here, the allegations make it difficult for the Court or the defendants to discern what the claims against the Term C Lenders are. Because the Committee does not specify what acts are attributed to the Term C Lenders, the Objection neither complies with the pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure, as incorporated by Rule 7008 of the Bankruptcy Rules, which requires "a short and plain statement of [its] claim," see Conley v. Gibson, 355 U.S. 41, 47 (1957), nor states facts in support of the legal theories it asserts.

### 1.    The Objection Fails to State Facts Relevant to The Claimants

The Committee refers, in most of its allegations, to "DLJ," sometimes identified as one of the "DLJ" entities – a term that, as used by the Committee, encompasses DLJ Securities Corporation, DLJ Merchant Banking Partners II, and DLJ Capital Funding. The only parties to this adversary proceeding, however, are the distinct limited partnership funds that are the Term C Lenders. The Committee fails to delineate the acts upon which the Term C Lenders are being sued. In fact, the Committee, by using the term "DLJ" to describe actions allegedly taken by entities other than the Term C Lenders, has engaged in a form of syntactic obfuscation that renders it impossible for the Term C Lenders to respond to the allegations set forth in the Objection. The Objection thus fails to meet the standards of Rule 8(a) of the Federal Rules of Civil Procedure.

In a very similar case, the court dismissed equitable subordination claims against one entity based upon the alleged acts of another separate, but affiliated, entity. See, In re

18

Sunbeam Corp., 284 B.R. 355, 361-69 (Bankr. S.D.N.Y. 2002), app. dism., mot. denied,

287 B.R. 861 (S.D.N.Y. 2003). There, the committee filed an equitable subordination

complaint against a Morgan Stanley lending affiliate, seeking to subordinate its claims

for loans to the debtor based upon alleged inequitable acts of Morgan Stanley, not its

lending affiliate. The court found no basis for imputing the acts of Morgan Stanley to its

lending affiliate, and found that none of the allegations directed at the lenders themselves

would support equitable subordination of the lenders' claims. The court ruled:

> In this case, the allegations of wrongdoing are all based on the conduct of
> Morgan Stanley. Morgan Stanley's purported wrongful conduct is blamed
> for the injury to the Noteholders and other unsecured creditors. There is
> no evidence, however, that Morgan Stanley used MSSF [the lending
> affiliate] to shield itself from potential liability. Rather, Morgan Stanley
> has liability exposure to the Noteholders by virtue of its role as
> underwriter of the Note Offering. Moreover, MSSF is not the typical
> undercapitalized shell used to shield a related entity from creditors. MSSF
> had sufficient capital to make the loan and there are no allegations that it
> did not have sufficient capital to fund its operations generally. Thus, the
> corporate form was not used to allow Morgan Stanley to escape any
> liability it might have based on its conduct. The Committee has not
> presented a sufficient rationale to overcome the reluctance to disregard the
> corporate structure.
>
> In addition, the Court finds that the Committee has not alleged a sufficient
> basis upon which to hold MSSF liable for any conduct on Morgan
> Stanley's part based upon a theory of agency. The Court has rejected
> application of alter ego liability and as the characteristics of agency based
> upon complete dominance and control are identical, agency cannot be
> established on that basis. Under a traditional agency theory, in order to
> hold the principal liable for the agent's conduct, there would have to be
> allegations that the principal directed and controlled the agent. There are
> no allegations in the Amended Complaint that Morgan Stanley acted
> subject to MSSF's direction and control. Thus, there are no allegations
> that MSSF controlled Morgan Stanley upon which to conclude that
> Morgan Stanley was MSSF's agent. Indeed, the Committee has alleged
> the opposite, that Morgan Stanley controlled MSSF.

19

Other courts also have held that, in order to meet the pleading rules, specific acts of the defendants must be alleged. Thus, in In re Providian Financial Corp. ERISA Litigation, No. C 01-05027, 2002 WL 31785044, at *1 (N.D. Cal. Nov. 14, 2002), the court found that "[p]laintiffs have lumped the various classes of defendants into an undifferentiated mass and alleged that all of them violated all of the asserted fiduciary duties. The resulting cause of action is so general that it fails to put the various defendants on notice of the allegations against them." See also Wolfgram v. El Dorado County, No. 90-15820, 1991 U.S. App. LEXIS 11754, at *2-*3 (9th Cir. May 31, 1991) ("Wolfgram's pleading does not meet the requirements of Rule 8.... The pleading gives no notice to defendants of what they must defend against because it fails to associate many of the facts or allegations with any specific defendant.").

The Objection fails to provide the Term C Lenders with adequate notice of the allegations against them, and offers no explanation of why they should have to litigate the merits of the acts of other, separate, entities. No allegation is made to suggest that the DLJ entities not before this Court are mere instrumentalities of the Term C Claimants, or that these funds are otherwise responsible for the alleged acts of the absent DLJ entities. The Objection therefore fails to provide a short and plain statement of the case against these funds.

20

## 2. Neither Subordination nor Recharacterization is Properly Pleaded

For the same and additional reasons, the Objection fails to plead a claim for equitable subordination or recharacterization. In order to state a claim for equitable subordination, the Committee must allege: (i) that the Term C Lenders engaged in inequitable conduct; (ii) that the misconduct resulted in injury to the creditors of the bankrupt estate or otherwise conferred an unfair advantage on the Term C Lenders; and (iii) that equitable subordination of the Term C Lenders' claims is not inconsistent with the provisions of the Bankruptcy Code. See United States v. Noland, 517 U.S. 535, 538-39 (1996); Eastern Minerals & Chemicals Co. v. Mahan, 225 F.3d 330 (3d Cir. 2000); Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims, 160 F.3d 982, 986-87 (3d Cir. 1998).

The most basic requirement is an allegation that the creditor has engaged in misconduct. As to the Term C Lenders, the only acts alleged by the Committee are holding of the equity investments and making the Term C Loan.[7] Neither of these is an act that can be found to be inequitable *per se*. The Committee offers no explanation as to why the mere holding of stock would ever be inequitable. As to the making of the Term C Loan, the Committee appears to contend, without supportive fact allegations, that the loan was inequitable because (a) it was made in violation of the 12% Note Indenture, and

---

[7] Cf. In re Exide Tech., Inc., 299 B.R. 732, 743-46 (Bankr. D. Del. 2003). As stated, the Committee has failed to allege any facts that would support the inference that the Term C Lenders themselves, each a distinct limited partnership fund, engaged in any of the purported inequitable conduct. As demonstrated above, while the Objection may have defined "DLJ" as the Term C Lenders, the actions alleged in the Objection cannot be attributed to these limited partner funds, and indeed, the Committee uses the term "DLJ" to refer to the purported acts of entities that are separate and distinct from the Term C Lenders. Accordingly, contrary to the situation presented to the Court in Exide, the Committee's confusing allegations here present no allegations to support for its equitable subordination claim against the Term C Lenders

21

(b) that it caused "deepening insolvency." Neither assertion is supported by allegations of fact.

### a.    The Indenture Provides No Basis for Subordination

The Committee first contends that the making of the Term C Loan violated the 12% Note Indenture. But the Committee has no standing to assert claims of the 12% Noteholders. See, e.g., Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416 (1972) (committee may assert only claims of debtors or estate.)

Further, no facts evidencing a breach of Section 10.10 of the 12% Note Indenture are alleged. Section 10.10 states that "[t]he company shall not incur any Debt which by its terms is (i) subordinated in right of payment to any Senior Debt and (ii) senior in right of payment to the Notes." (Obj. ¶ 11.) The Objection states that that Insilco and "DLJ" "attempted" to violate this covenant, but does not allege any factual basis for a conclusion that the covenant was violated. There is no allegation of the existence of a subordination agreement, for example, to support the legal conclusion that the Term C Loan was subordinated in right of payment to the other senior loans under the Credit Agreement. Therefore, this part of the Objection states no claim.

### b.    No Deepening Insolvency Cause of Action is Pleaded

The second basis offered for equitable subordination is that the Term C Loan caused Insilco's "deepening insolvency." Again, the Objection does not plead the cause adequately.

Several courts have recognized the tort of "deepening insolvency." See, e.g., Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., 267 F. 3d 340, 348-49

(3d Cir. 2001) ("<u>Lafferty</u>") (analyzing the tort of deepening insolvency under Pennsylvania law); <u>In re Exide Technologies, Inc.</u>, 299 B. R. at 751 (finding that Delaware would recognize the tort). These courts have found at least three essential elements to the claim of "deepening insolvency," including (i) harm to the corporation; (ii) that the debt allegedly causing the deepening insolvency be fraudulent or spurious; and (iii) that the alleged perilous financial condition of the borrower be concealed. <u>See</u> <u>Lafferty</u>, 267 F. 3d at 349-50. Further, no claim of deepening insolvency can be made prior to the onset of insolvency, <u>see</u> <u>id.</u> at 349, which is alleged here to have occurred by June 30, 2001. (Obj, ¶ 55).

The alleged harm must be to the debtor; allegations of harm to unsecured creditors is no substitute. <u>Cf.</u> <u>Caplin</u>, 406 U.S. at 434 (holding that a trustee may not assert claims on behalf of creditors.")); <u>Lafferty</u>, 267 F. 3d at 348-49 ("[T]he Committee sought recovery of damage to the Debtors' property from 'deepening insolvency.' We see no indication that the Committee is attempting to recover for injuries to the creditors."); <u>see</u> <u>also</u>; <u>Holland v. Arthur Andersen & Co.</u>, 212 Ill. App. 3d 645, 651 (Ill. App. Ct. 1991) ("While the deepening insolvency theory may be one the courts have recognized, the plaintiff's version of the theory appears to be no more than a restatement in different terms of the injury suffered by ARC's creditors"); <u>Coroles v. Sabey</u>, 79 P.3d 974, 983 (Utah Ct. App. 2003) (holding that, if "deepening insolvency is recognized in Utah, "it includes damages as an essential element").

The Objection fails to plead facts demonstrating harm to the Debtor, or fraudulent debt, or that Insilco's financial state was concealed. First, nothing other than the most

23

conclusory allegation of harm to Insilco is made. (Obj. ¶ 8(f) ("compounding the losses suffered by the Debtors, their estates and the unsecured creditors.")) The Objection instead asserts, in an equally conclusory manner, harm to unsecured creditors. (See, e.g., id. ¶¶ 2 ("defeat the rightful claims of unsecured creditors"), 66 ("elevate interests above Insilco's unsecured creditors"), 73 (advance position "to the detriment of unsecured creditors"), 76 ("interests of unsecured creditors were sacrificed"), 77 ("The Debtors, their estates and unsecured creditors have been harmed.").) Thus, the Objection does not adequately plead harm to Insilco. Second, no allegation of fraud or concealment is made with respect to the Term C Loan. Therefore, no "deepening insolvency" claim is stated.

Similarly, there are no allegations sufficient to support the elements of a claim for recharacterization. First, there is some doubt about the vitality of a recharacterization claim after the enactment of Section 510(c) of the Code, which does not recognize such a claim but appears to be the sole source for reclassifying an otherwise allowable claim. See, e.g., In re Pacific Express, 69 B.R. 112, 115 (B.A.P. 9th Cir. 1986). The United States Court of Appeals for the Third Circuit has not yet addressed whether Bankruptcy Code Section 510(c) precludes recharacterization; other circuits are split. See United States v. State St. Bank & Trust Co., 303 B.R. 35, 38 (Bankr. D. Del. 2003) (summarizing).

Those courts that have addressed recharacterization claims have employed a multi-factor test. See In re Exide Technologies, Inc., 299 B.R. 732, 740 (Bankr. D. Del. 2003) (court considered the eleven factors found in In re Autostyle Plastics, 269 F. 3d 726, 751-53(6th Cir. 2001)). Where a debt is formally documented as part of a credit

24

agreement, as here, it is unlikely to be recharacterized. See In re SubMicron Sys. Corp., 291 B.R. 314, 325 (D. Del. 2003) (funding characterized as debt where name given to funding was debt, intent of parties was to create debt, and funding had fixed maturity and interest rate). In Exide, this Court dismissed a recharacterization claim where, as here, a loan was documented as such, provided a fixed maturity date and schedule of payments, provided for payment of a fixed rate of interest and was senior to other debt, though, in distinction to this case, the debt there was not made by a holder of equity and was secured. 299 B.R. at 740-42.

Here, the Objection alleges that the Term C Loan was documented as part of the Credit Facility. (Obj. ¶ 61.) The Objection also alleges that Insilco's Board of Directors retained the firm of Houlihan Lokey Howard & Zukin to provide an opinion that the Term C Loans were "(a) . . . fair to Insilco's outstanding 14% Senior Discount Noteholders, (b) the dilution that Insilco could suffer as a result of the transaction was 'fair' to Insilco, and (c) the terms which Insilco received in this transaction were no less favorable than what Insilco could have 'obtained in a comparable arm's length transaction with an unaffiliated entity.'" (Id. ¶ 64.) These allegations support only one conclusion – that the Term C Loan was a loan, not an equity investment.

Because no claim for equitable subordination or recharacterization is properly pleaded, the Objection must be dismissed.

CONCLUSION

For the reasons set forth herein, the Term C Lenders respectfully request that the

Court enforce its Settlement and Confirmation Orders, dismiss the Objection with

prejudice, and order the distribution due under the Plan on the allowed claims of the

Term C Lenders.

Dated: New York, New York,
      July 23, 2003

Respectfully submitted,

THE BAYARD FIRM

OF COUNSEL:

Neil B. Glassman (No. 2087)
Charlene B. Davis (No. 2336)

By: _Charlene D. Davis_

222 Delaware Avenue, 9th Floor
Wilmington, Delaware  19801
Tel:  (302) 655-5000
Fax:  (302) 658-6395

OF COUNSEL:

Karen E. Wagner
Patrick A. Bradford
James I. McClammy

DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York  10017

Tel:  (212) 450-4000
Fax:  (212) 450-3800

Counsel for the Term C Lenders

26

A - 392

## CERTIFICATE OF SERVICE

I, Charlene D. Davis, Esquire, do hereby certify that on the 23rd day of July, 2004,

I caused a true and correct copy of the **Motion of Term-C Lenders to Enforce Orders,**

**Dismiss Objection of the Official Committee of Unsecured Creditors, and Authorize**

**Distribution** and **Memorandum of Law of Term C Lenders in Support of Motion to**

**Enforce Orders, Dismiss Objection of the Official Committee of Unsecured**

**Creditors, and Authorize Distribution** to be served upon the parties listed below in the

manner(s) indicated:

**VIA U.S. MAIL and ELECTRONIC MAIL:**

Andrew I. Silfen, Esquire
Arent Fox Kintner Plotkin & Kahn, PLLC
25th Floor
1675 Broadway
New York, NY 10019
silfen.andrew@arentfox.com

Michael Cryan, Esquire
Arent Fox Kintner Plotkin & Kahn, PLLC
25th Floor
1675 Broadway
New York, NY 10019
cryan.michael@arentfox.com

Scott Shelley, Esquire
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
sshelley@shearman.com

**VIA HAND DELIVERY and ELECTRONIC MAIL:**

Pauline K. Morgan, Esquire
Young Conaway Stargatt & Taylor LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
pmorgan@ycst.com

David P. Primack, Esquire
Drinker, Biddle & Reath LLP
1100 North Market Street
Suite 1000
Wilmington, DE 19801-1254
david.primack@dbr.com

David L. Buchbinder, Esquire
Office of the United States Trustee
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801-3519
david.l.buchbinder@usdoj.gov

_(signature)_

Charlene D. Davis (No. 2336)

548056v1

A - 393

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| INSILCO TECHNOLOGIES, INC., *et al.*, | : | Case No. 02-13672 (KJC) |
|  | : |  |
| Debtors | : | (Jointly Administered) |
|  | : |  |
|  | : | Hearing Date: October 28, 2004 at 2:00 p.m. |

**MEMORANDUM OF LAW OF OFFICIAL COMMITTEE
OF UNSECURED CREDITORS IN OPPOSITION TO THE CLASS 7
CREDITORS' MOTION TO DISMISS THE COMMITTEE'S OBJECTION**

ARENT FOX PLLC
Andrew I. Silfen
Schuyler G. Carroll
Michael S. Cryan
1675 Broadway
New York, NY 10019
(212) 484-3900

-and-

DRINKER BIDDLE & REATH LLP
Warren T. Pratt
David P. Primack
1100 North Market Street, Suite 1000
Wilmington, DE 19801
(302) 467-4200

Counsel for the Official Committee of
Unsecured Creditors

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ..................................................................................................................... 2

ARGUMENT

    POINT I

    THE COMMITTEE'S OBJECTION DOES NOT VIOLATE PRIOR ORDERS
    OF THIS COURT AND THE COMMITTEE DID NOT RELINQUISH ITS
    RIGHT TO, AMONG OTHER THINGS, SEEK TO SUBORDINATE OR
    RECHARACTERIZE THE TERM-C LENDERS' CLASS 7 CLAIMS UNDER
    THE PLAN ...................................................................................................................... 10

    POINT II

    THIS COURT HAS JURISDICTION TO REVIEW THE COMMITTEE'S
    OBJECTION, AND THE RECENT RULING IN *IN RE RESORTS INT'L, INC.*
    SUPPORTS THIS CONCLUSION ................................................................................ 17

    POINT III

    THE COMMITTEE'S OBJECTION ADEQUATELY ALLEGES
    RECHARACTERIZATION, EQUITABLE SUBORDINATION, AND
    DEEPENING INSOLVENCY ........................................................................................ 20

    A.   The Term-C Lender Claims Should Be Recharacterized ........................ 22

    B.   The Term-C Lender Claims Should Be Equitably Subordinated .............. 29

    C.   The Committee Properly Alleges Deepening Insolvency ........................ 32

CONCLUSION ........................................................................................................................ 35

i

## TABLE OF AUTHORITIES

Page

### CASES

Caplin v. Marine Midland Grace Trust Co.,
406 U.S. 416 (1972) ............................................................................................ 15, 16

Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims,
160 F.3d 982 (3d Cir. 1998) ............................................................................... 29, 30

City of Philadelphia v. Lead Indus. Ass'n, Inc.,
994 F.2d 112 (3d Cir. 1993) ....................................................................................... 21

Conley v. Gibson,
355 U.S. 41 (1957) ....................................................................................................... 21

CorEstates Bank, N.A. v. Huls Am., Inc.,
176 F.3d 187 (3d Cir. 1999) ...................................................................................... 15

Coroles v. Sabey,
79 P.3d 974 (Utah Ct. App. 2003) .......................................................................... 34

Diasonics Inc. v. Ingalls,
121 B.R. 626 (Bankr. N.D. Fla. 1990) ............................................................. 23, 28

Eastern Minerals & Chemicals Co. v. Mahan,
225 F.3d 330 (3d Cir. 2000) ..................................................................................... 32

Geftman v. C.I.R.,
154 F.3d 61 (3d Cir. 1998) ........................................................................................ 24

Holland v. Arthur Anderson & Co.,
212 Ill. App. 3d 645 (Ill. App. Ct. 1991) ............................................................. 34

In re Atlanticrancher Inc.,
279 B.R. 413 (Bankr. D. Mass. 2002) .............................................................. 24, 25, 28

In re Autostyle Plastics, Inc.,
269 F.3d 726 (6th Cir. 2001) ......................................................................... 23, 27, 28

ii

# TABLE OF AUTHORITIES
## Continued

Page

In re Cold Harbor Assocs.,
  204 B.R. 904 (Bankr. E.D. Va. 1997) .................................................. 24, 26, 27, 28

In re Computer Personalities Sys., Inc.,
  284 B.R. 415 (Bankr. E.D. Pa. 2002) .................................................. 21, 29, 30

In re Continental Airlines, Inc.,
  236 B.R. 318 (Bankr. D. Del. 1999) .................................................. 15
In re Exide Technologies, Inc.,
  299 B.R. 732 (Bankr. D. Del. 2003) .................................................. 23, 29, 30, 31, 33

In re Fett Roofing & Sheet Metal Co., Inc.,
  438 F. Supp. 726 (E.D. Va. 1977) .................................................. 24

In re Gillingham,
  150 B.R. 907 (W.D. Pa. 1993) .................................................. 14

In re Harry Levin, Inc.,
  175 B.R. 560 (Bankr. E.D. Pa. 1994) .................................................. 21

In re Heartland Wireless Communications, Inc.,
  2002 WL 31319460, at *2 (D. Del.) .................................................. 14

In re Herby's Foods,
  2 F.3d 128 (5th Cir. 1993) .................................................. 23

In re Hyperion Enters.,
  158 B.R. 555 (D.R.I. 1993) .................................................. 23, 29

In re Kids Creek Partners L.P.,
  212 B.R. 898 (Bankr. N.D. Ill. 1997) .................................................. 24

In re Mid-American Waste Sys., Inc.,
  284 B.R. 53 (Bankr. D. Del. 2002) .................................................. 30

In re Midtown Prod. Terminal Inc.,
  599 F.2d 389 (10th Cir. 1979) .................................................. 22

In re Providian Fin. Corp. ERISA Litigation,
  2002 WL 31785004 (N.D. Cal. Nov. 14, 2002) .................................................. 32

In re Resorts Int'l, Inc.,
  372 F.3d 154 (3d Cir. 2004) .................................................. 18, 19

In re Submicron Sys. Corp.,
  291 B.R. 314 (D. Del. 2003) .................................................. 23

iii

## TABLE OF AUTHORITIES
### Continued

Page

In re Sunbeam Corp.,
283 B.R. 355 (Bankr. S.D.N.Y. 2002) .................................................31, 32

In re Transystems Inc.,
569 F.2d 1364 (5th Cir. 1978) ...............................................24, 26, 29

Katchen v. Landy,
382 U.S. 323 (1966) ..............................................................15

Local Loan Co. v. Hunt,
292 U.S. 234 (1934) ..............................................................15

Morse v. Lower Merion School Dist.,
132 F.3d 902 (3d Cir. 1997) .....................................................22

Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics
v. Chinery,
330 F.3d 548 (3d Cir. 2003) ..................................................13, 14

Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.,
267 F.3d 340 (3d Cir. 2001) ..................................................32, 33

Pacific Express Inc.,
69 B.R. 112 (9th Cir. B.A.P 1986) ...............................................22

Pardo v. Pacificare of Texas, Inc. (In re APF Co.),
264 B.R. 344 (Bankr. D. Del. 2001) ..........................................20, 21

Roth Steel Tube Co. v. Comm'r. of Internal Revenue Serv.,
800 F.2d 625 (6th Cir. 1986) .................................................23, 28

Schaedler v. Reading Eagle Publ'n. Inc.,
370 F.2d 795 (3d Cir. 1967) ....................................................21

Stoll v. Gottlieb,
305 U.S. 134 (1937) ............................................................15

United States v. Noland,
517 U.S. 535 (1996) ...........................................................32

Wolfgram v. El Dorado County,
1991 U.S. App. LEXIS 11754 (9th Cir. 1991) ..................................32

iv

TABLE OF AUTHORITIES
Continued

Page

STATUTES

Fed. R. Bankr. P. 3007 ..................................................................................15

Fed. R. Bankr. P. 7008 ..................................................................................20

Fed. R. Civ. P. 8(a) ..................................................................................20, 31

Fed. R. Civ. P. 8(e) ......................................................................................20

11 U.S.C. § 1102(a) .......................................................................................9

11 U.S.C. § 1107 ...........................................................................................9

11 U.S.C. § 1108 ...........................................................................................9

11 U.S.C. § 501 ...........................................................................................12

11 U.S.C. § 510(c) ..................................................................................13, 29

28 U.S.C. 157(b)(1) ......................................................................................17

42 U.S.C.A. § 1983 .......................................................................................22

MISCELLANEOUS

15 Collier on Bankruptcy ¶ 7008.02[2] (L. King 15th ed. rev. 1999) ........................21

Di Massa, <u>Deepening Insolvency Concerns Secured Lenders</u>, Bankruptcy Update,
    Legal Intelligencer, Vol. 229, No. 67 at 5 (2003) .........................................33

## PRELIMINARY STATEMENT

The Official Committee of Unsecured Creditors (the "Committee") of Insilco Technologies, Inc. *et al.*[1] ("Insilco" or the "Debtors"), by its attorneys, Arent Fox PLLC and Drinker Biddle & Reath LLP, respectfully submits this memorandum in opposition to the Class 7 Creditors' motion to dismiss (the "DLJ Motion") and in further support of its first omnibus (substantive) objection (the "Objection") to the claims of Class 7 Creditors,[2] including MBP II Plan Investors, L.P., DLJ Offshore Partners II, C.V., DLJ Millennium Partners-A, L.P., DLJ Millennium Partners, L.P., DLJ ESC II, L.P., DLJ EAB Partners, L.P., DLJ Merchant Banking Partners II-A, L.P., DLJ Merchant Banking Partners II, L.P., DLJ Diversified Partners, L.P., and DLJ Diversified Partners-A, L.P. (collectively, "DLJ," the "Term-C Lenders" or the "Claimants"), claim nos. 607-616 (collectively, the "Claims").

The Court should deny the DLJ Motion and properly maintain the Committee's Objection for three basic reasons. First, the Committee has authoritative power, right, and standing to bring and prosecute its Objection under the terms of the confirmed Plan. Second, this Court has jurisdiction to hear and determine the Committee's Objection. Third, the Committee has made a bona fide and meritorious objection with specific examples of the Term-C Lenders' inequitable conduct that subjects the Claims to recharacterization or equitable subordination.

For the reasons discussed below, the DLJ Motion should be denied.

---

[1]    The other debtors in these jointly administered Chapter 11 proceedings are Insilco Holding Co., InNet Technologies Inc., Insilco International Holdings, Inc., Precision Cable Mfg. Corporation, Eyelets for Industry, Inc., EFI Metal Forming, Inc., Stewart Stamping Corporation, Stewart Connector Systems, Inc., Signal Caribe, Inc. and Signal Transformer Co., Inc.

[2]    Class 7 Creditors include: MBP II Plan Investors, L.P., DLJ Offshore Partners II, C.V., DLJ Millenium Partners-A, L.P., DLJ Millenium Partners, L.P., DLJ ESC II, L.P., DLJ EAB Partners, L.P., DLJ Merchant Banking Partners II-A, L.P., DLJ Merchant Banking Partners II, L.P., DLJ Diversified Partners, L.P., and DLJ Diversified Partners-A, L.P. (collectively, "DLJ," the "Term-C Lenders" or the "Claimants").