## BACKGROUND[3]

DLJ Acquires Insilco and Takes Control

In late 1997 or early 1998, members of DLJ Merchant Banking Partners II ("DLJMB") identified Insilco as an attractive equity investment, and DLJ and its affiliates acquired control of the company via a merger in 1998.

Utilizing a strategy of leveraged recapitalization,[4] DLJ financed the transaction with credit facilities that were initially funded and syndicated by another DLJ entity, DLJ Capital Funding, Inc. ("DLJ Capital")  With this highly-leveraged transaction, DLJ acquired more than 70% of the Debtors' equity – valued at over $471 million – while only contributing $43 million of DLJ's own capital.  After the merger, DLJ owned approximately 70% of the company while Insilco's prior shareholders and its management retained only 10%.[5]

DLJ immediately took advantage of its financial control over the new company in 1998 by causing the company to buy or sell eight different businesses and amend its existing pre-merger credit agreements three times to fund many of these transactions.  Many, if not all, of these transactions were conducted with insiders or DLJ-related entities and resulted in financial losses to the Debtors.  Additionally, these unsuccessful transactions allowed DLJ to generate substantial fees for itself – in 1999 alone, DLJ received in excess of $5.2 million in banking and underwriting fees, and $3.5 million in "merger advisory fees."  Over the course of five years, DLJ received at least $15 million in such fees from Insilco.

---

[3]  All of the facts discussed herein are derived from the Objection and other pleadings and motions filed in this case.

[4]  "Leveraged recapitalization" is a tactic whereby a company borrows 80%-90% of the market value of its common stock and then distributes the funds to its shareholders either as a special dividend or a share repurchase.  The debt financing the leverage is often secured by substantially all of the borrower's assets.  The strategy is highly dependent upon management having confidence in the future prospects of the company.  The tactic is so risky that it is popularly known as "shark repellant" in the securities business.

[5]  399 Venture Partners, Inc., an affiliate of CVC, acquired the remaining approximately 19.3%.  This contested matter does not deal with the claims of the Debtors and the Estates against CVC; upon the occurrence of the effective date of the Plan, such claims will be transferred to the Creditor Trustee.

A - 401

DLJ also abused its control over the company by requiring the Debtors to employ DLJ as Insilco's financial advisor, underwriter, syndication agent, lead arranger and lender. Additionally, DLJ controlled and dominated the Debtors' ownership and management by installing insiders on the Board of Directors – by 1999, four of the seven positions on the Insilco Board of Directors were filled by DLJ insiders; by 2000, five of the seven positions were held by DLJ insiders.[6]

Insilco Is Forced to Refinance and Amend Its Premerger Credit Agreements

The leveraged recapitalization strategy utilized by DLJ when it acquired Insilco volatized Insilco's financial position and forced Insilco to refinance its 10.25% Senior Subordinated Notes[7] on November 9, 1998, only three months after it was acquired by DLJ. Insilco did this by underwriting the sale of $120 million of 12% Senior Subordinated Notes governed by a 12% Note Indenture. Specifically, Insilco issued 12% Senior Subordinated Notes due 2007 in the principal amount of up to $150,000,000.

Notably, the 12% Note Indenture included an anti-layering provision. Section 10.10 of the 12% Note Indenture, called "Limitation on Layered Debt," prohibited Insilco from issuing debt that was subordinate to Senior Debt, but senior in right of payment to the 12% Senior Subordinated Notes under the 12% Note Indenture.

Insilco was forced to borrow an additional $30 million from its credit facilities to complete this transaction because the $116 million generated from this sale was insufficient to pay off the 10.25% Senior Subordinated Notes.

---

[6]   The DLJ insiders were William F. Dawson, Jr., Thompson Dean, John F. Fort, III, Keith Palumbo, and George A. Peinado.

      All capitalized terms not defined herein shall have the meanings ascribed to them in the Amended Joint Liquidating Plan Pursuant To Chapter 11 of The United States Bankruptcy Code dated February 13, 2004 (as amended, the "Plan").

A - 402

The merger apparently left Insilco without sufficient working capital to continue its operations. As a result, Insilco on November 24, 1998 (again, only three months after DLJ acquired the Debtors), amended and restated its then-existing $200 million revolving credit line to add an additional $100 million to its credit facility. Insilco replaced its prior credit facility with a new two-tier $300 million credit facility: a $175 million, 4.8-year senior secured revolving loan (replacing the prior $200 million facility) and a new $125 million "term" loan. Similar to the prior credit facility, this new facility was secured by a first-priority perfected lien on substantially all of Insilco's assets, including a pledge of the stock of Insilco's domestic subsidiaries.[8]

But even after refinancing and amending its credit agreements, Insilco, at year-end 1999, had in excess of $430 million in total liabilities – of which $401 million was designated as long-term debt – against $280 million in total assets.

DLJ Directs Insilco to Enter into Transactions with Insiders that Force
Insilco to Restructure Its Credit Facility and Further Harm Its Financial Position

Using its majority status on the Insilco Board, DLJ caused Insilco to amend the "Amended and Restated Credit Agreement" two times when it acquired two businesses and sold one in 2000, thus further complicating Insilco's financial situation. The First Amendment to the Amended and Restated Credit Agreement was executed on or about February 16, 2000, when DLJ caused Insilco to buy T.A.T. Technologies ("TAT"), a small Canadian wire and cable assembly operation.

---

[8]    Insilco's pledge and security agreement, however, excluded Insilco's real property leaseholds, certain general intangibles, and the capital stock of substantially all of Insilco's foreign subsidiaries in excess of 65% thereof. Upon information and belief, Insilco did not pledge the remaining 35% of its foreign subsidiaries as collateral in order to avoid triggering Section 7701(a)(30) of the Internal Revenue Code, which would cause Insilco to incur a major tax liability. Insilco ended up pledging the remaining 35% of Insilco's foreign subsidiaries in mid-2002 prior to filing bankruptcy. This pledge caused Insilco to incur an approximately $8 million tax liability.

4

On August 25, 2000, the Second Amendment to the Amended and Restated Credit Agreement (the "Credit Agreement") was executed in order to finance the sale of Insilco's Automotive Businesses and the acquisition of Precision Cable Manufacturing and its Mexican subsidiaries ("PCM"), another cable and wire assembly manufacturer. Significantly, DLJ installed an affiliate, DLJ Capital, as Lead Arranger and Syndication Agent under the Credit Agreement, who ultimately received a total fee income of at least $6.7 million for assisting the company with this transaction.

The Credit Agreement provided for three credit facilities: (a) a $50 million, 6-year senior secured revolving loan (the "Revolver"), (b) a $35 million, 6-year senior secured amortizing term-A loan (the "Term-A Facility"), and (c) a $125 million, 7-year senior secured amortizing term-B loan (the "Term-B Facility"). The Revolver matured on the sixth anniversary of the Credit Agreement. The Term-A Facility required quarterly prepayments in each of its six years, beginning with December 2000, as follows: $875,000 for the first two years, $1,312,500 for the third year, $1,750,000 for the fourth and fifth years and $2,187,500 for the final year. The Term-B Facility required quarterly prepayments of $312,500 for the first six years and quarterly prepayments of $29.4 million in the seventh year. This Credit Agreement remained subject to the 12% Note Indenture (including the Indenture's anti-layering provision) executed by Insilco in November of 1998.

Upon information and belief, DLJ subsequently syndicated and/or assigned its interest in the Revolver and Term-A and Term-B Facilities to various lenders and continued to market the syndication, soliciting potential lenders to invest in Insilco high-yield secured credit facilities.

As a result of DLJ's self-interested acts, Insilco's working capital in December of 2000 was half of what it was from the previous year (down from $150 million to approximately $75

5

million), while its long-term debt remained a staggering $380 million against $357 million in total assets.

Although in financial turmoil, Insilco acquired yet another company, InNet Technologies, Inc., financing it with cash and all remaining funds under the Term-B Facility.

Insilco Enters Into the Zone of Insolvency

By the second quarter of 2001, Insilco was on the brink of insolvency when the market slowed and Insilco's major customers greatly reduced their order forecast and canceled previously-placed orders. Soon thereafter Insilco was forced to write down $147 million in goodwill and ultimately violated its loan covenants under the Credit Agreement. As of June 30, 2001, Insilco was insolvent.

The Term-C Loan

By June 30, 2001, Insilco, while either insolvent or in the zone of insolvency, had violated the loan covenants under the Credit Agreement. Insilco's Lenders instructed the company to produce additional cash and amend certain negative covenants in the Credit Agreement in order to avoid enforcement of the Credit Agreement's default provisions. Upon information and belief, DLJ – Insilco's majority equity holder – was asked to contribute such funds to Insilco as equity capital. Specifically, DLJ was asked to make a "cash infusion" of $15 million. junior and subordinate to the claims of the Lenders.

Upon information and belief, DLJ at that time expressed its desire to make such funds as a loan rather than an equity contribution. It appears that the Lenders agreed to the terms upon which DLJ was willing to make the loan, so long as the DLJ funds were made junior to the credit facility. Thus, DLJ attempted to make this cash infusion as an equity investment under the guise of a loan.

6

On August 15, 2001, the Lenders amended Section 2.1 the Credit Agreement to include a new provision, Section 2.1.6, whereby DLJ agreed to make a "loan" to the company (the "Term-C Loan"). As Term-C Lenders,[9] DLJ was to receive warrants to purchase approximately 60,000 shares of Insilco's common stock at $0.01 per share, which would, upon exercise, constitute approximately 38% of Insilco's then-outstanding common stock.

This purported loan was in direct violation of the 12% Note Indenture's anti-layering provision, as it essentially directed the Debtors to issue debt that was junior to the Senior Lenders and senior in right of payment to the 12% Senior Subordinated Notes issued under the 12% Note Indenture. The Term-C Loan was, by its terms, part of the facility under the Credit Agreement, but in actuality an unsecured obligation not entitled to the benefit of the liens granted to the Lenders. The Term-C Loan, however, as part of the credit facility, improperly entitled the Term-C Lenders to the benefits of the subordination provisions of the 12% Note Indenture. By virtue of the subordination turnover provisions of the 12% Note Indenture, any payments made to the 12% Senior Subordinated Notes would be given back to the Lenders, including the Term-C Lenders.

Since the Term-C Lenders were neither entitled to the secured position of the other Lenders nor entitled to structurally subordinate themselves (to the Senior Lenders) or the holders of the 12% Note, the Term-C Loan violated the 12% Note Indenture's anti-layering provisions. Moreover, this transaction was improper because DLJ had attempted to camouflage its risk investment in the Debtors as a loan to take above other unsecured creditors and avoid the fate of equity holders in bankruptcy.

---

[9] The Term-C Lenders were the Claimants herein – DLJ Merchant Banking Partners II-A, L.P., DLJ Offshore Partners II, C.V., DLJ Diversified Partners, L.P., DLJ Diversified Partners-A, L.P., DLJ EAB Partners, L.P., DLJ Millenium Partners, L.P., DLJ ESC II, L.P., DLJ Millenium Partners-A, L.P., and MBP II Plan Investors, L.P., and their respective successors and assigns.

7

DLJ Stalls Insilco's Bankruptcy

By January 2002, Insilco's Board had already allegedly determined that the combination of the declining economy and Insilco's highly-leveraged position seriously threatened Insilco's ability to continue as a going concern. Despite the fact that Insilco was clearly insolvent and that its Board clearly owed fiduciary duties to all of its creditors, DLJ exercised dominion and control over Insilco by delaying Insilco's bankruptcy filing so that DLJ could enhance its position with the Lenders, to the detriment of unsecured creditors.

After DLJ enhanced its position with the Lenders to the detriment of other creditors, it appears that DLJ and the Lenders in the last year of the Debtors' prepetition existence acted in concert to manipulate the Debtors' bankruptcy filings and aggressively pushed the Debtors to sell their various business assets to ensure that solely the Lenders, including the Term-C Lenders, would benefit from the value of the sales of such assets. The Lenders expressed to the Debtors their belief that these sales should take place within the context of a Chapter 11 proceeding and advised the Debtors to file bankruptcy (i) after the Debtors received letters of intent from proposed buyers and, upon information and belief, (ii) after any preference periods that applied to the last-minute grants of additional liens and security interests to the Lenders had expired.

DLJ arranged for the sale of Insilco to take place within the context of a bankruptcy, after improperly increasing the Lenders' security interests in Insilco's assets and after receiving letters of intent from proposed buyers. Through the orchestration of this wrongful scheme and the interests and agendas of DLJ and the Lenders, DLJ prevented Insilco from filing for bankruptcy until the Lenders' interests were maximized at the expense of the Debtors and the Debtors' unsecured creditors. This arrangement wrongfully benefited DLJ, as it enabled them to preserve their good will and relationship with the Lenders, to the detriment of all other unsecured creditors.

8

Insilco Finally Files For Bankruptcy

On December 16, 2002 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware. The Debtors continue in the management and operation of their businesses and properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed to date.

On January 3, 2003, the Office of the United States Trustee for the District of Delaware appointed five members of the Committee pursuant to Section 1102(a) of the Bankruptcy Code.

On February 13, 2004, the Debtors filed their Plan, as amended.

On June 9, 2004, prior to the Confirmation Date, the Committee filed its Objection to the Claims of Class 7 Creditors. This Objection was filed in accordance with the objection procedure set forth under Section 4.8(b) of the Plan.

The Term-C Lenders comprising Class 7 voted for the Plan containing the foregoing provision, and thus consented to the objection procedure contained in the Plan and utilized by the Committee.

Despite the Term-C Lenders' consent to the Plan's objection procedure, the Term-C Lenders filed the DLJ Motion to dismiss the Committee's Objection.

9

## ARGUMENT

### POINT I

**THE COMMITTEE'S OBJECTION DOES NOT VIOLATE
PRIOR ORDERS OF THIS COURT AND THE COMMITTEE
DID NOT RELINQUISH ITS RIGHT TO, AMONG OTHER
THINGS, SEEK TO SUBORDINATE OR RECHARACTERIZE
THE TERM-C LENDERS' CLASS 7 CLAIMS UNDER THE PLAN**

The Term-C Lenders argue that the Committee improperly brings its Objection because prior orders of this Court deemed the Term-C Lenders' Claims "allowed" and, as a result, the Committee relinquished all rights to bring any and all objections against the Term-C Lenders' Claims under the Court-approved Asset Reallocation and Settlement Agreement (the "Settlement Agreement"). This argument is simply incorrect because, although the Court approved the Settlement Agreement and incorporated its terms into its Order confirming the Plan, the terms of the Settlement Agreement do not provide for the waiver of the rights of the Debtors, their Estates, or any party in interest to object to the Term-C Lenders' Claims. To the contrary, the Settlement Agreement by its terms specifically allows and contemplates objections to the Term-C Lenders' Claims, and as such, reserves and maintains the right to bring an objection.

Despite the clear and unambiguous language of the Settlement Agreement, the Term-C Lenders seek to expand the releases provided for in the Settlement Agreement and include themselves as part of the released parties. The Settlement Agreement was made by and among Insilco, the Committee, indenture trustee for the 12% Senior Subordinated Notes, indenture trustee for the 14% Senior Discount Notes, and the "Senior Lenders." The Term-C Lenders were not signatories to the Settlement Agreement. The Term-C Lenders, however, are beneficiaries of the terms of the Settlement Agreement. As such, the Term-C Lenders can only benefit from those provisions applicable to them

10

(as defined in Section 101 of the Bankruptcy Code), agents, employees, and professionals, only in respect of the Term-C Loans under the Credit Agreement (as defined therein) and **notwithstanding anything herein to the contrary, the Term-C Lenders and their affiliates, insiders (as defined in Section 101 of the Bankruptcy Code) agents, employees and professionals, shall not otherwise be released or deemed released. Nothing contained herein shall be deemed to discharge, impair or otherwise affect any claim, action, cause of action or right against the Term-C Lenders and any affiliate, insider, agent or professional of the Term-C Lenders, except as specifically set forth in the preceding sentence, provided however that the reservation of non-released claims, causes of action or rights in this Paragraph shall not extend to the Released Lender Parties.**

<u>See</u> Exh. A, the Settlement Agreement, ¶4.C at 12-13 (bold emphasis added)  The Committee's right to bring its Objection is further supported by Section 14.9(a) of the Plan (attached hereto, with corresponding Order approving the Plan, as Exhibit B), titled "Releases by the Debtors and the Creditors' Committee," which confirms the limited release terms of the Settlement Agreement:

> Pursuant to Paragraph 4A of the Asset Reallocation and Settlement Agreement. the Debtors and the Creditors' Committee have provided the releases, waivers and discharge in respect of the Released Lender Parties as set forth herein  Pursuant to Paragraph 4C of the Asset Reallocation and Settlement Agreement, the release, waiver and discharge of the Term-C Lenders is expressly limited and qualified as set forth therein

<u>See</u> Exh. B, the Plan, § 14.9(a) at 34.

So although the Senior Lenders (which as defined does not include the Term-C Lenders) received a release. it was agreed by the parties to the Settlement Agreement that the Term-C Lenders would not receive a release. but rather, that the Term-C Lender Claims would only be deemed "allowed." The term "allowed," however. is undefined in the Settlement Agreement  In the context used by the parties, such term simply means only that a valid claim exists against the Debtors as provided under Section 501 of the Bankruptcy Code, not the wild and fabricated definition used by the Term-C Lenders. Thus, the Term-C Lenders did not obtain a release other than relating to allowance, and the relief and remedies available to the Debtors. Estates and creditors against the Term-C Lenders on the allowed claims are reserved

The fact that the Term C-Lenders' Claims are deemed allowed does not mean that the Committee cannot bring its Objection against the Class 7 Claims. To the contrary, the allowed status of the Term-C Lender Claims enables the Committee to bring its Objection, as subordination under Section 510(c) may only be sought against allowed claims. Thus, the allowance of the Claims under the Settlement Agreement is consistent with the Plan's provisions providing the Committee with the right to seek relief that may be afforded against allowed claims.

The Term-C Lenders in their Motion misquote the terms of the Settlement Agreement to imply not only that the Term-C Lenders' Claims were deemed allowed, but also that the ability of the Debtors, their Estates and all other parties in interest to object to these Claims was relinquished. The releases, however, that the Term-C Lenders quote in their Motion are only applicable to the claims of the Term-A and Term-B Senior Lenders' Claims, and thus do not prevent the Committee from bringing its Objection against the unsecured claims of the Term-C Lenders.

Thus, the Settlement Agreement as incorporated by prior orders of this Court does not prohibit the Committee from bringing its Objection to the Term-C Lenders' Claims. and the Plan, which carries out the terms of the Settlement Agreement. distinctly provides for the objection procedure used by the Committee. Specifically, Section 4.8(b) of the Plan addressing "Treatment" states that the Term-C Lender Claims in Class 7 would be allowed "[u]nless the Debtors (or the Creditors' Committee[11] on behalf of the Debtors or their Estates) or the Indenture

---

[11] The Term-C Lenders incorrectly state that the Committee needed to obtain authorization to classify the Allowed Term-C Claims as 'Disputed Claims." As is clear from this provision, the Committee was automatically granted the authority if it followed the detailed procedure. The Term-C Lenders support this incorrect statement with case law (Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics v. Chinery. 330 F.3d 548. 580 (3d Cir. 2003)) that has no relevance to the issue at hand because it involved a different set of facts. The committee in Cybergenics needed to seek permission from the court to bring avoidance claims because the debtor refused to bring the claims. The court in Cybergenics used its equitable powers to grant derivative standing because the debtor was negligent in fulfilling its fiduciary duty

Trustees have commenced an adversary proceeding or contested matter prior to the Confirmation Date seeking to subordinate or recharacterize the Allowed Claims in Class 7." See Exh. B, the Plan, § 4.8(b) at 17. The Plan provides that

> [i]f the Debtors (or the Creditors' Committee or Indenture Trustees) have commenced such an adversary proceeding or contested matter prior to the Confirmation Date, then the Allowed Class 7 Claims shall be Disputed Claims, and any Distribution otherwise payable to the Holders of Class 7 Claims shall be held in the Unsecured Creditor Disputed Claims Reserve pending the resolution of such adversary proceeding or contested matter by a Final Order.

See Exh. B, the Plan, § 4.8(b) at 17.

Section 4.8 of the Plan was carefully drafted so as to allow the Committee to bring this Objection to the Term-C Lender Claims. The fact that the Term-C Lender Claims were allowed under the Settlement Agreement is consistent with the Plan. More importantly, the Term-C Lenders voted for the Plan. As such, the Term C-Lenders consented to the Committee's right to seek relief against their Claims or themselves when they voted for the Plan containing the foregoing provisions. Because the Term-C Lenders did not object to the Plan, these provisions are binding on them. See In re Heartland Wireless Communications, Inc., 2002 WL 31319460 at *2 (D. Del. Sept. 23, 2002) (holding that provisions of a confirmed plan bind any creditor or equity security holder); In re Gillingham, 150 B.R. 907, 909 (W.D. Pa. 1993) (explaining that the effect of confirmation is to bind all parties to the terms of a plan of reorganization and the effect of such order has a res judicata effect barring relitigation of any issues raised or that could have been raised in the confirmation proceedings).

---

See Cybergenics, 330 F.3d at 580. Here, neither the Debtors nor the Committee are bringing derivative or avoidance actions, and, in any event, the Committee was given express permission in the Plan to make its Objection. Thus, Cybergenics is irrelevant or has been satisfied.

14

The Term-C Lenders cite to several cases[12] to support the argument that the Committee is "bound by res judicata or claim preclusion to observe the terms of both the Orders." See DLJ Mot. at 13. However, this argument and the cited cases are irrelevant, as the Committee is not arguing that the Court's prior orders are not binding. In fact, the Committee is acting within the terms of the Settlement Agreement and Plan, and is asking that this Court enforce the Settlement Agreement and the Plan. Moreover, the Committee agrees that this Court has inherent and statutory authority to enforce its prior orders. See DLJ Mot., ¶2 at 13-14 (citing to Local Loan Co. v. Hunt, 292 U.S. 234 (1934) and In re Continental Airlines, Inc., 236 B.R. 318, 225 (Bankr. D. Del 1999))

The Term-C Lenders also argue that the Committee cannot bring its Objection because it does not have standing to assert the claims of the 12% Noteholders, citing the decision of the United States Supreme Court in Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416 (1972). See the DLJ Motion, ¶ 1 at 22. The Term-C Lenders' argument is irrelevant, however, for several reasons. As an initial matter, the Committee, as a party in interest, clearly has standing pursuant to Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). Moreover, the Committee has standing because the terms of the Plan specifically provide the Committee with authority, power, and standing to bring its Objection, and to the extent that this Objection is brought by the Estates and derivatively by all creditors, the Committee's Objection does not trigger this standing issue. Additionally, the Committee is not only objecting to the Term C Lenders' Claims based on the effect that DLJ's improper acts had

---

[12] Katchen v. Landy, 382 U.S. 323, 325 (1966) (found that bankruptcy court had summary jurisdiction to order surrender of voidable preferences asserted and proved by the trustee; it is only after bankruptcy court has dealt with the preference issue that normal rules of res judicata and collateral estoppel apply); Stoll v. Gottlieb, 305 U.S. 134, 137 (1937) ("where the judgment or decree of the Federal court determines a right under a Federal statute, that decision is 'final until reversed in an appellate court, or modified or set aside in the court of its rendition'"); CorEstates Bank, N.A. v. Huls Am., Inc., 176 F.3d 187, 191 (3d Cir 1999) (finding that claim preclusion bars a party from litigating a claim – both core and non-core – that it could have raised or did raise in a prior proceeding)

on the 12% Subordinated Noteholders, the creditors and the Estates; rather, the Committee points to DLJ's violation of the 12% Note Indenture as one example of why the Class 7 Claims should be recharacterized or equitably subordinated. Under either case, the Committee undoubtedly has standing.

Caplin is simply unhelpful to the Claimants' argument. In Caplin, the trustee attempted to bring an action on behalf of debenture holders to recover damages from the indenture trustee who failed to fulfill its obligations. The trustee was unable to assert the claims of the debenture holders because the Trust Indenture Act, which established an "elaborate system of controls" on indenture trustees, did not suggest that the trustee was to assume responsibility for third parties Caplin, 406 U.S. at 428-29. Moreover, the Caplin Court saw no benefit to the estate in having the trustee sue on behalf of the debenture holders. See id. at 429-32. The facts in the present case are distinguishable from the fact pattern in Caplin, as the Plan provides for a specific procedure and rights that gives the Committee standing to sue. Also, the Debtors and their Estates stand to benefit directly from the Committee's Objection. The relief requested by the Objection will serve to reduce the denominator of the class of claims that receive distributions and increase the distributions available to unsecured creditors under the Plan.

Thus, this Court should utilize its inherent and statutory authority to enforce its prior orders and enforce the Settlement Agreement and Plan, all of which was supported by the Term-C Lenders, by denying the Term-C Lenders' Motion in its entirety and granting the Committee's properly-filed Objection.

16

## POINT II

### THIS COURT HAS JURISDICTION TO REVIEW THE COMMITTEE'S OBJECTION, AND THE RECENT RULING IN *IN RE RESORTS INT'L, INC.* SUPPORTS THIS CONCLUSION

The Committee's Objection to the Class 7 Claims is a core proceeding over which this Court has jurisdiction. Bankruptcy judges "may hear and determine all core proceedings arising under title 11, or arising in a case under title 11 ... and may enter appropriate orders and judgments, subject to review under section 158 of ... [Title 28 of the United States Code]." 28 U.S.C. 157(b)(1).

The Committee's Objection is deemed a core proceeding under several subsections of Section 157 because the Objection (i) "concerns the administration of the estate" (Section 157 (b)(2)(A)), (ii) involves confirmation of a plan (Section 157 (b)(2)(L)), and (iii) is a proceeding "affecting the liquidation of the assets of the estate, or the adjustment of the debtor-creditor or the equity security holder relationship" (Section 157 (b)(2)(O)). Thus, the Term-C Lenders' jurisdictional argument is flawed and this Court does in fact have authority to hear the Committee's Objection.

Moreover, Paragraph 13 of the Court's Order approving the Settlement Agreement (See Exh. A, the corresponding Order to the Settlement Agreement at 6), Paragraph 26 of the Court's Order confirming the Plan (See Exh. B, the corresponding Order to the Plan at 15), and Section 13.1 of the Plan (See Exh. B, the Plan, § 13.1 at 31-32) all provide for the Court's jurisdiction over the Committee's Objection. All of these provisions, which provide for this Court's jurisdiction over this contested matter, were consented to by the Term-C Lenders and are now binding on them.

The Term-C Lenders' jurisdictional argument is further flawed because they argue in a prior section of their motion that this Court does in fact have jurisdiction over this matter. After

17

craftily misstating prior orders of this Court and arguing that this Court has both express and inherent statutory authority to enforce its prior orders, the Term-C Lenders proceed to argue that this Court **does not** have jurisdiction to hear the Committee's Objection and enforce its prior orders. By asking this Court to enforce its prior orders, they are in essence conceding to the Court's jurisdiction over the Committee's Objection, as the Court must consider the Committee's Objection when determining how it will enforce its prior orders.

Not only do the Term-C Lenders concede that this Court in fact has jurisdiction over this matter to hear the Committee's Objection and enforce its prior orders, the Term-C Lenders rely on a Third Circuit case that supports the Committee's argument. The Term-C Lenders state that In re Resorts Int'l, Inc., 372 F.3d 154 (3d Cir. 2004) serves to "sharply curtail the post-confirmation jurisdiction of a bankruptcy court with respect to matters, even core proceedings, **that do not have** 'a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution or administration of a confirmed plan . . . . .'" See the DLJ Motion, ¶ 1 at 15 (citing Resorts, 372 F.3d at 168-69) (bold emphasis added). But, as the Third Circuit points out, "where there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement, retention of post-confirmation bankruptcy court jurisdiction is normally appropriate." Resorts, 372 F.3d at 168-69. Thus, in situations such this one, where a hearing on the Committee's Objection **does in fact have a close nexus to the Debtors' Plan**, the court can properly retain jurisdiction and resolve the issue because the resolution of the Committee's Objection is a matter affecting the "interpretation, implementation, consummation, execution or administration" of the Debtors' confirmed Plan. See Resorts, 372 F.3d at 168-69.

Resorts presents a situation that is clearly distinguishable from the present case. In
Resorts, a post-confirmation litigation trust sued an accounting firm that it had hired to provide
the trust with post-confirmation auditing services and tax advice. The trustee argued that the
court did have jurisdiction over the proceeding because the trust in question was a "continuation
of the estate." See Resorts, 372 F.3d at 169. The Third Circuit found that that proceeding did
not create a nexus to the bankruptcy plan sufficient to confer bankruptcy jurisdiction because the
debtor deliberately acted to separate the litigation claims (that constituted the trust) from the
bankruptcy estate by assigning its rights to litigate the claims to the trustee. Id. Moreover, the
trust was created "in part so that the Plan could be confirmed and the debtor freed from
bankruptcy court oversight without waiting for the resolution of the litigation claims." Id. The
fact that the trust's assets were once assets of the estate did not alone create a close nexus to the
bankruptcy plan or proceeding sufficient to confer bankruptcy jurisdiction. Id.

The present case involves a completely different fact pattern from the one involved in
Resorts. Here, a proceeding resolving the Committee's Objection clearly bears a close and direct
nexus to the Plan and does not merely affect matters collateral to the bankruptcy process. In this
case, resolution of the Committee's Objection will determine whether the Term-C Lenders are
entitled to share equally with other unsecured creditors, whether the Term-C Claims should be
subordinated or recharacterized, or whether additional money will be made available to the
Estates. The Settlement Agreement and Plan contemplated these very issues and disputes, and as
such specifically provided for the procedure and mechanism to resolve the instant dispute. Thus,
the instant contested matter is surely a matter that will affect the Debtors' bankruptcy and how
the Plan is administered, including distributions under the Plan. Resolution of this contested
matter is clearly necessary to implement the Plan.

19

As the DLJ Motion points out, the Committee brought its Objection prior to the confirmation of DLJ's Claims under the Plan, and thus the Committee's Objection will directly affect the administration and implementation of the Plan, as well as the treatment of creditors. DLJ's jurisdictional argument thus lacks merit and this Court should properly hear the Committee's Objection.

**POINT III**

**THE COMMITTEE'S OBJECTION ADEQUATELY ALLEGES RECHARACTERIZATION, EQUITABLE SUBORDINATION, AND DEEPENING INSOLVENCY**

The Committee more than adequately alleges recharacterization, equitable subordination, and deepening insolvency in their Objection because, among other things, the Objection – containing seventy-four paragraphs of allegations – sufficiently puts the Term-C Lenders on notice of the basis for which the Committee brings its Objection. The Objection sets forth DLJ's inequitable conduct that triggers recharacterization and equitable subordination. Even if formal pleading rules for a complaint apply to the Objection, DLJ's conduct satisfies all of the elements.

Rule 8(a) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P." or "Federal Rules"), as incorporated by Rule 7008 of the Bankruptcy Rules and made applicable to this contested matter under this Court's prior order (see Order Granting Response and Limited Objection of the Committee to the Term-C Lenders' Motion for Order Clarifying Rules Applicable in Adversary Proceeding, Docket No. 1215), sets forth the pleading requirements for claims for relief. One of the requirements of Fed. R. Civ. P. 8(a) is that the pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a).

There is no technical form of pleading required. See Fed. R. Civ. P. 8(e). In fact, the Federal Rules do not even require a complaint to "set forth facts with such specificity so as to constitute a complete cause of action." Pardo v. Pacificare of Texas, Inc. (In re APF Co.), 264

20

B.R. 344, 354 (Bankr. D. Del. 2001) (citing <u>Schaedler v. Reading Eagle Publ'n, Inc.</u>, 370 F.2d

795, 798 (3d Cir. 1967)). Rather, the plaintiff need only give the defendant "fair notice of the

nature of the claims asserted." <u>Id.</u>; <u>see also</u> <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957) ("the

Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon

which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of

the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds

upon which it rests."); <u>In re Harry Levin, Inc.</u>, 175 B.R. 560, 569 (Bankr. E.D. Pa. 1994) (factual

averments of a complaint need only "provide enough detail to enable the defendant to respond to

the allegations and, if proven, to entitle ... [the claimant] to some relief."). This is because the

"chief function of the pleadings under the Civil Rules is to give fair notice of the claim in order

for the defendant to answer and prepare for trial." 15 Collier on Bankruptcy ¶ 7008.02[2] (L.

King 15th ed. rev. 1999).

    Moreover, a complaint "must not be dismissed for failing to state a claim unless it

appears beyond a reasonable doubt that plaintiffs can prove no set of facts in support of their

claim that would entitle them to relief." <u>In re Computer Personalities Sys., Inc.</u>, 284 B.R. 415,

419 (Bankr. E.D. Pa. 2002) (citing <u>City of Philadelphia v. Lead Indus. Ass'n, Inc.</u>, 994 F.2d 112,

118 (3d Cir. 1993) (citing <u>Conley</u>, 355 U.S. at 45-46)); <u>APF</u>, 264 B.R. at 353 (a motion to

dismiss must not be granted "unless it appears beyond doubt that [plaintiffs] can prove no set of

facts in support of [their] claim which would entitle [them] to relief.").

    In the present case, it is clear that the Committee's Objection is sufficiently pleaded and

thus cannot be dismissed. The Objection is detailed and contains over seventy paragraphs of

allegations. The Objection thus gives fair notice of the Committee's basis for objecting to the

Term-C Lender Claims. The fact that the Term-C Lenders addressed the Committee's

allegations of recharacterization, equitable subordination and deepening insolvency in their

Motion confirms this fact. The Term-C Lenders cannot allege that they were unable to "discern

what the claims against the Term-C Lenders are" and that it was "impossible for the Term-C

Lenders to respond to the allegations set forth in the Objection" (See DLJ Mot., ¶¶ 1-2 at 18),

and then proceed to address each allegation in their Motion. The Committee's Objection clearly

provides enough detail so as to allow the Term-C Lenders to respond to the allegations, and thus

the Term-C Lenders' Motion lacks merit. Moreover, the Term-C Lenders' Motion lacks merit

because it does not appear "beyond reasonable doubt" that the Committee can prove no set of

facts in support of their Objection which would entitle the Committee to relief. The Committee

can reasonably prove the facts alleged in their Objection and herein.

In support of their insufficient pleading argument, the Term-C Lenders inappropriately

cite to a case[13] addressing the dismissal of a complaint for failure to allege all elements of the

state-created danger theory under 42 U.S.C.A. § 1983. This case is irrelevant for purposes of

determining whether the Objection was sufficiently pleaded. Thus, based on the above-analysis

and the relevant cases cited by the Committee, the DLJ Motion must be dismissed and the

Committee's Objection sustained.

A.    The Term-C Lender Claims Should Be Recharacterized

As addressed in the Committee's Objection, this Court should recharacterize the Claims

of the Term-C Lenders because (i) it has jurisdiction and authority to do so; and (ii) the Claims

are based on an equity investment made under the guise of a loan. Although a few courts have

suggested that bankruptcy courts have no authority to recharacterize an alleged loan because

there is no specific Code provision providing for such a procedure (see, e.g., Pacific Express

---

[13]    Morse v. Lower Merion School Dist., 132 F.3d 902, 904 (3d Cir. 1997) (plaintiff's civil rights action dismissed against the state because plaintiff failed to sufficiently plead a viable claim under the state-created danger theory of 42 U.S.C.A. § 1983).

Inc., 69 B.R. 112, 115 (9th Cir. B.A.P 1986)), almost all other courts have disagreed with this

line of cases. See, e.g., In re Herby's Foods, 2 F.3d 128, 133 (5th Cir. 1993) (bankruptcy court

authorized to recharacterize a loan as equity contribution even in absence of grounds for

equitable subordination); In re Midtown Prod. Terminal Inc., 599 F.2d 389, 393 (10th Cir. 1979);

In re Hyperion Enters., 158 B.R. 555, 561-62 (D.R.I. 1993); Diasonics Inc. v. Ingalls, 121 B.R.

626, 630 (Bankr. N.D. Fla. 1990).

Courts in this jurisdiction[14] consider eleven factors in conducting a recharacterization

analysis: (a) the names given to instruments, if any, and whether they evidence indebtedness; (b)

the presence or absence of a fixed maturity date and schedule of payments; (c) the presence or

absence of a fixed rate of interest and interest payments; (d) the source of repayments; (e) the

adequacy or inadequacy of capitalization; (f) the identity of interest between the creditor and the

stockholder; (g) the security, if any, for the advances; (h) the corporation's ability to obtain

financing from outside lending institutions; (i) the extent to which the advances were

subordinated to the claims of outside creditors; (j) the extent to which the advances were used to

acquire capital assets; and (k) the presence or absence of a sinking fund to provide repayments.

In re Exide Technologies, Inc., 299 B.R. 732, 740 (Bankr. D. Del. 2003). Claims for

recharacterization are determined on a case-by-case basis, as no one factor is controlling. In re

Autostyle Plastics, Inc., 269 F.3d 726, 750 (6th Cir. 2001) (citing Roth Steel Tube Co. v.

Comm'r. of Internal Revenue Serv., 800 F.2d 625, 630 (6th Cir. 1986)).

Moreover, "where the same individuals control both the transferor and the transferee, the

transaction must be scrutinized according to 'an objective test of economic reality' to determine

its true economic nature." In re Submicron Sys. Corp., 291 B.R. 314, 323 (D. Del. 2003)

---

[14]    This Court in Exide clearly stated that under Delaware law parties could bring a recharacterization claim where
appropriate. In re Exide Technologies, Inc., 299 B.R. 732, 740 (Bankr. D. Del. 2003).

23

(quoting <u>Geftman v. C.I.R.</u>, 154 F. 3d 61, 75 (3d Cir. 1998) (court chose not to recharacterize

debt as equity because it was clear that the parties intended the transaction to be secured debt,

and there were only a few factors that weighed slightly towards recharacterizing the fundings as

equity)). In order to do this, a court must look at "the manner in which, and the circumstances

under which, the advance was consummated in order to determine whether the bona fides of

indebtedness had been established" and should not elevate form over substance. See <u>In re</u>

<u>Transystems Inc.</u>, 569 F. 2d 1364, 1366 (5th Cir. 1978); <u>see also</u> <u>In re Cold Harbor Assocs.</u>, 204

B.R. 904, 915 (Bankr. E.D. Va. 1997) (court "is not required to accept the label of 'debt' or

'equity' placed by the debtor upon a particular transaction, but must inquire into the actual nature

of a transaction to determine how best to characterize it.") As it follows, a court may

recharacterize debt as equity where "a creditor has contributed capital to a debtor in the form of a

loan, but the loan has the substance and character of an equity contribution." See <u>In re Kids</u>

<u>Creek Partners L.P.</u>, 212 B.R. 898, 931 (Bankr. N.D. Ill. 1997), <u>aff'd</u>, 233 B.R. 409 (N.D. Ill.

1999), <u>aff'd</u>, 200 F.3d 1070 (7th Cir. 2000); <u>In re Atlanticrancher Inc.</u>, 279 B.R. 413, 434-35

(Bankr. D. Mass. 2002) (recharacterizing loan, even though note and related agreements were

properly documented, because lender never made an attempt to collect on the note or foreclose

on collateral)

Further, the court in its recharacterization analysis must consider whether the entity

making the contribution was a corporate insider, because an entity cannot use its status as

corporate insider to gain an unfair advantage over outside creditors dealing at arms length. See

<u>In re Fett Roofing & Sheet Metal Co., Inc.</u>, 438 F. Supp. 726, 729-30 (E.D. Va. 1977)

(recharacterizing a loan because a corporate insider as the corporate alter ego unfairly used its

position to gain an advantage over outside creditors). In this situation a court must "disregard the outward appearances of the transaction and determine its actual character and effect." See id.

First and foremost, DLJ is an insider of the Debtors. See Obj., ¶ 1. The Debtors are controlled by DLJ. The transaction was not the result of arm's length negotiations between the Debtors and DLJ. The Insilco Board, controlled by DLJ nominees, approved the transaction. See Obj., ¶¶ 25, 56-65. Thus, the transferor and transferee are essentially the same entities. Equally clear based upon the allegations is the fact that DLJ took unfair advantage over the Debtors' creditors. See Obj., ¶ 66.

Upon information and belief, the Lenders had asked DLJ to make a "cash infusion" of $15 million, junior and subordinate to the claims of the Lenders. See Obj., ¶ 57. As DLJ is the majority equity holder of the Debtors (see Obj., ¶ 20), the economic reality of the transaction is that the parties intended the contribution to be an equity investment. It is apparent that DLJ, fearing that its rights to payment would be extinguished in Insilco's impending bankruptcy, arranged a deal with the Lenders so that it could protect its funding.

Moreover, the transaction had the substance and character of an equity transaction in that the terms of the Term-C Loan were devised in such a way that makes the transaction in actuality an equity contribution. A careful review of the Term-C Loan (attached hereto as Exhibit C) clearly shows that the $15 million "loan" that The Term-C Lenders made to Insilco has the characteristics of an equity security and is not a true loan, even though it is labeled as such.

First, the rate and payment of interest is contingent, speculative, and tied to benchmarks more associated with an equity investment. The absence of a fixed rate of interest and interest payments is a strong indication that the contribution was an equity investment and not a loan. See Atlanticrancher, 279 B.R. at 434 (recharacterizing loan even though it had properly

25

documented maturity dates and interest rates); see also Transystems, 569 F.2d at 1369

(recharacterizing loan because the loan was payable on demand and did not have a date of

maturity). The terms of the Term-C Loan show that the new tranche, which would mature on

June 25, 2007, would bear quarterly compounded **non-cash** interest at rates ranging from 15% to

30% **depending on the company's leverage ratio.** See Exh. C, the Term-C Loan, § 2.7 at 8,

and §2.15 at 14 ("On the Stated Maturity Date for Term-C Loans, the Company shall repay the

entire outstanding principal amount of, and all accrued and unpaid interest on, the Term-C

Loans.") Clearly, the phrase "non-cash interest" indicates that DLJ was not going to be

receiving any monies in interest from Insilco, and that the compounded amounts in interest

would be added unto the principal amount and paid, if at all, in 2007 when the "loan" was due.

Additionally, the fact that the amount of interest paid to the Term-C Lenders would depend on

Insilco's leverage ratio lends support to the fact that these "interest payments," if they can be

called such. were definitely not fixed. Based on these speculative, performance-based interest

terms, this funding lacked a fixed rate of true interest and had the character of equity

　　Second, the Term-C Loan was by its terms unsecured and was to be junior to the Senior

Lenders, and the "absence of a security for an advance is a strong indication that the advances

were capital contributions rather than loans." Cold Harbor, 204 B.R. at 918. Here, the Term-C

Loan document clearly shows that the Term-C Lenders were **not** entitled to a security interest in

any of Insilco's assets. Each section of the Term-C Loan that makes reference to the Collateral

Documents supporting the Credit Agreement specifically excludes the provision's applicability

to the Term-C Loan. See, e.g., Exh. C, the Term-C Loan, § 2.7 at 9. The fact that the Term-C

Lenders "loaned" $15 million while the Debtors were insolvent and bankruptcy imminent, and

neither secured the loan with assets nor benefited from those provisions of the Credit Agreement

26

granting liens to the Senior Lenders, supports the fact that this was an equity investment made under the guise of a loan.

Third, the Term-C Lenders' rights were subordinate in all ways to the payment rights of the Term-A and Term-B Lenders in the credit facility, and "subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans." Autostyle, 269 F.3d at 751. Insilco could not, by the terms of the loan, make prepayments to the Term-C Lenders without first seeking permission of the Term-A and Term-B Lenders. See Exh. C, the Term-C Loan, § 2.11 at 13. Moreover, the Term-C Loans were specifically excluded from receiving default interest. See Exh. C, the Term-C Loan, § 2.21 at 16. These provisions are only a few of the many that subordinate the payment rights of the Term-C Lenders to the rights of the Term-A and Term-B Lenders. See, e.g., Exh. C, the Term-C Loan, §§ 2.48 and 2.49 at 27. This is clearly an indication that the Term-C Lenders' contribution was an equity investment and not a loan.

Fourth, a court must consider the identity of interest between creditor and stockholder, and whether the expectation of the "loan" was based partly on the success of the business. See Cold Harbor, 204 B.R. at 918-19. Here, the advances were made by stockholders in the business; this indicates that an equity contribution was made. DLJ maintained a majority share in the company, and apparently made this cash infusion with the hope of realizing more value for the Senior Lenders or preserving its equity position in Insilco. Moreover, the expectation of the "loan" was based partly on the success of Insilco's business – as Term-C Lenders, DLJ, a majority shareholder, received warrants to purchase approximately 60,000 shares of Insilco's common stock at $0.01 per share, which would, upon exercise, constitute approximately 38% of Insilco's then-outstanding common stock. Clearly, the Term-C Lenders' ability to collect on