these warrants depended on the financial success of the Debtors' business, and in this respect, had the appearance of a capital contribution.

Fifth, in a case where the questioned loan is unsecured, the absence of a sinking fund to provide repayments is evidence that the advances were capital contributions and not loans. See Cold Harbor, 204 B.R. at 918; Autostyle, 269 F.3d at 752. In the present case, it is highly unlikely that the Term-C Lenders would have lent $15 million to Insilco without establishing a sinking fund, especially considering the fact that they neither obtained a security interest in Insilco's assets nor requested set cash payments of interest at a time when Insilco was insolvent and bankruptcy was imminent. The absence of a sinking fund confirms the fact that this contribution was made as an equity infusion and not as a loan.

Sixth, the fact that the Debtors were apparently not able to obtain outside financing lends support to a finding that the Term-C Lenders made an equity investment and not a loan. See Atlanticrancher, 279 B.R. at 434-35; Diasonics, 121 B.R. at 631. The proper inquiry is whether a reasonable outside creditor would have made a loan to the debtor on similar terms. See Cold Harbor, 204 B.R. at 918 (citing Roth Steel Tube, 800 F.2d at 631). It appears that the Lenders had asked DLJ to make a $15 million cash infusion because they acknowledged that Insilco was in dire straits and needed help quickly. The Lenders could have amended the existing credit facility to increase the revolver or could have added an outside lending company to the credit facility. The Lenders amended the Credit Agreement solely to arrange for this contribution. This contribution was an equity contribution and thus should be treated as such.

Also relevant to the analysis is the fact that the Debtors were severely undercapitalized and insolvent at the time of the transaction. Courts have found that when a debt is incurred by an undercapitalized debtor and the prospect for repayment is poor, such advances are a capital

28

contribution and not a loan. See Transystems, 569 F.2d at 1369-71. In this case it is clear that

the Debtors were severely undercapitalized when the Term-C Loan was made; in fact, at the time

of the transaction, Insilco was insolvent and in violation of its covenants under the Credit

Agreement. See Obj., ¶ 55. Because the recharacterization elements weigh in favor of labeling

the Term-C Lenders' contribution as an equity investment, the Committee asks that this Court

properly recharacterize the Class 7 Claims as equity.[15]

**B.    The Term-C Lender Claims Should Be Equitably Subordinated**

Alternatively, the Claims of the Term-C Lenders should be equitably subordinated. A

plaintiff must establish three elements to allege equitable subordination under Section 510(c) of

the Bankruptcy Code:

> (a)    The defendant must have engaged in some type of inequitable conduct;
>
> (b)    the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the defendant; and
>
> (c)    equitable subordination must not be inconsistent with the provisions of the Bankruptcy Code.

Exide, 299 B.R. at 744 (citing Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding

Unsecured Claims, 160 F.3d 982, 986-87 (3d Cir. 1998)). The purpose of this remedy is to

"undo or offset any inequity in the claim position of a creditor that will produce injustice or

unfairness to other creditors in terms of the bankruptcy results." Computer Personalities, 284

B.R. at 427.

The "quality of conduct that will be deemed 'inequitable' under § 510(c) depends on the

nature of the relationship between the debtor and the party whose claim is subject to attack."

---

[15]    On a related note, this Court should consider the Committee's Objection and deny the DLJ Motion because the Committee needs time to review DLJ business records. Some courts have found that another relevant consideration in the recharacterization analysis is how the obligation was treated in the business records. See Hyperion, 158 B.R. at 562. The Committee has requested, but not yet received such documents. Thus, if nothing else is considered, this Court must deny the DLJ Motion so as to allow the Committee the time needed to review potentially relevant DLJ business records when they are received.

Computer Personalities, 284 B.R. at 427. If the defendant is an insider, the standard is not as

demanding.  See id. at 427-28; see also Exide, 299 B.R. at 740. Specifically, in the case of an

insider, three areas of misconduct may constitute inequitable conduct:

> (a)    fraud, illegality, and breach of fiduciary duties;
>
> (b)    undercapitalization; or
>
> (c)    use of the debtors as a mere instrumentality or alter ego.

Exide, 299 B.R. at 740 (citing In re Mid-American Waste Sys., Inc., 284 B.R. 53, 70 (Bankr. D.

Del. 2002)). Under this insider test, "the insider or fiduciary creditor must have actually used its

power to control the debtor or its position of trust with the debtor to its own advantage or to the

other creditors' detriment." Exide, 299 B.R. at 740 (citing Mid-American Waste, 284 B.R. at 69;

Citicorp, 160 F.3d at 987)

This Court in Exide found that the creditors' committee sufficiently pleaded equitable

subordination under the Rule 12(b)(6) standard. In that case, this Court found that equitable

subordination was warranted because certain prepetition lenders had improperly induced the

debtors' companies to proceed with acquisitions in order to "gain overwhelming influence and

leverage" over the debtors, "which they later used to firm up their control" of the debtors and

obtain additional collateral and guarantees, while "providing minimal if any consideration to the

Debtors in exchange, to the detriment of the debtors' unsecured creditors." Exide, 299 B.R. at

744. Specifically, the defendants had used their control over the debtors to (i) install insiders

onto the debtors' board. (ii) compel the grant of additional liens 100 days prior to the petition

date, and (iii) dictate the date when the debtors' petitions would be filed so as to prevent these

new liens and guarantees from being subject to avoidance. See id. at 744-45. This inequitable

conduct, this Court found, resulted in a "transfer of substantial value" to the prepetition banks "to

the detriment of general unsecured creditors." Id. at 745. Moreover, this Court found that the

30

lenders' acts of delaying the debtors' bankruptcy in an effort to protect their liens "further injured the unsecured creditors as the Estates became more and more insolvent." See id.

The facts of the present equitable subordination allegation are very similar to the facts of the equitable subordination allegation at issue in Exide, and thus the Term-C Lenders' Claims are also subject to equitable subordination. Based on the Committee's Objection and the facts detailed in this opposition's fact section, it is clear that DLJ's actions constituted inequitable conduct. DLJ used its majority equity interest in the Debtors to control the Debtors. By causing the Debtors to enter into transactions that hurt the Debtors while benefiting DLJ and the Lenders, DLJ used its position of trust with the Debtors both to its own advantage and to other creditors' detriment. Of particular significance is the fact that DLJ divested significant assets to related parties, engaged in numerous transactions benefiting itself, and worked in concert with the Lenders to maximize the value of the collateral securing their loans to the Debtors – delaying the filing of the company's bankruptcy until they were able to do so. See Obj. ¶¶ 65-76. These acts served to unfairly benefit DLJ, including the Term-C Lenders, to the detriment of the Debtors' unsecured creditors. Thus, DLJ's Claims under the Term-C Loan must be equitably subordinated to the rights of other unsecured creditors under the Plan.

The Claimants attempt to discount the Committee's equitable subordination argument on procedural grounds by stating that the Committee fails to meet the standards of Rule 8(a). In support of their argument, the Term-C Lenders cite extensively to a New York case that addressed the issues under a very different fact pattern. In In re Sunbeam Corp., 283 B.R. 355 (Bankr. S.D.N.Y. 2002), the committee had brought a complaint against an entity that had not filed a proof of claim in the case. Sunbeam, 283 B.R. 355 at 362. The creditors' committee attempted to subordinate the claims of another creditor that did file a proof of claim in the case

31

based on the non-claimant's alleged improper acts. See id. The court dismissed the complaint because the committee did not set forth any examples of alleged domination that could have supported an alter ego claim, which would have allowed the committee to bring their equitable subordination argument based on the non-claimant's acts.

The facts in the present case are clearly distinguishable from the facts in Sunbeam and other cases cited by DLJ for the same or other tenuously-related propositions of law.[16] The Committee in this case, unlike the committee in Sunbeam, properly brings its Objection against entities that have filed proofs of claim in this case. More importantly, the Committee in this case sets forth a plethora of facts that support its equitable subordination argument against these Claimants. Thus, the Term-C Lenders' arguments are without merit, and this Court should consider the Committee's Objection.

C.    **The Committee Properly Alleges Deepening Insolvency**

The Claims of the Term-C Lenders should also be recharacterized or equitably subordinated under the Plan because the Term-C Lenders, through the acts of DLJ, deepened the Debtors' insolvency pursuant to the "deepening insolvency" doctrine. The Third Circuit has described this tort as "an injury to the Debtors' corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life." Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 347 (3d Cir. 2001).

---

[16]    In re Providian Fin. Corp. ERISA Litigation, 2002 WL 31785004 at *1 (N.D. Cal. Nov. 14, 2002) (class action complaint based on fiduciary duty requirements imposed by ERISA claims dismissed (with instructions to file amended complaint) because it did not set forth which defendants committed which acts); Wollgram v. El Dorado County, 1991 U.S. App. LEXIS 11754 at 2*- 3* (9th Cir. 1991) (court dismissed complaint filed by pro se attorney attempting to initiate class action suit after he failed to file an amended complaint); United States v. Noland, 517 U.S. 535, 538-39 (1996) (IRS claim could not be equitably subordinated because such a ruling would run directly counter to postpetition tax penalty priority scheme set forth in Section 503(b)(1)(C) and 507(a)(1) of the Bankruptcy Code); Eastern Minerals & Chemicals Co. v. Mahan, 225 F.3d 330, 333 (3d Cir. 2000) (reversing district court's order dismissing summary judgment motion because district court misapplied claim preclusion when denying plaintiff's request to amend complaint to add alter ego liability argument; court only addresses equitable subordination as an unrelated matter in a footnote)

There are three factors that courts consider when recognizing deepening insolvency as giving rise to a cognizable injury: (i) soundness of the theory; (ii) growing acceptance of the theory among courts; and (iii) remedial theme in state law. Exide, 299 B.R. at 751 (citing Lafferty, 267 F.3d at 340). The deepening insolvency doctrine is based on the theory that the lender, in providing financing to a failing company and causing the company to remain in business for the lender's benefit, is extracting value from the borrowing company at the expense of unsecured creditors. See Di Massa, Deepening Insolvency Concerns Secured Lenders, Bankruptcy Update, Legal Intelligencer, Vol. 229, No. 67 at 5 (2003). Thus, unsecured creditors under this tort can assert that they suffered financial harm, as they could have been paid a higher percentage of their claims had the company not been artificially "propped up" with additional financing. See id.

Delaware courts have recognized deepening insolvency allegations when there has been damage to corporate property. See Exide, 299 B.R. at 752. This Court in Exide found that prepetition lenders were liable to unsecured creditors for the tort of deepening insolvency because they continued to finance and exert such control over a failing company so as to allow the company to operate, despite its continuing decline in value. See Exide, 299 B.R. at 751-52.

This Court should recognize the tort of deepening insolvency in this case as well, as the facts in the present case are analogous to the facts presented in Exide. It is proper for this Court to recognize the tort of deepening insolvency because DLJ essentially destroyed the corporate property of Insilco by causing it to enter into numerous transactions that ultimately caused Insilco, a once promising corporate business, to file for bankruptcy.

Moreover, it is self-evident that DLJ prevented Insilco from filing bankruptcy when it became insolvent so that DLJ and the Lenders could protect their own interests to the detriment

33

of the company and its other creditors. Thus, the Committee asks that this Court grant its
Objection and subordinate DLJ's Class 7 Claims to the claims of unsecured creditors or
recharacterize them as equity investments pursuant to the deepening insolvency doctrine.

The Term-C Lenders improperly cite to several cases[17] to suggest that the Committee
does not have standing to bring an objection based on the deepening insolvency doctrine.
However, as the Committee has addressed in numerous other sections of this opposition, the
Committee was given standing to object to the Term-C Lender Claims both under prior orders of
this Court and the Plan, which was consented to by the Term-C Lenders  Thus, this Court should
properly dismiss the DLJ Motion and grant the Committee's Objection.[18]

---

[17] Holland v. Arthur Anderson & Co., 212 Ill. App 3d 645. 651 (Ill App Ct 1991) (court barely addresses
deepening insolvency doctrine in context of a summary judgment motion. merely stating that the plaintiff did
not plead deepening insolvency, but rather restated the suffered injuries); Coroles v. Sabey, 79 P 3d 974  983
(Utah Ct. App. 2003) (court does not analyze the deepening insolvency theory; merely mentions that it will
decline to recognize it because plaintiffs failed to plead damages)

[18] The Objection does not deal with all of the claims that exist against DLJ and, under the terms of the Plan. such
remaining claims will be transferred to the Creditor Trustee  The Committee only filed its Objection when it
did because the Plan required that certain objections relating to the Term-C Loan be filed prior to the
Confirmation Hearing  Thus, all other claims have been reserved and will be prosecuted by the Creditor
Trustee.

## CONCLUSION

WHEREFORE, the Term-C Lenders' motion to dismiss lacks merit and should be

denied.

Dated:    Wilmington, Delaware                    Respectfully submitted
          September 3, 2004

                                                 ARENT FOX PLLC
                                                 Andrew I. Silfen
                                                 Schuyler G. Carroll
                                                 Michael S. Cryan
                                                 1675 Broadway
                                                 New York, NY 10019
                                                 (212) 484-3900

                                                 -and-

                                                 DRINKER BIDDLE & REATH LLP

                                                 /s/ David P. Primack
                                                 Warren T. Pratt
                                                 David P. Primack
                                                 1100 North Market Street. Suite 1000
                                                 Wilmington, DE 19801
                                                 (302) 467-4200

                                                 Counsel for the Official Committee of
                                                 Unsecured Creditors

35

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

--------------------------------------------------x

In re                                          :       Chapter 11
                                               :
INSILCO TECHNOLOGIES, INC., et al.[1],         :       Case No. 02-13672 (KJC)
                                               :
                    Debtors.                   :       (Jointly Administered)
                                               :
                                               :       Docket Ref. Nos. 666 and 670
--------------------------------------------------x

### ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 363(b) AND 105(a) AND FED. R. BANKR. P. 9019 APPROVING SETTLEMENT AGREEMENT BY AND AMONG THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, WACHOVIA BANK, N.A., U.S. BANK, N.A., CERTAIN OF THE DEBTORS' SENIOR SECURED LENDERS AND THE AGENT FOR THE DEBTORS' SENIOR SECURED LENDERS

This matter having come before the Court upon the motion (the "Motion")[2] filed by

Insilco Holding Co. and certain of its direct and indirect subsidiaries, as debtors and debtors-in-

possession in these chapter 11 cases (collectively, the "Debtors"), requesting entry of an order

pursuant sections 363(b) and 105(a) of the Bankruptcy Code and Rule 9019(a) of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") approving the Asset Reallocation and

Settlement Agreement dated as of May 13, 2003 (the "Settlement Agreement", a copy of which

is annexed hereto as Exhibit A) by and among the Debtors, the official committee of unsecured

creditors appointed in these cases (the "Creditors' Committee"), Wachovia Bank, N.A. as

indenture trustee for the Debtors' 12% senior subordinated notes ("Wachovia"), U.S. Bank, N.A.

as indenture trustee for the Debtors' 14% senior discount notes ("U.S. Bank"), the Senior

---

[1]    The other debtors in these jointly administered chapter 11 proceedings are Insilco Holding Co., InNet Technologies, Inc., Insilco International Holdings Inc., Precision Cable Mfg. Corporation, Eyelets for Industry, Inc., EFI Metal Forming, Inc., Stewart Stamping Corporation, Stewart Connector Systems, Inc., Signal Caribe, Inc. and Signal Transformer Co., Inc.

[2]    All capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

NYDOCS03/680669.3
WP3:889101.1                                   1

61683 1001

A - 435

→ and objections having been filed by the City of El Paso, Rio Grande
City CISD, Rockwall CAD, Rockwall County and Starr County and
the New York State Department of Taxation ~~and~~ & Finance, and
such objections having been withdrawn;

Lenders[3] that have consented to the terms of the Settlement Agreement and delivered to the
Debtors' a duly executed signature page thereto, and Bank One, N.A. as agent to the senior
secured lenders (the "Agent", and together with the Debtors, the Creditors' Committee, the
Lenders, Wachovia and U.S. Bank, the "Settling Parties"); and the Court having reviewed the
Settlement Agreement and the pleadings filed with the Court related thereto, and considered the
arguments of counsel and the opposition thereto, if any, the Court having determined that
granting the relief requested in the Motion is in the best interests of the Debtors and their estates
and creditors, that the settlement is fair and equitable and will result in the resolution of complex
and potentially protracted litigation, the outcome of which is uncertain, and that the settlement is
the product of arm's length, non-collusive bargaining among the Settling Parties and has been
reached in good faith; and it appearing that notice of the Motion has been given as provided for
in the Motion, that such notice was adequate under the circumstances, and that no other or
further notice need be given; and for sufficient cause shown, it is hereby

ORDERED that:

1.    The Motion is granted.

2.    The settlement by and among the Settling Parties, as embodied in the
Settlement Agreement, is hereby approved, and the terms of the Settlement Agreement are
hereby incorporated herein by reference.

3.    The Settlement Agreement constitutes valid and binding obligations of the
Settling Parties which shall be enforceable in accordance with the terms thereof.



---

[3]    In accordance with the Settlement Agreement, the term "Senior Lenders" as used herein does not include
those lenders participating in Term Loan C, except in respect of Paragraph 1 of the Settlement Agreement and the
corresponding Paragraph 2 of this Order only, wherein the term "Senior Lenders" shall include those lenders
participating in Term Loan C.

4.    The Settling Parties are authorized to take any and all actions necessary to effectuate and implement the Settlement Agreement, and the Settling Parties are directed to take such actions in furtherance of the settlement as are required by the Settlement Agreement.

5.    The Senior Lenders' liens and claims against the Debtors (i.e., the claims arising under prepetition revolving credit facility, Term Loan A, Term Loan B and Term Loan C) are fully and finally allowed in the amount of $254,933,571.49[4] (the "Allowed Senior Lenders' Claims"). The liens and security interests of the Senior Lenders (other than the Term Loan C Lenders, which are, under the terms of the Credit Agreement, unsecured) are deemed valid, perfected, first priority and indefeasible and neither such liens nor such claims shall be subject to any further challenge, and the Senior Lenders shall not be required to file any proof of claim or further evidence of the indebtedness owing by the Debtors or of any collateral securing such indebtedness.

6.    In consideration of the treatment accorded them under the Settlement Agreement (including as set forth in Paragraphs 5 and 7 of this Order), the Senior Lenders have agreed to waive and relinquish any right or entitlement to recovery or distributions on their allowed unsecured deficiency claims and, effective upon the receipt of the releases described in Paragraph 4B of the Settlement Agreement from the holders of the 12% Senior Subordinated Notes and the 14% Senior Discount Notes, to waive enforcement of their contractual and structural subordination rights vis-à-vis the holders of the 12% Senior Subordinated Notes and the 14% Senior Discount Notes, respectively, in order to effectuate the reallocation and distributions set forth in Paragraph 3 of the Settlement Agreement; provided that, the Senior

---

[4]    Of this amount $232,712,443.42 represents principal, accrued interest and fees owing in respect of the revolving credit facility, Term Loan A and Term Loan B as of the Petition Date, and $22,221,128.07 represents principal and accrued interest owing in respect of the Term Loan C as of the Petition Date.

Lenders' sharing and reallocation of the Contributed Assets in respect of the holders of the 14% Senior Discount Notes and 12% Senior Subordinated Notes is expressly conditioned upon and subject to the provisions of Paragraph 4B of the Settlement Agreement. Likewise, in consideration of the treatment accorded them under the Settlement Agreement (including as set forth in Paragraph 5 and 7 of this Order), and subject to the provisions of Paragraph 4B of the Settlement Agreement, the Senior Lenders have agreed to the sharing and reallocation of the Contributed Assets to the holders of allowed general unsecured claims, with the Contributed Assets to be distributed in a manner and pursuant to the terms set forth in Paragraph 3 of the Settlement Agreement.

7.     Except with respect to (i) amounts which are required to be funded pursuant to the "Carve Out" and "Wind Down Budget" under the Cash Collateral Order, (ii) the Contributed Assets (subject to the provisions of Section 4B of the Settlement Agreement in respect of the holders of the 14% Senior Discount Notes and the 12% Senior Subordinated Notes), and (iii) Avoidance Actions (including the proceeds of Avoidance Actions) (clauses (i) through (iii), collectively the "Excluded Assets"), the Senior Lenders shall receive and be entitled to receive and to indefeasibly retain as of the Settlement Effective Date, in full satisfaction of their secured claims, all proceeds (including all payments previously received by the Agent or its professionals in connection with these Chapter 11 cases), from the disposition of the Debtors' businesses and assets whether pursuant to the Sale Orders or otherwise, and all other cash, including without limitation cash currently held or to be received in the future by the Debtors from any source whatsoever, including without limitation, litigation recoveries, tax refunds, asset dispositions, unapplied retainers and cash on hand   The Agent's prepetition and postpetition liens on all such cash and assets other than the Excluded Assets shall remain in place

until the payments required herein have been made to the Agent, and the Agent shall be entitled to the receipt of all cash and proceeds of assets (whether or not subject to any such liens) other than the Excluded Assets; provided, however, that the Senior Lenders' recovery shall not exceed the amount of the Allowed Senior Lenders' Claims. The Debtors (or such other party as may be responsible for administering the Settlement Agreement on behalf of, or as successor to, the Debtors' estates) shall, without further order of the Court, promptly remit to the Agent all proceeds other than Excluded Assets as and when such proceeds are received and shall expeditiously remit all such proceeds in their possession and cause their foreign subsidiaries to repatriate any such proceeds in their possession.

8.    The waivers and releases contained in the Settlement Agreement are supported by good, valid and sufficient consideration and are hereby approved, and the Settling Parties are hereby released to the extent and in the manner provided in the Settlement Agreement.

9.    The Trustee Motion is hereby deemed withdrawn with prejudice, provided however, that nothing in this Order shall limit the right of the Creditors' Committee, Wachovia or U.S. Bank to file a motion for appointment of a chapter 11 trustee or examiner based on events or facts occurring after the date of entry of this Order.

10.    The Cash Collateral Order is hereby deemed amended to the extent necessary to implement the provisions of Paragraphs 3A(iv) and 5 of the Settlement Agreement.

11.    The Settlement Agreement shall inure to the benefit of and be binding upon the Parties and their respective agents, representatives, successors and assigns, including without limitation, any chapter 7 trustee or any other representative of these estates, custodian of

the assets subject to this Settlement Agreement or such other legal entity as may be responsible for carrying out all or any portion of this Settlement Agreement.

    12.    The provisions of this Order and the Settlement Agreement shall survive any order dismissing these cases or converting these cases to cases under chapter 7 of the Bankruptcy Code.

    13.    This Court shall retain jurisdiction over the Settling Parties for the purposes of interpreting, implementing and enforcing the terms and conditions of the Settlement Agreement and resolving any disputes arising thereunder during the pendency of the Debtors' chapter 11 cases.  To the extent of any conflict or inconsistency between the terms of the Settlement Agreement and this Order, the Settlement Agreement shall control.

Date:  Wilmington, Delaware
       June 11      , 2003

                                        HONORABLE KEVIN J. CAREY
                                        UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT

# A

## ASSET REALLOCATION AND SETTLEMENT AGREEMENT

THIS ASSET REALLOCATION AND SETTLEMENT AGREEMENT ("SETTLEMENT AGREEMENT") dated as of May 13, 2003, by and among (i) Insilco Technologies, Inc. ("Technologies") and its undersigned affiliated debtors (together with Technologies, the "Debtors") in the administratively consolidated chapter 11 bankruptcy cases pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") bearing docket number 02-13672 (KJC) (the "Chapter 11 Cases"), (ii) the official committee of unsecured creditors appointed in the Bankruptcy Cases (the "Creditors' Committee"), (iii) Bank One, NA as agent (the "Agent") and the lenders, including Bank One, NA, under the Second Amended and Restated Credit Agreement dated as of August 25, 2000, as amended (the "Credit Agreement") that have consented to the terms of this Settlement Agreement (the "Senior Lenders")[1], (iv) Wachovia Bank, National Association, as indenture trustee for the 12% senior subordinated notes due 2007 (the "12% Senior Subordinated Notes") issued by Technologies ("Wachovia") and (v) U.S. Bank, N.A. ("U.S. Bank") as the indenture trustee for the 14% senior discount notes due 2008 (the "14% Senior Discount Notes") issued by Insilco Holding Co. (collectively, the parties to this Settlement Agreement are hereinafter referred to as the "Parties"). Except as expressly provided otherwise herein, the terms and provisions of this Settlement Agreement shall become effective and binding upon the Settlement Effective Date, as defined in Paragraph 6 below.

## RECITALS

---

[1] As used herein, the term "Senior Lenders" does not include those lenders participating in Term Loan C, except in respect of Paragraph 1 only, wherein the term "Senior Lenders" shall include those lenders participating in Term Loan C

2

A.     On December 16, 2002 (the "Filing Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code") commencing the Chapter 11 Cases. The Debtors continue in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Chapter 11 Cases have been consolidated for procedural purposes and are being jointly administered pursuant to an order of the Bankruptcy Court. No trustee or examiner has been appointed in the Chapter 11 Cases.

B.     On December 19 and 20, 2002, the Debtors filed motions seeking, inter alia, the entry of orders (i) approving bidding procedures governing the sale of substantially all of the Debtors' assets, (ii) approving the sale of substantially all of the Debtors' assets, and (iii) granting certain relief related thereto (the "Sale Motions"). The Sale Motions contemplated the sale of substantially all of the Debtors' assets in separate transactions (the "Sales") pursuant to five separate sale agreements described below (collectively, the "Sale Agreements"), subject to higher or otherwise better offers and Bankruptcy Court approval:

        a.  Stock and Asset Purchase Agreement By and Among Amphenol Corporation, Amphenol Technical Products International Co., Insilco Technologies, Inc., T.A.T. Technology Inc., Insilco International Holdings, Inc. and Precision Cable Mfg. Co., Inc. dated as of December 15, 2002;

        b.  Stock and Asset Purchase Agreement Among Bel Fuse Ltd., Bel Fuse Macau, L.D.A., Bel Connector Inc., Bel Transformer Inc., and Insilco Technologies, Inc. and Certain of its Subsidiaries, dated as of December 15, 2002;

        c.  SRDF Acquisition Company, LLC, Insilco Technologies, Inc., Stewart Stamping Corporation, Eyelets For Industry, Inc. and EFI Metal Forming, Inc., dated as of December 15, 2002;

        d.  Asset Purchase Agreement By and Between LI.&R Partnership and Insilco Technologies, Inc., dated as of December 15, 2002; and

3

      e.  Share Sale and Asset Purchase Agreement between Insilco Technologies, Inc. and Stephen Bullock, dated as of December 15, 2002.

      C.  On January 3, 2003, the Office of the United States Trustee appointed five members to serve on the Creditors' Committee in these cases.

      D.  On January 14, 2003, the Creditors' Committee and Wachovia filed objections to the bidding procedures. After extensive negotiations with the Creditors' Committee and Wachovia at the January 16, 2003 hearing to consider approval of the bidding procedures, the Debtors consented to various amendments to Debtors' proposed bidding procedures and agreed to continue the hearing on the Sale Motions until March 7, 2003.

      E.  On January 16, 2003, the Bankruptcy Court entered the Final Order Authorizing Use of Cash Collateral and Granting Replacement Liens (the "Cash Collateral Order"). Annexed to the Cash Collateral Order as Exhibit B is a budget listing anticipated wind down expenses (the "Wind Down Budget"), including line items for payments that may be triggered under the Debtors' Key Executive and Key Employee Severance Plan (the "KESP") and the Debtors' Key Executive and Key Employee Retention Plan (the "KERP"). Paragraph 3 of the Cash Collateral Order provides that, subject to certain limitations, to the extent amounts allocated to line items other than "Selling Costs" in the Wind Down Budget exceed the amounts necessary to fund such line items, then up to $500,000 of the amount allocated to non "Selling Costs" line items may be reallocated and used by the Debtors' estates for other necessary expenses for a period of six months following the completion of the Sales (the "Reallocated Monies"), at which time the remaining balance of the Reallocated Monies shall be returned to the Agent.

4

F.    On January 30, 2003, the Court docketed the orders approving the Bidding Procedures. With respect to the Custom Assemblies deal and the N. Myrtle Beach deal, the Debtors submitted revised orders to effect certain ministerial changes, on or about February 6, 2003. These revised orders were entered by the Bankruptcy Court on February 19, 2003.

G.    On February 26, 2003, the Creditors' Committee and Wachovia filed objections to the Sale Motions, and on March 6, 2003, the Creditors' Committee filed a supplement to the objection (collectively, the "Sale Objections").

H.    On March 5, 2003, the Creditors' Committee filed a motion seeking inter alia appointment of a chapter 11 trustee for the Debtors' estates or an examiner (the "Trustee Motion").

I.    At the Sale Hearing on March 7, 2003, the Debtors presented argument and evidence in support of the Sales. Prior to the Committee and Wachovia presenting evidence in support of the Sale Objections and a ruling by the Bankruptcy Court on the Sale Motions, counsel for the Debtors, the Agent and the Creditors' Committee informed the Bankruptcy Court that they, together with Wachovia, had reached a settlement in principle pursuant to which the Sale Objections were withdrawn. Counsel for the Debtors, the Agent and the Creditors' Committee described certain of the general terms and conditions of the settlement on the record at the Sale Hearing and noted that the settlement was subject to definitive documentation and certain further approvals, including Bankruptcy Court approval and, in the case of the Agent, approval of the terms of the settlement by the requisite majorities of the Senior Lenders sufficient to bind the Senior Lenders, including as a class under a plan incorporating the settlement terms, if necessary.

5

J.    Pursuant to the terms and conditions set forth in this Settlement Agreement, the Parties have agreed to resolve all disputes among them, including without limitation the disputes regarding the Sale Motion (including the Sale Objections), the Trustee Motion and all matters related thereto, and otherwise resolve their differences amicably in order to avoid costly litigation and facilitate the orderly conclusion of these Chapter 11 Cases.

K.    Following the withdrawal of the Sale Objections, the Bankruptcy Court approved the Sale Motions by orders dated March 7, 2003 (the "Sale Orders").

NOW THEREFORE, in consideration of the mutual covenants, release of claims and agreements contained herein, including without limitation the resolution of the Sale Objections and the withdrawal of the Trustee Motion (which shall be deemed a withdrawal "with prejudice" to the extent set forth herein), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, in full and final settlement of the disputes among the Parties, the Parties to this Settlement Agreement hereby agree as follows:

## AGREEMENT

1.    ALLOWANCE OF SENIOR LENDERS' CLAIMS. The Senior Lenders' liens and claims against the Debtors (i.e., the prepetition revolving credit facility, Term Loan A, Term Loan B and Term Loan C) are fully and finally allowed in the amount of $254,933,571.49[2] (the "Allowed Senior Lenders' Claims") The liens and security interests of the Senior Lenders (other than the Term Loan C Lenders, which are, under the terms of the Credit Agreement, unsecured) are deemed valid, perfected, first priority and indefeasible and neither

---

[2] Of this amount $232,712,443 42 represents principal, accrued interest and fees owing on the revolving credit facility, Term Loan A and Term Loan B as of the Petition Date, and $22,221,128 07 represents principal and accrued interest owing on Term Loan C as of the Petition Date.

A - 446

6

such liens nor such claims shall be subject to any further challenge, and the Senior Lenders shall not be required to file any proof of claim or further evidence of the indebtedness owing by the Debtors or of any collateral securing such indebtedness.

2.    TREATMENT OF SENIOR LENDERS' CLAIMS.  A.  Except with respect to (i) amounts which are required to be funded pursuant to the "Carve Out" and "Wind Down Budget" under the Cash Collateral Order, (ii) the Contributed Assets (as defined in Paragraph 3, below, subject to the provisions of Section 4B in respect of the holders of the 14% Senior Discount Notes and the 12% Senior Subordinated Notes), and (iii) Avoidance Actions (as defined in Paragraph 3 below and which, whenever used herein, shall be deemed to include the proceeds of Avoidance Actions) (clauses (i) through (iii), collectively the "Excluded Assets"), the Senior Lenders shall receive and be entitled to receive and to indefeasibly retain as of the Settlement Effective Date, in full satisfaction of their secured claims, all proceeds (including all payments previously received by the Agent or its professionals in connection with these Chapter 11 cases), from the disposition of the Debtors' businesses and assets whether pursuant to the Sale Orders or otherwise, and all other cash, including without limitation cash currently held or to be received in the future by the Debtors from any source whatsoever, including without limitation, litigation recoveries, tax refunds, asset dispositions, unapplied retainers and cash on hand.  The Agent's prepetition and postpetition liens on all such cash and assets other than the Excluded Assets shall remain in place until the payments required herein have been made to the Agent, and the Agent shall be entitled to the receipt of all cash and proceeds of assets (whether or not subject to any such liens) other than the Excluded Assets; provided, however, that the Senior Lenders' recovery shall not exceed the amount of the Allowed Senior Lenders' Claims.  The Debtors (or such other party as may be responsible for administering this Agreement) shall, without further

A - 447

7

order of the Court, promptly remit to the Agent all proceeds other than Excluded Assets as and when such proceeds are received and shall expeditiously remit all such proceeds in their possession and cause their foreign subsidiaries to repatriate any such proceeds in their possession.

       B.       In consideration of the treatment set forth in Paragraph 2A, the Senior Lenders waive and relinquish any right or entitlement to recovery or distributions on their allowed unsecured deficiency claims and, effective upon the receipt of the releases described in Paragraph 4B from the holders of the 12% Senior Subordinated Notes and the 14% Senior Discount Notes, further waive any enforcement of their contractual subordination rights vis-à-vis the holders of the 12% Senior Subordinated Notes and their structural subordination rights vis-à-vis the holders of the 14% Senior Discount Notes in order to effectuate the reallocation and distributions set forth in Paragraph 3 below, provided, however that, the Senior Lenders' sharing and reallocation of the Contributed Assets in respect of the holders of the 14% Senior Discount Notes and the 12% Senior Subordinated Notes (collectively, the "Noteholders") is expressly conditioned upon and subject to the provisions of Paragraph 4B.

       3.       **ASSET REALLOCATION/CONTRIBUTED ASSETS.**  A.  Subject to the provisions of Paragraph 4B, the Senior Lenders agree to the following sharing and reallocation of cash and proceeds, as set forth in the following subparagraphs (i) through (iv) (the "Contributed Assets"), to the holders of allowed general unsecured claims including those of the Noteholders (collectively the "Unsecured Creditors") to be distributed in a manner set forth in a liquidating trust agreement or a Plan (as defined in Paragraph 6), if such a Plan is required:

       i.       $1.75 million of the net proceeds realized from the closing of the pending Sales;

       ii.      the sale proceeds paid to the Debtors' estate from the sale of the real properties located in Larne, Northern

A - 448

8

Ireland (whether paid directly to the Debtors or paid to TAT Canada and by TAT Canada to the Debtors), Taylorsville, North Carolina and McAllen, Texas, and the proceeds paid to the Debtors' estate from the sale of miscellaneous personal property, including the Debtors' interest in artwork, equipment and furnishings, located in the Debtors' Columbus, Ohio offices and listed on Exhibit A hereto; provided, however, that, in the event the Debtors seek to implement this Settlement Agreement through a Plan, then, to the extent that the Debtors' estates do not otherwise have sufficient readily available unencumbered assets to pay administrative expenses required to be paid in order to confirm such a Plan (other than professional fees, including the Agent's professional fees, incurred pursuant to Paragraph 11 below), the estate shall have the benefit of up to $250,000 of the Contributed Assets described in this subparagraph (ii) for the payment of such administrative expenses (the "Administrative Expense Carve Out"); provided further that the aggregate Contributed Assets under subparagraphs (i) and (ii) shall not together exceed $3 million (inclusive of the Administrative Expense Carve Out) with any excess over such $3 million to be promptly remitted to the Senior Lenders and any such excess will not constitute "Contributed Assets";

iii.   $250,000 of cash collateral (which shall be asset sale proceeds), plus 10% of the net recoveries derived from (x) the Debtors' claims and causes of action against Star Services, Inc. relating to the litigation bearing Supreme Court of the State of New York Index # 605676/97 and generally referred to as the "Star Services Litigation" and (y) income tax refunds received by the Debtors from and after April 15, 2003, for the purpose of establishing a "Creditors' Trust" to investigate and pursue claims, actions and causes of action not specifically released under this Settlement Agreement, assertable by or on behalf of the Debtors or their estates for the benefit of unsecured creditors and, including claims arising under Chapter 5 of the Bankruptcy Code ("Avoidance Actions"), provided the Contributed Assets under this subparagraph (iii) shall not exceed $750,000, with any excess over $750,000 to be promptly remitted to the Senior Lenders and which

9

excess (including any net recoveries derived from the assets described under (x) and (y) beyond the amount allocated to the Creditor Trust in this paragraph (iii)) will not constitute "Contributed Assets";

iv.    the Cash Collateral Order shall be amended (or deemed amended on the Settlement Effective Date) to provide that the Reallocated Monies shall remain as a reserve with the estate (not subject to the requirement that such Reallocated Monies be returned to the Agent), and that the first $200,000 of any such Reallocated Monies shall be allocated and earmarked for the payment of the allowed and unpaid fees and expenses of the Creditors' Committee's professionals incurred from and after May 1, 2003, with any remaining Reallocated Monies available for payment of other administrative expenses of the Debtors' estates.

B.    The Contributed Assets, as and when received by the Agent, shall be held by the Agent in a separate interest bearing account pending the earlier to occur of (i) the Settlement Effective Date (as defined herein) at which time such Contributed Assets shall be remitted to such account as has been designated by the Creditors' Committee, if any, for further distribution in accordance with the terms hereof upon order of the Court pursuant to a confirmed Plan (as defined in Paragraph 6), or other court order (provided that the Debtors or such other entity as may be administering this Settlement Agreement shall be responsible for the costs of maintaining such account for so long any of the Contributed Assets are held by the Agent), or (ii) the Settlement Termination Date (as defined herein) at which time such Contributed Assets may be provisionally applied by the Agent in accordance with the Cash Collateral Order. In the event any of the assets described in Paragraph 3A have not been liquidated as of the Settlement Effective Date ("Unliquidated Contributed Assets"), the provisions of this Paragraph 3 shall apply to the proceeds of such Unliquidated Contributed Assets as and when any of such Unliquidated Contributed Assets are liquidated. The Debtors shall use their reasonable best