35

Lenders of their contractual and structural subordination rights in respect of the Holders of Class 5 and Class 6 Claims. In addition, the releases set forth in and in the manner provided by Section 4.B. of the Asset Reallocation and Settlement Agreement shall be deemed delivered by the 12% Note Indenture Trustee and the 14% Note Indenture Trustee as of the Effective Date.

(c)    Releases by the Agent and the Senior Lenders. Pursuant to Paragraph 4D of the Asset Reallocation and Settlement Agreement, the Agent and the Senior Lenders waived and relinquished any and all interest in and claims that each of them have or may have against the Excluded Assets, including the Contributed Assets and Rights of Action, except to the extent specifically set forth in the Asset Reallocation and Settlement Agreement.

(d)    Release of Certain Avoidance Actions. Pursuant to Paragraph 4E of the Asset Reallocation and Settlement Agreement, the Debtors, the Creditors' Committee, the Agent and the Senior Lenders, on behalf of themselves and the estates of the Debtors, and each of their respective predecessors, successors and assigns, have fully waived, released and forever discharged all Avoidance Actions arising under chapter 5 of the Bankruptcy Code or otherwise relating to or concerning the conversion from recourse to non-recourse of certain loans and the deferred payment of certain bonuses, in an aggregate amount not to exceed $250,000, in respect of the Released Employees.

Section 14.10. *Exculpation and Limitation of Liability*

(a)    None of the Agent, the Debtors, the Creditor Trust, the Trustees, the Creditors' Committee, the Senior Lenders or the Indenture Trustees, nor any of their respective present or former members, officers, directors, employees, advisors, or attorneys shall have or incur any liability to any holder of a Claim or Equity Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, including, without limitation, the Asset Reallocation and Settlement Agreement, the formulating, negotiating or implementing of this Plan, the solicitation of acceptances of this Plan, the pursuit of confirmation of this Plan, the confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for their gross negligence or willful misconduct, and in all respects such parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities in the Chapter 11 Cases and under this Plan.

(b)    Notwithstanding any other provision of this Plan, no holder of a Claim or Equity Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, shall have any right of action against the Creditor Trust, the Trustees, any of the Debtors, any statutory committee, or any of their respective present or former members, officers, directors, employees, advisors or attorneys, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, formulating, negotiating or implementing this Plan, the consummation of this Plan, the confirmation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except to the extent such right of action arises from any such party's gross negligence or willful misconduct.

(c)    The Creditor Trust shall indemnify each Person exculpated pursuant to this Section 14.10 against, hold each such Person harmless from, and reimburse each such Person for, any and all losses, costs, expenses (including attorneys' fees and expenses), liabilities and damages sustained by such Person arising from any liability described in Section 14.10(a) of this Plan.

NYDOCS03/672357 16

WP3 973424 1        61683 1001

36

Section 14.11. *Cancellation of Notes, Instruments, Debentures and Equity Securities*

On the Effective Date, except to the extent provided otherwise in this Plan, all notes, instruments, certificates and other documents evidencing Claims and all Equity Interests in any of the Debtors shall be canceled and deemed terminated, without any further act or action under any applicable agreement, law, regulations, order or rule. On the Effective Date, except to the extent provided otherwise in this Plan, any indenture relating to any of the foregoing, shall be deemed canceled as permitted by section 1123(a)(5)(F) of the Bankruptcy Code. The Indentures shall survive confirmation of this Plan solely to effectuate Distributions to be made to holders of the Senior Notes as provided herein and to enforce the rights, duties and administrative functions of the Indenture Trustees as provided herein and therein with respect to such Distributions, and permitting the Indenture Trustees to assert the Charging Lien against such Distributions for the payment of the Indenture Trustees' fees and expenses. Upon the final Distributions to the holders of the Senior Notes pursuant to this Plan, the Indentures shall be canceled and deemed terminated and the Indenture Trustees shall be discharged of any further duties, without any further act or action under any applicable agreement, law, regulations, order or rule and the obligations of the Debtors under such Indentures shall be terminated.

Section 14.12. *Post-Effective Date Fees and Expenses*

From and after the Effective Date, the Creditor Trust shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Plan Oversight Committee, the Indenture Trustees in their capacity as disbursing agents, and the Creditor Trust related to implementation and consummation of this Plan, subject to any restrictions imposed under the Cash Collateral Order, provided that such payment shall be borne by the Series of the Creditor Trust to which such fees and expenses relate.

Section 14.13. *Section 1146 Exception*

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of any security under this Plan, or the making or delivery of an instrument of transfer under this Plan, may not be taxed under any law imposing a stamp tax or similar tax.

Section 14.14. *Severability*

The provisions of this Plan shall not be severable unless such severance is agreed to by the Debtors, the Creditors' Committee and the Lenders and such severance would constitute a permissible modification of this Plan pursuant to section 1127 of the Bankruptcy Code.

Section 14.15. *Recognition*

As of the close of business on the Record Date, the Indenture Trustees will have no obligation to recognize any transfer of Notes occurring after the Record Date. For purposes of making distributions under this Plan, the Indenture Trustees will be entitled to recognize and deal for all purposes herein with only those holders of record stated on the transfer ledger maintained by the Indenture Trustees or their designees as of the close of business on the Record Date.

Section 14.16. *Governing Law*

Except to the extent that other federal law is applicable, or to the extent that an exhibit hereto provides otherwise, the rights, duties and obligations arising under this Plan shall be governed by, and

37

construed and enforced in accordance with, the Bankruptcy Code and, to the extent not inconsistent therewith, the laws of the State of New York.

Section 14.17. *Notices*

All notices, requests and demands to or upon the Debtors, the Creditor Trust, the Creditors' Committee or the Lenders to be effective shall be in writing, including by facsimile transmission, and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered to all of the following or, in the case of notice by facsimile transmission, when received by all of the following and telephonically confirmed, addressed as follows or to such other addresses as filed with the Bankruptcy Court.

To:

**On behalf of the Debtors:**

Constance A. Fratianni
Scott C. Shelley
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179

- and -

Pauline K. Morgan
YOUNG CONAWAY STARGATT
& TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

**On behalf of the Creditor Trust:**

_____
_____
_____
_____
_____
Telephone: _____
Facsimile: _____

**On behalf of the Creditors' Committee:**

Andrew I. Silfen
ARENT FOX KINTER PLOTKIN & KAHN

NYDOCS03/672357 16

WP3:973424 1          61683 1001

A - 578

38

1675 Broadway
New York, NY 10019
Telephone: (212) 484-3903
Facsimile: (212) 484-3990

**On behalf of the Prepetition Agent:**

Janet E. Henderson
SIDLEY AUSTIN BROWN & WOOD
10 South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

**On behalf of the US Trustee:**

David L. Buchbinder
Officer of the United States Trustee
844 King Street
Suite 2313
Wilmington, DE 19801
Telephone: (302) 573-6491
Facsimile: (302) 573-6497

Section 14.18. *Closing of Cases*

The Creditor Trust shall, promptly upon the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to obtain a Final Decree closing the Chapter 11 Cases.

Section 14.19. *Section Headings*

The section headings contained in this Plan are for reference purposes only and shall not affect the meaning or interpretation of this Plan.

Section 14.20. *Primacy of Asset Reallocation and Settlement Agreement*

To the extent of any conflict or inconsistency between the provisions of this Plan and the provisions of the Asset Reallocation and Settlement Agreement, the provisions of the Asset Reallocation and Settlement Agreement shall govern and be deemed controlling. Notwithstanding anything herein to the contrary, the rights and entitlement of the Senior Lenders, as set forth in the Asset Reallocation and Settlement Agreement, shall in no way be dependent upon, and are expressly independent of, the provisions of this Plan.

Section 14.21. *Continuing Viability of Other Orders/Agreements*

Except to the extent expressly modified by this Plan or the Asset Reallocation and Settlement Agreement, (i) all Final Orders previously entered by the Bankruptcy Court and (ii) any agreements between creditors or between the debtors and their creditors shall continue in full force and effect.

NYDOCS03/672357 16

WP3:973424 1          61683 1001

A - 579

39

Section 14 22. *Administration of Wind Down Budget*

The Trustees shall provide the Agent and the Plan Oversight Committee upon request and no less frequently than monthly a written accounting of (i) all line item expenses paid in the prior month pursuant to the Wind Down Budget and (ii) all projected payments for line item expenses.  As soon as the Unsecured Creditors' Trustee determines in his reasonable judgment that any line item expense provided for in the Wind Down Budget has been paid, the Trustee shall, in accordance with the Cash Collateral Order, remit to the Agent for the benefit of the Senior Lenders any and all remaining cash collateral allocable to such line item in the Wind Down Budget, provided that the Unsecured Creditors' Trustee shall remit to the Agent all remaining unused cash allocable to the Wind Down Budget no later than January 5, 2004 (or such later date as the Agent may agree in writing).  Notwithstanding anything herein to the contrary, and except as expressly provided in the Asset Reallocation and Settlement Agreement, the Creditor Trust or Contributed Assets shall not be subject to any Claims payable under the Wind Down Budget.

Dated: Wilmington, Delaware
February 23, 2004

Respectfully Submitted,

INSILCO HOLDING CORPORATION
By: _Carol Wster_
Its: _President and General Counsel_

INSILCO TECHNOLOGIES, INC.
By: _Carol W_
Its: _President and General Counsel_

INNET TECHNOLOGIES, INC.
By: _Carol Wn_
Its: _Secretary and General Counsel_

INSILCO INTERNATIONAL HOLDINGS, INC.
By: _Carol Wster_
Its: _Secretary and General Counsel_

PRECISION CABLE MFG. CORPORATION
By: _Carol W_
Its: _General Counsel_

EYELETS FOR INDUSTRY, INC.
By: _Carol W_
Its: _Secretary and General Counsel_

EFI METAL FORMING, INC.
By: _Carol Wn_
Its: _Secretary and General Counsel_

STEWART STAMPING CORPORATION
By: _Carol Wster_
Its: _Secretary and General Counsel_

STEWART CONNECTOR SYSTEMS, INC.

By: _Carol A Steil_

Its: _Secretary and General Counsel_

SIGNAL CARIBE, INC.

By: _Carol A Steil_

Its: _General Counsel_

SIGNAL TRANSFORMER CORPORATION, INC.

By: _Carol A Steil_

Its: _Secretary and General Counsel_

# EXHIBIT C

*157*

**EDGAR Filing**                                                        ❷ Help

Click Here for an Important Message

## INSILCO HOLDING CO - 10-Q

⟪return to filings⟫

| Next Section | Exhibits | |
|---|---|---|

Return to Navigational Table of Contents
1

| | Material Contracts | First Section |
|---|---|---|

Exhibit 10.1

Return to Navigational Table of Contents

EXECUTION COPY

AMENDMENT NO. 1
TO
SECOND AMENDED AND RESTATED CREDIT AGREEMENT

This Amendment No. 1 (this "AMENDMENT") is entered into as of August 14, 2001 by and among INSILCO TECHNOLOGIES, INC., a Delaware corporation (the "COMPANY"), T.A.T. TECHNOLOGY INC., a company organized under the laws of Quebec (the "CANADIAN BORROWER"), the undersigned lenders (collectively, the "LENDERS"), BANK ONE, NA, having its principal office in Chicago, Illinois, both as one of the Lenders and as Administrative Agent (the "AGENT") on behalf of itself and the other Lenders, and DLJ Capital Funding, Inc., as Syndication Agent for the Lenders.

RECITALS:

WHEREAS, the Company, the Canadian Borrower, certain of the Lenders (the "ORIGINAL LENDERS") and the Agent are parties to that certain Second Amended and Restated Credit Agreement dated as of August 25, 2000 (as amended, supplemented or otherwise modified prior to the date hereof, the "CREDIT AGREEMENT"); and

WHEREAS, the parties hereto desire to (i) waive certain currently existing Defaults under the Credit Agreement and (ii) amend the Credit Agreement in certain respects more fully described below;

NOW, THEREFORE, in consideration of the premises herein contained and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1. DEFINED TERMS. Capitalized terms used herein and not otherwise defined herein shall have the meanings attributed to such terms in the Credit Agreement.

SECTION 2. AMENDMENT TO CREDIT AGREEMENT. Upon the effectiveness of this Amendment in accordance with the provisions of SECTION 4 below, the Credit

INSL 005868

Agreement is hereby amended as set forth in this SECTION 2 below:

SECTION 2.1. SECTION 1.1 of the Credit Agreement is hereby amended by amending each of the following defined terms in its entirety, in each case to read as follows:

"AGENTS" means the Administrative Agent.

"AGGREGATE PRO RATA SHARE" means, with respect to any Lender, the percentage obtained by dividing (a) the sum of (i) such Lender's Revolving Loan

2

Commitment at such time and (ii) such Lender's Term Loans (other than Term-C Loans) outstanding at such time by (b) the sum of (i) the aggregate amount of all Revolving Loan Commitments at such time and (ii) the aggregate amount of all Term Loans (other than Term-C Loans) outstanding at such time; PROVIDED, HOWEVER, if all of the Commitments are terminated pursuant to the terms hereof, then "Aggregate Pro Rata Share" means the percentage obtained by dividing (x) such Lender's outstanding Term Loans (other than Term-C Loans) and Revolving Loans by (y) the aggregate outstanding amount of all Term Loans (other than Term-C Loans) and Revolving Loans.

"CHANGE IN CONTROL" means (a) the failure of Holdco at any time to own, free and clear of all Liens and encumbrances (other than Liens of the types permitted to exist under CLAUSES (B), (D) and (g) of SECTION 7.2.3), all right, title and interest in 100% of the Capital Stock of the Company (other than (i) warrants to purchase common stock and (ii) shares of common stock of the Company issued upon exercise of such warrants); (b) the failure of the Equity Investors, their Affiliates and members of management of the Company and the Restricted Subsidiaries, in the aggregate, at any time to own, free and clear of all Liens and encumbrances (other than Liens of the types permitted to exist under CLAUSE (D) or (G) of SECTION 7.2.3) all right, title and interest in at least 51% (on a fully diluted basis) of the economic and voting interest in the Voting Stock of Holdco.

"COMMITTED LOAN" means a Term Loan (other than Term-C Loans), a Committed Revolving Loan or a Swing Line Loan.

"EBITDA" means, (I) for any applicable period ending on or prior to December 31, 2001, subject to CLAUSE (B) of SECTION 1.4, the sum for the Company and its Restricted Subsidiaries on a consolidated basis of

(a) Net Income;

PLUS

(b) the amount deducted in determining Net Income for such period representing non-cash charges or expenses, including depreciation, amortization, non-cash periodic post-retirement benefits and non-cash expenses related to employee stock options and stock incentive plans (excluding any non-cash charges representing an accrual of or reserve for cash charges to be paid within the next twelve months);

INSL 005869

PLUS

(c) the amount deducted in determining Net Income for such period representing income taxes (whether paid or deferred);

PLUS

3                                    2

(d) the amount deducted in determining Net Income for such period representing interest expense and Transaction Payments;

PLUS

(e) the amount deducted in determining Net Income for such period representing all transaction-related costs and expenses incurred in connection with or relating to the Taylor Sale or the T.A.T. Acquisition;

PLUS

(f) the "Performance Bonus" payable by the Canadian Borrower to David Mesri pursuant to Section 4.1 of the Employment Agreement attached as Schedule B to the T.A.T. Acquisition Agreement and accrued bonuses payable in connection with the Acquisition;

PLUS

(g) to the extent not included in Transaction Payments, deferred compensation or performance bonuses actually paid in cash to members of management in connection with an acquisition permitted pursuant to CLAUSE (B) of SECTION 7.2.8;

MINUS

(h) Restricted Payments of the type referred to in CLAUSE (a) of SECTION 7.2.6 made during such period;

and (II) for any applicable period ending after December 31, 2001, subject to CLAUSE (B) of SECTION 1.4, the sum for the Company and its Restricted Subsidiaries on a consolidated basis of

(a) Net Income;

PLUS

(b) the amount deducted in determining Net Income for such period representing non-cash charges or expenses, including depreciation, amortization, non-cash periodic post-retirement benefits and non-cash expenses related to employee stock options and stock incentive plans (excluding any non-cash charges representing an accrual of or reserve for cash charges to be paid in any subsequent period, other than non-cash charges for post-retirement benefits not exceeding $1,000,000 for any four-Fiscal Quarter period);

INSL 005870

A - 586

PLUS

4                                          3

      (c) the amount deducted in determining Net Income for such period representing income taxes (whether paid or deferred);

PLUS

      (d) the amount deducted in determining Net Income for such period representing interest expense and Transaction Payments (excluding Transaction Payments incurred after the Fiscal Quarter ended on or about June 30, 2001, other than fees and expenses incurred in connection with Amendment No. 1);

PLUS

      (e) the amount deducted in determining Net Income for such period representing all transaction-related costs and expenses incurred in connection with or relating to the Taylor Sale or the T.A.T. Acquisition (excluding such costs and expenses incurred after the Fiscal Quarter ended on or about June 30, 2001);

PLUS

      (f) the "Performance Bonus" payable by the Canadian Borrower to David Mesri pursuant to Section 4.1 of the Employment Agreement attached as Schedule B to the T.A.T. Acquisition Agreement and accrued bonuses payable in connection with the Acquisition (excluding any bonus payments (or similar payments pursuant to any acquisition) made after the Fiscal Quarter ended on or about June 30, 2001).

      "LENDER PARTIES" means, collectively, the Lenders, the Issuers and the Administrative Agent.

      "LOAN" means, as the context may require, a Revolving Loan, a Term-A Loan, a Term-B Loan, a Term-C Loan or a Swing Line Loan, of any type, PROVIDED, HOWEVER, that as used in the Collateral Documents, "Loan" shall not include a Term-C Loan.

      "LOAN DOCUMENT" means this Agreement, the Notes, the Letters of Credit, each Rate Protection Agreement, each Borrowing Request, each Issuance Request, the Administrative Agent Fee Letter, each Pledge Agreement, the Subsidiary Guaranty, the Canadian Collateral Documents, each Mortgage (upon execution and delivery thereof), and each other agreement, document or instrument delivered in connection with this Agreement or any other Loan Document, whether or not specifically mentioned herein or therein, PROVIDED, HOWEVER, that as used in the Collateral Documents, "Loan Document" shall not include the Term-C Notes.

      "NOTE" means, as the context may require, a Revolving Note, a Term-A Note, a Term-B Note, a Term-C Note or a Swing Line Note, PROVIDED, HOWEVER,

**INSL 005871**

A - 587

5                                          4

that as used in the Collateral Documents, "Note" shall not include the Term-C Notes.

"OBLIGATIONS" means all obligations (monetary or otherwise, whether absolute or contingent, matured or unmatured) of the Borrowers and each other Obligor arising under or in connection with a Loan Document, including Reimbursement Obligations and the principal of and premium, if any, and interest (including interest accruing during the pendency of any proceeding of the type described in Section 8.1.9, whether or not allowed in such proceeding) on the Loans, PROVIDED, HOWEVER, that as used in the Collateral Documents, "Obligations" shall not include the Term-C Obligations.

"OBLIGOR" means a Borrower or any other Person (other than any Secured Party or any Term-C Lender) obligated under any Loan Document.

"SECURED PARTIES" means, collectively, the Lender Parties other than the Term-C Lenders and each counterparty to a Rate Protection Agreement that is (or at the time such Rate Protection Agreement was entered into, was) a Lender other than a Term-C Lender or an Affiliate of a Lender other than a Term-C Lender; PROVIDED, HOWEVER, that the Term-C Lenders shall be deemed to be "Secured Parties" solely for the purpose of effectuating, and only to the extent required to effectuate, the Subsidiary Guaranty and the guaranty contained in ARTICLE III of the Holdco Guaranty and Pledge Agreement and the covenants of Holdco set forth in SECTIONS 5.6, 5.7, 5.8 and 5.9 thereof (but not for purposes of the benefits of the Collateral covered by the Holdco Guaranty and Pledge Agreement).

"STATED MATURITY DATE" means (a) in the case of any Committed Loan (other than a Term- B Loan), the sixth anniversary of the Effective Date, (b) in the case of any Term-B Loan, March 25, 2007, (c) in the case of any Term-C Loan, June 25, 2007 and (d) in the case of any Uncommitted Revolving Loan, the earlier of (i) the Stated Maturity Date for Committed Revolving Loans and (ii) the maturity date that shall have been agreed between the Company and the Lender or Lenders that shall have made, or offered or agreed to make, such Uncommitted Revolving Loan, or, in the case of any such day that is not a Business Day, the first Business Day following such day.

"TERM LOANS" means, collectively, the Term-A Loans, the Term-B Loans and the Term-C Loans, PROVIDED, HOWEVER, that as used in the Collateral Documents, "Term Loans" shall not include the Term C-Loans.

"TOTAL EXPOSURE AMOUNT" means,

(I) on any date of determination on which any Commitments or any Obligations other than Term-C Obligations are outstanding, (a) with respect to any provision of this Agreement other than the declaration of the acceleration of

6                                          5

INSL 0(

A - 588

the maturity of all or any portion of the outstanding principal amount of the Loans and other Obligations to be due and payable pursuant to SECTION 8.3, the sum of (i) the aggregate principal amount of all Term Loans (other than Term-C Loans) outstanding at such time, (ii) the aggregate undrawn amount of any Additional Term Loan Commitments then outstanding and (iii) (A) the then effective Revolving Loan Commitment Amount, if there are any Revolving Loan Commitments then outstanding, or (B) if all Revolving Loan Commitments shall have expired or been terminated, the sum of (1) the aggregate principal amount of all Revolving Loans and Swing Line Loans outstanding at such time and (2) the Letter of Credit Outstandings at such time; and (b) with respect to the declaration of the acceleration of the maturity of all or any portion of the outstanding principal amount of the Loans and other Obligations to be due and payable pursuant to SECTION 8.3, the sum of (i) the aggregate principal amount of all Loans (other than Term-C Loans) outstanding at such time and (ii) the Letter of Credit Outstandings at such time. and

(II) on any date of determination on which no Commitments or any Obligations other than Term-C Obligations are outstanding, the sum of (a) the aggregate principal amount of all Term-C Loans outstanding at such time and (b) the aggregate amount of accrued and unpaid interest on Term-C Loans outstanding at such time.

"TRANCHE" means. as the context may require, the Loans or Commitments constituting Term-A Loans or Additional Term-A Loan Commitments, Term-B Loans or Additional Term-B Loan Commitments, Term-C Loans, Revolving Loans or Revolving Loan Commitments, Swing Line Loans or the Swing Line Loan Commitment.

SECTION 2.2. SECTION 1.1 of the Credit Agreement is hereby further amended by amending the definition of "APPLICABLE COMMITMENT FEE" by:

(i) deleting the word "and" at the end of CLAUSE (a) thereof;

(ii) adding immediately after the words "each day thereafter" in CLAUSE (b) thereof the words "to but excluding the First Amendment Date"; and

(iii) adding immediately following the table set forth therein, a new CLAUSE (C) to read as follows:

and (c) from and after the First Amendment Date, a fee which shall accrue at a rate of 0.75% per annum.

SECTION 2.3. SECTION 1.1 of the Credit Agreement is hereby further amended by amending the definition of "APPLICABLE MARGIN" by:

(i) amending clause (a) thereof to read in its entirety as follows:

6

(a) with respect to the unpaid principal amount of each Term-B Loan maintained as a (i) Base Rate Loan, (x) prior

INSL O

A - 589

to the First Amendment Date, 2.50% per annum and (y) from and after the First Amendment Date, 3.25% per annum and (ii) LIBO Rate Loan, (x) prior to the First Amendment Date, 3.75% per annum and (y) from and after the First Amendment Date, 4.50% per annum;

(ii) deleting the word "and" at the end of CLAUSE (b) thereof;

(iii) adding immediately after the words "Compliance Certificate described in CLAUSE (B) above" in CLAUSE (c) thereof the words "to but excluding the First Amendment Date" and replacing the period at the end of CLAUSE (c) thereof with a colon; and

(iv) adding immediately after the table set forth therein a new CLAUSE (d) to read as follows:

(d) at all times on and after the First Amendment Date, with respect to the unpaid principal amount of each (i) Swing Line Loan, Committed Revolving Loan and Term-A Loan maintained as a Base Rate Loan, 2.75% per annum, and (ii) Committed Revolving Loan and Term-A Loan maintained as a LIBO Rate Loan, 4.00% per annum.

SECTION 2.4. SECTION 1.1 of the Credit Agreement is hereby further amended by adding the word "Adjusted" immediately before the word "EBITDA" in the definition of "FIXED CHARGE COVERAGE RATIO".

SECTION 2.5. SECTION 1.1 of the Credit Agreement is hereby further amended by deleting the second proviso at the end of the definition of "INTEREST PERIOD" in its entirety and substituting therefor the following:

PROVIDED, FURTHER, that the applicable Borrower shall not select an Interest Period longer than one month until after the date on which the Compliance Certificate for a four-Fiscal Quarter period ending after the Fiscal Quarter ending on or about March 31, 2002 reports EBITDA for such four-Fiscal Quarter period greater than $45,000,000.

SECTION 2.6. SECTION 1.1 of the Credit Agreement is hereby further amended by adding at the end of the definition of "UNRESTRICTED SUBSIDIARY" the following sentence:

Notwithstanding the foregoing, from and after the First Amendment Date, each Subsidiary of the Company shall be a Restricted Subsidiary, and the Company shall not have the right to designate any Subsidiary of the Company as an Unrestricted Subsidiary.

8                                    7

SECTION 2.7. SECTION 1.1 of the Credit Agreement is hereby further amended by adding thereto the following defined terms:

"ADJUSTED EBITDA" means, for any applicable period, the sum of EBITDA PLUS Supplemental EBITDA for such period.

"AMENDMENT NO. 1" means Amendment No. 1 to Second Amended and

INSL 005874

A - 590

Restated Credit Agreement dated as of August __, 2001 among the Company, the Canadian Borrower, the Lenders party thereto, the Administrative Agent and the Syndication Agent.

"APPLICABLE TERM-C RATE" means at all times during the applicable periods set forth below.

(a) from the First Amendment Date to (but excluding) the date upon which the Compliance Certificate for the Fiscal Quarter ending on or about June 30, 2001 is delivered by the Company to the Administrative Agent pursuant to CLAUSE (c) of SECTION 7.1.1, 30.0% per annum; and

(b) at all times after the date of delivery of the Compliance Certificate described in CLAUSE (a) above, the rate determined by reference to the applicable Leverage Ratio set forth below:

| Leverage Ratio | Applicable Term-C Rate |
| --- | --- |
| greater than 6.0:1 | 30.0% |
| greater than 5.0:1 but not greater than 6.0:1 | 25.0% |
| greater than 4.0 but not greater than 5.0:1 | 20.0% |
| less than or equal to 4.0:1 | 15.0% |

The Leverage Ratio used to compute the Applicable Term-C Rate for any day referred to in CLAUSE (b) above shall be the Leverage Ratio set forth in the Compliance Certificate most recently delivered by the Company to the Administrative Agent on or prior to such day pursuant to CLAUSE (c) of SECTION 7.1.1. Changes in the Applicable Term-C Rate resulting from a change in the Leverage Ratio shall become effective on the first day following delivery by the Company to the Administrative Agent of a new Compliance Certificate pursuant to CLAUSE (c) of SECTION 7.1.1. If the Company shall fail to deliver a Compliance Certificate within the number of days after the end of any Fiscal Quarter as

9                                    8

required pursuant to CLAUSE (c) of SECTION 7.1.1 (without giving effect to any grace period), the Applicable Term-C Rate from and including the first day after the date on which such Compliance Certificate was required to be delivered to the date the Company delivers to the Administrative Agent the next Compliance Certificate shall conclusively equal the highest Applicable Term-C Rate set forth above.

"COLLATERAL DOCUMENTS" means each Pledge Agreement, the Canadian Collateral Documents, each Mortgage and each other security agreement, pledge agreement, mortgage, deed of trust, collateral assignment, financing statement or other agreement, document or instrument delivered in connection with this Agreement or any other Loan Document intended to create or evidence any Lien to secure the

INSL 005875

A - 591

Obligations (other than Obligations owing to the Term-C Lenders); PROVIDED, HOWEVER, that the Holdco Guaranty and Pledge Agreement shall not be deemed to be a Collateral Document for purposes of the guaranty contained in Article III thereof or SECTIONS 5.6, 5.7, 5.8 and 5.9 thereof.

"DEFERRED ACCRUAL DATE" means the date on which the Compliance Certificate for a Fiscal Quarter ending on or after December 31, 2002 is delivered by the Company to the Administrative Agent pursuant to CLAUSE (c) of SECTION 7.1.1 and EBITDA for any period of two consecutive Fiscal Quarters during the four-Fiscal Quarter Period covered by such Compliance Certificate was greater than $38,000,000; PROVIDED, HOWEVER, that the Deferred Accrual Date shall not occur on any date on which a Default shall have occurred and be continuing.

"DEFERRED AMENDMENT FEE" means the fee, if any, determined in accordance with SECTION 3.3.4.

"DEFERRED INTEREST" means at any time the aggregate amount of interest accrued on Base Rate Loans and LIBO Rate Loans (other than Uncommitted Revolving Loans) pursuant to SECTION 3.2.1(d).

"DEFERRED LETTER OF CREDIT FEE" means at any time the letter of credit fee accrued pursuant to SECTION 3.3.3(b).

"DEFERRED PAYMENT ALLOCATION DATE" means the earlier to occur of the Deferred Accrual Date and the Deferred Payment Date.

"DEFERRED PAYMENT DATE" means the earliest of (i) the date on which all Obligations (other than principal of and accrued interest on the Term-C Loans) have been paid in full in cash, all Letters of Credit have been terminated, expired or Cash Collateralized, all Rate Protection Agreements have been terminated and all Commitments have been terminated, (ii) the date on which the Obligations are accelerated pursuant to SECTION 8.2 or 8.3, and (iii) the applicable Stated Maturity Date.

10                                    9

"FIRST AMENDMENT DATE" means the effective date of Amendment No. 1.

"FUNDED INDEBTEDNESS" means the outstanding principal amount of all Indebtedness of the Company and its Restricted Subsidiaries that (i) is of the type referred to in CLAUSE (a) (PROVIDED, HOWEVER, that any Earn-Outs included in Indebtedness under such CLAUSE (A) shall be included as "Funded Indebtedness" at the after-tax amount thereof), (b) or (c), in each case of the definition of "Indebtedness" and (ii) any Contingent Liability in respect of any of the foregoing types of Indebtedness; PROVIDED, HOWEVER, that "Funded Indebtedness" shall not include (A) Deferred Interest, Deferred Letter of Credit Fees or Deferred Amendment Fees, (B) the Term-C Loans or deferred interest thereon or (C) the New Subordinated Notes or deferred interest thereon.

"INITIAL TERM-C LENDER" means each of the following:

INSL 005876

A - 592

DLJ Merchant Banking Partners II, L.P.
DLJ Merchant Banking Partners II-A, L.P.
DLJ Offshore Partners II, C.V.
DLJ Diversified Partners, L.P.
DLJ Diversified Partners-A, L.P.
DLJ Millenium Partners, L.P.
DLJ Millenium Partners-A, L.P.
DLJ EAB Partners, L.P.
DLJ ESC II, L.P.
Donaldson, Lufkin & Jenrette Securities Corporation (as nominee for EMA 2001 Plan, L.P., DLJ First ESC, L.P., Paradeplatz 2001 Plan, L.P., Credit Suisse First Boston Private Equity, Inc. and CSFB 2001 Investors, L.P.)

"NEW SUBORDINATED NOTE" means a note (an "INITIAL NOTE") in the form of EXHIBIT K hereto and any note issued in exchange for, or upon transfer of, any Initial Note (or any note so issued upon exchange or transfer), in each case in accordance with the terms of the Initial Notes or an indenture in the form of Exhibit A to the Initial Notes.

"NEW SUBORDINATED NOTES DOCUMENTS" means the New Subordinated Notes and all other instruments, agreements, indentures or other documents evidencing or governing any of the New Subordinated Notes or pursuant to which any New Subordinated Notes are issued.

"SUPPLEMENTAL EBITDA" means, for any Fiscal Quarter of the Company, the amount of Net Debt Proceeds deemed received by the Company during such Fiscal Quarter from the incurrence of additional Term-C Loans pursuant to SECTION 2.1.6 (b) and/or the sale or issuance of New Subordinated Notes (in each case calculated as if the term "Net Debt Proceeds" applied to such incurrence, sale

11

10

or issuance). The aggregate of Supplemental EBITDA for all Fiscal Quarters during the term of this Agreement shall not exceed $30,000,000. Such Net Debt Proceeds shall be deemed to have been received by the Company during a particular Fiscal Quarter to the extent that they are received on or prior to the tenth Business Day after the date on which the Company is required to deliver its Compliance Certificate pursuant to SECTION 7.1.1 (c) with respect to such Fiscal Quarter; PROVIDED, HOWEVER, that (i) if the Company intends to receive such Net Debt Proceeds after the date on which it delivers its Compliance Certificate for such Fiscal Quarter, it shall deliver a notice to such effect together with such Compliance Certificate and shall give the Administrative Agent written notice of the receipt of such Net Debt proceeds within one Business Day after such receipt, and (ii) any such Net Debt Proceeds counted as Supplemental EBITDA for a particular Fiscal Quarter shall not count as Supplemental EBITDA for any other Fiscal Quarter. Notwithstanding the foregoing, Net Debt Proceeds shall be deemed to have been received by the Company during any Fiscal Quarter at the end of which the Company is required to comply with the last paragraph of SECTION 7.1.1 only if the Company shall have received such Net Debt Proceeds, and shall have given the Administrative Agent written notice to such effect, not later than the second Business Day prior to the next interest payment date on the 1998

INSL 005877

A - 593

Subordinated Notes.

"TERM-C COMMITMENT" means, with respect to each Initial Term-C Lender, such Initial Term-C Lender's commitment to make a Term-C Loan to the Company pursuant to SECTION 2.1.6 (a) in the amount set forth below opposite such Initial Term-C Lender's name:

| INITIAL TERM-C LENDER | TERM-C COMMITMENT |
|---|---|
| DLJ Merchant Banking Partners II, L.P. | $ 9,449,000 |
| DLJ Merchant Banking Partners II-A, L.P. | $ 376,000 |
| DLJ Offshore Partners II, C.V. | $ 445,000 |
| DLJ Diversified Partners, L.P. | $ 372,000 |
| DLJ Diversified Partners-A, L.P. | $ 208,000 |
| DLJ Millenium Partners, L.P. | $ 133,000 |
| DLJ Millenium Partners-A, L.P. | $ 20,000 |
| DLJ EAB Partners, L.P. | $ 43,000 |
| DLJ ESC II, L.P. | $ 1,033,000 |
| Donaldson, Lufkin & Jenrette Securities Corporation (as nominee for DLJ 2001 Plan, L.P., DLJ First ESC, L.P., Paralleplata 2001 Plan, L.P., Credit Suisse First Boston Private Equity, Inc. and CSFB 2001 Investors, L.P.) | $ 2,635,000 |
| | ---------- |
| | $15,000,000 |

12                                         11

"TERM-C LENDERS" means, collectively, the Initial Term-C Lenders, any Person that shall make a Term-C Loan pursuant to SECTION 2.16(b) and their respective successors and assigns as holders of the Term-C Loans from time to time.

"TERM-C LOAN" means a loan made pursuant to SECTION 2.16.

"TERM-C OBLIGATIONS" means the Obligations in respect of the Term-C Loans or any guaranty thereof (including, without limitation, pursuant to the Subsidiary Guaranty and the Holdco Guaranty and Pledge Agreement) or otherwise owing to the Term-C Lenders in their capacity as holders of the Term-C Loans, including, without limitation, rights to reimbursement of expenses pursuant to SECTION 11.3 and indemnification pursuant to SECTION 11.4.

SECTION 2.8. SECTION 1.4(b) of the Credit Agreement is hereby amended by adding at the end thereof the following sentence:

Notwithstanding the foregoing, for any period ending after December 31, 2001, such computations and calculations shall be made in accordance with the preceding sentence in the case of any Disposition, but not in the case of any acquisition.

SECTION 2.9. SECTION 2.1.4 of the Credit Agreement is hereby amended by deleting the period at the end of CLAUSE (e) thereof and substituting a semicolon and the word "or" therefor and by adding a new CLAUSE (f) at the end thereof to read as follows:

(f) any Uncommitted Revolving Loans on or after the First Amendment Date without the prior written consent of the Required Lenders.

http://www.primark.com/ga/edgar/EdgarResults.asp

4/19/2002

INSL 005878

A - 594

EDGAR Filing

SECTION 2.10. SECTION 2.1 of the Credit Agreement is hereby amended by adding at the end thereof a new SECTION 2.1.6 to read as follows:

SECTION 2.1.6. TERM-C LOANS.

(a) On the First Amendment Date, each Initial Term-C Lender shall make a Term-C Loan to the Company in a principal amount equal to the amount of such Initial Term-C Lender's Term-C Commitment by delivering to the Administrative Agent on such date same day funds in Dollars in such amount. To the extent such funds are received from the Initial Term-C Lenders, the Administrative Agent shall make such funds available to the Company by wire transfer to the account the Company shall have specified to the Administrative Agent in writing.

13                                          12

(b) From time to time on any Business Day occurring on or after the First Amendment Date but prior to the Stated Maturity date of the Term-C Loans, the Company may request in writing (with a copy to the Administrative Agent) that one or more of the Initial Term-C Lenders or any of their respective Affiliates that shall have been consented to by the Administrative Agent make additional Term-C Loans to it in an aggregate principal amount not to exceed $15,000,000. The Initial Term-C Lenders or any such Affiliate may, but shall have no obligation to, make such Loans. If and to the extent any Initial Term-C Lender or any such Affiliate agrees to make any such additional Term-C Loan, such Initial Term-C Lender or Affiliate shall deliver to the Administrative Agent on the date such additional Term-C Loan is to be made same day funds in Dollars in the principal amount of such additional Term-C Loan. To the extent such funds are received from such Initial Term-C Lender or Affiliate, the Administrative Agent shall make such funds available to the Company by wire transfer to the account the Company shall have specified to the Administrative Agent in writing.

SECTION 2.11. SECTION 3.1.1(a)(i) of the Credit Agreement is hereby amended (I) by deleting the word "and" at the end of CLAUSE (c) thereof, (ii) by deleting the word "or" at the end of CLAUSE (d) thereof and substituting the word "and" therefor and (iii) by adding a new CLAUSE (e) at the end thereof to read as follows:

(E) so long as any Commitments or Obligations other than Term-C Obligations are outstanding, the Company may not voluntarily prepay any Term-C Loans, in whole or in part, or any accrued interest thereon without the prior written consent of the Required Lenders; or

SECTION 2.12. SECTION 3.1.1(b) of the Credit Agreement is hereby amended by deleting the percentage "50%" therein and substituting the percentage "80%" therefor.

SECTION 2.13. SECTION 3.1.1(c) of the Credit Agreement is hereby amended by deleting the number "365" in both places such number appears therein and substituting the number "90" therefor.

SECTION 2.14. SECTION 3.1.1(d) of the Credit Agreement is hereby amended by deleting the percentage "50%" therein and substituting the percentage

http://www.primark.com/ga/edgar/EdgarResults.asp

4/19/2002

INSL 005879

A - 595

"100%" therefor and by deleting the ratio "3.50:1" therein and substituting the ratio "2.25:1" therefor.

SECTION 2.15. SECTION 3.1.1(g) of the Credit Agreement is hereby amended (A) by deleting therefrom in its entirety the table of scheduled principal repayments of the Term-B Loans and substituting the following therefor:

| Period | Scheduled Principal Repayment |
| --- | --- |

14                                           13

| Period | Scheduled Principal Repayment |
| --- | --- |
| First Amendment Date to (and including) 10/15/06 | $375,000 |
| 10/16/06 to (but not including) the Stated Maturity Date for Term-B Loans | $35,250,000 |
| Stated Maturity Date | $105,812,500 |

and (b) by adding at the end thereof a new paragraph to read as follows:

On the Stated Maturity Date for Term-C Loans, the Company shall repay the entire outstanding principal amount of, and all accrued and unpaid interest on, the Term-C Loans. The Company may not (either directly or indirectly through any of its Subsidiaries) voluntarily prepay, redeem or repurchase the Term-C Loans, in whole or in part, or any accrued interest thereon, prior to the Stated Maturity Date for Term-C Loans.

SECTION 2.16. SECTION 3.1.1(h) of the Credit Agreement is hereby amended by deleting the words "such excess;" at the end thereof and substituting therefor the phrase "the excess of such sum over 100% of the Revolving Loan Commitment Amount then in effect."

SECTION 2.17. SECTION 3.1.2(b) of the Credit Agreement is hereby amended in its entirety to read as follows:

(b) Each prepayment of Loans pursuant to CLAUSES (b), (c), (d) and (e) of SECTION 3.1.1 or CLAUSE (d) of this SECTION 3.1.2 shall be applied (i) FIRST, to the prepayment of Term Loans (other than Term-C Loans), until all Term Loans (other than Term-C Loans) shall have been repaid in full, (ii) SECOND, to the prepayment of Swing Line Loans, until all Swing Line Loans shall have been repaid in full, (iii) THIRD, to the prepayment of Revolving Loans, until all Revolving Loans shall have been repaid in full and (iv) FOURTH, to the Cash Collateralization of Letter of Credit Outstandings.

INSL 005880

A - 596

EDGAR Filing

SECTION 2.18. SECTION 3.1.2(c) of the Credit Agreement is hereby amended in its entirety to read as follows:

(c) Each prepayment of Term Loans made pursuant to CLAUSES (a), (b), (c), (d) and (e) of SECTION 3.1.1 shall be applied, (i) except in the case of a payment made pursuant to the last sentence of SECTION 3.1.3, on a pro rata basis, to the outstanding principal amount of all remaining Term-A Loans and Term-B Loans

15                                         14

(PROVIDED, HOWEVER, that prepayments of Term-B Loans shall be applied, FIRST, to Initial U.S. Term-B Loans and Additional Term-B Loans until all Initial U.S. Term-B Loans and Additional Term-B Loans have been repaid in full and, SECOND, to Initial Canadian Term-B Loans) and (ii) in respect of each Tranche of Term Loans, in inverse order of maturity of the remaining scheduled principal payments in respect thereof, until all such Term-A Loans and Term-B Loans have been repaid in full; PROVIDED, HOWEVER, that if the Company at any time elects in writing, in its sole discretion, to permit any Lender that has Term-B Loans to decline to have such Loans prepaid, then any Lender having Term-B Loans outstanding may, by delivering a notice to the Agents at least one Business Day prior to the date that such prepayment is to be made, decline to have such Loans prepaid with the amounts set forth above, in which case 100% of the amounts that would have been applied to a prepayment of such Lender's Term-B Loans, shall instead be applied to a prepayment of the Term-A Loans (until paid in full).

SECTION 2.19. SECTION 3.1.2(d) of the Credit Agreement is hereby amended by inserting therein immediately after the words "Term Loans" in each place such words appear therein the parenthetical phrase "(other than the Term-C Loans)".

SECTION 2.20. SECTION 3.2.1 of the Credit Agreement is hereby amended by adding at the end thereof new CLAUSES (d), (e) and (f) read as follows:

(d) In addition to interest at the applicable rate set forth in CLAUSES (a) and (b) above, each Base Rate Loan and each LIBO Rate Loan (in each case other than an Uncommitted Revolving Loan) in any currency shall accrue interest on the unpaid principal amount thereof for each day from and including July 1, 2001 to but excluding the earlier of the Deferred Accrual Date and the date such Loan is repaid at the rate of 2% per annum.

(e) As of the Deferred Payment Allocation Date, the total sum of each Lender's (other than Term-C Lenders) Deferred Interest, Deferred Letter of Credit Fee and Deferred Amendment Fee on such date shall, if such date is not the Deferred Payment Date, be payable on the Stated Maturity Date applicable to such Lender's Loans and shall in any event bear interest from the Deferred Payment Allocation Date until paid in full at a per annum rate from time to time equal to the LIBO Rate (Reserve Adjusted) for successive one-month Interest Periods commencing on the Deferred Payment Allocation Date plus 4.00% per annum.

(f) Each Term-C Loan shall accrue interest on the unpaid

4/19/2002

INSL 005881

A - 597

principal amount thereof for each day from and including the day upon which such Term-C Loan was made to but excluding the date such Term-C Loan is repaid at a rate per annum equal to the Applicable Term-C Rate on such day. As of each Quarterly Payment Date, all accrued and unpaid interest on the Term-C Loans and on any deferred interest theretofore accrued shall be deemed to be deferred interest, and

16                                      15

interest shall thereafter accrue on such deferred interest for each day from and including such Quarterly Payment Date to but excluding the date such deferred interest is repaid at a rate per annum equal to the Applicable Term-C Rate on such day.

SECTION 2.21. SECTION 3.2.2 of the Credit Agreement is hereby amended in its entirety to read as follows:

SECTION 3.2.2. POST-MATURITY AND POST-DEFAULT RATES.

(a) After the date any principal amount of any Loan (other than a Term-C Loan) shall have become due and payable (whether on the applicable Stated Maturity Date, upon acceleration or otherwise), or any other monetary Obligation (other than accrued interest, including deferred interest, on Term-C Loans, and other than overdue Reimbursement Obligations which shall bear interest as provided in SECTION 2.6.2) of any Borrower shall have become due and payable, the applicable Borrower shall pay, but only to the extent permitted by law, interest (after as well as before judgment) on such amounts at a rate per annum equal to (a) in the case of any overdue principal of Loans, overdue interest thereon, overdue commitment fees or other overdue amounts in respect of Loans or other obligations (or the related Commitments) under a particular Tranche, the rate that would otherwise be applicable to Base Rate Loans (or, in the case of Foreign Currency Loans denominated in a Foreign Currency other than Canadian Dollars, LIBO Rate Loans having an Interest Period of one month beginning on the date such amount shall have become due or the last day of the prior Interest Period applicable thereto) under such Tranche pursuant to SECTION 3.2.1 plus 2% per annum, (b) in the case of Uncommitted Revolving Loans, the rate that would otherwise be applicable to such Loans pursuant to CLAUSE (c) of SECTION 3.2.1 plus 2% per annum, and (c) in the case of other overdue monetary Obligations, the rate that would otherwise be applicable to Revolving Loans maintained as Base Rate Loans pursuant to SECTION 3.2.1 plus 2% per annum.

(b) During the continuance of an Event of Default, the Required Lenders may, at their option, by notice to the Borrowers, declare that each outstanding Loan (other than Term-C Loans) shall bear interest at a rate equal to the rate otherwise applicable thereto plus 2% per annum (but without duplication with respect to overdue principal of Loans or other overdue monetary Obligations to which CLAUSE (A) above shall apply).

SECTION 2.22. SECTION 3.2.3 of the Credit Agreement is hereby amended by adding at the end thereof a new sentence to read as follows:

Notwithstanding anything to the contrary contained in this SECTION 3.2.3, Deferred Interest shall be payable on the Deferred Payment Date.

INSL 005882

A - 598

17                                          16

SECTION 2.23. SECTION 3.3.3 of the Credit Agreement is hereby amended by designating the existing SECTION 3.3.3 as CLAUSE (a) thereof, by deleting the percentage "1.25%" therein and substituting the percentage "2.00%" therefor, and by adding thereto new CLAUSES (B) and (C) to read follows:

(b) In addition to the letter of credit fee at the applicable rate set forth in CLAUSE (a) above, each Borrower that shall have requested the issuance of a Letter of Credit agrees to pay to the Administrative Agent, for the PRO RATA account of the applicable Issuer and each other Lender that has a Revolving Loan Commitment, a letter of credit fee, in Dollars, for each day from and including July 1, 2001 to but excluding the Deferred Accrual Date on which there shall be any Letters of Credit requested by it outstanding, with respect to each Letter of Credit requested by it, at the rate of 2% per annum on the Dollar Equivalent of the Stated Amount of each such Letter of Credit outstanding on such day, such fees being payable on the Deferred Payment Date.

(c) During the continuance of an Event of Default, the Required Lenders may, at their option, by notice to the Borrowers, declare that the letter of credit fee set forth in CLAUSE (a) above shall be increased by 2% per annum.

SECTION 2.24. SECTION 3.3 of the Credit Agreement is hereby further amended by adding at the end thereof a new SECTION 3.3.4 to read as follows:

SECTION 3.3.4. DEFERRED AMENDMENT FEE. If, as of the Deferred Payment Allocation Date, the sum of the Deferred Interest and the Deferred Letter of Credit Fee payable on such date is less than $7,000,000, the Company agrees to pay to the Administrative Agent, for the account of each Lender (other than the Term-C Lenders) in accordance with its Aggregate Pro Rata Share as of the Deferred Payment Allocation Date, a deferred amendment fee equal to the amount by which $7,000,000 exceeds such sum, such fee being payable on the Deferred Payment Date.

SECTION 2.25. SECTION 4.8(c) of the Credit Agreement is hereby amended by adding immediately after the word "Lenders" each place such word appears therein the parenthetical phrase "(other than the Term-C Lenders)".

SECTION 2.26. SECTION 4.9 of the Credit Agreement is hereby amended by adding immediately after the words "Each Lender" and "each Lender" each place such words appear therein the parenthetical phrase "(other than the Term-C Lenders)".

SECTION 2.27. SECTION 6.6 of the Credit Agreement is hereby amended by deleting the date "March 31, 2000" therein and substituting the date "June 30, 2001" therefor.

SECTION 2.28. SECTION 6.8 of the Credit Agreement is hereby amended in its entirety to read as follows:

INSL 005883

A - 599

18

17

SECTION 6.8. SUBSIDIARIES. The Company has only those Subsidiaries (a) which are identified in AMENDED ITEM 6.8 ("Existing Subsidiaries") of the Disclosure Schedule, or (b) which are permitted to have been acquired in accordance with SECTION 7.2.5 or 7.2.8. As of the First Amendment Date, the Company has only those Subsidiaries which are identified in AMENDED ITEM 6.8 of the Disclosure Schedule.

SECTION 2.29. SECTION 7.1.1 of the Credit Agreement is hereby amended (a) by amending CLAUSES (a) and (b) thereof in their entirety to read as follows:

(a) as soon as available and in any event within 45 days after the end of each of the first three Fiscal Quarters of each Fiscal Year of the Company (or, if the Company is required to file such information on a Form 10-Q with the Securities and Exchange Commission, promptly following such filing), consolidated and consolidating (on a business segment basis) balance sheets of the Company and its Subsidiaries as of the end of such Fiscal Quarter, together with the related consolidated and consolidating (on a business segment basis) statement of operations for such Fiscal Quarter and the related consolidated and consolidating (on a business segment basis) statements of operations and cash flows for the period commencing at the end of the previous Fiscal Year and ending with the end of such Fiscal Quarter (it being understood that the foregoing requirement (other than with respect to consolidating statements) may be satisfied by delivery of the Company's report to the Securities and Exchange Commission on Form 10-Q, if any), certified by an Authorized Officer that is the president, chief executive officer, treasurer, assistant treasurer, controller or chief financial or accounting officer of the Company;

(b) as soon as available and in any event within 90 days after the end of each Fiscal Year of the Company (or, if the Company is required to file such information on a Form 10-K with the Securities and Exchange Commission, promptly following such filing), a copy of the annual audit report for such Fiscal Year for the Company and its Subsidiaries, including therein a consolidated balance sheet for the Company and its Subsidiaries as of the end of such Fiscal Year, together with the related consolidated statements of operations and cash flows for such Fiscal Year (it being understood that the foregoing requirement may be satisfied by delivery of the Company's report to the Securities and Exchange Commission on Form 10-K, if any), in each case certified (without any Impermissible Qualification) by KPMG LLP or another "Big Five" firm of independent public accountants, together with (i) a certificate from such accountants as to whether, in making the examination necessary for the signing of their report on such annual report by such accountants, they have become aware of any Default in respect of any term, covenant, condition or other provision of this Agreement (including any Default in respect of any of the financial covenants contained in Section 7.2.4) that relates to accounting matters that has occurred and is continuing or, if in the opinion of such accounting firm such a Default has

19

18

INSL 005884

A - 600