EDGAR Filing

occurred and is continuing, a statement as to the nature thereof, and (ii) a consolidating (on a business segment basis) balance sheet for the Company and its Subsidiaries as of the end of such Fiscal Year, together with the related consolidating (on a business segment basis) statements of operations and cash flows for such Fiscal Year.

and (b) by redesignating CLAUSE (i) thereof as CLAUSE (k) and adding thereto immediately after CLAUSE (h) thereof new CLAUSES (i) and (j) to read as follows:

(i) as soon as available and in any event within 30 days after the end of each of the first two Fiscal Months of each Fiscal Quarter of the Company, consolidated and consolidating (on a business segment basis) balance sheets of the Company and its Subsidiaries as of the end of such Fiscal Month, together with the related consolidated and consolidating (on a business segment basis) statements of operations for such Fiscal Month and the related consolidated and consolidating (on a business segment basis) statements of operations and cash flows for the period commencing at the end of the previous Fiscal Year and ending with the end of such Fiscal Month, certified by an Authorized Officer that is the president, chief executive officer, treasurer, assistant treasurer, controller or chief financial or accounting officer of the Company;

(j) as soon as available and in any event written 20 days after the end of each Fiscal Month of the Company, (A) a cash management report showing the location of all deposit accounts in which cash is maintained, cash balances by business segment as of the end of such Fiscal Month, and the changes in such cash balances from the end of the previous Fiscal Month, and (B) a cash forecast for the three Fiscal Months following such Fiscal Months, in each case such report or forecast to be in a form reasonably acceptable to the Administrative Agent; PROVIDED, HOWEVER, that if any cash management report shows that the sum of total cash as of the date such report plus the unused portion of the Revolving Loan Commitment Amount (net of Letter of Credit Outstandings) as of such date is less than $8,000,000, the Company shall thereafter furnish such cash management report on a weekly basis within 10 days after the end of each week until the Company shall deliver a cash management report showing that such condition has been rectified as of the date of such subsequent report; and

SECTION 2.30. SECTION 7.1.1 of the Credit Agreement is hereby further amended by adding at the end thereof a new paragraph to read as follows:

The Company further agrees that (x) if the Company shall not have complied with CLAUSE (a) above within 40 days after the end of the Fiscal Quarter ending on or about June 30 in any Fiscal Year, then the Company shall, within such 40 days, deliver to the Administrative Agent preliminary (but complete, except with respect to notes) copies of the consolidated financial statements required by CLAUSE (a) (which may be a draft of the Company's report on Form

20                              19

INSL  005885

A - 601

10-Q) together with a preliminary (but completed) Compliance Certificate; and (y) within 40 days after the end after the end of each Fiscal Year of the Company, the Company shall deliver to the Administrative Agent preliminary (but complete, except with respect to notes) copies of the consolidated financial statements required by CLAUSE (b) above together with a preliminary (but completed) Compliance Certificate. The delivery of such preliminary copies shall not relieve the Company from its obligation to provide the final documents required by CLAUSES (a), (b) and (c) above within the periods set forth therein. The Administrative Agent shall be entitled to rely on a preliminary Compliance Certificate delivered pursuant to CLAUSE (x) or (y) above that shows the existence of a Default as the basis for delivery of a payment blockage notice pursuant to Section 13.03 of the 1998 Subordinated Note Indenture, but for all other purposes of this Agreement (including the following sentence), a reference to a Compliance Certificate shall mean a final Compliance Certificate delivered pursuant to CLAUSE (c) above. After the date on which a Compliance Certificate reports EBITDA greater than $55,700,000 for a four-Fiscal Quarter period, the Company shall no longer be required to comply with CLAUSE (y) above.

SECTION 2.31. SECTION 7.2.2 of the Credit Agreement is hereby amended by adding the word "and" at the end of CLAUSE (I) thereof and immediately thereafter adding a new CLAUSE (J) hereto to read as follows:

(j) Indebtedness evidenced by New Subordinated Notes of the Company in an aggregate principal amount (excluding accrued and unpaid interest, whether or not deferred) not to exceed $15,000,000 at any time outstanding;

SECTION 2.32. SECTION 7.2.3 of the Credit Agreement is hereby amended by adding immediately after the word "Obligations" in CLAUSE (b) thereof the parenthetical phrase "(other than Term-C Obligations)".

SECTION 2.33. SECTION 7.2.4 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

SECTION 7.2.4. FINANCIAL COVENANTS.

(a) ADJUSTED EBITDA. The Company will not permit Adjusted EBITDA for the period of four consecutive Fiscal Quarters ending on the last day of any Fiscal Quarter to be less than the amount set forth below opposite such Fiscal Quarter:

| Fiscal Quarter Ending on or about | Adjusted EBITDA |
|---|---|
| 9/30/01 | $30,000,000 |
| 12/31/01 | $12,000,000 |
| 3/31/02 | $10,000,000 |
| 6/30/02 | $18,000,000 |

21

20

INSL 005886

A - 602

EDGAR Filing

| | |
|---|---|
| 9/30/02 | $27,000,000 |
| 12/31/02 | $37,000,000 |
| 3/31/03 | $40,000,000 |
| 6/30/03 | $43,000,000 |
| 9/30/03 | $44,000,000 |
| 12/31/03 | $45,000,000 |
| 3/31/04 | $46,000,000 |
| 6/30/04 | $47,500,000 |
| 9/30/04 | $49,000,000 |
| 12/31/04 | $50,000,000 |
| 3/31/05 | $52,000,000 |
| 6/30/05 | $53,000,000 |
| 9/30/05 | $55,000,000 |
| 12/31/05 | $56,000,000 |
| 3/31/06 | $58,000,000 |
| 6/30/06 | $59,000,000 |
| 9/30/06 | $60,000,000 |
| 12/31/06 | $65,000,000 |
| Thereafter | $68,000,000 |

The foregoing schedule shall be modified automatically for periods ending after December 31, 2003 as follows: If the Compliance Certificate delivered pursuant to SECTION 7.1.1(c) with respect to any Fiscal Year financial statements, beginning with the Fiscal Year ending December 31, 2003, reports EBITDA in an amount exceeding 125% of the scheduled minimum Adjusted EBITDA for such Fiscal Year set forth above, then for each Fiscal Quarter ending after such Fiscal Year, the minimum Adjusted EBITDA shall be the greater of (i) the scheduled minimum Adjusted EBITDA set forth above with respect to such Fiscal Quarter and (ii) an amount equal to the lesser of (A) 80% of EBITDA reported for the period of four consecutive Fiscal Quarters ended on the last day of the Fiscal Quarter immediately prior to such Fiscal Quarter and (B) $72,000,000.

22

21

(b) FUNDED INDEBTEDNESS. The Company will not permit Funded Indebtedness at any time during any period set forth below to be greater than the amount set forth opposite such period:

| Period | Funded Indebtedness |
|---|---|
| 6/30/01 through and including the last day of the Fiscal Quarter ending 12/31/02 | $355,000,000 |
| 1/1/03 through and including the last day of the Fiscal Quarter ending 12/31/03 | $350,000,000 |
| 1/1/04 through and including the last day of the Fiscal Quarter ending 12/31/04 | $340,000,000 |
| 1/1/05 through and including the last day of the Fiscal Quarter ending | |

http://www.primark.com/ga/edgar/EdgarResults.asp

4/19/2002

INSL 005887

A - 603

| | |
|---|---|
| 12/31/05 | $330,000,000 |
| 1/1/06 through and including the last day of the Fiscal Quarter ending 12/31/06 | $320,000,000 |
| Thereafter | $315,000,000 |

(c) FIXED CHARGE COVERAGE RATIO. The Company will not permit the Fixed Charge Coverage Ratio as of the end of any Fiscal Quarter ending on or after December 31, 2003 to be less than 1.00:1.

SECTION 2.34. SECTION 7.2.5 of the Credit Agreement is hereby amended as follows:

(a) CLAUSE (b) of SECTION 7.2.5 is amended by adding at the end thereof the following:

PROVIDED, HOWEVER, that from and after the date that is 30 days after the First Amendment Date, Cash Equivalent Investments of the Company and its U.S. Subsidiaries in excess of $8,000,000 in the aggregate at any time shall not be

23                                22

permitted unless such Cash Equivalent Investments are held or maintained in accounts at Bank One or an Affiliate of Bank One and subject to a first priority perfected security interest in favor of the Administrative Agent pursuant to Collateral Documents in form and substance reasonably satisfactory to the Administrative Agent;

(b) CLAUSES (e), (g) and (k) of SECTION 7.2.5 are deleted in their entirety and in each case "(intentionally omitted)" substituted therefor;

(c) CLAUSES (o) and (q) of SECTION 7.2.5 are each amended by adding at the end of each thereof the following:

PROVIDED, HOWEVER, that no such Investment shall be made on or after the First Amendment Date;

(d) CLAUSE (p) of SECTION 7.2.5 is deleted in its entirety and "(intentionally omitted)" substituted therefor.

SECTION 2.35. SECTION 7.2.6 of the Credit Agreement is hereby amended by deleting CLAUSE (c) thereof in its entirety and substituting "(intentionally omitted)" therefor.

SECTION 2.36. SECTION 7.2.7 of the Credit Agreement is hereby amended by amending CLAUSE (a) thereof in its entirety to read as follows:

(a) The Company will not, and will not permit any Restricted Subsidiary to, make or commit to make Capital Expenditures in any Fiscal Year ending on or after December 31, 2001, except Capital Expenditures of the Company and the Restricted Subsidiaries not to exceed $8,000,000 in the aggregate in the case of any Fiscal Year

INSL 005888

A - 604

ending on or prior to December 31, 2004, and $10,000,000 in the aggregate in the case of any Fiscal year ending after December 31, 2004; PROVIDED, HOWEVER, that (i) if any Compliance Certificate delivered pursuant to SECTION 7.1.1 (c) reports EBITDA greater than $45,000,000 but less than or equal to $55,000,000 for the four-Fiscal Quarter period covered by such Compliance Certificate, then maximum permitted Capital Expenditures for the Fiscal Year in which such four-Fiscal Quarter period ends (or, if such period is a Fiscal Year, then for the following Fiscal Year) shall be $10,000,000, and (ii) if any Compliance Certificate delivered pursuant to SECTION 7.1.1(c) reports EBITDA greater than $55,000,000 for the four-Fiscal Quarter period covered by such Compliance Certificate, then maximum permitted Capital Expenditures for the Fiscal Year in which such four-Fiscal Quarter period ends (or, if such period is a Fiscal Year, then for the following Fiscal Year) shall be $12,000,000.

SECTION 2.37. SECTION 7.2.10 of the Credit Agreement is hereby amended in its entirety to read as follows:

24

23

SECTION 7.2.10. MODIFICATION OF CERTAIN AGREEMENTS. The Company will not, and will not permit any of its Restricted Subsidiaries to, consent to any amendment, supplement, amendment and restatement, waiver or other modification of any of the terms or provisions contained in, or applicable to, the Transaction Agreement, the Investors' Agreement, the 1998 Subordinated Note Documents or the New Subordinated Note Documents or any schedules, exhibits or agreements related thereto (the "RESTRICTED AGREEMENTS"), in each case which would materially adversely affect the rights or remedies of the Lenders, or any Obligor's ability to perform under any Loan Document or which would (a) decrease the cash consideration payable in respect of the Divestiture, (b) increase the Company's or any Restricted Subsidiary's obligations or liabilities, contingent or otherwise (other than adjustments to the cash consideration payable in respect of the Divestiture made pursuant to the terms of such Transaction Agreement), (c) increase the principal amount of, or increase the interest rate on, or add or increase any fee with respect to the Indebtedness evidenced by the 1998 Subordinated Notes, the New Subordinated Notes or any such Restricted Agreement, advance any dates upon which payments of principal or interest are due thereon or change any of the covenants with respect thereto in a manner which is more restrictive to the Borrower or any of its Restricted Subsidiaries or (d) in the case of any 1998 Subordinated Notes Documents or any New Subordinated Note Documents, change the subordination provisions thereof (including any default or conditions to an event of default relating thereto), or change any collateral therefor (other than to release such collateral), if (in the case of this CLAUSE (d)), the effect of such amendment or change, individually or together with all other amendments or changes made, is to increase the obligations of the obligor thereunder or to confer any additional rights on the holders of the 1998 Subordinated Notes, the New Subordinated Notes or any such Restricted Agreement (or a trustee or other representative on their behalf)

SECTION 2.38. SECTION 7.2.11 of the Credit Agreement is hereby amended

INSL 005889

A - 605

EDGAR Filing

by adding at the end of CLAUSE (c) thereof a new proviso to read as follows:

PROVIDED, HOWEVER, that payments in respect of such obligations to DLJ Merchant Banking II, Inc. and its successors and assigns shall not exceed $250,000 in the aggregate during any twelve-month period.

SECTION 2.39. SECTION 7.2 of the Credit Agreement is hereby further amended by adding at the end thereof two new subsections to read as follows:

SECTION 7.2.16. CONTINGENT PAYMENTS. The Company will not, and will not permit any Restricted Subsidiary to, enter into any contract or agreement with, or otherwise become obligated to, any Person for professional financial advisory, restructuring, investment banking or other similar services providing for actual and/or contingent payments by the Company and/or any Restricted Subsidiary in excess of $2,000,000 in the aggregate.

25                                        24

SECTION 7.2.17. PREPAYMENTS. The Company will not, and will not permit any Restricted Subsidiary to, either directly or indirectly, voluntarily redeem, retire or otherwise pay or defease prior to their scheduled maturity, or accelerate the maturity of, the 1998 Subordinated Notes or the New Subordinated Notes.

SECTION 2.40. SECTION 8.1.4 of the Credit Agreement is hereby amended by deleting therefrom the words "at the direction of" and substituting the word "or" therefor.

SECTION 2.41. SECTION 8.3 of the Credit Agreement is hereby amended by adding at the end thereof the following sentences:

Anything in this SECTION 8.3 to the contrary notwithstanding, if the Administrative Agent shall declare any portion of the Revolving Loans, Term-A Loans or Term-B Loans outstanding to be due and payable, or require any Borrower to Cash Collateralize any Letter of Credit Outstandings, in any such case pursuant to this SECTION 8.3, it shall, unless consented to in writing by Term-C Lenders holding at least 51% of the aggregate principal amount of Term-C Loans then outstanding, declare an equal portion of the Term-C Loans outstanding to be due and payable. Upon and after the acceleration of any Term-C Obligations pursuant to this SECTION 8.3, (i) each Term-C Lender shall have the right to seek payment directly from the Company or any other Obligor with respect to such Term-C Obligations that have become due and payable and to pursue any available remedies to enforce payment of its Term-C Obligations, and (ii) neither the Administrative Agent nor any Lender other than the Term-C Lenders shall be required to pay to or share with any Term-C Lender any portion of any payment or other recovery the Administrative Agent or such other Lender receives pursuant to this Agreement or any other Loan Document or otherwise applies to any of the Obligations other than the Term-C Obligations.

SECTION 2.42. SECTION 9.9 of the Credit Agreement is hereby amended in its entirety to read as follows:

http://www.primark.com/ga/edgar/EdgarResults.asp

INSL 005890

A - 606

EDGAR Filing

SECTION 9.9. CO-DOCUMENTATION AGENTS, ETC. Notwithstanding anything else to the contrary contained in this Agreement or any other Loan Document, neither the Lead Arranger nor any Lender identified on the signature pages of this Agreement as the "Syndication Agent" or a "Co-Documentation Agent" shall have any right, power, obligation, liability, responsibility or duty under this Agreement (or any other Loan Document) other than those applicable to all Lenders as such. Without limiting the foregoing, the Lenders so identified as the "Syndication Agent" or a "Co-Documentation Agent" shall not have or be deemed to have any fiduciary relationship with any other Lender. Each Lender acknowledges that it has not relied, and will not rely, on any Lender so identified as the "Syndication Agent" or a "Co-Documentation Agent" in deciding to enter

26                                          25

into this Agreement and each other Loan Document to which it is a party or in taking or not taking action hereunder or thereunder.

SECTION 2.43. SECTION 9.11 of the Credit Agreement is hereby amended by adding immediately after the words "Lender Party" and "Lender Parties" in each place such words appear therein the parenthetical phrase "(other than the Term-C Lenders)".

SECTION 2.44. SECTION 11.1(a) of the Credit Agreement is hereby amended by adding at the end thereof the following proviso:

; PROVIDED, HOWEVER, that the release of all or substantially all of the Collateral shall not require the consent of any Term-C Lender.

SECTION 2.45. SECTION 11.1(c) of the Credit Agreement is hereby amended by adding thereto, immediately after the words "any Loan or any Reimbursement Obligation" in the second place such words appear therein and prior to the comma, the words "or change the currency in which any Loan or any Reimbursement Obligation is payable".

SECTION 2.46. SECTION 11.1(e) of the Credit Agreement is hereby amended in its entirety to read as follows:

(e) No such amendment, modification or waiver shall be effective if it would amend, modify or waive the provisions of CLAUSE (a)(i) of SECTION 3.1.1 or CLAUSE (b) of SECTION 3.1.2 or effect any amendment, modification or waiver that by its terms adversely affects the rights of Lenders participating in any Tranche (other than the Tranche consisting of Term-C Loans) differently from those of Lenders participating in other Tranches, unless such amendment, modification or waiver shall have been consented to by the holders of at least 51% of the aggregate amount of Loans outstanding under the Tranche or Tranches (other than the Tranche consisting of Term-C Loans) affected by such modification, or, in the case of a modification affecting the Revolving Loan Commitments, the Lenders holding at least 51% of the Revolving Loan Commitments.

SECTION 2.47. SECTION 11.1 of the Credit Agreement is hereby further amended by adding immediately after CLAUSE (e) thereof a new CLAUSE (f) to read as follows:

INSL 005891

A - 607

(f) No such amendment, modification or waiver of any Loan Document other than a Collateral Document shall be effective if it would (i) modify the last two sentences of SECTION 8.3 or (ii) by its terms expressly impose any additional obligation on, or change or condition any rights of, the Term-C Lenders without imposing such additional obligation on, or so changing or conditioning the rights of, the other Lenders, unless, in each such case, such amendment, modification or waiver shall have been consented to by the holders of at least 51% of the aggregate principal amount of Term-C Loans outstanding.

27                                    26

SECTION 2.48. SECTION 11.3 of the Credit Agreement is hereby amended by adding a sentence at the end thereof to read as follows:

Notwithstanding anything contained in this SECTION 11.3 to the contrary, any reimbursement or other payment by the Company pursuant to this SECTION 11.3 to any Term-C Lender shall be payable on the earliest of (i) the Stated Maturity Date for Term-C Loans, (ii) the date upon which all principal of and interest on the Term-C Loans is paid in full and (iii) the date on which any Term-C Obligations are accelerated pursuant to SECTION 8.3; PROVIDED, HOWEVER, that this sentence shall not apply to any Person to the extent that such Person has a right to reimbursement from the Company in any capacity other than as a Term-C Lender.

SECTION 2.49. SECTION 11.4 of the Credit Agreement is hereby amended by adding a sentence at the end thereof to read as follows:

Notwithstanding anything contained in this SECTION 11.4 to the contrary, any indemnification or other payment by the Company pursuant to this SECTION 11.4 to any Term-C Lender or any Affiliate of a Term-C Lender, or any of their respective partners, officers, directors, employees or agents, or any other Person controlling any of the foregoing within the meaning of either Section 15 of the Securities Act of 1933, as amended, or Section 20 of the Securities Exchange Act of 1934, as amended, shall be due and payable on the earliest of (i) the Stated Maturity Date for the Term-C Loans, (ii) the date upon which all principal of and interest on the Term-C Loans is paid in full and (iii) the date on which any Term-C Obligations are accelerated pursuant to SECTION 8.3; PROVIDED, HOWEVER, that this sentence shall not apply to any such Indemnified Party to the extent that its right to indemnification arises other than as a Term-C Lender or by virtue of its relationship to a Term-C Lender.

SECTION 2.50. SECTION 11.11.1 of the Credit Agreement is hereby amended by amending CLAUSE (a) thereof in its entirety to read as follows:

(a) with the written consents of the Administrative Agent and (in the case of any assignment of participations in Letters of Credit or Revolving Loan Commitments) the Issuers (which consents (i) shall not be unreasonably delayed or withheld and (ii) shall not be required in the case of assignments made by DLJ or any of its Affiliates), may at any time assign and delegate to one or more commercial banks, funds

INSL 005892

that are regularly engaged in making, purchasing or investing in loans or securities, or other financial institutions, and

SECTION 2.51. The Disclosure Schedule to the Credit Agreement is hereby amended by amending ITEMS 6.8 (Existing Subsidiaries), 7.2.2(a)(i) (Ongoing Indebtedness), 7.2.3(a) (Ongoing Liens) and 7.2.5(A) (Ongoing Investments) in their entirety as set forth in the Disclosure Schedules attached hereto.

28                                          27

SECTION 2.52. The Credit Agreement is hereby further amended by deleting EXHIBITS E (Form of Compliance Certificate) and I (Form of Lender Assignment Agreement) thereto in their entirety and substituting therefor AMENDED EXHIBITS E and I, respectively, attached hereto, and by adding thereto a new EXHIBIT A-5 (Form of Term-C Note) in the form of EXHIBIT A-5 attached hereto and a new EXHIBIT K (Form of New Subordinated Note) in the form of EXHIBIT K attached hereto.

SECTION 3. WAIVER. Upon the effectiveness of this Amendment in accordance with the provisions of SECTION 4 below, the Lenders hereby specifically waive the violation of SECTIONS 7.2.4(a), (b) and (c) of the Credit Agreement and any Default caused thereby to the extent such violation or Default was caused by the Company's failure to maintain the Leverage Ratio, the Interest Coverage Ratio and the Fixed Charge Coverage Ratio as of the end of the Fiscal Quarter ended on or about June 30, 2001. This specific waiver applies only to the above-specified violation and Default and only during the period from June 30, 2001 through the date hereof. This specific waiver is limited to the express circumstances described herein and shall not be construed to constitute (i) a waiver of any other event, circumstance or condition or of any other right or remedy available to the Administrative Agent or any Lender pursuant to the Credit Agreement or any other Loan Document or (ii) a consent to any departure by the Company or any Restricted Subsidiary from any other term or requirement of the Credit Agreement.

SECTION 4. CONDITIONS OF EFFECTIVENESS. This Amendment shall become effective and be deemed effective as of the date hereof (the "EFFECTIVE DATE") if, and only if, each of the following conditions shall have been satisfied:

SECTION 4.1. The Agent shall have received each of the following:

(a) counterparts of this Amendment duly executed by the Company, the Canadian Borrower, the Required Lenders, the Initial Term-C Lenders (as defined in the Credit Agreement as amended hereby) and the Administrative Agent;

(b) counterparts of the Master Reaffirmation Agreement of even date herewith duly executed by each of the Obligors pursuant to which each Obligor reaffirms each of the other Loan Documents to which it is a party;

(c) a Secretary's Certificate from each Obligor duly executed by the Secretary or an Assistant Secretary of such Obligor certifying (i) the incumbency of officers of such Obligor executing and delivering documents on behalf of such Obligor, (ii) a resolution of the Board of Directors of such Obligor authorizing the transactions contemplated by this Amendment, (iii) the Certificate or Articles of Incorporation of

INSL 005893

A - 609

such Obligor and (iv) the By-laws of such Obligor; and

(d) an opinion addressed to the Agent and the Lenders from Davis Polk & Wardwell, special New York counsel to each of the Obligors, in form and substance satisfactory to the Agent.

29                                28

SECTION 4.2. The Agent shall have received from the Company, for the account of the Original Lenders, an amendment fee equal to 0.25% of the sum of the Revolving Loan Commitment Amount and the aggregate outstanding principal balance of the Term-A Loans and Term-B Loans as of the Effective Date.

SECTION 4.3. The Agent shall have received from the Initial Term-C Lenders, for the account of the Company, funds in the aggregate amount of $15,000,000 as proceeds of the Term-C Loans contemplated to be made on the Effective Date pursuant to the Credit Agreement as amended hereby.

SECTION 4.4. Prior to the Effective Date, the Company shall have voluntarily reduced the Revolving Loan Commitment Amount to $44,000,000 pursuant to SECTION 2.2.1 of the Credit Agreement.

SECTION 4.5. The Agent shall have received from the Company payment of all fees and expenses of Sidley Austin Brown & Wood then invoiced.

SECTION 5. DIRECTION BY LENDERS. The Required Lenders hereby authorize and direct the Agent to execute and deliver the Intercreditor Agreement on behalf of the Original Lenders.

SECTION 6. REPRESENTATIONS AND WARRANTIES OF THE COMPANY. The Company hereby represents and warrants to the Lenders that, as of the Effective Date after giving effect to this Amendment, (a) there exists no Default, and (b) the representations and warranties contained in ARTICLE VI of the Credit Agreement are true and correct as of the Effective Date after giving effect to this Amendment, except to the extent any such representation or warranty is stated to relate solely to an earlier date, in which case such representation or warranty was true and correct on and as of such earlier date.

SECTION 7. COVENANT. The Company hereby agrees as follows:

SECTION 7.1. The Company will, and will cause each applicable Subsidiary to, execute and deliver to the Agent, promptly upon the Agent's request, account control agreements in form and substance reasonably satisfactory to the Agent with respect to the deposit accounts listed on SCHEDULE 1 attached hereto.

SECTION 7.2. Within 60 days after the Effective Date, the Company will, and will cause each applicable Subsidiary to, comply with SECTION 7.1.7(B) of the Credit Agreement, as amended hereby, with respect to the Capital Stock of the Subsidiaries listed on SCHEDULE 2 attached hereto.

SECTION 7.3. Within 60 days after the Effective Date, the Company will, and will cause each applicable Subsidiary to, comply with SECTION 7.1.8(B) of the Credit Agreement, as amended hereby, with respect to the real properties listed on SCHEDULE 3 attached hereto; PROVIDED, HOWEVER, that title insurance and surveys shall not be required except as requested by the Administrative

INSL 005894

A - 610

EDGAR Filing

Agent in its reasonable discretion.

30                                            29

SECTION 8. REFERENCE TO AND EFFECT ON THE CREDIT AGREEMENT.

SECTION 8.1. Upon the effectiveness of this Amendment pursuant to SECTION 4 hereof, on and after the Effective Date each reference in the Credit Agreement to "this Agreement," "hereunder," "hereof," "herein" or words of like import and each reference to the Credit Agreement in each Loan Document shall mean and be a reference to the Credit Agreement as modified hereby.

SECTION 8.2. Except as specifically waived or amended herein, all of the terms, conditions and covenants of the Credit Agreement and the other Loan Documents shall remain in full force and effect and are hereby ratified and confirmed.

SECTION 8.3. The execution, delivery and effectiveness of this Amendment shall not, except as expressly provided herein, operate as a waiver of (i) any right, power or remedy of any Lender or the Agent under the Credit Agreement or any of the other Loan Documents, or (ii) any Default under the Credit Agreement.

SECTION 9. CHOICE OF LAW. THIS AMENDMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.

SECTION 10. COUNTERPARTS. This Amendment may be executed in any number of counterparts, each of which when so executed shall be deemed an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Amendment by telecopier shall be effective as delivery of a manually executed counterpart of this Amendment.

SECTION 11. HEADINGS. Section headings in this Amendment are included herein for convenience of reference only and shall not constitute a part of this Amendment for any other purpose.

31                                            30

BANK ONE, NA,
as Administrative Agent

By:  /s/ Kevin Christensen

4/19/2002

INSL 005895

A - 611

```
                              -------------------------------
                              Name: Kevin Christensen
                              Title: First Vice President

          DLJ MERCHANT BANKING PARTNERS II, L.P.,
          a Delaware Limited Partnership


          By:  DLJ Merchant Banking II, Inc.,
               as managing general partner


          By: /s/ George Peinado
              -------------------------------
                   Name: George Peinado
                   Title:

          DLJ MERCHANT BANKING PARTNERS II-A,
          L.P., a Delaware Limited Partnership


          By:  DLJ Merchant Banking II, Inc.,
               as managing general partner


          By: /s/ George Peinado
              -------------------------------
                   Name: George Peinado
                   Title:


          DLJ OFFSHORE PARTNERS II, C.V.,
           a Netherlands Antilles Limited Partnership


          By:  DLJ Merchant-Banking II, Inc.,
               as advisory general partner


          By: /s/ George Peinado
              -------------------------------
                   Name: George Peinado
                   Title:
```

32

31

```
          DLJ DIVERSIFIED PARTNERS, L.P.,
          a Delaware Limited Partnership
```

INSL 005896

A - 612

EDGAR Filing

```
                      By:  DLJ Diversified Partners, Inc.,
                           as managing general partner

                      By: /s/ George Peinado
                          -----------------------------------
                                Name: George Peinado
                                Title:

                      DLJ DIVERSIFIED PARTNERS-A, L.P.,
                      a Delaware Limited Partnership

                      By:  DLJ Diversified Partners, Inc.,
                           as managing general partner

                      By: /s/ George Peinado
                          -----------------------------------
                                Name: George Peinado
                                Title:

                      DLJ MILLENIUM PARTNERS, L.P.,
                      a Delaware Limited Partnership

                      By:  DLJ Merchant Banking II, Inc.,
                           as managing general partner

                      By: /s/ George Peinado
                          -----------------------------------
                                Name: George Peinado
                                Title:

                      DLJ MILLENIUM PARTNERS-A, L.P.

                      By:  DLJ Merchant Banking II, Inc.,
```

32

33

```
                      as managing general partner

                      By: /s/ George Peinado
                          -----------------------------------
                                Name: George Peinado
                                Title:
```

INSL 005897

A - 613

EDGAR Filing

DLJ EAB PARTNERS, L.P.

By:  DLJ LBO Plans Management Corporation,
       as managing general partner

By: /s/ George Peinado
----------------------------------
       Name: George Peinado
       Title:

DLJ ESC II, L.P.

By:  DLJ LBO Plans Management Corporation,
       as general partner

By: /s/ George Peinado
----------------------------------
       Name: George Peinado
       Title:

DONALDSON, LUFKIN & JENRETTE SECURITIES
COPORATION as authorized signatory and nominee
for EMA 2001 Plan, L.P., DLJ First ESC, L.P.,
Docklands 2001 Plan, L.P., Paradeplatz 2001
Plan, L.P., Credit Suisse First Boston Private
Equity, Inc. and CSFB 2001 Investors, L.P.

By: /s/ George Peinado
----------------------------------
       Name: George Peinado
       Title:

33

INSL 005898

A - 614

EDGAR Filing




**Top**

(c) 2001 Thomson Financial. All rights reserved.

Customer Service 1-800-843-7747
Terms and Conditions

4/19/2002

INSL 005899

A - 615

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| INSILCO TECHNOLOGIES, INC., *et al.*, | : | Case No. 02-13672 (KJC) |
|  | : |  |
| Debtors | : | (Jointly Administered) |
|  | : |  |
|  | : | Hearing Date:   October 28, 2004<br>Hearing Time:   2:00 p.m. |

## CERTIFICATE OF SERVICE

I, David P. Primack, hereby certify that on September 3, 2004, I caused a true and correct copy of the Memorandum of Law of Official Committee of Unsecured Creditors In Opposition To The Class 7 Creditors' Motion To Dismiss The Committee's Objection to be served on the attached Service List. Parties located in Wilmington, Delaware were served Via Hand Delivery and all other parties were served Via United States Mail, first class, postage prepaid.

/s/ David P. Primack
David P. Primack (DE 4449)
DRINKER BIDDLE & REATH LLP
1100 North Market Street, Suite 1000
Wilmington, DE 19801
(302) 467-4200

WM\2389\1

A - 616

## SERVICE LIST

**Via Hand Delivery**
Neil B. Glassman, Esq.
Charlene D. Davis, Esq.
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
**Counsel for Term-C Lenders**


**Via Hand Delivery**
David Buchbinder, Esq.
Office of the United States Trustee
844 N. King Street, Suite 2313
Lock Box 35
Wilmington, DE 19801
**Counsel for the U.S. Trustee**

**Via Hand Delivery**
Pauline K. Morgan, Esq.
Maureen D. Luke, Esquire
Young Conaway Stargatt & Taylor LLP
The Brandywine Bldg., 17th Floor
1000 West Street
Wilmington, DE 19899
**Counsel to Debtors**

**Via United States Mail**
Karen E. Wagner, Esq.
Patrick A. Bradford, Esq.
Lorilee A. Vaughan, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
**Counsel for Term-C Lenders**


**Via United States Mail**
Constance A. Fratianni, Esq.
Scott Shelley, Esquire
Shearman & Sterling
599 Lexington Avenue
New York, NY 10022
**Counsel to Debtors**

A - 617

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

|  |  |
|---|---|
| In re | : Chapter 11 |
|  | : |
| INSILCO TECHNOLOGIES, INC., *et al.*, | : Case No. 02-13672 (KJC) |
|  | : |
| Debtors. | : Jointly Administered |
|  | : |
|  | : Related to: Docket Nos. 1169 |
|  | : & 1234 |

-------------------------------------------------------------x

## REPLY MEMORANDUM OF LAW IN SUPPORT OF THE
## TERM C LENDERS' MOTION TO ENFORCE ORDERS, DISMISS
## COMPLAINT AND AUTHORIZE DISTRIBUTION

THE BAYARD FIRM

Neil B. Glassman (No. 2087)
Charlene D. Davis (No. 2336)
222 Delaware Avenue, 9th Floor
Wilmington, Delaware 19801
Tel: (302) 655-5000
Fax: (302) 658-6395

DAVIS POLK & WARDWELL

Karen E. Wagner
Patrick A. Bradford
James I. McClammy
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000
Fax: (212) 450-4800

Counsel for the Term C Lenders

557020v2

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................... ii

PRELIMINARY STATEMENT .................................................................. 1

POINT I      CHALLENGES TO THE TERM C LOANS
             ARE BARRED ...................................................................... 2

POINT II     THIS COURT LACKS JURISDICTION OVER
             THE COMPLAINT ............................................................... 5

POINT III    THE COMPLAINT FAILS TO STATE ANY CLAIM ............ 7

             A.    The Complaint Fails to State A Claim
                   Against the Term C Lenders ............................................ 7

             B.    No Claim Is Properly Pleaded .......................................... 9

             C.    No Deepening Insolvency Cause of
                   Action is Pleaded ............................................................ 14

CONCLUSION ........................................................................................ 15

557020v2

i

## TABLE OF AUTHORITIES

### Cases

Page

In re Autostyle Plastics, Inc., 269 F.3d 726 (6th Cir. 2001) ........................... 10, 12

Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416 (1972) ........................ 4

In re Exide Techs., Inc., 299 B.R. 732 (Bankr. D. Del. 2003) ........................ 9, 13

Hart Holding Co. v. Drexel Burnham Lambert Inc.,
    1992 WL 127567 (Del. Ch. May 28, 1992) ........................................ 8

In re Hedged-Investments Assoc., Inc.,
    2004 U.S. App. LEXIS 18164 (10th Cir. Aug. 26, 2004) ............... 11, 13

Kinney v. Dominick's Finer Foods, Inc., 780 F. Supp. 1178
    (N.D. Ill. 1991) ......................................................... 13

Morse v. Lower Merion Sch. Dist., 132 F.3d 902 (3d Cir. 1997) .................... 9

In re Resorts Int'l. Inc., 372 F.3d 154 (3d Cir. 2004) ...................... 5, 6

In re Sunbeam Corp., 284 B.R. 355 (Bankr. S.D.N.Y. 2002) ..................... 9

United States v. Bestfoods, 524 U.S. 51 (1998) ............................ 8

In re Warfarin Sodium Antitrust Litig., 214 F.3d 395 (3d Cir. 2000) ........... 13

Woods v. City Nat'l Bank & Trust Co., 312 U.S. 262 (1941) ................ 5

A - 620

## PRELIMINARY STATEMENT

The Committee's Response Memorandum is a cynical effort to eviscerate the releases granted by the Committee for the benefit of the Term C Lenders.[1] Though the Committee was a proponent of both the Settlement Agreement and the Settlement Order, the Committee deliberately misrepresents both. This litigation, commenced in violation of the Settlement Order and the Committee's fiduciary obligations to creditors, must be dismissed.

The Committee's Response Memorandum also fails adequately to address the recent holding of the Court of Appeals for the Third Circuit that sharply restricts jurisdiction over post-confirmation litigation. The Committee argues that the complaint commencing this litigation has some bearing on the administration of the Insilco case. But the Insilco bankruptcy case is over. That this action might affect the amount to be distributed by the post-confirmation litigation trust is jurisdictionally irrelevant.

Finally, the Committee's elaboration in its Response Memorandum upon the facts alleged in the complaint cannot remedy its pleading deficiencies. Most importantly, the Committee utterly fails to address the central infirmity of the complaint: there is no alleged basis for holding the Term C Lenders liable for the acts of other parties not before this Court. Therefore, the complaint must be dismissed.

---

[1] All capitalized used herein shall, unless otherwise defined, have the meanings set forth in the moving memorandum of the Term C Lenders ("Moving Memorandum").

POINT I

## CHALLENGES TO THE
## TERM C LOANS ARE BARRED

Pursuant to the Settlement Agreement, the Committee and the Estates

have released the Term C Lenders from claims and defenses with respect to the

Term C Loans. See Moving Mem. at 4-6. The Settlement Agreement was

approved by final order of this Court. See id. at 6-7. The Settlement Order

provides that the Term C Claims are "not subject to any further challenge." See

id. at 6 (citing Settlement Order, ¶ 5). The Settlement Agreement was

incorporated into the Plan, which provides that the Settlement Agreement

governs, and the Disclosure Statement repeatedly represented that the Plan is

subject to the Settlement Agreement, and that the released claims are not

actionable by the litigation trustee. The Term C Lenders voted for the Plan

because it was based upon the Settlement Agreement. The Plan was confirmed by

final order. See id. at 7-8. *Res judicata* and law of the case therefore require

dismissal of the Committee's complaint. See id. at 12-14.

Remarkably, the Committee now contends, first, that the Settlement

Agreement and Order provided *no* release for the Term C Lenders, and second,

that, because the Plan contained a mechanism by which objections, if any, to the

Term C Claims might be asserted, the Term C Lenders knowingly and

intentionally waived, for no apparent reason or consideration, all of the rights

provided by the Settlement Agreement and the Settlement Order. Both assertions

are patently absurd.

2

The Committee first states that "it was agreed by the parties to the

Settlement Agreement that the Term C Lenders would not receive a release[.]"

Response Mem. at 12. The very paragraph of the Settlement Agreement cited to

support this proposition, however, states "[t]he release and waivers contained in

paragraph 4A of this Settlement Agreement for the benefit of the Released Lender

Parties shall also apply to the Term C Lenders[.]" Settlement Agreement, ¶ 4 C.

The Committee's argument that the Settlement Agreement excluded the Term C

Loans from the reaffirmation of the secured status of the other loans is

meaningless – the Term C Loans were not secured. Response Mem. at 11 [2] That

exclusion does not impair the breadth and scope of the releases of affirmative and

defensive claims with respect to the Term C Loans

    The Committee's second contention – waiver by vote – is equally

frivolous. The Plan states: "to the extent of any conflict or inconsistency between

the provisions of the plan and the provisions of the Asset Reallocation and

Settlement Agreement, the provisions of the Asset Reallocation and Settlement

Agreement shall govern and be deemed controlling." Plan, § 14.20. The

Settlement Agreement provides that the Term C Claims are allowed, and the

Term C Lenders and all affiliates are released from "any and all manner of

actions, causes of action, in law or in equity, suits, debts, liens, contracts,

---

[2] While the Term C Lenders were not released from all possible claims, they were very
broadly released from all claims and objections "in respect of the Term C Loans." Settlement
Agreement, ¶ 4 C. The Response Memorandum makes reference, in footnote 18, to other actions
contemplated against "DLJ" If those claims relate to matters other than the Term C Loans, as the
complaint in this adversary proceeding suggests they will, the Settlement Agreement will not
provide a release except "in respect of the Term C Loans."

3

agreements, promises, liabilities, claims, damages, losses, controversies, trespass, remedies, defenses, setoffs, surcharges, costs or expenses of any nature whatsoever, known or unknown" in respect of the Term C Loans. The Settlement Order provides that such claims shall not be subject to any further challenge. Settlement Order, ¶ 5.

This extremely broad release of both affirmative and defensive objections forecloses any challenge to the validity or status of the Term C Claims, as does the Settlement Order. To the extent that the objection mechanism provided by the Plan can be considered inconsistent with the existence of this release, the Settlement Agreement, not the Plan, controls.[3]

Finally, the Committee fails to refute the holding of Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416 (1972), which precludes the assertion by the Committee of a contractual claim held by the 12% Noteholders. Contrary to the allegation in the Response Memorandum, p. 16, the Plan does not give the contract claims of the 12% Noteholders to the Committee, to be asserted for the benefit of the Debtors or the creditor body as a whole.

The commencement of this litigation, in the face of an absolute bar to further challenge of the Term C Claims by the Committee, is more than

---

[3] The Committee contends that the plan provision for an objection process was 'carefully drafted." Response Mem. at 14. If it was "carefully drafted" to trick the Term C Lenders into unknowingly waiving the benefits of the Settlement Agreement, the ploy failed. As noted, the Plan and the Confirmation Order provide that the Settlement Agreement controls in the event of any conflict. The Term C Lenders had no reason to be concerned about an objection by the Debtors or the Committee on the Debtors' behalf, since those entities had already released the Term C Lenders, and their claims were not subject to further challenge

4

inappropriate – it is completely inconsistent with the Committee's fiduciary duties to unsecured creditors. Woods v. City Nat'l Bank & Trust Co., 312 U.S. 262, 268 (1941). Here, the Term C Lenders hold allowed claims not subject to further challenge, yet their own fiduciary has commenced an attack on those claims after that very body granted the releases and consented to the court order precluding further challenge. The complaint must be dismissed.

## POINT II

### THIS COURT LACKS JURISDICTION OVER THE COMPLAINT

As noted in the Moving Memorandum, by its holding in In re Resorts International, Inc., 372 F.3d 154 (3d Cir. 2004), the Court of Appeals for the Third Circuit sharply limited post-confirmation bankruptcy jurisdiction over a matter that does not have a close nexus to a bankruptcy plan or proceeding. The Resorts adversary proceeding was brought by a bankruptcy litigation trust that asserted a malpractice claim against a professional employed by the trust. The Third Circuit found an insufficient nexus to permit the exercise of post-confirmation jurisdiction, and issued a broad holding setting tight parameters upon the exercise of such jurisdiction.

The Committee argues that this case does have a sufficiently close nexus to administration of the Insilco bankruptcy case because it will determine the status of the Term C Claims, and whether "additional money will be made available to the Estates." Response Mem. at 19. But the Third Circuit expressly

5

rejected this basis for jurisdiction, holding that where, as here, a litigation trust

has been created, the trust beneficiaries are no longer creditors of the estate, and

their connection to the bankruptcy plan or proceeding is attenuated.[4]  See Moving

Mem. at 15-16 (quoting Resorts, 372 F.3d at 169-71).  The court further held that

the mere fact that litigation might increase the assets of the litigation trust is not a

sufficient basis for jurisdiction.  See id.

 The Committee's arguments therefore fail to place its complaint within the

narrow jurisdictional confines mandated by the Third Circuit.

---

[4] The Committee seems to suggest, in its final footnote warning "DLJ" of the future
actions contemplated by the litigation trust, that the Committee and not the trust will continue this
litigation.  Such a result is not contemplated by the Plan.  The Committee no longer exists.  See
Plan Section 7.2.  Therefore, the fact that this adversary proceeding was commenced one day
before the Plan was confirmed does not strengthen the argument that subject matter jurisdiction
exists.  On the contrary, as of that date no court order existed that authorized the Committee to act
for the Debtors.  No action was ever commenced, and none can now be commenced.  The
Committee had no authority then, and has no authority now.

6

## POINT III

## THE COMPLAINT FAILS TO STATE ANY CLAIM

As noted, the Committee has agreed not to assert any further challenge to the Term C Claims. In addition, the complaint fails properly to allege a claim addressed to the status of the Term C Claims.

In its response, the Committee restates and expands upon the allegations of its complaint, but fails to address its fundamental defect: its allegations are not linked to the Term C Lenders, the only defendants that may be brought before this Court. Unless the Committee can allege why the claims of the Term C Lenders should be subordinated because of the alleged acts of other entities, the complaint can state no cause of action and must be dismissed.[5]

### A.     The Complaint Fails to State A Claim Against the Term C Lenders

The Term C Lenders have demonstrated that the Committee, by asserting allegations against "DLJ" – a term the Committee deliberately employs to refer to entities other than the Term C Lenders – fails to plead a claim against the Term C Lenders. See Moving Mem. at 18-20. The Committee responds only that "[t]he fact that the Term-C Lenders addressed the Committee's allegations of recharacterization, equitable subordination, and deepening insolvency in their

---

[5] To the extent these claims are to be permitted to go forward, both parties agree that discovery is needed. See Response Mem. at n. 15. The Committee has already had extensive discovery pursuant to Rule 2004; the Term C Lenders have had almost none. The Committee's introduction of part of the loan documentation is not sufficient to bolster the pleading deficiencies of the complaint, let alone to permit any conclusion on the merits.

Motion" is evidence that the Complaint was properly pleaded.  See Response Mem. at 21-22.

The Committee misses the point.  While the ultimate thrust of the Committee's complaint may be gleaned from the complaint, one cannot glean why the Term C Lenders are its target.  By using the term "DLJ," the Committee cannot simply wish away the law of corporate separateness, of which Delaware courts are respectful.  See, e.g., Hart Holding Co. v. Drexel Burnham Lambert Inc., 1992 WL 127567, at *10 n.11 (Del. Ch. May 28, 1992) ("Our law tends to accord dignity to legal entities except in cases in which the traditional law of piercing the corporate veil is met."); United States v. Bestfoods, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries.")

Here, the Committee does not seek, traditionally, to pierce a veil between a subsidiary and a parent, based upon acts of the subsidiary sought to be attributed to the parent.  The Committee seeks to pierce a veil between certain DLJ entities and the fraternal entity that manages the funds that are the Term C Lenders, and then another veil, to hold the funds responsible for the alleged acts of the brethren of its managing entity.  No Delaware doctrine permits such lateral or reverse piercing in disregard of corporate separateness.

8

A complaint is not properly pleaded if it does not state why a particular entity should be liable for a particular act.[6] See Moving Mem. at 18-20 (citing, inter alia, In re Sunbeam Corp., 284 B.R. 355, 361-69 (Bankr. S.D.N.Y. 2002) (dismissing equitable subordination claims against one entity based upon the alleged acts of another separate, but affiliated, entity). Because the weight of legal authority cuts against the Committee, the Committee raises irrelevant factual distinctions to the cases cited by the Term C Lenders in the Moving Memorandum. In particular, its efforts to distinguish Sunbeam are unavailing. See Response Mem. at 31-32. As the Committee states, the court in Sunbeam "dismissed the complaint because the committee did not set forth any examples of alleged domination that could have supported an alter ego claim." Id. at 32. The same holds true with respect to this Committee's complaint. Accordingly, the complaint should be dismissed.

**B.     No Claim Is Properly Pleaded**

In addition to the above, the complaint fails properly to plead a claim against anyone.

The Committee's first claim is for recharacterization. In In re Exide Technologies, Inc., 299 B.R. 732 (Bankr. D. Del. 2003), to evaluate whether a

---

[6] The Committee errs when it states that the Term C lenders inappropriately cite to the Morse v. Lower Merion School District case. See Response Mem. at 22 & n.13. The Morse case was cited by the Term C Lenders as setting forth the standard of review on a motion to dismiss: (i) a court is required to accept as true all allegations in the complaint and view them in a light most favorable to the plaintiff; and (ii) a court need not credit a complaint's "bald assertions" or "legal conclusions" when deciding a motion to dismiss. See Moving Mem. at 17 (citing Morse, 132 F.3d 902, 906 (3d Cir 1997)). The Committee does not, and could not, dispute that these are the appropriate standards.

recharacterization claim was stated, this Court employed the factors found in In re
Autostyle Plastics, Inc., 269 F.3d 726, 750-53 (6th Cir. 2001). Neither the
complaint nor the partial documentation provided by the Committee support a
claim for recharacterization under Autostyle.

First, as alleged in Complaint, the Term C Loan was documented as part
of the Credit Facility. See Objection ¶ 61; Response Mem., Ex. C. The
amendment appended to the Committee's papers is one part of the Credit Facility,
which is clearly an instrument of indebtedness.

Second, contrary to the Committee's allegations, the Credit Facility
provided for a fixed maturity date. Payment of principal and interest were due on
the Stated Maturity Date. See Response Mem., Ex. C, § 2.15, and p. 5 (definition
of "Stated Maturity Date"). Indeed, the Committee recognizes that the loan was
to mature on June 25, 2007. See Response Mem. at p. 26.

Third, the credit agreement provided for interest to be paid at specified
percentages of the principal amount. See Ex. C, Section 2.7. The Committee
states that the rate and payment of interest is "contingent, speculative, and tied to
benchmarks more associated with an equity investment." Response Mem. at 25.
No factual allegation supports that conclusion, which indeed has no basis.

Fourth, there is no allegation that repayment of the Term C Loans was tied
to the success of the company. The Committee argues that holders of Insilco
warrants would benefit if the company were successful, but that tautology is in no
way tied to repayment of the Term C Loans.

10

A - 630

Fifth, though the Committee alleges that the company was in financial distress, it is inappropriate to place excessive weight on this criterion to recharacterize a rescue loan. See In re Hedged-Investments Assoc., Inc., 2004 U.S. App. LEXIS 18164, at *11-12 (10th Cir. Aug. 26, 2004) ("Undercapitalization certainly remains an important factor to consider, but under the multi-factor approach we adopt today business owners need not fear, should their rescue efforts fail, that the bankruptcy court would give disproportionate weight to the poor capital condition of their failing companies and thus too quickly refuse to treat their cash infusions as loans.")

Sixth, there is no allegation that advances were made in proportion to the Term C Lenders' equity interests, and indeed the Amendment to the Credit Agreement suggests to the contrary. See Response Mem., Ex. C, §§ 2.7, 2.10

Seventh, the Credit Agreement provides for no security for the Term C Loan.

Eighth, the Committee contends that, because the Term A and B lenders did not make the Term C Loans, it is apparent there could have been no other lenders. See Response Mem. at 28. This conclusion is no substitute for a factual allegation.

Ninth, the Term C Loans were not subordinated. The Committee's assertion that the loans were "subordinate in all ways" to the payment rights of the Term A and Term B lenders is simply wrong. The Term C Loans were unsecured, and were made on terms that differed temporally and in other respects

11

from the terms of the Term A and B loans, but the Term C Loans were not

subordinated to the Term A and B loans or to any other debt. See Response

Mem., Ex. C.

Tenth, the Credit Agreement provides for no sinking fund.

The Committee's own factual allegations, as opposed to its conclusory

hyperbole, demonstrate that the Term C Loans meet many of the Autostyle

factors, and therefore the Committee fails to state a recharacterization claim.

The claim for equitable subordination is equally without merit. First, as

stated in the complaint, Houlihan Lokey provided an opinion that the Term C

Loans were "(a)fair to Insilco's outstanding 14% Senior Discount Noteholders,

(b) the dilution that Insilco could suffer as a result of the transaction was 'fair' to

Insilco, and (c) the terms which Insilco received in this transaction were no less

favorable than what Insilco could have 'obtained in a comparable arm's length

transaction with an unaffiliated entity '" Complaint, ¶ 64. Under applicable law,

such a loan is unlikely to be subject to equitable subordination. See Moving

Mem. at 24-25. In response, the Committee simply argues that "DLJ" was an

insider. But this factor is not controlling, and certainly is not, alone, a basis for

subordination, even if "DLJ" is intended to mean the Term C Lenders. "[T]he

mere fact of an insider relationship is insufficient to warrant subordination."

Autostyle, 269 F 3d at 745. There is no allegation that the Term C Lenders made

the loans based upon non-public information or believed the loans would harm

12

Insilco's creditors. See, e.g., In re Hedged-Investments Assoc., 2004 U.S. App.
LEXIS 18164, at * 23.

Similarly, nothing in the Complaint supports an inference of inequitable
conduct on the part of the Term C Lenders. See Moving Mem. at 21-22. The
allegations intended to support that assertion concern entities other than the Term
C Lenders. Further, the Committee cannot turn this case into Exide. There, it
was alleged that certain pre-petition lenders improperly induced the debtors to
make acquisitions, so as to increase the lenders' control so that they could compel
the debtors' to grant additional liens to the lenders 100 days before the petition
date. In contrast, the Committee claims here that many transactions over many
years were simply unwise;[7] that the entities who assisted Insilco with respect to
those transactions did so to benefit the Term A and B Lenders, and are affiliated
with the funds that are the Term C Lenders, and, so the Term C Loans must be
subordinated. This contorted set of allegations makes little sense.[8] It is most

---

[7] There are no facts alleged to support an inference that any asset sale, divestiture or
acquisition by Insilco did not fall within the broad range of acceptable business judgment. In fact,
the complaint itself alleges that, financial advisors were retained in connection with these
transactions. See, e.g., Objection, ¶¶ 31, 39, 64. Further, the complaint acknowledges that Insilco
established a special committee of its board of directors to review any "insider" transaction, and
hired an outside financial advisor for independent advice. See id. ¶¶ 40-43.

[8] The Committee's argument that the Term C Lenders "worked in concert" with the Term
A and Term B Lenders to maximize the value of their collateral is unsupported. The Committee
cites to paragraphs 65 through 76 of its complaint, but there is no reading of those paragraphs to
indicate such a claim. The Committee cannot rely on arguments and allegations that are not
pleaded to defeat the Term C Lenders' motion to dismiss. See In re Warfarin Sodium Antitrust
Litig., 214 F.3d 395, 398 (3d Cir. 2000) (finding that it was improper for district court to consider
facts outside the pleadings that were gleaned from counsel's arguments in deciding a motion under
Rule 12(b)(6)); Kinney v. Dominick's Finer Foods, Inc., 780 F. Supp. 1178, 1182 (N.D. Ill. 1991)
("introduction    of additional facts in Respondent['s] brief was improper in a Rule 12(b)(6)
motion which is strictly a procedural device to test the sufficiency of the plaintiff's pleadings").

13

unlikely that a group of funds would act to benefit unrelated bank lenders. Accordingly, the complaint fails to allege facts that would support equitable subordination of the Term C Claims.

## C.    No Deepening Insolvency Cause of Action is Pleaded

The Term C Lenders have demonstrated that the Committee has failed to plead a cause of action for "deepening insolvency." See Moving Mem. at 22-25. There is no allegation that the Term C Loan was fraudulent or concealed, as required to state a "deepening insolvency" claim. The Committee says only that "it is self-evident that DLJ prevented Insilco from filing bankruptcy when it became insolvent so that DLJ and the Lenders could protect their own interests." See Response Mem. at 33-34. Whoever "DLJ" is, in this instance, it is difficult to see how making an unsecured loan or delaying a bankruptcy filing protected the interests of the Term C Lenders.

The complaint must be dismissed for failure to state a claim addressed to the validity or status of the Term C Claims, particularly as any such claim or defense has been released.

14

A - 634

CONCLUSION

For the reasons set forth herein and in the Moving Memorandum, the

Term C Lenders respectfully request that the Court enforce its Settlement and

Confirmation Orders, dismiss the Complaint with prejudice, and order the

distribution due under the Plan on the allowed claims of the Term C Lenders.

Dated: Wilmington, Delaware,
        September 24, 2004

Respectfully submitted,

THE BAYARD FIRM

By: _____
    Neil B. Glassman (No. 2087)
    Charlene B. Davis (No. 2336)
    222 Delaware Avenue, 9th Floor
    Wilmington, Delaware  19801
    Tel:  (302) 655-5000
    Fax:  (302) 658-6395

    DAVIS POLK & WARDWELL
    Karen E. Wagner
    Patrick A. Bradford
    James I. McClammy
    450 Lexington Avenue
    New York, New York  10017
    Tel:  (212) 450-4000
    Fax:  (212) 450-3800

    Counsel for the Term C Lenders

557020v3

A - 635

## CERTIFICATE OF SERVICE

I, Charlene D. Davis, Esquire, do hereby certify that on the 24th day of September, 2004, I caused a true and correct copy of the **Reply Memorandum of Law in Support of The Term C Lenders' Motion to Enforce Orders, Dismiss Complaint and Authorize Distribution** to be served upon the parties listed below in the manner(s) indicated:

**VIA U.S. MAIL and ELECTRONIC MAIL:**

Andrew I. Silfen, Esquire
Arent Fox Kintner Plotkin & Kahn, PLLC
25th Floor
1675 Broadway
New York, NY 10019
silfen.andrew@arentfox.com

Michael Cryan, Esquire
Arent Fox Kintner Plotkin & Kahn, PLLC
25th Floor
1675 Broadway
New York, NY 10019
cryan.michael@arentfox.com

Scott Shelley, Esquire
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
sshelley@shearman.com

Karen E. Wagner, Esquire
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
wagner@dpw.com

**VIA HAND DELIVERY and ELECTRONIC MAIL:**

Pauline K. Morgan, Esquire
Young Conaway Stargatt & Taylor LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
pmorgan@ycst.com

David P. Primack, Esquire
Drinker, Biddle & Reath LLP
1100 North Market Street
Suite 1000
Wilmington, DE 19801-1254
david.primack@dbr.com

David L. Buchbinder, Esquire
Office of the United States Trustee
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801-3519
david.l.buchbinder@usdoj.gov

557021v1

A - 636

James McClammy, Esquire
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
james.mcclammy@dpw.com

_____
Charlene D. Davis (No. 2336)

557021v1

2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | Chapter 11 |
| | : | |
| INSILCO TECHNOLOGIES, INC., | : | Case No. 02-13672 (KJC) |
| et al., | : | |
| | : | (Jointly Administered) |
| Debtor. | : | |

## ORDER[1]

AND NOW, this 18th day of November, 2004, upon consideration of the Motion and

Memorandum of Law of the Term C Lenders to Enforce Orders, Dismiss Objection of the

Official Committee of Unsecured Creditors, and Authorize Distribution (Docket No.

1234)("Motion"), the opposition Memorandum of the Official Committee of Unsecured

Creditors thereto (Docket No. 1275), the Reply Memorandum of the Term C Lenders (Docket

No. 1298) and after oral argument thereon, it is hereby

**ORDERED and DECREED** that:

1.       The Motion is GRANTED and the First Omnibus (Substantive) Objection of the

Official Committee of Unsecured Creditors to Claims of Class 7 Creditors (Docket No.

1169)("Objection") to Claim Nos. 607-616 ("Term C Claims") is DISMISSED, and

2.       The Debtors shall make distribution on the Term C Claims as provided by the

terms of the confirmed Plan and Confirmation Order.

---

[1]The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 157(a). This is a
core proceeding pursuant to 28 U.S.C. § 157((b)(1) and (b)(2)(A),(B),(L) and (O). The Court also acts
here pursuant to 11 U.S.C. § 105(a) and the Court's inherent authority to interpret and enforce its own
orders.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE[2]

---

[2]The Term C Claims were allowed by virtue of paragraph 1 of the Asset Reallocation and Settlement Agreement dated May 13, 2003 ("Settlement Agreement"), approved by the Court on June 11, 2003 (Docket No. 721) (and also specifically by paragraph 5 of the Order). The Objection seeks subordination of the Term C Claims, or, in the alternative, reclassification of the claims, set off or netting of the claims, all due to the claimants' alleged, pre-petition improper conduct by the exercise of "dominion and control over the debtors in order to enhance [their] position to the detriment of unsecured creditors."

Section 4 of the Settlement Agreement provides, in pertinent part:

A.   Releases by the Debtors and the Creditors' Committee - - The Debtors and the Creditors' Committee, on behalf of themselves and the estates of the Debtors, and each of their respective predecessors, successors and assigns (the "Releasing Estate Parties"), hereby fully waive, release and forever discharge the Agent and each of the Senior Lenders and each of their agents, employees and professionals (Released Lender Parties") from any and all manner of actions, causes of action, in law or in equity, suits, debts, liens, contracts, agreements, promises, liabilities, claims, damages, losses, controversies, trespasses, remedies, defenses, set-offs, surcharges, costs or expenses of any nature whatsoever, known or unknown, fixed or contingent, which the Releasing Estate Parties have had, now have, or may hereafter have against the Released Lender Parties, by reason of any matter, cause or thing whatsoever, from the beginning of time through and to the Settlement Effective Date; provided, however, that nothing in this Paragraph 4A releases any Parties' obligations or agreements pursuant to this Settlement Agreement, or bars claims directed solely at enforcing the provisions of this Settlement Agreement.

C.   Limitation on Release of Term C-Lenders - - *The releases and waivers contained in Paragraph 4A of this Settlement Agreement for the benefit of the Released Lender Parties shall also apply to the Term C Lenders* [emphasis added] (DLJ Capital Funding, Inc., DLJ Merchant Banking Partners II, L.P., DLJ Merchant Banking Partners II-A, L.P., DLJ Offshore Partners, II, C.V., DLJ Diversified Partners, L.P., DLJ Diversified Partners-A, L.P., DLJ EAB Partners, L.P., DLJ Millenium Partners, L.P., DLJ ESC II, L.P., DLJ Millenium Partners-A, L.P. and Donaldson, Lufkin and Jenrette Securities Corporation (collectively, the "Term-C Lenders")) and their affiliates, insiders (as defined in Section 101 of the Bankruptcy Code), agents, employees and professionals, *only in respect of the Term-C Loans under the Credit Agreement* [emphasis added] (as defined therein) and notwithstanding anything herein to the contrary, the Term-C

2

A - 639

Lenders and their affiliates, insiders (as defined in Section 101 of the Bankruptcy Code) agents, employees and professionals, shall not otherwise be released or deemed released. Nothing contained herein shall be deemed to discharge, impair or otherwise affect any claim, action, cause of action or right against the Term-C Lenders and any affiliate, insider, agent or professional of the Term-C Lenders, except as specifically set forth in the preceding sentence, provided however that the reservation of non-released claims, causes of action or rights in this Paragraph shall not extend to the Released Lender Parties.

Paragraph 52 of the June 10, 2004 Confirmation Order (Docket No. 1173) provides:

Confirmation Order Controlling If there is any direct conflict between the Plan and this Confirmation Order, the terms of this Confirmation Order shall control, provided however that nothing in this Confirmation Order shall undermine or impair the effectiveness of the Asset Reallocation and Settlement Agreement, and to the extent there is any conflict between this Confirmation Order and the provisions of the Asset Reallocation and Settlement Agreement, the provisions of the Asset Reallocation and Settlement Agreement shall control.

It is undisputed that the Settlement Agreement provided the framework for the consensual chapter 11 plan ultimately confirmed by the Court The Term C Claims, allowed by agreement of the parties and prior Court order, arise out of the Term C Loans under the Credit Agreement The claims asserted in the Objection, necessarily, arise "in respect of the Term-C Loans under the Credit Agreement." I conclude, therefore, that the terms of the Settlement Agreement, and the Order approving it, along with the Confirmation Order, unambiguously release the Term C Lenders from the claims asserted in the Objection.

3

Copies to:

Constance A. Fratianni, Esquire
SHEARMAN & STERLING
599 Lexington Avenue
New York, New York 10022

Pauline K. Morgan, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

John H. Knight, Esquire
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899

Janet E. Henderson, Esquire
SIDLEY AUSTIN BROWN & WOOD LLP
10 S. Dearborn Street
Chicago, Illinois 60603

Andrew I. Silfen, Esquire
ARENT FOX KINTNER PLOTKIN & KAHN PLLC
1675 Broadway, 25th Floor
New York, New York 10019

Michael G. Wilson, Esquire
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, Virginia 23219-4074

Lisa J. Sotto, Esquire
HUNTON & WILLIAMS LLP
200 Park Avenue
43rd Floor
New York, New York 10166-0136

Attorney General of the State of New York
Jeanna E. Hussey, Esquire
Assistant Attorney General
Environmental Protection Bureau
New York State Department of Law
120 Broadway, 26th Floor
New York, New York 10271-0332

4