## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------x
In re                                    :      Chapter 11
                                         :
INSILCO TECHNOLOGIES, INC., et al.,      :      Case No. 02-13672 (KJC)
                                         :
              Debtors.                   :      Jointly Administered
                                         :
-------------------------------------------------------------x
                                         :
CHAD SHANDLER, as Trustee to the Insilco :
Liquidating Trust,                       :      Case No. 04-1567 (GMS)
                                         :
              Appellant,                 :
                                         :
       v.                                :
                                         :
TERM C LENDERS,                          :
                                         :
              Appellees.                 :
-------------------------------------------------------------x
```

## BRIEF FOR APPELLEES THE TERM C LENDERS

THE BAYARD FIRM

Neil B. Glassman (No. 2087)
Charlene D. Davis (No. 2336)
222 Delaware Avenue, 9th Floor
Wilmington, Delaware 19801
Tel: (302) 655-5000
Fax: (302) 658-6395


DAVIS POLK & WARDWELL

Karen E. Wagner
Patrick A. Bradford
James I. McClammy
450 Lexington Avenue
New York, New York 10017

Tele: (212) 450-4000
Fax: (212) 450-4800

Counsel for the Term C Lenders

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

JURISDICTIONAL STATEMENT ................................................................................1

QUESTION PRESENTED ..............................................................................................1

STATEMENT OF THE CASE.........................................................................................1

PRELIMINARY STATEMENT ......................................................................................2

STATEMENT OF FACTS ..............................................................................................3

SUMMARY OF ARGUMENT .......................................................................................8

STANDARD OF REVIEW .............................................................................................8

ARGUMENT....................................................................................................................9

    POINT I
    THE SETTLEMENT AGREEMENT RELEASED ALL
    CLAIMS AGAINST THE TERM C LENDERS WITH
    RESPECT TO THE TERM C LOANS  .................................................................9

        1.  The Settlement Agreement Is Unambiguous .............................................10

        2.  The Order Is Consistent with the "Harmonious Whole" Argument ..........11

        3.  The Filing of the Objection Violated the Settlement Order and
            the Confirmation Order............................................................................14

CONCLUSION................................................................................................................15

596107v1

i

# TABLE OF AUTHORITIES

## Cases

**Page**

CoreStates Bank, N.A. v. Huls Am., Inc., 176 F.3d 187 (3d Cir. 1999) ..........................14

Donaldson v. Bernstein, 104 F.3d 547 (3d Cir. 1997).......................................................14

In re: Gen. Datacomm Indus., Inc., 407 F.3d 616 (3d Cir. 2005).......................................8

In re O'Brien Envtl. Energy, Inc., 188 F.3d 116 (3d Cir. 1999)..........................................8

In re Trans World Airlines, Inc., 145 F.3d 124 (3d Cir. 1998)............................................8

John F. Harkins Co. v. Waldinger Corp., 796 F.2d 657
(3d Cir. 1986)..........................................................................................................................8

Katchen v. Landy, 382 U.S. 323 (1966) ...........................................................................14

Stoll v. Gottlieb, 305 U.S. 165 (1938) ..............................................................................14

Landtect Corp. v. State Mut. Life Assurance Co., 605 F.2d 75
(3d Cir. 1979).........................................................................................................................8

In re: Prof'l Video Ass'n, Inc., No. 95-016-PJW,
CIV.A.01-488 GMS, 2005 WL 189733
(D. Del. Jan. 27, 2005).........................................................................................................8

In re: United Healthcare Sys., Inc., 396 F.3d 247 (3d Cir. 2005).......................................8

In re WorldCom, Inc. ERISA Litig., 354 F. Supp. 2d 423
(S.D.N.Y. 2005) ...........................................................................................................12, 13

## Statutes & Rules

11 U.S.C. § 1141(a) ...........................................................................................................14

28 U.S.C. § 157....................................................................................................................1

28 U.S.C. § 158(a)(1)...........................................................................................................1

28 U.S.C. § 1334...................................................................................................................1

596107v1

ii

Appellees the Term C Lenders[1] respectfully request that this Court affirm the order (the "Order") of the United States Bankruptcy Court for the District of Delaware (Honorable Kevin J. Carey, U.S.B.J.) (the "Bankruptcy Court"), entered on November 18, 2004 dismissing an objection (the "Objection") to the claims of the Term C Lenders (the "Term C Claims"). The Bankruptcy Court correctly ruled that the Official Committee of Unsecured Creditors (the "Committee") had "unambiguously release[d] the Term C Lenders from the claims asserted in the Objection."

## JURISDICTIONAL STATEMENT

The Bankruptcy Court exercised jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and this Court has appellate jurisdiction under 28 U.S.C. § 158(a)(1).

## QUESTION PRESENTED

Whether the Bankruptcy Court correctly ruled that the Objection must be dismissed on the grounds that unambiguous language released the Term C Lenders from all claims relating to certain loans (the "Term C Loans").

## STATEMENT OF THE CASE

The Term C Claims were filed in respect of the Term C Loans, which were made to the debtor, Insilco Technologies, Inc. ("Insilco"), by the Term C Lenders prior to

---

[1] So designated in the caption. The Term C Lenders are DLJ Merchant Banking Partners II, L.P., DLJ Merchant Banking Partners II-A, L.P., DLJ Diversified Partners, L.P., DLJ Diversified Partners-A, L.P., DLJ EAB Partners, L.P., DLJ ESC II, L.P., DLJ Millennium Partners, L.P., DLJ Millennium Partners-A, L.P., DLJ Offshore Partners II, C.V., MBP II Plan Investors. No other DLJ entities are parties to this matter.

Insilco's bankruptcy filing.  (Obj. ¶¶ 47, 61, 62, A-186, A-189.)[2]  The Committee filed
the Objection on the eve of the hearing on confirmation of Insilco's Amended Joint
Liquidating Plan of Reorganization (the "Plan").  (A-71 to A-172.)  The Term C Lenders
filed their motion to dismiss the Objection on July 23, 2004.  (A-356 to A-393.)  The
Committee served its response on September 3, 2004 (A-394 to A-617), and the Term C
Lenders submitted their reply on September 24, 2004.  (A-618 to A-637.)  Oral argument
on the motion to dismiss was heard on November 8, 2004.

The Bankruptcy Court issued its Order dismissing the Objection on November 18,
2004.  (A-638 to A-641.)  The Bankruptcy Court held that the Term C Lenders had been
"unambiguously release[d] . . . from the claims asserted in the Objection."  (Order at 2
n.2, A-640.)

On November 23, 2004, the Creditor Trustee[3] filed his notice of appeal to the U.S.
District Court for the District of Delaware.  After an unsuccessful attempt at a mediated
resolution, the instant appeal proceeded.

## PRELIMINARY STATEMENT

As determined by the Bankruptcy Court, the Settlement Agreement
"unambiguously release[d] the Term C Lenders from the claims asserted in the
Objection."  The Committee, which owed a fiduciary duty to all of Insilco's unsecured
creditors, including the Term C Lenders, nevertheless chose to prosecute the Objection,

---

[2] References to "A-__" are to the Appendix filed by the Appellant.

[3] After the date the Plan became effective, the Committee ceased to exist and the
appellant, the Creditor Trustee, designated by the Plan to prosecute certain claims under the Plan,
assumed prosecution of the Objection.

596107v1

and the Creditor Trustee, also a fiduciary, has chosen to pursue this appeal. Remarkably, the Creditor Trustee contends that there was no release with respect to the claims asserted in the Objection: "The Settlement Agreement does not contain such a release or waiver." (Appellant's Brief ("App. Br.") at 4.) The falsity of this statement is demonstrated by the language in the Settlement Agreement relied upon by the Bankruptcy Court, which appears in paragraphs entitled "**Releases** by the Debtors and the Creditors' Committee" in which the Debtors and the Creditor's Committee "**fully waive, release and forever discharge**…each of the Senior Lenders…from any and all manner of actions, causes of action, in law or in equity…." (Emphasis added.) The same broad release was extended to the Term C Lenders with respect to the Term C Loans. The continued prosecution of this Objection in the face of unambiguous releases and the Bankruptcy Court's orders is not only a waste of judicial resources, but also a waste of the meager resources of the Creditor Trust for no benefit to its beneficiaries.

## STATEMENT OF FACTS

### The Debtor, the Bankruptcy and the Settlement

Prior to its filing, Insilco was a corporation engaged in manufacturing. (Obj. ¶ 14, A-177 to A-178.) The Term C Lenders are limited partnership funds managed by DLJ Merchant Banking Partners II that held equity interests in Insilco. (Id. ¶¶ 61, 62, A-189.) In August of 2001, the Term C Lenders made the Term C Loan to Insilco in the principal amount of $15 million. (Id.)[4]

---

[4] The Term C Loan was the third tranche of debt in an existing credit facility. (Obj. ¶¶ 47, 61, A-186, A-189.)

596107v1

On December 16, 2002, Insilco and its affiliates filed voluntary Chapter 11

petitions. (Docket No. 1.) On January 3, 2003, the Committee was appointed. (Docket

No. 78.) On March 5, 2003, the Committee filed a motion for the appointment of a

trustee. (Docket No. 398.) That motion was resolved pursuant to an "Asset Reallocation

and Settlement Agreement" dated May 13, 2003, entered into by the Debtor, the pre-

petition lenders, and the Committee, pursuant to which the senior lenders agreed to

provide some of their recovery to the unsecured creditors (the "Settlement Agreement").

(Settlement Agreement, Ex. A to June 11, 2003 "Order Approving Settlement

Agreement," A-7 to A-70.)

Under the Settlement Agreement, the pre-petition claims of the "Senior Lenders,"

including the Term C Lenders, were to be allowed. (Settlement Agreement ¶ 1, A-12.)

In addition, broad releases were granted, as to all manner of claims and defenses for the

Senior Lenders, and as to the Term C Loans for the Term C Lenders:

> "4.    **RELEASE AND WAIVER OF CLAIMS** AND INTERESTS.
>
> A.    **Releases by the Debtors and the Creditors' Committee** –
> **The Debtors and the Creditors' Committee,** on behalf of themselves
> and the estates of the Debtors, and each of their respective predecessors,
> successors and assigns (the "Releasing Estate Parties"), hereby **fully
> waive, release and forever discharge** the Agent and **each of the Senior
> Lenders** and each of their agents, employees and professionals ("Released
> Lender Parties") **from any and all manner of actions, causes of action,
> in law or in equity, suits, debts, liens, contracts, agreements, promises,
> liabilities, claims, damages, losses, controversies, trespasses, remedies,
> defenses, set-offs, surcharges, costs or expenses of any nature
> whatsoever, known or unknown, fixed or contingent, which the
> Releasing Estate Parties have had, now have, or may hereafter have
> against the Released Lender Parties,** by reason of any matter, cause or
> thing whatsoever, from the beginning of time through and to the
> Settlement Effective Date[.]

*   *   *

C.    <u>Limitation on Release of Term-C Lenders</u> – **The releases and waivers contained in Paragraph 4A of this Settlement Agreement for the benefit of the Released Lender Partners shall also apply to the Term-C Lenders** (DLJ Capital Funding, Inc., DLJ Merchant Banking Partners II, L.P., DLJ Merchant Banking Partners II-A, L.P., DLJ Offshore Partners II, C.V., DLJ Diversified Partners, L.P., DLJ Diversified Partners-A, L.P., DLJ EAB Partners, L.P., DLJ Millenium Partners, L.P., DLJ ESC II, L.P., DLJ Millenium Partners-A, L.P. and Donaldson, Lufkin and Jenrette Securities Corporation (collectively, the "Term-C Lenders")) and their affiliates, insiders (as defined in Section 101 of the Bankruptcy Code), agents, employees and professionals, **only in respect of the Term-C Loans** under the Credit Agreement (as defined therein) and notwithstanding anything herein to the contrary, the Term-C Lenders and their affiliates, insiders (as defined in Section 101 of the Bankruptcy Code) agents, employees and professionals, **shall not otherwise be released** or deemed released." (Settlement Agreement ¶¶ 4A, 4C, A-17, A-19 to A-20 (emphasis added).)

**The Settlement Order**

The Debtor, with the Committee's support, sought approval of the Settlement Agreement. The terms of the Settlement Agreement were approved by, and incorporated in, a now final order of the Bankruptcy Court dated June 11, 2003 (the "Settlement Order"). (A-1 to A-70.) The Settlement Order provides that "[t]he liens and security interests of the Senior Lenders (other than the Term C Lenders, which are, under the terms of the Credit Agreement, unsecured) are deemed valid, perfected, first priority and indefeasible and neither such liens nor such claims shall be subject to any further challenge." (Settlement Order ¶ 5, A-3.) Finally, the Settlement Order states that "the Settling Parties are hereby released to the extent and in the manner provided in the Settlement Agreement." (<u>Id.</u> ¶ 8, A-5.) The Settlement Order specifically provides that the Term C Lenders have the benefit of both provisions. (<u>Id.</u> at 2 n.3, A-2.)

596107v1

5

**The Plan and Confirmation Order**

On February 13, 2004, Insilco filed its Plan (A-71 to A-172) and an Amended Disclosure Statement. (Docket No. 1019.) Sections 7.2 and 7.3 of the Plan specifically exclude from the scope of Rights of Action conveyed to the Committee the Released Claims, defined by Section 1.2 of the Plan to include "[t]hose Rights of Action or Claims that were specifically waived and released under the Asset Reallocation and Settlement." (Plan § 1.2, A-82; see also id. §§ 7.2, 7.3, A-96 to A-98.) Similarly, Section 8.2 provides that all claims of the Debtors are reserved "[u]nless a claim or Right of Action against a Creditor or other Entity is expressly waived, relinquished, released, compromised or settled in the Asset Reallocation and Settlement Agreement, and this Plan, or any Final Order." (Plan § 8.2, A-98 to A-99.)

The Term C Lenders voted for the Plan in reliance upon these express terms, which plainly recognized the supremacy of the Settlement Agreement and the Settlement Order. (See Plan § 4.8, A-91 to A-92.)

The Plan was confirmed by order of the Bankruptcy Court (the "Confirmation Order") after a hearing on June 10, 2004. (Confirmation Order, A-207 to A-355.) The Confirmation Order states that "nothing in this Confirmation Order shall undermine or impair the effectiveness of the Asset Reallocation and Settlement Agreement, and to the extent there is any conflict between this Confirmation Order and the provisions of the Asset Reallocation and Settlement Agreement, the provisions of the Asset Reallocation and Settlement Agreement shall control." (Confirmation Order ¶ 52, A-233.) Similarly, the Plan states "[t]o the extent of any conflict or inconsistency between the provisions of

this Plan and the provisions of the Asset Reallocation and Settlement Agreement, the

provisions of the Asset Reallocation and Settlement Agreement shall govern and be

deemed controlling." (Plan § 14.20, A-112.)

### The Objection and the Order Dismissing It

On May 13, 2004, the Term C Claims were filed, seeking recovery on the Term C

Loans. On June 9, 2004, in violation of the Settlement Order and the Confirmation

Order, the Committee filed the Objection, contending that the Term C Loans breached an

indenture governing some of Insilco's debt, and caused Insilco's "deepening

insolvency."[5] (Obj., A-173 to A-206.) On July 23, 2003, the Term C Lenders moved to

dismiss on the grounds that all claims regarding the Term C Loans had been released.

(A-356 to A-393.)

On November 18, 2004, the Bankruptcy Court granted the motion to dismiss the

Objection. (A-638 to A-641.) In its Order, the Bankruptcy Court ruled:

> It is undisputed that the Settlement Agreement provided the framework for
> the consensual chapter 11 plan ultimately confirmed by the Court. The
> Term C Claims, allowed by agreement of the parties and prior Court order,
> arise out of the Term C Loans under the Credit Agreement. The claims
> asserted in the Objection, necessarily, arise "in respect of the Term-C
> Loans under the Credit Agreement." I conclude, therefore, that the terms
> of the Settlement Agreement, and the Order approving it, along with the
> Confirmation Order, unambiguously release the Term C Lenders from the
> claims asserted in the Objection. (Order at 2 n.2, A-640.)

---

[5] The Creditor Trustee has since sued the Term C Lenders, and others, on exactly the
same causes of action as are alleged in the Objection and that are the subject of this appeal. The
Term C Lenders have moved to dismiss these claims again.

## SUMMARY OF ARGUMENT

As the Bankruptcy Court held, the Settlement Agreement unambiguously released all claims and defenses against the Term C Lenders relating to the Term C Loans. The Plan and the Confirmation Order, both of which incorporate the Settlement Agreement, state that the terms of the Settlement Agreement control. The Creditor Trustee's contention that the Term C Claims were merely allowed, and no release of the claims raised in the Objection was granted, is manifestly wrong. This Court should affirm the Order.

## STANDARD OF REVIEW

This Court reviews the Bankruptcy Court's "legal determinations de novo, its factual findings for clear error and its exercise of discretion for abuse thereof." In re: Gen. Datacomm Indus., Inc., 407 F.3d 616, 619 (3d Cir. 2005) (quoting In re Trans World Airlines, Inc., 145 F.3d 124, 130-31 (3d Cir. 1998)); see also In re: United Healthcare Sys., Inc., 396 F.3d 247, 249 (3d Cir. 2005); In re O'Brien Envtl. Energy, Inc., 188 F.3d 116, 122 (3d Cir. 1999). Where the language of the agreement in question is unambiguous, a lower court's interpretation of that agreement is reviewed de novo as a question of law. See John F. Harkins Co. v. Waldinger Corp., 796 F.2d 657, 659 (3d Cir. 1986) ("Discerning contractual intent is a question of fact unless the provisions of a contract are wholly unambiguous." (quoting Landtect Corp. v. State Mut. Life Assurance Co., 605 F.2d 75, 79 (3d Cir. 1979) (internal quotation omitted)); see also In re: Prof'l Video Ass'n, Inc., No. 95-016-PJW, CIV.A.01-488 GMS, 2005 WL 189733, at *4 (D. Del. Jan. 27, 2005).

## ARGUMENT

### POINT I

### THE SETTLEMENT AGREEMENT RELEASED ALL CLAIMS AGAINST THE TERM C LENDERS WITH RESPECT TO THE TERM C LOANS

The Bankruptcy Court correctly ruled that the Settlement Agreement unambiguously released all claims against the Term C Lenders with respect to the Term C Loans. The Creditor Trustee now asserts three arguments that find no support in the unambiguous language of the Settlement Agreement or the Plan: first, that there is no release of the claims raised in the Objection; second, that the release is really only an allowance of the Term C Claims, granted to permit further challenges to those claims; and third, that the Bankruptcy Court ignored the "harmonious whole" doctrine, even though all documents to which the Creditor Trustee refers provide that the Settlement Agreement, including the releases, are controlling.[6]

The first and second arguments are perversely at odds with the terms of the Settlement Agreement and the implementing Settlement Order. The Creditor Trustee deliberately ignores the operative language of the release provisions in proposing such arguments. The third, based on the "harmonious whole" doctrine, is inapplicable where the language of the release is unambiguous, but in any event the Bankruptcy Court's interpretation of the Settlement Agreement is consistent with that doctrine.

---

[6] The Creditor Trustee also contends that the Bankruptcy Court should have conducted an evidentiary hearing. (See App. Br. at 6.) No such hearing was required given the unambiguous release language. Nor was such a hearing requested by the Creditor Trustee.

596107v1

9

1.    **The Settlement Agreement Is Unambiguous**

The language of the Settlement Agreement is abundantly clear: the Term C

Lenders are released as to "any and all manner of actions" with respect to the Term C

Loans. (Settlement Agreement ¶¶ 4A, 4C, A-17, A-19 to A-20.)

The Creditor Trustee's contention that the Settlement Agreement only allowed the

Term C Loans, but did not release claims or defenses against them, is contradicted by its

terms, in which the Debtors and the Committee, on behalf of themselves and their

successors, "**fully waive[d], release[d] and forever discharge[d]**" the Term C Lenders

"from any and all manner of actions, causes of action, in law or in equity, suits, debts,

liens, contracts, agreements, promises, liabilities, claims, damages, losses, controversies,

trespasses, remedies, defenses, set-offs, surcharges, costs or expenses of any nature

whatsoever, known or unknown, fixed or contingent, which the Releasing Estate Parties

have had, now have, or may hereafter have against the" Term C Lenders for matters "in

respect of the Term C Loans." (Id. ¶¶ 4A, 4C, A-17, A-19 to A-20) (emphasis added.)

This is not "allowance" language – this is extremely broad release language. The

Creditor Trustee acknowledges that "the Senior Lenders…did receive a broad, absolute

release." (App. Br. at 5.) But he then ignores language that extends the same "broad,

absolute release" to the Term C Loans: "The releases and waivers contained in

Paragraph 4A of this Settlement Agreement for the benefit of the Released Lender parties

shall also apply to the Term-C Lenders," but "only in respect of the Term-C Loans…."[7]

(Settlement Agreement ¶ 4C, A-19 to A-20.)

_____

[7] The idea that this language was meant to allow the claims for the express purpose of
subjecting them to challenge by equitable claims of subordination or recharacterization is
596107v1

10

Thus, while the crux of the Creditor Trustee's argument is that the release as to the Term C Loans is completely different from the release to the Senior Lenders, it is in fact identical – Paragraph 4 C extends exactly the same broad release to the Term C Loans – not from any and all causes of action "from the beginning of time through and to the Settlement Effective Date," as it was for the secured lenders, but completely, as regards the Term C Loans.

The ruling of the Bankruptcy Court properly recognizes that the release as to the Term C Claims is unambiguous, and broad. That Court's reading does not render the limiting language "completely meaningless." (App. Br. at 17). The decision correctly recognizes the defined limit: all claims with respect to the Term C Loans are released from further challenge, but there is no release of other potential claims against the Term C Lenders. As the Court recognized, there is no basis in the terms of the Settlement Agreement for arguing that subordination or recharacterization claims addressed to the Term C Loans were excepted from the broad scope of the release.

### 2.     The Order Is Consistent with the "Harmonious Whole" Argument

The Trustee's "harmonious whole" argument supports the Bankruptcy Court's analysis, not the Trustee's tortured effort to evade the plain language of the Settlement Agreement and the Orders implementing it by omitting reference to material provisions of those Orders.

---

completely belied by the language, which extends the release to actions "in law or in equity," and by the Settlement Order, never appealed by the Committee, that provides that these claims are not to be subject to further challenge. (Settlement Order ¶ 5, A-3.)

596107v1

11

The Creditor Trustee argues that "all provisions of a contract [should] be read together as a harmonious whole, if possible," quoting In re WorldCom, Inc. ERISA Litig., 354 F. Supp. 2d 423, 442 (S.D.N.Y. 2005).  (App. Br. at 19.)  The Creditor Trustee, having ignored material consistencies in the Settlement Agreement and Order, and subsequent documents and orders, then points to one procedural section of the Plan that states "[u]nless the Debtors (or the Creditors' Committee on behalf of the Debtors or their estates) or Indenture Trustees have commenced an adversary proceeding or contested matter prior to the Confirmation Date seeking to subordinate or reclassify" the Term C Claims, then the Term C Lenders were to be paid the distributions due them under the Plan.  (Plan § 4.8, A-91 to A-92.)  The Creditor Trustee makes the unlikely argument that this provision limits the releases provided in the Settlement Agreement and Order, despite the lack of any disclosure in the Disclosure Statement to that effect.

The Creditor Trustee's argument is the one lacking in harmony.  He is forced to ignore not only the unambiguous release language of the Settlement Agreement and Settlement Order, but also the provisions of the Plan and Confirmation Order dictating that "[t]o the extent of any conflict or inconsistency between the provisions of this Plan [or Confirmation Order] and the provisions of the [Settlement] Agreement, the provisions of the [Settlement] Agreement shall govern and be deemed controlling."  (Plan § 14.20, A-112; see also Confirmation Order ¶ 52, A-233.)  The only "harmonious" interpretation that gives effect to all of these documents is that the Term C Lenders were released from "any and all" claims with respect to the Term C Loans, including the claims raised in the

Objection.[8] The fact that provision was made for payment of the Term C Claims unless

someone who had retained a defense to those claims had interposed an objection is

entirely consistent with the Settlement Agreement and all of the other documents – the

Debtor and the Committee had retained no such claims and had no right to avail

themselves of this procedure.

In addition, the argument that the Term C Lenders consented to the evisceration

of the releases provided in the Settlement Agreement and Order by voting for the Plan is

preposterous. The Term C Lenders voted for the Plan because the Plan recognized that

the Settlement Agreement controlled in the event of any conflict. The Plan and

Disclosure Statement certainly did not put the Term C Lenders on notice that any Plan

provision was intended to limit the terms of the court-ordered release – on the contrary,

they both stated the exact opposite. The Creditor Trustee cannot now, after the Term C

Lenders voted in reliance upon these provisions, take the position that the Plan and

---

[8] The District Court's decision in In re WorldCom, Inc. ERISA Litig., 354 F. Supp. 2d 423 (S.D.N.Y. 2005), cited by the Creditor Trustee, is instructive. In that case, the plaintiff emphasized language in an agreement to argue that Merrill Lynch, a directed trustee, was given more discretion than was appropriate under ERISA, contending that the statement "'the Trustee [Merrill Lynch] may limit the categories of assets in which the Trust fund may be invested' vests Merrill Lynch with precisely the type of investment discretion that could not be granted to a directed trustee." Id. at 442 (quoting trustee agreement). The District Court found that the obvious meaning of this language, and the only one consistent with the rest of the agreement, was that Merrill Lynch was allowed to limit WorldCom's asset choices to the types of assets that Merrill Lynch was physically equipped to trade. Id. at 442-43. Similarly, the language cited by the Creditor Trustee cannot be read as having reserved the substantive right of the Debtor, or the Committee, to pursue claims that had already been released. The only reading of that language that is consistent with the rest of the provisions of the Plan and Settlement Agreement is that a procedure was created whereby certain parties could assert claims, if, in fact, they possessed such claims. In the Settlement Agreement, the Debtor and Committee had relinquished such claims. Their claims were not revived by this procedural provision.

596107v1

Disclosure Statement, as well as the Confirmation Order, mean the opposite of what they say.

> **3.    The Filing of the Objection Violated the
> Settlement Order and the Confirmation Order**

Finally, the Creditor Trustee, like the Committee, acts in this matter on behalf of the Debtors.  The Debtors are bound by the terms of the Settlement Order and the Confirmation Order.  See 11 U.S.C. § 1141(a); Katchen v. Landy, 382 U.S. 323, 334 (1966) ("The normal rules of res judicata and collateral estoppel apply to the decisions of bankruptcy courts."); Stoll v. Gottlieb, 305 U.S. 165, 170-171 (1938) (confirmation order is final adjudication precluding later claims); CoreStates Bank, N.A. v. Huls Am., Inc., 176 F.3d 187, 195 (3d Cir. 1999) ("[A] confirmation order is res judicata as to all issues decided or which could have been decided at the hearing on confirmation," quoting Donaldson v. Bernstein, 104 F.3d 547, 554 (3d Cir. 1997)).

The Settlement Agreement released the Term C Lenders from claims and objections relating to the Term C Loans.  The Settlement Order directed that the Term C Claims shall not "be subject to any further challenge."  The Confirmation Order and the Plan direct that the terms of the Settlement Agreement control where any conflict exists.  (Confirmation Order ¶¶ 52, 56, A-233, A-234; Plan § 14.20, A-112.)  The filing and prosecution of the Objection, therefore, violates, and is in contempt of, the Settlement Agreement, both Orders, and the Plan.  The Bankruptcy Court's Order dismissing the Objection should be affirmed.

## CONCLUSION

For the reasons set forth herein, the Term C Lenders respectfully request that the

Court affirm the Order of the Bankruptcy Court, entered on November 18, 2004,

dismissing the Objection of the Committee to the Term C Claims, and ordering

distribution on those claims.

Dated: July 29, 2005
       Wilmington, Delaware

Respectfully submitted,

THE BAYARD FIRM

By: _Charlene D. Davis_
    Neil B. Glassman (No. 2087)
    Charlene D. Davis (No. 2336)

222 Delaware Avenue, 9th Floor
Wilmington, Delaware 19801
Tel: (302) 655-5000
Fax: (302) 658-6395


DAVIS POLK & WARDWELL

Karen E. Wagner
Patrick A. Bradford
James I. McClammy
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000
Fax: (212) 450-3800

Counsel for the Term C Lenders

596107v1

15

Westlaw.

Slip Copy

Page 1

2005 WL 189733 (D.Del.)

(Cite as: 2005 WL 189733 (D.Del.))

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
In re: PROFESSIONAL VIDEO ASSOCIATION,
INC., Debtor,
Michael J HORAN, Appellant,
v.
William DANTON, Video Lottery Consultants, Inc.
and Professional Video
Association, Inc., Appellees.
**No. 95-016-PJW, Civ.A.01-488 GMS.**

Jan. 27, 2005.
Stephen W. Spence, Phillips, Goldman & Spence, P.A., Wilmington, DE, for Debtor.

Elwyn Evans, Jr., Evans & Evans, Wilmington, DE, for Appellant.

Michael B. Joseph, Ferry & Joseph, P.A., Wilmington, DE, for Appellees.

*MEMORANDUM*

SLEET, J.

I. INTRODUCTION

*1 On April 17, 1998, Michael J. Horan ("Horan") initiated an adversary proceeding in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") against William Danton ("Danton"), Professional Video Association, Inc. ("PVA"), and Video Lottery Consultants, Inc. ("VLC") (collectively, the "appellees"). Horan's complaint alleged three counts: (1) fraud, misrepresentation of ownership of

certain "Software Assets" that are the subject of the settlement agreement (the "Settlement Agreement") executed by the parties on February 27, 1997 and approved by the Bankruptcy Court on March 4, 1997; (2) breach of the Settlement Agreement; and (3) judicial estoppel. The Bankruptcy Court held a three day trial on the matter. On June 4, 2001, the Bankruptcy Court issued a final Order, entering judgment in favor of the defendants. On July 18, 2001, Horan appealed the decision. For the following reasons, the court will affirm the decision of the Bankruptcy Court.

II. STANDARD OF REVIEW

In reviewing a case on appeal, the Bankruptcy Court's factual determinations will not be set aside unless they are clearly erroneous. *See Mellon Bank, N.A. v. Metro Comm., Inc.,* 945 F.2d 635, 641 (3d Cir.1991), *cert. denied,* 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620, (1992). Conversely, a Bankruptcy Court's conclusions of law are subject to plenary review. *See id.* Mixed questions of law and fact are subject to a "mixed standard of review." *See id.* at 641-42. Under this "mixed standard of review," the appellate court accepts findings of "historical or narrative facts unless clearly erroneous, but exercise[s] plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to historical facts." *Id.*

III. BACKGROUND

A. Elimination Draw Poker

In the 1980's, Horan developed Elimination Draw Poker, a game in which players could conduct a computer-operated poker tournament. Horan copyrighted the game and, with the help of his brother-in-law, wrote a computer software program to run the game. On October 28, 1983, he copyrighted the software program. In addition,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 189733 (D.Del.)

**(Cite as: 2005 WL 189733 (D.Del.))**

Horan's company, PVA, copyrighted the rules of the game in February 1985. On March 10, 1987, Horan obtained a patent for the game..

In 1993, Stephen Holniker ("Holniker"), President of Amusement World, Inc., and Amusement World (collectively "Amusement World"), obtained the operating software for Elimination Draw Poker. Amusement World then began to manufacture the game for PVA. The game, however, was manufactured for demonstration only because it did not have the necessary network software. In 1995, Amusement World developed the network software to make the game operational. Amusement World owns the software application that runs Elimination Draw Poker.

In December 1999, Don Pierce ("Pierce"), a software developer, created a software package to run Elimination Draw Poker for Fortune Entertainment Corporation ("FEC"), PVA's successor in interest. [FN1] Pierce testified, at the Bankruptcy Court trial, that he produced a complete software package for FEC that ran Elimination Draw Poker on a personal computer. Pierce further testified that the software was a demonstration model and not operational. Gaming Laboratories International Corporation ("GLI"), a regulatory firm that tests and approves gaming devices, tested Pierce's version of Elimination Draw Poker and determined that it was inoperable.

> FN1. On January 6, 1995, PVA filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On September 5, 1997, FEC purchased PVA. FEC is not a party to this lawsuit.

B. The Settlement Agreement

**\*2** On February 27, 1997, Horan and the appellees executed the Settlement Agreement at issue in this appeal. The relevant portions of the Settlement Agreement provide:
*Background:* Horan invented a certain computer software program commercially known as "Elimination Draw Poker". "Elimination Draw Poker" was patented at Patent No. 4,648,604 (the

Patent). "Elimination Draw Poker" together with the Patent, related copyrights, rules, design, format, system and related hardware (the Software Assets) were assigned to PVA, a Delaware Corporation.
*Grant of Exclusive Rights to Software Assets:* PVA, with the joinder of Danton, hereby grants and conveys to Horan, all exclusive distribution and all other related rights in and to the Software Assets, including any and all upgrades, updates, modifications, the name and/or new versions [in 10 exclusive locations] ..., which rights include the exclusive right to sell, advertise, distribute, demonstrate, manufacture and duplicate the Software Assets.
*Warranty of Ownership:* Danton and PVA warrants that PVA has exclusive ownership of the Software Assets and, subject to approval of the Bankruptcy Court as set forth herein, has the authority and power to transfer, convey, assign, sell, or grant the exclusive rights to the Software Assets as set forth herein to Horan. Danton and PVA acknowledges that this is a material representation of PVA and Danton and Horan is relying on such representations and warranty in connection with this Settlement Agreement.
*Governing Law:* The laws of the State of Delaware shall apply to and govern the enforcement of the terms and conditions of this Settlement Agreement....
The court approved the Settlement Agreement on March 4, 1997, despite an objection by Holniker, who contended that the Settlement Agreement attempted to convey Amusement World's software to Horan. Amusement World then appealed the Bankruptcy Court's Order approving the Settlement Agreement. The appeal prevented the parties from finalizing the Settlement Agreement because the agreement, by its terms, required a final Order from the Bankruptcy Court. Amusement World later withdrew its appeal, but suggested that the parties redraft the Settlement Agreement to specifically exclude the Amusement World software. The parties did not redraft the Settlement Agreement but, instead, finalized and closed on the original Settlement Agreement in August 1997.

C. Proceedings in the Bankruptcy Court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 3

2005 WL 189733 (D.Del.)

(Cite as: 2005 WL 189733 (D.Del.))

On January 4, 2000, the Bankruptcy Court held a pretrial conference. Prior to the conference, the parties submitted a pretrial order, including a section of "facts which are admitted and require no proof." In the pretrial order, the parties admitted that "Danton agreed that in the event that he or his entity came up with a software program so that he didn't need Holniker, he'd give Horan use of that, to the extent that we changed the game, we would give Horan that also." (D.I. 135, at 9). The parties also admitted the following:

\*3 The term "Software Assets" as set forth in the "Background" paragraph of the Settlement Agreement included whatever Plaintiff Horan assigned to Defendant PVA in 1985, and to the extent that Defendant PVA, after it received the assignment from Mr. Horan in 1985, either developed or acquired, upgrades, updates or new versions, then Mr. Horan was entitled to their use in connection with his distribution rights pursuant to the Settlement Agreement.

*Id.* During the pretrial conference, the Bankruptcy Court found that the settlement agreement was unambiguous and denied the admission of parol evidence for the purpose of interpreting the agreement. Using the language of the pretrial order as a guide, Judge Walsh determined that the term "Software Assets," as used in the Settlement Agreement, means whatever was assigned by Mr. Horan to PVA in 1985. Judge Walsh further determined that "to the extent that PVA, after it received the assignment from Mr. Horan in 1985, either developed or acquired upgrades, updates or new versions. Then, Mr. Horan was entitled to their use in connection with his distribution rights." (Defs.' Trial Exh. 46).

The Bankruptcy Court held a trial on February 12 and 13, 2001, and June 1, 2001. At the conclusion of Horan's case, Judge McCullough granted the appellees motion to dismiss and entered judgment in their favor on all three counts of the complaint pursuant to Federal Rule of Civil Procedure 52©. [FN2] Judge McCullough concurred in Judge Walsh's ruling as to the meaning of "Software Assets." He also found that the Software Assets including any and all upgrades, updates, modifications, the name and/or new versions (the

"upgrades, etc.") have to be upgrades, updates, modifications that PVA had. Next, Judge McCullough determined that PVA neither upgraded the Software Assets nor acquired any upgrades, etc. He then concluded that the appellees did not commit fraud or breach the Settlement Agreement, and that judicial estoppel did not apply.

FN2. Federal Rule of Civil Procedure 52(c) provides:
If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.... Such a judgment shall be supported by findings of fact and conclusions of law.
Fed. R. Civ. P. 52(c).

IV. DISCUSSION

Horan appeals from the Bankruptcy Court's opinion on three grounds. First, Horan argues that the Bankruptcy Court erred in its construction of an unambiguous contract by failing to give effect to the plain terms of the Settlement Agreement. Second, Horan maintains that the Bankruptcy Court erred by failing to find fraud under the plain and unambiguous terms of the Settlement Agreement. Finally, Horan contends that had the Bankruptcy Court properly construed the Settlement Agreement, it would have reached the conclusion that the representations made in the appellees warranty were fraudulent and that the fraudulent representations amounted to a breach of the warranty and, therefore, a breach of contract. The court will address each of these issues in turn.

A.      The     Bankruptcy      Court's Construction/Interpretation    of   the   Settlement Agreement

As a preliminary matter, the parties disagree as to what standard of review the court should apply to the Bankruptcy Court's determinations. Horan

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 189733 (D.Del.)

(Cite as: 2005 WL 189733 (D.Del.))

asserts that the Bankruptcy Court misconstrued the unambiguous terms of the Settlement Agreement. The appellees, however, contend that Horan's appeal is to the Bankruptcy Court's interpretation, not construction, and that contract interpretation and contract construction are reviewed according to different standards.

**\*4** After considering the parties' arguments and the appropriate case law, the court concludes that a different standard of review applies to contract interpretation than to contract construction in certain instances. Questions of contract interpretation are reviewed according to the clearly erroneous standard, while questions of contract construction are reviewed *de novo*. *See Medtronic AVE Inc. v. Advanced Cardiovascular Systems, Inc.*, 247 F.3d 44, 53 n. 2 (3d Cir.2001); *John F. Harkins Co., Inc. v. Waldinger Corp.*, 796 F.2d 657, 659 (3d Cir.1986). When a court engages in "interpretation of language," it determines what ideas the language induces in other persons. When a court engages in "construction of the contract," it determines the contract's legal operation -that is, its effect upon the action of courts and administrative officials. *Harkins*, 796 F.2d at 659. "[T]he construction of a contract starts with the interpretation of its language but does not end with it; while the process of interpretation stops wholly short of a determination of the legal relations of the parties." *Id.* (citing 3 Corbin, Corbin on Contracts § 534, at 9 (1960)).

In the present case, however, the disagreement between the contracting parties concerns the meaning of terms in an unambiguous contract, [FN3] and "[t]he interpretation and construction of a written contract present only questions of law ... so long as the contract is unambiguous and the intent of the parties can be determined from the agreement's face." 11 Williston on Contracts § 30:6 (4th ed.2004). Moreover, Delaware law applies to all disputes arising out of the Settlement Agreement and, under Delaware law, construction and/or interpretation of contract language is a question of law. *See Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Insurance Co.*, 616 A.2d 1192, 1195 (Del.1992). Thus, it does not matter whether the

Bankruptcy Court "construed" or "interpreted" the Settlement Agreement, as the court must review the Bankruptcy Court's determination *de novo*.

> FN3. Both Judge Walsh and Judge McCullough found that the Settlement Agreement was unambiguous. In addition, the parties agree that the Settlement Agreement is unambiguous.

When interpreting or construing a contract, the court's primary function is to ascertain the intent of the parties. *Coca-Cola Bottling Co., Inc. v. Coca-Cola Co.*, 769 F.Supp. 599, 616 (D.Del.1991) , *aff'd in part*, 988 F.2d 386 (3d Cir.1993). When a contract is clear on its face, the court should rely solely on the clear, literal meaning of the words contained in the contract. *See Myers v. Myers*, 408 A.2d 279, 281 (Del.1979). "Where [the] parties have entered into an unambiguous integrated written contract, the contract's construction should be that which would be understood by an objective reasonable third party." *Demetree v. Commonwealth Trust Co.*, 1996 WL 494910, at \*4 (Del.Ch. Aug.27, 1996). When a contract is unambiguous, *i.e.* when the provisions in controversy are not reasonably or fairly susceptible of different interpretations, an inquiry into the subjective unexpressed intent or understanding of the individual parties is neither necessary nor appropriate. *See id.* Additionally, when the language of a contract is clear and unambiguous, the court may not consider parol evidence to interpret the intent of the parties. *See Citadel Holding Corp. v. Roven*, 603 A.2d 818, 822 (Del.1992).

**\*5** Horan asserts that the Bankruptcy Court erred when it construed the terms "any and all upgrades, etc. of the Software Assets" to mean any and all upgrades, etc. "that PVA had." According to Horan, the plain and unambiguous meaning of "any and all" is every possible number or specification possible. The Bankruptcy Court's construction is contrary to this meaning because it creates a condition that was not present in the contract--that is, any and all "that PVA had." In other words, Horan contends that he was not merely granted and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 189733 (D.Del.)

(Cite as: 2005 WL 189733 (D.Del.))

Page 5

conveyed the right to manufacture and duplicate that which he assigned to PVA in 1985. Rather, he maintains that he was granted and conveyed the Software Assets including any and all upgrades, etc. that existed as of March 4, 1997, even those that PVA did not own.

In response, the appellees contend that Horan's interpretation is neither credible nor comports with the plain meaning of the Settlement Agreement. The court agrees. Horan's reading of the Settlement Agreement is overly broad. It would require the appellees to provide Horan with any and all upgrades, etc. of the "Software Assets" that existed anywhere in the universe. The "Software Assets" are defined in the Background section of the Settlement Agreement as " 'Elimination Draw Poker' together with the Patent, related copyrights, rules, design, format, system and related hardware" assigned to PVA in 1985. The "Terms and Conditions" establish that PVA granted and conveyed to Horan "all exclusive distribution and all other related rights in and to the Software Assets, including any and all upgrades, updates, modifications, the name and/or new versions." (Defs.' Trial Exh. 24 ¶ 1(a)). The parties' intent is clear from the terms of the Settlement Agreement--PVA agreed to convey to Horan exclusive distribution and related rights in the Software Assets, and any and all upgrades, etc. that PVA had. That is, in order for Horan to receive exclusive distribution and related rights to the Software Assets, PVA had to upgrade, update, modify, or create a new version of the them. [FN4] Thus, the court concludes that the Bankruptcy Court did not err in its construction/interpretation of the Settlement Agreement.

> FN4. Indeed, the pretrial order filed by the parties supports this construction/interpretation:
> Danton agreed that in the event that he or his entity came up with a software program so that he didn't need Holniker, he'd give Horan use of that, to the extent that we changed the game, we would give Horan that also.
> The term "Software Assets" as set forth in

the "Background" paragraph of the Settlement Agreement included whatever Plaintiff Horan assigned to Defendant PVA in 1985, and to the extent that Defendant PVA, after it received the assignment from Mr. Horan in 1985, either developed or acquired, upgrades, updates or new versions, then Mr. Horan was entitled to their use in connection with his distribution rights pursuant to the Settlement Agreement. (D.I. 135, at 9).

B. The Bankruptcy Court's Finding of No Fraud

Horan next asserts that the Bankruptcy Court erred by failing to find fraud under the plain and unambiguous terms of the Settlement Agreement. Under Delaware law, the elements of fraud consist of: (1) a false representation of material fact; (2) the knowledge or belief that the representation was false, or made with reckless indifference to the truth; (3) the intent to induce another party to act or refrain from acting; (4) justifiable reliance on the representation in the form of action or inaction; and (5) damage ensuing to the other party as a result. *See DRR, LLC v. Sears, Roebuck & Co.,* 949 F.Supp. 1142, 1137 (D.Del.1996) (citing *Matter of Enstar Corp.,* 593 A.2d 543, 549 (Del.Ch.1991)). Horan maintains that the appellees committed fraud because (1) the appellees made three material representations in the "Warranty of Ownership"; (2) they knew that these representations were false when made; (3) they made the representations in order to get Horan to sign the Settlement Agreement; (4) Horan relied on the false representations; and (5) they have never produced any software to Horan in accordance with the plain language of the Settlement Agreement.

*6 The court is not persuaded by Horan's assertions. First, Horan's argument is premised on his reading of the Settlement Agreement as requiring PVA to grant and convey "every possible number or specification [of the Software Assets] possible," even those that PVA did not develop or own. According to Horan, the appellees warranted ownership and the ability to grant and convey any and all upgrades, etc. of the Software Assets that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 189733 (D.Del.)

**(Cite as: 2005 WL 189733 (D.Del.))**

exist anywhere in the universe when, in fact, they neither owned the upgrades, etc. nor had the ability to grant and convey them. For example, Horan states that "Danton and VLC denied ownership of any software." (D.I. 11, at 19). Horan also states that the appellees "have consistently asserted that they do not own, nor have the ability to grant and convey the exclusive right to duplicate and manufacture the Software Assets including any and all upgrades, updates, names and/or new versions." *Id.*

Horan's argument, however, misses the point and mischaracterizes the facts. The appellees did not deny ownership of "any software." Rather, they denied ownership of the software that Holniker developed and owned. In addition, the appellees contended that they did not develop, acquire, or own any upgrades, etc. of the Software Assets that Horan is entitled to under the terms of the Settlement Agreement. They never contended that they did not own or have the ability to grant the Software Assets. Moreover, the "Warranty of Ownership" term is clear on its face. PVA represented that it "has exclusive ownership of the Software Assets and ... has the authority and power to transfer, convey, assign, sell or grant the exclusive rights to the Software Assets as set forth herein to Horan." (Defs.' Trial Exh. 24). After reviewing the record, the court concludes that PVA had exclusive ownership of the Software Assets and also had the authority and power to transfer, convey, assign, sell or grant the exclusive rights to Horan at the time the Settlement Agreement was executed. The appellees, therefore, did not make any false representations of material fact. As such, Horan has failed to establish a fraud claim and the court adopts the Bankruptcy Court's holding on this issue.

C. The Bankruptcy Court's determination of No Breach

Horan asserts that the Bankruptcy Court erred by failing to find that the appellees breached the Settlement Agreement. Horan's primary argument is again premised on his construction of the Settlement Agreement. He states that "[i]nitially,

had the Bankruptcy Court properly construed the Settlement Agreement, it would have reached the conclusion that the representations made in the warranty were a fraud by the Appellees. Equally, these same misrepresentations amount to a breach of the warranty, and therefore a breach of the contract." (D.I. 11, at 21). This argument is untenable, however, because the court has already determined that the Bankruptcy Court properly construed/interpreted the Settlement Agreement, and that the record did not support a claim of fraud.

*7 Nevertheless, Horan offers further arguments concerning his claim for breach of the Settlement Agreement. First, Horan seems to assert that the appellees breached the Settlement Agreement by failing to grant and convey rights to manufacture and duplicate Amusement World's "new version" of the Software Assets. According to Horan, the appellees had an obligation to obtain a license to permit him to duplicate and manufacture the Amusement World software. The court disagrees. Were the court to read such an obligation into the Settlement Agreement, the appellees would have to determine whether any other person or company has developed software comparable to the Software Assets, then negotiate a license with that person or company to permit Horan to duplicate and manufacture the software. The court cannot find any term in the Settlement Agreement that imposes this obligation on the appellees. Nor has Horan brought any such term to the court's attention. Accordingly, the court concludes that the plain language of the Settlement Agreement does not require the appellees to purchase a license so that Horan can duplicate and manufacture software developed and owned by another person or company.

Horan next asserts that the Appellees, through FEC, developed operational software in 1999, but have not turned the software over to him, thereby breaching the Settlement Agreement. Horan contends that Pierce created a "new version" of the PVA Elimination Draw Poker game for FEC, but was unable to configure the software to any specific hardware because FEC did not provide proper hardware. Horan maintains that this is undisputed evidence that the appellees have breached the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 189733 (D.Del.)

**(Cite as: 2005 WL 189733 (D.Del.))**

Settlement Agreement. The court is not persuaded. First, as previously discussed, Pierce testified at the trial that his software was a demonstration model and not operational. In addition, James Maida, president of GLI, testified that GLI performed tests on the device submitted by Pierce. The test results showed that Pierce's device was inoperable and that GLI "couldn't get it to first base." (Tr. 42:9-43:7, 62:1-11). Pierce's Elimination Draw Poker software, therefore, is not a new version of the Software Assets.

Lastly, Horan asserts that the appellees breached the Settlement Agreement because they purchased 38 machines from Holniker and Amusement World in 1996. According to Horan, after VLC purchased the machines, it was in possession of upgrades, etc. and he was entitled to duplicate and manufacture them. During the Bankruptcy Court trial, Horan maintained that the software Holniker developed and PVA bought in the 38 machines, for more than $3,600 each, were upgrades of Software Assets, which Horan was entitled to receive. *See* D.I. 11, at 18. Judge McCullough disagreed, stating that Horan's argument wasn't "going to fly." (Tr. 16:21). The court agrees with Judge McCullough. There is no issue as to whether PVA purchased and owned 38 Amusement World machines because the appellees stipulated to this fact during the trial. However, PVA did not (and does not) own the software used to run the machines. The software was developed, manufactured, and owned by Holniker and Amusement World. [FN5] Thus, PVA did not acquire any upgrades, updates, modifications, names and/or new versions of the Software Assets when it purchased the Amusement World Machines, or at any other time. The court, therefore, adopts the Bankruptcy Court's holding that the appellees did not breach the Settlement Agreement.

> FN5. The record does not contain any evidence that the software was owned by anybody other than Holniker. In fact, Holniker objected to the Settlement Agreement because he "was concerned that Amusement Wold software [would] be construed as being part and party to the

[Settlement] [A]greement." (Tr. 330:114-15). However, Horan stated that he was not interested in the Amusement World software. Additionally, Horan and Danton explained that they were not making any claims to the Amusement World software. (Tr. 330:16-20; D.I. 135, at 9).

V. CONCLUSION

*8 For the foregoing reasons, the Bankruptcy Court's legal conclusions regarding the construction/interpretation of the Settlement Agreement, fraud, and breach of the Settlement Agreement are affirmed.

*ORDER*
For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:
 1. The June 4, 2001 Order by the Bankruptcy Court for the District of Delaware is AFFIRMED.
 2. The Clerk shall close this case.

2005 WL 189733 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:01CV00488 (Docket)
(Jul. 18, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Charlene D. Davis, Esquire, do hereby certify that on the 29th day of July, 2005,

I caused a true and correct copy of the **Brief For Appellees The Term C Lenders** to be

served upon the parties listed below in the manner(s) indicated.

**VIA FIRST CLASS U.S. MAIL and
ELECTRONIC MAIL**

Andrew I. Silfen, Esquire
Arent Fox Kintner Plotkin & Kahn, PLLC
25th Floor
1675 Broadway
New York, NY  10019
silfen.andrew@arentfox.com

Michael Cryan, Esquire
Arent Fox Kintner Plotkin & Kahn, PLLC
25th Floor
1675 Broadway
New York, NY  10019
cryan.michael@arentfox.com

**VIA HAND DELIVERY**

Michael Lastowski, Esquire
Duane Morris LLP
110 N. Market Street
Suite 1200
Wilmington, DE  19801

Charlene D. Davis (No. 2336)

596115v1